Page 1

AMERICAN ARBITRATION ASSOCIATION
EMPLOYEE ARBITRATION TRIBUNAL
CASE NO.: 01-20-0005-4874

ELLIANDRIA GRIFFIN,

Claimant,

-vs-

TERI GALARDI, an individual,
Respondent.
_____/

- - -

ARBITRATION BEFORE JOHN BARKETT

March 19, 2021
9:58 a.m. - 4:48 p.m.

Page 2

APPEARANCES:

On behalf of the Claimants:
   RICHARDS LEGAL
   mutepe.akemon@richardslegal.com
   BY: MUTEPE AKEMON, ESQUIRE
On behalf of the Respondent:
   GERALD J. TOBIN, PA
   4551 Ponce de Leon Boulevard
   Coral Gables, Florida 33146
   305-858-9020
   howardbrodskyesq@aol.com
   geraldtobinpa@aol.com
   BY: HOWARD BRODSKY, ESQUIRE
   GERALD J. TOBIN, ESQUIRE

- - -

INDEX
MARQUISHA HOLMES
Direct Examination by Mr. Akemon......................7
Cross-Examination by Mr. Tobin......................41
Redirect Examination by Mr. Akemon...................74

ELLIADRIA GRIFFEN
Direct Examination by Mr. Akemon......................81
Cross-Examination by Mr. Tobin......................122
Redirect Examination by Mr. Akemon................159
TERI GALARDI
Direct Examination by Mr. Brodsky..................170
Cross-Examination by Mr. Akemon....................194

Page 3

1     PROCEEDINGS
2         *****
3     THE ARBITRATOR:  We're here for the final
4 hearing in the matter of Elliandria Griffen and
5 Marquisha Holmes, claimants, versus Teri Galardi,
6 respondent.  I'm Arbitrator John Barkett.  Let's
7 have appearances for the record; counsel for the
8 claimants?
9     MR. AKEMON:  Attorney Mutepe Akemon.  That's
10 M-U-T-E-P-E.
11     THE ARBITRATOR:  And counsel for the
12 respondents?
13     MR. BRODSKY:  Howard Brodsky and Gerald Tobin
14 on behalf of Teri Galardi, respondent, who is
15 present.
16     THE ARBITRATOR:  Very good.  And Ms. Galardi
17 is present, as Mr. Brodsky just noted, and Ms.
18 Holmes and Ms. Griffen are also present.  And are
19 we going to have any other witnesses today?
20     MR. AKEMON:  No, Your Honor.
21     MR. BRODSKY:  No, Your Honor.
22     THE ARBITRATOR:  Excellent.  Very good.  And
23 I'll note for the record that to expedite matters,
24 I suggested and the parties agreed that we have Ms.
25 Holmes and Ms. Griffen prepare just declarations

Page 4

1 setting forth their damages claims.  And they've
2 done that, and we'll make them exhibits, and they
3 can swear -- once they get sworn in, they can swear
4 to the fact that this is their claim.  Who will be
5 the first witness?
6     MR. AKEMON:  Your Honor, the claimants call
7 Marquisha Holmes.
8     THE ARBITRATOR:  Okay.  So the plan will be to
9 put Ms. Holmes here in this chair.  You can ask
10 questions from over there.  And Stephanie, the
11 court reporter, will sit between you, and she
12 will be able to pick up everything.
13     The only thing I ask is that you speak up,
14 because the lawyers will be -- on the respondent's
15 side will be behind Ms. Holmes.  So just speak up
16 when you're talking.  If they have any trouble, any
17 difficulty hearing you, I'm sure they will tell you
18 that.  But you may proceed.
19     So, Ms. Holmes, if you don't mind coming over
20 here, the court reporter will swear you in or have
21 you indicate that you'll be telling the truth if
22 you're not giving oaths.  Is everybody comfortable
23 from the distancing standpoint?
24     I've done my best to set this room up, so I
25 think we're all properly distanced.  Anybody

Page 5

1    nervous about the setup?  You're okay?
2        MR. BRODSKY:  We're fine.
3        THE ARBITRATOR:  Very good.
4        MR. BRODSKY:  Can we move Mr. Tobin over here?
5        THE ARBITRATOR:  Sure.
6        MR. TOBIN:  He worries about my ability to
7    hear.
8        THE ARBITRATOR:  Go ahead, if you would, to be
9    sworn in.
10       (Thereupon, the witness was duly sworn in
11   accordance with the law.)
12       MR. AKEMON:  Your Honor, may I give a brief
13   opening statement, if I may?
14       THE ARBITRATOR:  You know, I forgot about
15   that.  Did you want to make openings?  I thought
16   with all we've been through, there was no need to
17   do that.  But yes.  Mr. Tobin, did you want to make
18   an opening statement?
19       MR. BRODSKY:  I don't think it's necessary.
20       THE ARBITRATOR:  But you certainly may.  You
21   have the right to by all means.  And then if you
22   want to respond, gentlemen, you may, but there's no
23   need to.  I think I understand the case.  Go ahead.
24       MR. AKEMON:  Your Honor, we're here on the
25   issue of damages in the matter of Darden, et al v

Page 6

1    Teri Galardi.
2        As you're aware, this Honorable Court granted
3    our motion for summary judgment on the issue of
4    employer liability as to Ms. Galardi.  The Court
5    asked us to address four separate issues for the
6    final hearing.  Those issues are does the statute
7    allow for the respondent to avoid damages --
8        THE ARBITRATOR:  Mr. Akemon, you don't need to
9    go through this.  I know what I wrote, I know what
10   the issues are.  If there's something else you want
11   to say about what I'm going to hear today, I'll be
12   happy to listen to that.
13       MR. AKEMON:  No, Your Honor.  It's our
14   position that the case law supports that, one --
15       THE ARBITRATOR:  Let me shut this door.  The
16   only reason -- I think we'll be fine.  We'll finish
17   in one day.  But -- I'm happy to hear you talk, but
18   you're also going to set forth all that case law in
19   your post-hearing submissions.
20       MR. AKEMON:  Yes, I am.
21       THE ARBITRATOR:  And I'm not going to decide
22   legal questions today.  So I will listen to you if
23   you wish, but it might -- we might expedite matters,
24   since you're starting now 33 minutes later than we
25   were supposed to start, if you go right to

Page 7

1    questioning, unless there's something about the
2    facts that you want to tell me that you want me
3    to hear.
4        If you're just going to make arguments about
5    what you think the law should be or what the
6    answers are to the questions I posed, save all that
7    for your brief.
8        MR. AKEMON:  Yes, Your Honor.
9        THE ARBITRATOR:  Having said that, if there's
10   something else you want to add, by all means, go
11   ahead, sir.
12       MR. AKEMON:  No, Your Honor.  I'll start with
13   the questions.
14       THE ARBITRATOR:  Very good.  I understand the
15   case.  I just -- I appreciate the formality, and I
16   know it's always good to be reminded of things.  But
17   I'm quite familiar with the law here, and I'm
18   looking forward to your briefs because I still
19   have these questions that I would like to see
20   answers to, but I want to hear all the evidence
21   first.
22       MR. AKEMON:  Yes, Your Honor.
23       THE ARBITRATOR:  So let's get to that.
24          DIRECT EXAMINATION
25   BY MR. AKEMON:

Page 8

1    Q.  Please state your name for the record, please.
2    A.  Marquisha Holmes.
3    Q.  And please slow down because the room is
4    pretty large.
5    A.  I know I talk fast.  I'm sorry.  Marquisha
6    Holmes.
7    Q.  Can you spell that for the --
8    A.  M-A-R-Q-U-I-S-H-A, last name Holmes,
9    H-O-L-M-E-S.
10       THE ARBITRATOR:  It's I-S-H-A?  So this has
11   been spelled wrong this entire case?
12       THE WITNESS:  What is it?
13       THE ARBITRATOR:  It's E-S-H-A according to the
14   records.  But no problem.  I'm glad to know how to
15   spell it now.
16       THE WITNESS:  Okay.
17   BY MR. AKEMON:
18   Q.  And were you a dancer at the King of Diamonds
19   Gentleman's Club from approximately 2009 to 2014?
20   A.  Yes.
21   Q.  And when did you stop dancing at the King of
22   Diamonds?
23   A.  The night they closed.
24   Q.  And do you know what month and year that was?
25   A.  2018.

Page 9

1   Q.  And during that time, can you please describe
2   for the Court how you became a dancer at the King of
3   Diamonds?
4       A.  Well, I was -- I worked -- I started working
5   there when it was Crazy Horse.  So when it switched over
6   to King of Diamonds, I was just still there.  So I was
7   one of the house girls, what they say.
8       Q.  And can you tell the Court what a "house girl"
9   is?
10      A.  A house girl is --
11      Q.  And please slow down.
12      A.  I'm sorry.  The house girls are like, you
13  know, they say the main girls, the girls who work there
14  the longest.  It's not -- you know, the house girls.
15  Not you fly in from out of town.
16          If you live here, you're house, you're
17  stationed here.  They don't like us to work anywhere
18  else, just work there.  So that's the house girls.
19      Q.  So from my understanding, a house girl is
20  someone who consistently works at King of Diamonds?
21      A.  Yes.  So we have a schedule we have to follow
22  with the rules that's there.  You have so many hours you
23  have to work, you have so many months you have to work
24  there, you can't work at any other club or, you know,
25  you have to pay the outside rate.  You know, that's what

Page 10

1   the house girls are.
2       Q.  Okay.  And can you describe for me how you
3   were hired, the audition process, for working at King of
4   Diamonds?
5       A.  You come in, show your ID, do auditions, and
6   then they hire you.
7       Q.  And when you began work -- let's go through a
8   typical day at King of Diamonds.  When you would arrive
9   at King of Diamonds, what would you do to begin your
10  work shift?
11      A.  Well, you have to go in first, and you have to
12  pay.  You have to pay before you come in.  You can't
13  just go get dressed and say, oh, you'll pay at the end of
14  the night.  You have to pay a certain amount of money to
15  work.  So you go, you pay and you start working.
16      Q.  And do you remember who you would pay that
17  money to?
18      A.  Yeah.  Tan was the --
19      THE ARBITRATOR:  I'm sorry, paid to who?
20      THE WITNESS:  Tan.
21      THE ARBITRATOR:  Can you spell it for the
22  court reporter?
23      THE WITNESS:  You pay the club Tan, I don't
24  know.
25  BY MR. AKEMON:

Page 11

1       Q.  He wants you to spell the name of the person
2   that you paid the money to.
3       A.  Oh, Tangala, T-A-N-G-A-L-A, I believe.
4       THE ARBITRATOR:  Oh, that's what you were
5   saying, Tan?
6       THE WITNESS:  Yeah.  I'm sorry.
7       THE ARBITRATOR:  That's all right.  I want to
8   make sure the court reporter gets the names right,
9   so Tan is not something we normally call somebody.
10      THE WITNESS:  Right.  Me either, but that's
11  what we call her.
12      THE ARBITRATOR:  That's all right.  It's a
13  nickname, and I get it, but the court reporter
14  needs to get it all right.
15      THE WITNESS:  All right.  Well, we'll pay the
16  club when we go to work, and then we go upstairs.
17  And then we're required to pay the house mom.
18  You're required to pay a certain -- like things.
19      If you get on stage, you have to pay certain
20  things.  Like to go on stage, you have to pay at least
21  $200 to go on stage.  If you don't pay that day,
22  you're not going on stage.
23  BY MR. AKEMON:
24      Q.  So let's back up for just a second.  When you
25  arrived and you paid Tan, was there a term that they

Page 12

1   used to describe this payment?
2       A.  Yeah, a house fee.
3       Q.  It's called a house fee?
4       A.  Yes.
5       Q.  And would you also sign in for the beginning
6   of your shift?
7       A.  Yes, you have to.  You have to sign in for the
8   house fee.  You're on a list, they put your name there,
9   and they put your phone number next to it and your
10  e-mail, and they have this e-mail they send out to the
11  girls.
12          And if you -- we have to post it on Instagram.
13  You have to post everything on Instagram to get the
14  rates.  You have to show them the Instagram post or that
15  someone texted you and sent you the label before you pay
16  the house.
17          If you don't have that or they didn't assign
18  you that, you had to pay a different fee, which is a
19  higher fee.  So that's girls that come out of town that
20  don't know about the club just walking in.
21      Q.  And was there on occasion times that they
22  would notify you in advance what the house fees were
23  going to be?
24      A.  They would notify us what the house fee would
25  be, but it would change.  Every week it would be

Page 13

1  different.
2          So say Monday -- say it's spring break.
3  Spring break, it's going to be higher than anything.  So
4  you're going to start off paying close to $300, 9:00.
5  The girls from out of town have to pay five.  So it will
6  be different.  It will fluctuate from different times.
7      **Q.  Go ahead.  Finish.**
8      A.  From different times it would.  So the slow
9  nights, say like on Sunday, you come in, we probably
10  pay -- you pay $250 all night.  You can come in until
11  12:00.  The cutoff time is 12:00 midnight.
12          So the less you'll pay, $200.  You're not
13  paying -- $200 on a regular night.  That's the lowest
14  you're going to pay.  It can go all the way up.  Like if
15  Mayweather is there, oh, we're paying $400, $500.
16      **Q.  And when you say Mayweather, are you referring**
17  **to a celebrity or --**
18      A.  Yeah, any celebrity, we're going to start --
19  the house girls are going to start at $500.  Like
20  that's -- yeah.
21      **Q.  And these house fees are mandatory?**
22      A.  Yeah.  You got to go -- you got to pay before
23  you come in.  You pay in the front where they check your
24  bags.  They are not letting you through unless you pay
25  those fees.

Page 14

1      **Q.  And what's the highest amount of house fee**
2  **that you paid to work at King of Diamonds?**
3      A.  A lot of money.  Maybe -- I don't know.  I
4  don't really -- I don't know the exact amount.
5      **Q.  And during this time period -- and, Your Honor,**
6  **we entered the declaration -- well, we stipulated to the**
7  **declaration that we're going to use, so I don't want to**
8  **waste the Court's time by going through all those**
9  **numbers.**
10      THE ARBITRATOR:  That's fine.  You don't have
11  to.  If there's anything you want to emphasize,
12  because there is a paragraph here where you
13  indicated that on average, you were required to pay
14  approximately $150 per shift in house fees.  That's
15  what appears in this declaration.
16      MR. AKEMON:  Yes, Your Honor.  That's what I
17  was going to get to, but I didn't want to go
18  through that because I was going through every
19  day.  So --
20      THE ARBITRATOR:  Well, you asked her the
21  question about what the lowest was that she
22  received.  If you want to put this into evidence
23  and go over any of it, that's fine.  You're welcome
24  to do that.
25  BY MR. AKEMON:

Page 15

1      **Q.  Let me start here.  Ms. Holmes, what's the**
2  **average amount of house fee that you paid the King of**
3  **Diamonds?**
4      A.  Average is $150.
5      **Q.  Okay.  And were you required -- let's go**
6  **through the rest of your shift.  You would work -- after**
7  **you paid, you would then entertain customers at the King**
8  **of Diamonds?**
9      A.  Yes.
10      **Q.  How would you get paid?**
11      A.  From the customers.
12      **Q.  Okay.  Would they hand you the money**
13  **personally?**
14      A.  Yes.
15      **Q.  And would you also engage in, for purposes of**
16  **this arbitration, we'll call them lap dances, where you**
17  **danced personally for a customer?**
18      A.  Yes.
19      **Q.  And were you paid for those dances?**
20      A.  Yes.
21      **Q.  To the best of your knowledge, did the club**
22  **monitor keep track of the number of dances that you**
23  **participated in during any given shift?**
24      A.  No.
25      **Q.  And to the best of your knowledge, did the**

Page 16

1  club monitor or keep track of the amount of tips that you
2  earned while you worked at King of Diamonds?
3      A.  The singles, they take ten percent from the
4  singles.
5      THE ARBITRATOR:  I'm sorry, I didn't
6  understand what you said.
7      THE WITNESS:  I'm sorry.  They take ten
8  percent of the money.  So when you get off stage,
9  you have a bucket, they will take the money.  We're
10  not allowed to have the money.  They will count the
11  money and take the ten percent out, and then they
12  will put your name usually in envelopes and you'll
13  get it back at the end of the night.
14  BY MR. AKEMON:
15      **Q.  But to the best of your knowledge, did they**
16  **write down how much you made every night in tips to the**
17  **best of your knowledge?**
18      A.  No.
19      **Q.  And so let's explore the ten percent for just**
20  **a second.  You were required to pay ten percent at the**
21  **end of every night?**
22      A.  Yes.
23      **Q.  And who would determine what your ten percent**
24  **would be?**
25      A.  The managers.

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 17

1    **Q.** The managers make that determination?
2    **A.** Yes.
3    **Q.** And were you required to tip out anyone else
4  at King of Diamonds?
5    **A.** Yes. We had to tip out the DJ, the house mom,
6  mandatory, the on floor host. So say it's 9, 10
7  floor host and they don't help you --
8    THE ARBITRATOR: I'm sorry, DJ, house mom, and
9  what was the next one?
10   THE WITNESS: The floor host.
11   THE ARBITRATOR: Oh, floor host?
12   THE WITNESS: Yeah. Like the -- I don't know
13 if it's the running man or --
14   THE ARBITRATOR: Floor house is fine as long
15 as I understand the words.
16   THE WITNESS: Oh, I'm sorry. So it's 9 or
17 10 shift, you have to pay them at least $20, $30,
18 like each girl. Like it's mandatory. They go
19 and they -- you know, they have a list at the end
20 of the night.
21   So if you don't -- you have your name,
22 they will cross out. If you didn't pay this, you
23 didn't pay that, they won't let you leave. They --
24 you have a list.
25   So all the girls running around saying, oh, I

Page 18

1  paid, I paid this, I paid this. Some guys will
2  lie, oh, you didn't pay me, you didn't pay me, you
3  have to pay them again or you can't leave.
4  BY MR. AKEMON:
5    **Q.** And would the floor host be part of the
6  security staff at King of Diamonds?
7    **A.** Yes.
8    **Q.** Did you choose the security staff at the King
9  of Diamonds or the floor host?
10   **A.** No.
11   **Q.** Were you given the ability to choose which
12 floor host would assist you or would pick up your money?
13   **A.** No.
14   **Q.** And tipping these individuals, the house mom,
15 the DJ and the floor host, were these tip-outs
16 mandatory?
17   **A.** Yes.
18   **Q.** Were you disciplined at any time for not
19 tipping one of these individuals, say the DJ, the house
20 mom or the floor host?
21   **A.** Yeah. They would suspend us, or, oh, you don't
22 come back, $250, and then you come back, and you forget
23 about it -- like you forget about it, when they take your
24 singles, they will take the money out of it. Oh -- I'm
25 like, oh, I know this much money, I know how much money I

Page 19

1  made, they will say, oh, remember you have your $250 fine
2  or they will say that, and there's nothing you can do
3  because they already took your money out.
4    **Q.** Slow down just a little bit.
5    **A.** I'm sorry.
6    **Q.** The court reporter is typing. And with
7  respect to the DJ, did you pick the DJ or hire the DJ
8  for the club?
9    **A.** No.
10   **Q.** Did you have any involvement in selecting the
11 songs that were played throughout the night at the club?
12   **A.** No.
13   **Q.** Were you disciplined for not tipping the DJ?
14   **A.** Yes. You're not going to work if you don't
15 tip the DJ. The DJ makes -- that's where most of the
16 money comes, the DJs, too. That's one of the most
17 important things, paying the DJ the money. If you don't
18 pay the DJ, you don't get on stage, you're not going to
19 work.
20   **Q.** And to the best of your knowledge, the DJ was
21 hired by the club?
22   **A.** Yes.
23   **Q.** And to the best of your knowledge, the DJ
24 determined what songs were being played during certain
25 sets as well?

Page 20

1    **A.** Yes.
2    **Q.** And can you describe to the Court what a set
3  was?
4    **A.** A set is three songs, first song clothes on,
5  second song topless, third song nude.
6    **Q.** And would the DJ give you verbal instructions
7  during these sets?
8    **A.** Yes.
9    **Q.** And at the end of the night, you previously
10 described ten percent. Is that a tip-out or a mandatory
11 payment made to the club?
12   **A.** Yeah, it's mandatory. Out of $100, they take
13 out $10. So of the pot money, if you get $100 in
14 singles, you'll get $90. And then they give it to us,
15 and they give me the whole $90; when I go upstairs, they
16 will give me back $80.
17   **Q.** Okay. So let's describe it. So at the end of
18 the night -- let's go to the end of the night. When you
19 would get to the end of your shift, can you describe to
20 the Court what that would consist of?
21   **A.** At the end of the night, you go into the
22 locker room and you get changed. You can't do anything
23 until you're fully dressed. You go up to the house mom,
24 she gives you a list. You have your name on it, you
25 have all the lists of everybody you have to pay.

Choice - United

Page 21

1    You pay the house mom, she has -- she signs.
2 She says you have me, floor host, you have to go around,
3 oh, did I pay you, did I pay you.  The DJ has to be
4 marked off.  Everything has to be marked off or you
5 can't leave.  The money, ten percent, is the bucket.  So
6 say I have a bucket of $200, $300, they take ten percent
7 off and give me the rest.
8    Q.   Okay.  And could you leave prior to paying the
9 ten percent?
10    A.   No.
11    Q.   And what would happen if you attempted to
12 leave before paying ten percent to the club?
13    A.   Well, you won't be able to work, and they will
14 fine you, but you won't get your money, because they
15 already have the singles.  So if you leave without
16 paying everything, you're not going to -- they are not
17 going to give you your money back, because you have to
18 have everything signed before you can leave.
19    Q.   What do you mean, you had everything signed?
20    A.   You had to have a ticket, like a slip.  So it
21 has house mom, DJ, which was Prince Marky D.  You have
22 the floor hosts.  Everything needs to be signed.  And
23 then they give you your money back, and you're able to
24 leave.
25    Q.   And have you ever attempted to leave without

Page 22

1 that slip?
2    A.   Yeah.  Yes.
3    Q.   And what -- were you stopped?
4    A.   Yes, I was stopped, and they were like, oh,
5 you're not going to leave.  They go -- you know, because
6 it's security.  It's the floor host.  No, you're not
7 going to leave.
8    Basically, they are guarding the doors, and --
9 it's crazy.  Like, they would say, you're not going to
10 leave here, you're not going to come again, this, that,
11 and this, until you pay them.  But you pay them because
12 you want to get your money back, you know?
13    Q.   And on average, if we were to take the amount
14 of money that you paid in security, the house mom, the
15 DJ and the ten percent, on average, can you describe
16 for the Court what that average would be per night?
17    A.   At least $250 a night.
18    Q.   And are you -- let me go back.  Strike that,
19 Your Honor.
20    When you say $250 a night, are you including
21 house fees and the tip-outs?
22    A.   No.  The house fee, what we pay to get in the
23 club, has nothing to do with while we're working.  That's
24 to get in the door.  Basically, it's not -- you can come
25 to work and pay $500 and not make $100.  It happens so

Page 23

1 many times.  They don't care.  You still have to pay
2 everybody accordingly.
3    Q.   Okay.  And when you would pay these funds, you
4 would have to consistently pay these funds every shift?
5    A.   Every shift.  Every time you work.
6    Q.   And on average, how many days of a week per
7 week would you work at King of Diamonds?
8    A.   I would work at least five, six days a week.
9    Q.   And would that fluctuate?  Would you work some
10 days seven days a week or --
11    A.   Yeah, some days, I work seven.
12    THE ARBITRATOR:  Sorry, you said some days
13 you work seven?
14    THE WITNESS:  Sorry.  Some weeks I will work
15 seven.  Sorry, Your Honor.  Some weeks I will work
16 seven days, you know, seven days a week.  And some
17 weeks I will work five or six days.  It will, you
18 know --
19 BY MR. AKEMON:
20    Q.   Fluctuate a little?
21    A.   Yes.
22    Q.   And at any point during your employment with
23 King of Diamonds, did you happen to write down or log
24 what you paid in house fees and/or tip-outs to the club?
25    A.   Yes.  That was a long time ago, though.

Page 24

1    Q.   And at any time during your employment --
2 strike that.
3    From 2009 to 2014, did you write down the
4 times and dates for which you worked at King of
5 Diamonds?
6    A.   Yes, but you didn't need to write them down,
7 it was an every week thing.  It was -- you have to be in
8 by 9:00.  You have to go to work 9 until the end of the
9 night.
10    So it's not -- you can't come -- you know,
11 it's like every week, it's the same thing, same thing,
12 same thing.  So it's not really something that you have
13 to write down.
14    Q.   And from 2009 to 2014, what time would you --
15 on average, how many hours a day would you work?
16    A.   At least nine hours.  9:00 to 5:00.
17    Q.   And would that time fluctuate as well?  Would
18 you come into work earlier and leave later on some days,
19 or would you -- would you work ten hours on some days,
20 or twelve hours on some days?
21    A.   Yeah, because sometimes we had -- like they
22 have a Jamaican party, they have the car shows outside,
23 so I know we were -- it was a couple times that we had
24 some -- some girls actually spent the night in the club
25 because the club would open at 10:00 in the morning.  So

Page 25

1  they had a pool party, so it would be longer times that
2  we would work.
3      **Q.  Did the club also have mandatory meetings?**
4      A.  Yes.
5      THE ARBITRATOR:  I'm sorry, mandatory what?
6      MR. AKEMON:  Mandatory meetings.
7      THE ARBITRATOR:  Meetings.
8  BY MR. AKEMON:
9      **Q.  Did the club also have mandatory meetings?**
10     A.  Yes.
11     **Q.  And during what days of the week would those**
12 **meetings take place?**
13     A.  Wednesday, I believe.  Wednesday.
14     **Q.  And was the club open or closed on Wednesday?**
15     A.  Closed.
16     **Q.  So there were no customers there to tip or**
17 **engage in?**
18     A.  No.
19     **Q.  In addition to that, were you paid for these**
20 **mandatory meetings?**
21     A.  No.
22     **Q.  How long would these mandatory meetings**
23 **typically take place?**
24     A.  They would start at 5:00, say either at 5:00,
25 they lock the doors at 5:30, the meeting would start at

Page 26

1  7:00.  We would literally walk out of the club when the
2  customers are coming to the club to enjoy; that's how
3  long we were there.  At least five hours those meetings
4  were.
5      THE ARBITRATOR:  I'm sorry, I lost track of
6  your time.  I don't understand what you just said.
7      THE WITNESS:  The meetings, they would make us
8  come to meetings say 5:00 sharp.
9      THE ARBITRATOR:  That would be 5:00 p.m.?
10     THE WITNESS:  5:00 p.m.  And we would be -- we
11 would stay at the meetings until the club opened
12 and actual customers are walking in; that's how
13 long we would be there.
14     THE ARBITRATOR:  And what time did the club
15 open?
16     THE WITNESS:  Sometimes, on the weekend --
17 well, it's a weekday, so 8:00, 9:00.
18     THE ARBITRATOR:  Okay.  So you would be in the
19 meetings until either 8:00 or 9:00?
20     THE WITNESS:  Yes.
21     THE ARBITRATOR:  From 5:00?
22     THE WITNESS:  Yes.
23 BY MR. AKEMON:
24     **Q.  Ms. Holmes, do you recognize the young lady**
25 **sitting at the end of the table?**

Page 27

1      A.  Yes.
2      **Q.  Do you know her real name?**
3      A.  No.
4      **Q.  Do you know her dance name?**
5      A.  Yes.
6      **Q.  Could you tell the Court what her dance**
7  **name --**
8      A.  Persuasion.
9      **Q.  Slow down and say it louder.**
10     A.  I'm sorry, Persuasion.  I hate this mask.
11     THE ARBITRATOR:  Persuasion?
12     THE WITNESS:  Yeah, Persuasion.
13 BY MR. AKEMON:
14     **Q.  And did you work with Persuasion at the King**
15 **of Diamonds?**
16     A.  Yes.
17     **Q.  And would you often see Persuasion at the King**
18 **of Diamonds?**
19     A.  Yes.  She worked just as much as I worked,
20 every day.  Like we would see each other all the time.
21     **Q.  What are any other fees or tip-outs that the**
22 **club had that were mandatory?**
23     A.  Fees, mandatory fees besides what --
24     **Q.  I'm just asking was there anything else you**
25 **had to tip out?**

Page 28

1      A.  No, we had to tip out house mom ten percent --
2  oh, we had to give the managers of course.  The hype
3  man, Rick, we had to tip the managers.  Yeah.  Rick, we
4  had to -- yeah.  That was mandatory.
5      **Q.  And you're asking for damages in this case,**
6  **monetary damages?**
7      A.  Uh-huh.
8      **Q.  And you're also asking for damages from 2009**
9  **to 2014?**
10     A.  Yes.
11     **Q.  And did you on occasion have time to attempt**
12 **to calculate those damages?**
13     A.  Yeah.  I -- I'm a Virgo, so I think a lot.
14 How I did it was I put the months and the years, the
15 months, the dates, the times, minimum wage.  So I went
16 to five, six days a week, so I calculated that by the
17 minimum wage.  So twelve months in a year.  So that's
18 how I calculated it.
19     **Q.  Okay.  And did you on occasion take vacations**
20 **or time away from King of Diamonds?**
21     A.  Yes.
22     **Q.  And approximately how many weeks or days per**
23 **year?**
24     A.  I always take like a month, because I have no
25 family here.  So I would go back and see my family, just

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 29

1 me and my son.
2    Q.  And it wasn't consistent, was it?
3    A.  No, it was just like once a year, nothing
4 crazy.  I --
5    Q.  You stated -- I'm sorry.  Go ahead.
6    A.  No, it wasn't months; it was just go, see my
7 family, come back and get back to work.
8    Q.  And would you do that on occasion throughout
9 the year, take a few days off here, a few days off
10 there?
11    A.  Yes.
12    THE ARBITRATOR:  And you're saying that would
13 add up to about a month a year?  That's what you're
14 saying?
15    THE WITNESS:  Usually like a month, yeah.
16 Usually a month.
17    THE ARBITRATOR:  Okay.
18    THE WITNESS:  Because I know my birthday is in
19 August, so, yeah, I would take off a couple days in
20 August.  Yeah, about a month.
21 BY MR. AKEMON:
22    Q.  And you're also asking the Court to reimburse
23 you tip-outs and house fees that you paid to King of
24 Diamonds, is that right?
25    A.  Yes.

Page 30

1    Q.  Did you get a chance to calculate or attempt
2 to calculate what those tip-out amounts would be?
3    A.  Yeah.
4    Q.  Can you describe to the Court how you arrived
5 at that number?
6    A.  Well, the $250 that I would pay that they
7 would charge me over, not including the house fee --
8 like including the house fee, not including that, the
9 $250, and I would do the same thing.  I would put $250
10 plus how many days a week I would work, and that's how I
11 calculated that.
12    Q.  And it came -- do you have the ability today
13 to describe to the Court how much per year or how much
14 in total that you're asking the Court to award you in
15 damages?
16    A.  No, I don't have my notepad, but --
17    Q.  If I showed you a document, would it help
18 refresh your memory?
19    A.  Yes.
20    MR. AKEMON:  Your Honor, may I approach?
21    THE ARBITRATOR:  Yes.
22 BY MR. AKEMON:
23    Q.  Do you recognize that document, Ms. Holmes?
24    A.  Yes.  Do I recognize it?
25    Q.  Yeah.

Page 31

1    A.  Yes, I seen it.
2    Q.  Okay.  Is that a true and accurate reflection
3 of the number that you put together with your attorney?
4    A.  Yes.  Wait.  Yes.
5    MR. AKEMON:  Your Honor, that's the presuit
6 notice, Mr. Brodsky and Mr. Tobin.
7    MR. BRODSKY:  What exhibit number is it?
8    MR. AKEMON:  It's -- it would be Exhibit
9 Number 23 or 24 because they are back to back
10 between Ms. Holmes and Ms. Darden.
11    MR. BRODSKY:  And, Your Honor, just so we're
12 clear, I'm referring to the exhibit notebook.
13    MR. AKEMON:  Yes, Your Honor.  This one right
14 here.  Sorry.
15    THE ARBITRATOR:  All right.  This is where it
16 gets confusing to me because I have an exhibit
17 list that doesn't track the exhibit notebook.
18    MR. AKEMON:  May I see the exhibit list that
19 you have, Your Honor?
20    THE ARBITRATOR:  Well, that's what you
21 provided, the exhibit list that -- but it's in
22 here, you're saying?  We just have to decide how
23 we're numbering these.  Are we using the notebook
24 or using the list?
25    MR. AKEMON:  We're using the notebook, Your

Page 32

1 Honor, if I may, because they have a copy of the
2 exhibit list --
3    MR. BRODSKY:  May I ask a question for
4 clarification purposes?
5    THE ARBITRATOR:  I see what you're doing.  Do
6 these numbers match up?  The declaration, does it
7 match up to the letters?  Are they exactly the
8 same?
9    MR. AKEMON:  The numbers, yes, Your Honor.
10    THE ARBITRATOR:  I see.  Okay.  I got it now.
11 So you're telling me I didn't even need to have you
12 do the declaration because you already had the
13 letters?
14    MR. AKEMON:  Well, we did a presuit notice as
15 required under the law.
16    THE ARBITRATOR:  Yes, I understand that, but
17 you're saying that the declaration is identical to
18 the letter?
19    MR. AKEMON:  Yes, Your Honor.
20    MR. BRODSKY:  Your Honor, may I ask a
21 housekeeping question?
22    THE ARBITRATOR:  Yes.
23    MR. BRODSKY:  The exhibit list that Your Honor
24 has is dated March 15th?
25    MR. AKEMON:  I was going to ask you the same

Page 33

1    thing.  You may not have printed out the March 15th
2    exhibit list.
3        THE ARBITRATOR:  I don't have an exhibit list
4    from March 15th.  I have it from February the 2nd.
5    Is there another exhibit list?  What did I miss
6    here?  Did I miss an e-mail?  Is the exhibit list
7    in your --
8        MR. AKEMON:  I believe I e-mailed you guys.
9    Opposing counsel, you have that exhibit list?
10       MR. BRODSKY:  I do.
11       THE ARBITRATOR:  All right.  Well, let's do
12   this.  I'm not going to take up the time, but I'll
13   just write them down, so I'll sort it out later.
14   But Exhibit 23, the numbering that I used when I
15   dealt with objections was the proposed list, so
16   that's why I'm a little confused.
17       MR. AKEMON:  I'm sorry.  Let me fix this for
18   Your Honor.  This is actually Ms. Simmons.
19       THE ARBITRATOR:  I have letters here.  Maybe
20   this is it.  Is this April 27th?
21       MR. AKEMON:  Yes, Your Honor.
22       THE ARBITRATOR:  I have that.
23       MR. AKEMON:  That's Ms. Griffen.
24       THE ARBITRATOR:  Sorry.  Yes.  I have it.  So
25   this Exhibit 23 marker -- 25, rather, is what we're

Page 34

1    working with?
2        MR. AKEMON:  Yes, Your Honor.  And I'll fix
3    your --
4        THE ARBITRATOR:  No rush.  All right.  So I
5    have this now.  So we're looking at Exhibit 25,
6    which is a letter dated April 27th, 2019, to Ms.
7    Galardi from Miller Legal, PC, Harlan Esquire,
8    and the second page --
9        MR. BRODSKY:  That's Exhibit 25 in the book
10   or on the list?
11       THE ARBITRATOR:  That's what I have marked,
12   25.  Is it 25 in the book?
13       MR. AKEMON:  I'm sorry, Your Honor.  Exhibit
14   25, that was part of the motion for summary
15   judgment.  Remember, we had 25 exhibits --
16       THE ARBITRATOR:  This was what was in the
17   notebook handed to me yesterday.  So that's where I
18   got it from.  This exhibit number is not right?
19       MR. AKEMON:  No, Your Honor.
20       THE ARBITRATOR:  What exhibit number is this?
21       MR. AKEMON:  This will be Exhibit 24.
22       THE ARBITRATOR:  Let's have the court reporter
23   mark this, if you would, as Exhibit 24, Claimant's
24   Exhibit 24.
25       MR. BRODSKY:  I have it in this notebook as --

Page 35

1        MR. AKEMON:  The one for Marquisha Holmes.
2    There's two of them, Holmes and Griffen.
3        MR. BRODSKY:  I'm sorry?
4        MR. AKEMON:  There's Holmes and Griffen.  One
5    is 24, one is 25.
6        MR. BRODSKY:  What I have in the notebook from
7    yesterday for Number 24 is claimant Lygia Simons'
8    response to respondent Teri Galardi's request for
9    production.
10       THE ARBITRATOR:  I do, too.
11       MR. AKEMON:  And I did tell you yesterday --
12   well, not yesterday -- I e-mailed -- the only thing
13   that was changed was Ms. Simmons was coming out,
14   and Ms. Holmes and Ms. Griffen was coming in.
15   So --
16       MR. BRODSKY:  But in what number?  That's
17   where I'm confused.
18       MR. AKEMON:  It's the same number.  So take
19   out Lygia Simons.
20       MR. BRODSKY:  Yeah, but Number 24 in this
21   notebook says claimant Lygia Simons' response to
22   respondent Teri Galardi's request for production,
23   and then --
24       MR. AKEMON:  Your Honor, if I could clarify
25   something.

Page 36

1        THE ARBITRATOR:  Right.  You were in a hurry.
2    You had Simmons in another case --
3        MR. AKEMON:  No, that's not what happened,
4    Your Honor.
5        THE ARBITRATOR:  Tell me.
6        MR. AKEMON:  So on Monday, I had sent an
7    e-mail to opposing counsel informing him because
8    we're litigating the same issues in this case, the
9    exhibits will remain the same in the binders, and
10   if he would consent to using the same binders so I
11   didn't have to duplicate another binder.
12       THE ARBITRATOR:  That's fine.
13       MR. AKEMON:  I also informed him that --
14       THE ARBITRATOR:  But where -- he just wants to
15   know what number is the letter that has just been
16   marked as 24?  He just needs to know where to put
17   that.
18       MR. AKEMON:  That's what I'm getting to.  So I
19   told him in an e-mail that Exhibit 24 --
20       THE ARBITRATOR:  Forget the e-mail.  We're
21   going to work on it for today.  You can take out
22   whatever is in the notebook as 24 and put in the
23   letter that we've just marked as Number 24, which
24   is what I'm going to do.  And you're telling me
25   that -- what's the Holmes exhibit number going to

Page 37

1    be?
2         MR. AKEMON: 24.
3         THE ARBITRATOR: So they are both going to be
4    24?
5         MR. AKEMON: Yes.
6         THE ARBITRATOR: A and B?
7         MR. AKEMON: Yes.
8         THE ARBITRATOR: All right. So we'll mark
9    this 24A, Stephanie, if you would.
10        MR. BRODSKY: That's Griffen's.
11        MR. AKEMON: That's Griffen's. That will go
12   in Lygia Simmons.
13        THE ARBITRATOR: And when we get to Ms.
14   Holmes' letter, that will be 24B, and that way,
15   you'll maintain the symmetry of your notebook?
16        MR. AKEMON: Yes, Your Honor.
17        MR. BRODSKY: Okay. So this is going to be
18   24A?
19        MR. AKEMON: No, that's Griffen, so that's
20   24B.
21        THE ARBITRATOR: Griffen will be 24B, and
22   Holmes is 24A.
23        MR. BRODSKY: Do you have the Holmes one, too?
24        THE ARBITRATOR: You can insert those into
25   your notebook. I can bring a punchholer if you

Page 38

1    wish during a break and you can punch a hole in them
2    and stick them in the notebook.
3         MR. BRODSKY: I have a punchhole in this, but
4    I don't have 24A.
5         MR. AKEMON: You can use this one.
6         MR. BRODSKY: Thank you. Got it.
7         THE ARBITRATOR: You're going to pass me down
8    24A?
9         MR. AKEMON: I think I accidentally handed
10   it -- I'm sorry, I handed it to opposing counsel.
11        MR. BRODSKY: Do you have a copy for him?
12        MR. AKEMON: I e-mailed it to him and I gave
13   it to him. I believe I gave it to him.
14        THE ARBITRATOR: Okay. You can hold onto it
15   for now. I have this --
16        MR. BRODSKY: I know --
17        THE ARBITRATOR: Okay. Very good. Pass it
18   back down to me if you would.
19        MR. BRODSKY: May I approach, Your Honor?
20        THE ARBITRATOR: Yes, of course, of course.
21   Thank you so much.
22        All right. So we've gotten this -- at least I
23   now know how the notebook works, and, apparently,
24   there's another exhibit list that I wasn't aware
25   of.

Page 39

1         All right. So we have 24A in front of us, and
2    this was a letter that you're going to ask the
3    witness about. So go ahead.
4    BY MR. AKEMON:
5    **Q.  Yes.  And can you tell the Court what you're**
6    **asking for in total wages?  I'm sorry, strike that.**
7         **Can you please describe for the Court what**
8    **you're asking the Court to award you in total wages from**
9    **your time at King of Diamonds from 2009 to 2014?**
10        A.  318,000 -- I have it written down, but --
11        Q.  Please speak up.
12        A.  $318,000.
13        THE ARBITRATOR: I'm sorry?
14        THE WITNESS: $318,000.
15        THE ARBITRATOR: 318?
16        THE WITNESS: Yes.
17        THE ARBITRATOR: And that's different from the
18   number that's in here, 340, but I understand 318 is
19   what you're seeking.
20   BY MR. AKEMON:
21        Q.  And that's an approximate number, is that --
22        A.  That's an approximate number. I went from --
23   I have two numbers. So yeah.
24        THE ARBITRATOR: Very good.
25        THE WITNESS: Can I show him this?

Page 40

1         MR. AKEMON: No.
2         THE ARBITRATOR: He has it.
3         MR. AKEMON: I have it.
4         THE ARBITRATOR: Trust me, he's your lawyer.
5    He has it.
6    BY MR. AKEMON:
7    **Q.  And you're also asking for an equal amount of**
8    **liquidated damages?**
9         A.  Yes.
10        MR. AKEMON: No further questions, Your Honor.
11        THE ARBITRATOR: Okay. So we're not doing
12   anything with this declaration, just the letter?
13        MR. AKEMON: No, because the declaration and
14   the presuit notice are basically the same.
15        THE ARBITRATOR: That's not quite right,
16   because the declaration refers to -- I see. You
17   added 150 plus 100?
18        MR. AKEMON: Yes, Your Honor.
19        THE ARBITRATOR: I see. All right. Very
20   good. Mr. Tobin, your witness. Are you okay,
21   Stephanie? Do you need a break?
22        THE COURT REPORTER: I'm okay, thank you.
23        MR. AKEMON: Does anybody need a break? We're
24   all okay?
25        MR. BRODSKY: My client needs to use the



Page 41

1    rest room if that's okay.
2         THE ARBITRATOR:  Okay.  Take a moment.
3         (Off the record.)
4         THE ARBITRATOR:  We'll go back on the record.
5    So during our break, counsel conferred, and the
6    letter dated April 27th, 2019, to Ms. Galardi from
7    Miller Legal, PC has now been changed from 24A to
8    23A, and we'll see a similar letter on behalf of
9    Ms. Griffen.  This one is on behalf of Ms. Holmes.
10   That will be 23B.  Mr. Tobin, you may proceed with
11   your cross.
12             CROSS-EXAMINATION
13   BY MR. TOBIN:
14   Q.   Good morning again, Ms. Holmes.  How are you?
15   A.   Fine, and you?
16   Q.   Nice seeing you again.
17   A.   You, too.
18   Q.   Ms. Holmes, what year were you a dancer at
19   KOD?
20   A.   2008, 2009 -- you want me to list all of them,
21   or --
22   Q.   I'm sorry?
23   A.   Do you want me to just tell you -- okay, just
24   from this point to that point?
25   Q.   Would you be comfortable taking your mask off?

Page 42

1    A.   Yes, because this is annoying.  Okay.  I'm
2    ready.
3    Q.   Now tell me the years.  I'm sorry.
4    A.   2008 to the close.
5    Q.   Till it closed?
6    A.   Yes, the day it closed, I was there.
7    Q.   Was it 2018 that it closed?
8    A.   Yes.
9    Q.   Did you dance before KOD?
10   A.   No, not -- I was a go-go dancer before KOD.
11   Q.   Where were you a go-go dancer?
12   A.   In Illinois.
13   Q.   I'm sorry?
14   A.   In Illinois.
15   Q.   In Illinois.  And when did you come to South
16   Florida?
17   A.   I went back and forth, because I went to
18   school before, so -- when I came to Florida, it was -- I
19   looked at two, three clubs, and then I went to -- it was
20   Crazy Horse.  It wasn't King of Diamonds yet.
21        So I worked there, and when everything
22   switched over, it switched to King of Diamonds.  It
23   wasn't a black club when I was hired there.
24   Q.   It was not?
25   A.   No.  It was kind of mixed.  We had Russians,

Page 43

1    we had Spanish.  It was different.  Like it was
2    up north, like the go-go dancing.  But then it moved
3    to the urban club when King of Diamonds came.
4    Q.   So in 2008, you went to work for King of
5    Diamonds, correct?
6    A.   Yes.  Uh-huh.
7    Q.   Can you describe King of Diamonds for us?
8    A.   Yes.
9    Q.   Was it a giant club?
10   A.   Yeah, it was huge.
11   Q.   I'm sorry?
12   A.   It was huge.
13   Q.   Huge?
14   A.   Yes.
15   Q.   Would you say in square feet probably 60,000
16   square feet?
17   A.   I don't know.  I'm not a construction --
18   Q.   Was there any other club that you had been to
19   that was as large as KOD?
20   A.   No.  Been to, but never worked.
21   Q.   And you were a house girl, correct?
22   A.   Yes.
23   Q.   And that was because you lived here and they
24   could rely on you to be there, correct?
25   A.   Yes.

Page 44

1    Q.   Approximately how many ladies were there per
2    shift?
3    A.   I don't know.
4    Q.   Lots?
5    A.   Yeah.  It was a lot of girls.  I don't know.
6    Q.   Over 100?
7    A.   I would say over 100 girls there, King of
8    Diamonds, not Crazy Horse.
9    Q.   KOD.  KOD.
10   A.   Yes.  Yes.
11   Q.   And you had house rules, didn't you?
12   A.   Yes.
13   Q.   What were the purposes of those house rules?
14   A.   Are you asking my opinion or what they want
15   you to see the house rules are?  My opinion on it or --
16   Q.   What was your opinion of why they had house
17   rules?
18   A.   Because they wanted what they wanted to
19   benefit them.  They wanted you to pay and do what they
20   said.  If it wasn't to benefit them, then it wasn't --
21   there's no need for the rules.  The rules --
22   Q.   So none of the rules were assigned to benefit
23   you?
24   A.   No.
25   Q.   Tell us what some of the rules were.

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 45

1   A.  The rules, you have to pay a certain amount to
2  come into the club or you can't come, you had to tip out
3  generously to everyone.  When they see you making money,
4  they want your money.  You are going to have to give
5  them what they want out of that money.  To make money,
6  you have to give them money to make money.
7       Q.  And that was your interpretation of the rules?
8   A.  Yes.
9       Q.  Was there a large dance floor, stage at KOD?
10  A.  Dance floor.  Stage is different.
11      Q.  Was there a stage?
12  A.  Yes, there was a stage.
13      Q.  Girls danced on the stage?
14  A.  Yes.
15      Q.  Girls danced on the floor?
16  A.  Yes.
17      Q.  It was just giant?
18  A.  Yes.
19      Q.  I went through some of the notes.  You talked
20  about not being allowed to leave.
21  A.  Uh-huh.
22      Q.  Was there anything else about the club that
23  you didn't like?
24  A.  Oh, just -- yeah.  I didn't like a lot.  I
25  didn't like the fact that you're charging us to come

Page 46

1  into work not knowing what we're going to make.  You
2  know?  It's --
3       Q.  Why did you stay at King of Diamonds?
4   A.  Because I didn't know -- like coming here, I
5  didn't know any other club, and I was there.  It's so
6  long you're working there, you're just like, okay, just
7  stick with it.
8       Q.  But you were there at least eight years.  You
9  could have left at any time and gone to another club,
10  right?
11  A.  Yeah, but then you have to deal with the
12  different -- they are doing the same thing.  You're
13  probably going to have the same problem.
14      Q.  So it would have been the same thing at any
15  other club?
16  A.  Yeah.  You probably would have.  I don't know.
17  I never took that chance.
18      Q.  But you could have applied, couldn't you?
19  A.  Yeah, I could apply.
20      Q.  When you were held hostage, did you call the
21  police?
22      MR. AKEMON:  Objection, mischaracterizes the
23  testimony.
24      THE ARBITRATOR:  The objection is sustained.
25  BY MR. TOBIN:

Page 47

1       Q.  When you were not allowed to leave, did you
2  call the police?
3   A.  No.  You --
4       Q.  I'm sorry?
5   A.  No, we didn't call the police.  No.
6       Q.  You didn't?  Why not?
7   A.  Because you -- at that point when you're
8  saying you're leaving, they are going to have your
9  money.  They are not going to let you go.  You're going
10  to call the police and lose all your money, and then you
11  won't have a job.  So it was more of a fear because you
12  were so used to working there, you know?
13      Q.  These fees that you paid to the club, did any
14  of the other clubs have the same fees?
15  A.  I don't know.  I never worked at the clubs.
16      Q.  You worked at G5?
17  A.  Yeah.  G5?
18      Q.  Didn't you work for G5?
19  A.  It was Diamonds.  It was Diamonds.
20      Q.  It was Diamonds?
21  A.  Uh-huh.
22      Q.  Did they have the same fees?
23  A.  No, the fees weren't the same.
24      Q.  They weren't as high?
25  A.  No.  Diamonds -- now it's G5.  Diamonds was a

Page 48

1  flat rate.  You have day shift -- they have day shift
2  there.  So you have a day shift price and a night shift
3  price, so it was different.  King of Diamonds was
4  totally different than that.
5       Q.  Isn't it true that you stayed at King of
6  Diamonds because you made more money at King of Diamonds
7  than you would have made anyplace else?
8   A.  Well, I don't know, because I didn't work
9  other places.
10      Q.  You just didn't look?
11  A.  Yeah.  I just wanted to stay there.
12      Q.  You paid the house mom?
13  A.  Yes.
14      Q.  You paid security?
15  A.  Yes.  We have two different securities.  The
16  floor hosts are the money man, and you have the security
17  that's hired by the officers outside, like to wand you
18  and -- so you have to tip both of those, both of the
19  security and the floor man.
20      Q.  How did you determine the number that you
21  assigned to wages?  How did you determine that?
22  A.  Well, I took the minimum wage, and then I took
23  the year, like the calendar, and how many -- on average,
24  how much -- how many hours I worked a week.  So then I
25  just added that up.

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 49

1    Q.   Okay.  When did you do that?
2    A.   Well, I'm a Virgo, so I'm good with numbers.
3    Q.   You did it Monday?
4    A.   No, I'm good with numbers.  I'm a Virgo, so I
5    always think and contemplate on things.  It's always on
6    my mind.
7    Q.   I'm also a Virgo, but I'm terrible with
8    numbers.
9    A.   Yeah, but I'm August 28th.  You're probably on
10   the cusp.
11   Q.   I'm September the 11th.
12   A.   Yeah.  You're on a cusp.  You're like Beyonce.
13        THE ARBITRATOR:  And I'm right between you
14   both, August 26th.  I'm a Virgo also.
15        MR. AKEMON:  Me too.
16        THE WITNESS:  See, we have to have
17   everything -- like right now, if you had a spot on
18   your shirt, I would be looking at it the whole day,
19   like wanting to take it off.
20   BY MR. TOBIN:
21   Q.   You want to flick it off?
22   A.   No, I would want to, like --
23        THE ARBITRATOR:  Let's go back to the
24   question.  The question was how you computed the --
25   your wages, and you were answering that.  So

Page 50

1    let's --
2        THE WITNESS:  Okay.  Well, minimum wage -- so
3    I determined five to six days a week, right, the
4    calendar.  So I would go back to those years.  So
5    going back twelve months, you know, I had my little
6    highlighter, highlight it.
7        So I took off what vacations, what did I say,
8    a month, so you take off three days here, four days
9    here, so I determined the month.  I would take that
10   off, minus that and add everything up.
11   BY MR. TOBIN:
12   Q.   But when did you do it?  What year did you do
13   that?
14   A.   Well, I do it every -- I do it all the time.
15   This is --
16   Q.   You do it day by day?  You have calendars at
17   home?
18   A.   Anything I do, I have to think about it.  I
19   have to know about it.  Back then, it was different.  It
20   was like every night I had a notepad, this is how much
21   money I made, this is how much money I made, this is
22   how -- you know?  But --
23   Q.   But back then is when?
24   A.   When I first started dancing a long time ago.
25   Q.   How long ago?

Page 51

1    A.   Well, before I danced -- I did before this
2    club, when I started as a go-go dancer before I
3    worked -- I was a go-go dancer, and then I worked at
4    Crazy Horse, and then I was at King of Diamonds.
5    Q.   In 2008, did you keep a diary?
6    A.   Of hours?  The money that I made?  Like the
7    hours, like -- I worked this day, I worked this day, I
8    worked this day, you know, to keep it.  Because we had a
9    schedule, we had to abide by that.  So as you go by
10   weeks, it was just every day -- it was an every week
11   thing.
12   Q.   But where is that diary now from 2008?
13   A.   That's a long time ago.
14   Q.   What?
15   A.   The diary is in my head.  I don't keep it.
16   Q.   The numbers are in your head from 2008?
17   A.   Yes.  I keep everything in my head.
18   Q.   Tell me on September 11, 2008, how much did you
19   earn.
20   A.   I don't know how much money I made.
21   Q.   Well, how much money did you spend in 2008?
22   A.   If I worked at this club, how much money did
23   they take from me?  A lot.
24   Q.   How much in 2008?
25   A.   2008?  Let me think.  Paying my house fee,

Page 52

1    paying all the money that I had to pay in the club, a
2    lot of money.  At least $300, me paying.
3    Q.   How much?
4    A.   At least, over maybe -- I don't know.
5    Q.   You don't know, do you?
6    A.   No.  That was a long time ago, but it was a
7    lot.
8    Q.   And tell me about 2009.  How much did you earn
9    in 2009?
10   A.   Earned or paid?
11   Q.   How much did you pay?
12   A.   The same, the house fees, it was the same
13   thing every day.
14   Q.   But how much was it?
15   A.   Well, when you walk into the door, you have to
16   pay.  When you leave, you have to pay, ten percent
17   taken.  So say if I made $200, they would take that.
18   $300, they would take the ten percent.
19        And then plus everything that you paid.  So
20   some days, if it was like the big -- they have the big
21   event nights, sometimes, we wouldn't even leave out with
22   money.
23   Q.   Were you there on July 7th, 2009?
24   A.   I don't know what July 7th was.
25   Q.   You didn't work July 7th?

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 53

1    A.  I don't know when July 7th was.
2    Q.  You don't work in July?
3    A.  I said I don't know when July 7th was.
4    Q.  Oh, you don't know in 2009?
5    A.  No.
6    Q.  You don't know how much you paid that day in
7  house fees?
8    A.  No, but I'm sure it was the same day -- the
9  same price as the same --
10    Q.  Was it the same price then?
11    A.  If it was an event night, it was more.  If it
12  was a regular time, regular days, you paid the regular
13  price.
14    Q.  So you don't really know what you paid in
15  2009, do you?
16    A.  Paid?
17    Q.  Paid.
18    A.  I know exactly what I paid for the house fees.
19  I know exactly what I had to pay to leave out.  I had to
20  pay tip-outs --
21    Q.  How much did you pay in 2009?
22    A.  To pay, to come into work?  It depends on what
23  time.  9:00 to 5:00, I had to pay $150.
24    Q.  I understand that.  But how much did you pay
25  that year in fees?

Page 54

1    A.  All the year in fees?
2    Q.  In the year 2009, how much did you pay in
3  fees?
4    A.  I wouldn't know, but if you give me a
5  calculator, I can calculate it.
6    Q.  But you've already calculated it, haven't you?
7    A.  Yes, but I have to --
8    Q.  You don't remember, do you?
9    A.  I'll remember.  I have everything written
10  down.  I would do minimum wage by five, six -- add this
11  up, minimum wage five, six days a week, calendar year,
12  take off a month.  Plus the $250 that they would pay
13  extra every day, so you have to add that in.
14    Q.  Did you really work at KOD?
15    A.  Yes.
16    Q.  How would we know that?
17    A.  Well, I was on the disco -- Rick -- the list
18  of dancers under 40, I'm listed there as Vanity.
19    Q.  Do you have any photos of yourself at KOD?
20    A.  No, because I had a son.  My son is 20 now, so
21  I had a thing that anything that stays on the Internet
22  is going to haunt you forever, so that's why I never --
23  I don't even have a social media for myself.  I don't
24  have a social media for Instagram.
25    Q.  Do you have any advertising of yourself at

Page 55

1  KOD?
2    A.  No, I've never been on file.
3    Q.  Didn't some of the girls advertise?
4    A.  Yes, they did.
5    Q.  You didn't?
6    A.  No.  I had a son, so --
7    Q.  I know the best way of proving you were at
8  KOD, your income tax returns.  Did you file income tax
9  returns?
10    A.  No.
11    Q.  You didn't file income tax returns?
12    A.  No.
13    Q.  For no year?
14    A.  No.  I didn't think -- at that time, I didn't
15  think that dancing was -- we could claim it.  And at
16  that time, I didn't know how I would claim it.
17    Q.  When you're talking about claiming fees, what
18  about reporting to the IRS how much you earned?  Did you
19  do that?
20    MR. AKEMON:  Objection, relevance.
21    THE ARBITRATOR:  What's the objection?
22    MR. AKEMON:  Relevance.
23    THE ARBITRATOR:  I'll allow the question.
24    A.  I didn't -- I mean, at that time, I was young,
25  and I didn't know about any of that.

Page 56

1    Q.  In the year 2008, how much did you earn at
2  KOD?
3    A.  2008?  I don't know.
4    Q.  You don't remember?
5    A.  No.  It was so long ago.
6    Q.  What about 2009?
7    A.  2009?  No, I don't know.
8    Q.  What about 2010?
9    A.  I don't know.
10    Q.  You don't know?  What about 2011?
11    A.  I don't know the actual numbers.
12    Q.  What about 2012?
13    A.  I know the total --
14    Q.  For the year.
15    A.  No.
16    Q.  You don't know?
17    A.  No.
18    Q.  2013?
19    A.  I know that total, it would be -- can I -- can
20  I just -- I was just thinking about something because
21  it popped up in my head.
22    THE ARBITRATOR:  I'm sorry?
23    THE WITNESS:  I'm sorry, I was just thinking
24  about something from earlier, when I told you the
25  number that he said -- that when he asked me the

Choice - United

Page 57

1  total number, $340,000.  It wasn't 310.  I told you
2  310.
3       THE ARBITRATOR:  318 is what you said before.
4       THE WITNESS:  Yeah.  No.  That's wrong.  It's
5  340.  You just now --
6  BY MR. TOBIN:
7       Q.  It's not 318, it's 340?
8       A.  $340,000.
9       Q.  For what year?
10      A.  For all the years, from 2010 to 2014.
11      Q.  That's what you earned total from 2008 to --
12      A.  That's what -- that's the -- that's what I'm
13  owed.
14      Q.  That's what you're owed?
15      A.  Uh-huh.
16      Q.  And how did you determine that number?
17      A.  I told you.
18      Q.  You determined it by adding up the eight or
19  nine years?  Is that what you did?
20      A.  Yeah.  Not eight or nine years.  From 2010 to
21  2014.
22      Q.  Four years?
23      A.  From 2010, '11, '12, '13, '14.  Five years.
24      Q.  And that's what you're claiming in wages?
25      A.  Yes.

Page 58

1       Q.  In 2010, what was the hourly minimum wage?
2       A.  I don't remember hourly minimum wage.  I know
3  that 2010 -- yeah.  Next question?  I'm sorry.
4       Q.  You don't know the hourly minimum wage for
5  2010?
6       A.  No.
7       Q.  Then how did you determine what is owed to you
8  for 2010?
9       A.  Well, because you're -- this case is 2010 to
10 2014.  I worked at KOD from 2008 to 2018.  So as you go
11 down the years, the minimum wage changed, right?  So
12 everything changed.
13      So you have to still add that now.  Every
14 year, you have to do different calculations over again.
15 You're asking me about 2010, 2014.  So I'm trying to
16 break it down to the years that you're talking about.
17      Q.  Would you tell me how much you're owed for
18 2010 and what the minimum wage was in 2010?  Please tell
19 me.
20      A.  I'm not sure of that, but I --
21      Q.  You're not sure?
22      A.  I have it written down.
23      Q.  The club provided you with a stage, correct?
24      A.  Uh-huh.
25      Q.  It provided you with a place to perform,

Page 59

1  correct?
2       A.  Yes.
3       Q.  KOD wasn't a charitable organization, was it?
4       MR. AKEMON:  Objection, relevance.
5       THE ARBITRATOR:  Well, I'll allow the
6  question.  We know the answer to the question, but
7  I'll allow the question.  Mr. Tobin is trying to
8  make a point on cross.  Thank you.
9  BY MR. TOBIN:
10      Q.  Was it, ma'am?
11      A.  Ask the question again.  You said charitable?
12      Q.  Was KOD a charitable organization?
13      A.  No.
14      Q.  As an entertainer, if you didn't have that
15 stage, you couldn't perform, could you?
16      A.  Yeah, you could.  Some girls didn't get on
17 stage.  Some girls weren't allowed to get on stage.  You
18 had to look a certain way.  If you were the house girls,
19 you could go on stage because you paid more, you know,
20 but if you're out of town, they would pay -- they would
21 think they could get on the stage, but they wouldn't
22 allow them to get on stage.
23      Q.  In 2004 -- I'm sorry, in 2010 through 2014,
24 did you know Teri Galardi?
25      A.  Not know her.  You mean know her?  I seen her

Page 60

1  before, but I don't know her.
2       Q.  Did you ever meet Teri Galardi?
3       A.  No.
4       Q.  Did you ever speak to Teri Galardi?
5       A.  No.
6       Q.  Did you ever give Teri Galardi money?
7       A.  No.
8       Q.  You had a bank account, correct?
9       A.  No, I didn't have a bank account then.  I used
10 to have these little cards, momento cards, the black
11 momento cards, you know, from the cash place?  I don't
12 know.  You probably don't know what that is.
13      THE ARBITRATOR:  You can explain it by all
14 means.
15      THE WITNESS:  They are like little black cards
16 that you take them to the check cashing store to
17 put cash on them.  But going back to --
18 BY MR. TOBIN:
19      Q.  Wait.  Slow down, please.
20      A.  I'm sorry.  I know I talk so fast.  They used
21 to go to the cash store and load them, but I wanted to
22 tell you -- go back to when you said -- about Teri.  Her
23 hair was different.  Isn't how it was.  I seen her
24 before in the club talking to Akinyele.  That's the only
25 time I seen her, when his office was in the back before.

Page 61

1      Q.  Did you have a bank account?
2      A.  No.
3      Q.  You never had a bank account?
4      A.  No.
5      Q.  I'm going to refer you to your deposition that
6  I took, Page 20, Line 22, let's do 24.
7          MR. AKEMON:  Your Honor, I'm sorry, I don't
8      have a copy of whatever he's --
9          THE ARBITRATOR:  This is her deposition.
10         MR. AKEMON:  I wasn't provided a copy of --
11     are you going to -- is he going to --
12         THE ARBITRATOR:  I assume he's going to
13     impeach her with a question here, so let's see
14     where this goes.
15  BY MR. TOBIN:
16     Q.  Did you deposit your cash into that bank
17  account?
18         Answer, I don't remember if I did or don't.
19         Question, do you remember what bank it was?
20         Answer, no.
21         Question, what bank do you have your account
22  in now?
23         Answer, oh, I have -- the bank now that I have
24  is -- I think it's Bank of America and Chase.
25         Do you remember those questions and answers?

Page 62

1      A.  Yes, that's the bank that I have now.  I
2  didn't have a bank then.  And how I remember that is
3  because remember you asked me about the taxes and you
4  asked me for my Social Security number. It was in the
5  deposition. We were on Zoom --
6      Q.  When I asked you for your Social Security
7  number?
8      A.  Yeah.  You were asking me something.  So after
9  the deposition, when I was looking it up, I didn't -- I
10  never had a bank account then.  I have a bank account
11  now, not back then.
12     Q.  By the way, you refused to give me your Social
13  Security number back then?
14     A.  No, my lawyer told me not to give it to you.
15     Q.  As a matter of fact --
16         MR. AKEMON:  Objection, relevance, Your Honor.
17         THE ARBITRATOR:  We don't need to get into
18     this, Mr. Tobin.  The Social Security number is not
19     going to affect anything that I'm aware of in this
20     case.
21  BY MR. TOBIN:
22     Q.  You were instructed not to answer, is that
23  correct?
24         MR. AKEMON:  Your Honor, I'll restate --
25         THE ARBITRATOR:  That's okay.  I've heard the

Page 63

1      question, and I'm sure that's what you instructed
2      her to do.  Let's move on.
3  BY MR. TOBIN:
4      Q.  Do you know how much KOD's electric bill was
5  per month?
6      A.  No.
7      Q.  If I told you it was $10,000 a month, would
8  that surprise you?
9          MR. AKEMON:  Objection, Your Honor, relevance.
10         THE ARBITRATOR:  Well, I'll see where he's
11     going.  It's overruled.
12     A.  I don't know.  I know how much my bill is.
13     Q.  What about their mortgage payment?  Do you
14  know how much the mortgage payment was on that property?
15     A.  No.
16     Q.  If I told you it was over $60,000 a month,
17  would that surprise you?
18     A.  I don't know.  I don't --
19     Q.  They have expenses for the building, don't
20  they?
21     A.  Everyone does.
22     Q.  And is that what the fees you paid went
23  towards paying?
24     A.  I don't know.
25     Q.  Did you ever give Teri Galardi one penny?

Page 64

1      A.  No.
2      Q.  Did Teri Galardi ever suspend you?
3      A.  No.
4      Q.  Do you know anybody that she suspended?
5      A.  I don't know who knows her -- you know.  I
6  don't --
7      Q.  Do you know what she did in the building?
8      A.  Yeah.  She was owner of the building.
9          MR. AKEMON:  Objection, Your Honor, relevance.
10     I think we established her -- I'm sorry.
11     Relevance.
12         THE ARBITRATOR:  No, I'll allow some leeway.
13     I'm not sure where this is going, Mr. Tobin, but
14     I'll allow you some leeway.
15  BY MR. TOBIN:
16     Q.  Do you know whether or not she directed the
17  operation of that business?
18     A.  No.
19     Q.  Do you know if she made the rules, the house
20  rules?
21     A.  No.
22         MR. AKEMON:  Your Honor, I restate my previous
23     objection.
24         THE ARBITRATOR:  Well, there's an issue of
25     willfulness here, Mr. Akemon, and if he's going in

Page 65

1  that direction, I'm not -- I don't pretend to
2  decide how people make arguments.  So this sounds
3  like the area that he's in, and I'll allow the
4  questions.
5      MR. AKEMON:  Thank you, Your Honor.
6      THE ARBITRATOR:  I'm sorry, what was the last
7  question, Mr. Tobin?
8      MR. TOBIN:  Madam Reporter?
9      (Thereupon, the court reporter played back the
10  question.)
11  BY MR. TOBIN:
12    Q.  Do you know Akinyele Adams?
13    A.  Yes.
14    Q.  Can you just spell Akinyele for the court
15  reporter?
16    A.  I can't.
17      THE ARBITRATOR:  Mr. Brodsky, can you spell it
18  please?
19      MR. BRODSKY:  I don't know how to spell it.
20      THE WITNESS:  I can't.  I know A-K.  That's
21  it.
22      MR. AKEMON:  I know how to spell it, Your
23  Honor.
24      THE ARBITRATOR:  A-K-I-N-Y-E-L-E?
25      MR. AKEMON:  Yes, Your Honor.

Page 66

1      THE ARBITRATOR:  Very good.
2  BY MR. TOBIN:
3    Q.  Do you know him?
4    A.  Yes.
5    Q.  What was his role in KOD?
6      THE ARBITRATOR:  Oh, it's a him?
7      THE WITNESS:  It's a him.  It's a guy.
8      THE ARBITRATOR:  I said her.  I didn't know.
9      MR. TOBIN:  He's a man.
10      THE ARBITRATOR:  Yes.  It's my fault.  I do
11  remember now this is a male and not a female.  Go
12  ahead.  What was his role?
13      THE WITNESS:  He was the manager.
14  BY MR. AKEMON:
15    Q.  Was he the head manager?
16    A.  Yeah.  He was the head manager.
17    Q.  He ran the club, didn't he?
18    A.  No, he was the manager.  It was him, Rick.
19  Yeah.  Him, Rick were the managers.  He was head of
20  Rick, and then it was Rick.
21    Q.  He was ahead of Rick?
22    A.  He was ahead of Rick.
23    Q.  And he was the head manager?
24    A.  Yeah.  It was him and Rick.  He was the head
25  manager.

Page 67

1    Q.  Did you know Ms. Galardi's father?
2    A.  Yes.  Well, yeah.  I worked there before his
3  passing.
4    Q.  Do you know when he died?
5    A.  No.  It was one of those years, but yeah.
6    Q.  Do you know how long Mr. Adams operated the
7  club?
8    A.  No.
9    Q.  Do you know what year he took over the club?
10    A.  No, not -- it was years.  It was more than one
11  year.
12    Q.  Do you know if Ms. Galardi had anything at all
13  to do with running the club?
14    A.  Yes.
15    Q.  What do you know about that?
16    A.  Well, Akinyele talked a lot, and when I seen
17  her -- first time I seen her, she was talking to him by
18  the front bar.  Because his office was in the back, like
19  by the left side of the bar.  You don't know the layout
20  of the club.
21    Q.  His office or her office?
22    A.  His office, her office, the main office.  No
23  one was allowed in the office but them.  And I guess
24  what have -- not what I guess, but what Akinyele said
25  was she had a deal with him that he would run the club

Page 68

1  for her, and in exchange that her son, Daryl, whoever,
2  he was out of rehab, and he had to watch him.  So he
3  would stay on South Beach with Akinyele.
4      So he would watch him in the club, make sure
5  that he didn't get off his track, doing his
6  rehabilitation.  So that was one of his things for him
7  running the club.  Like he run the club, do this.
8      I don't know what kind of agreement they had,
9  but he was in charge of watching her son and making sure
10  that he wasn't, you know, going back into his old ways
11  of drug use.
12    Q.  Did he tell you that Ms. Galardi was the lady
13  that he paid his rent to?
14    A.  Yeah.  He told him that he had to pay -- he
15  had to pay, you know, a certain amount of money a month
16  to her.  Like he would say stuff.  I would hear him say
17  stuff on the phone.  He's always on the phone.  He's
18  always on his headset walking back and forth and
19  talking.  I'm a Virgo.  I like to know things.
20    Q.  So he paid her the rent?
21    A.  Yeah.  He paid her whatever agreement they
22  had.  I don't know.  Rent or mortgage or bills.  I don't
23  know about that.  But yeah.  All I know is whatever the
24  deal was, she added in him taking care of her son or
25  watching him so he wouldn't, you know --

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 69

1    Q.  Do you know if Ms. Galardi received any of the
2  money that the managers collected?
3    A.  I don't know about that.  That's -- you know,
4  I don't know.
5    Q.  Do you know whether or not the managers kept
6  the money they collected?
7    A.  No, I don't know that either.
8    Q.  Do you know whether or not Ms. Galardi earned
9  one penny out of that?
10    A.  No, I don't know.
11    MR. TOBIN:  May I have a couple of minutes
12  with Mr. Brodsky?
13    THE ARBITRATOR:  Yes, sir.
14    (Off the record.)
15  BY MR. TOBIN:
16    Q.  By the way, where are you working now?
17    MR. AKEMON:  Objection, relevance.
18    THE ARBITRATOR:  I'll allow the question.  We
19  won't take it any further than that.  You may
20  ask -- you can answer the question.
21    A.  Oh, I have my own day spa.
22    Q.  I'm sorry?
23    A.  I have my own business.
24    THE ARBITRATOR:  She has her own business.
25    MR. TOBIN:  Okay.  Thank you.

Page 70

1  BY MR. TOBIN:
2    Q.  In the year 2012, please tell us what you
3  earned at KOD.
4    MR. AKEMON:  Objection, Your Honor, asked and
5  answered.
6    MR. TOBIN:  I didn't ask about 2012.
7    THE ARBITRATOR:  Well, he didn't go to 2012.
8  He stopped there.  He stopped at 2011.  Ms.
9  Galardi -- I mean Ms. Holmes was referring back to
10  this compilation that is Exhibit 23A and giving
11  numbers from 2010 to 2014.  What he's asking is a
12  specific question.  Can you state what you earned
13  in 2012?
14    THE WITNESS:  No.
15  BY MR. TOBIN:
16    Q.  What about 2013?
17    A.  No.  I think you asked me all these questions.
18    Q.  How much did you earn in 2013?
19    A.  I don't know.
20    Q.  What about 2014?
21    A.  I don't know.
22    Q.  You don't know?
23    A.  No.
24    Q.  Did you keep the writings -- did you write the
25  number down as you had to pay it in your little book?

Page 71

1    A.  What I paid?
2    Q.  What you paid each day, you wrote it down in a
3  book, didn't you?
4    A.  A long time ago.
5    Q.  What?
6    A.  A long time ago.  I don't have that book now.
7    Q.  Where is it now?
8    A.  That book is gone.  I know what I paid in my
9  head.  Like every night, I know what I paid.  I don't
10  have --
11    Q.  And then you wrote it in the book.  You
12  figured it out every night, and you wrote it in the
13  book?
14    A.  I don't have that book.
15    Q.  As I understand it, you earned in -- I'm
16  sorry, you paid in fees about $250 a day, correct?
17    A.  Yes.  Not -- that's not including the house
18  fee.
19    Q.  That's not including the house fee?
20    A.  Right.  The house fee is when you come to
21  work, you have to pay to get in the club.
22    Q.  On the days that you -- on the days that you
23  paid $250, how much would you have earned?
24    A.  I don't know how much every night I would
25  earn.

Page 72

1    Q.  But you know how much you gave up, not how
2  much you earned?
3    A.  Right.  Yeah.  I remember that.
4    Q.  Did you ever earn as much as $1,000 a day?
5    A.  A night?
6    Q.  I'm sorry?
7    A.  I was taking home $1,000 a night?
8    Q.  A night, yes.
9    A.  Oh, that would rarely happen.
10    Q.  That rarely happened?
11    A.  Yes.
12    Q.  Did you ever earn as much as $2,000 a night?
13    A.  No.
14    Q.  Were you there when Jeezy was there?
15    A.  Yeah.  Jeezy was there -- can I tell the
16  story?  No?
17    THE ARBITRATOR:  We probably don't have time
18  for a story.  Maybe when it's all over if you want
19  to tell a story.  But who -- how do you spell
20  Jeezy.
21    THE WITNESS:  J-E-E-Z-Y.
22    THE ARBITRATOR:  Oh, Jeezy.
23    MR. TOBIN:  Jeezy.
24    THE ARBITRATOR:  Okay.  I know he's famous
25  now.

Page 73

1   MR. TOBIN:  You do?
2   THE WITNESS:  Yeah.  Really famous.
3   THE ARBITRATOR:  I think so.  Jay-Z, is that
4   the person we're talking about?
5   MR. TOBIN:  No, Jeezy, J-E-E-Z-Y.
6   BY MR. TOBIN:
7   Q.  How much did you earn when Jeezy was there?
8   A.  He came, he threw $60,000 on 22, 24 girls, and
9   then he said all the money was stolen.  None of the
10  girls got paid.
11  Q.  How much money did he throw up in the air?
12  A.  At least $60,000, 30 to 60,000.  He threw a
13  lot of money up, and they went in the office, had all the
14  plastic bags -- I remember this day.  And nobody got paid,
15  none of us.
16  Q.  Did Ms. Galardi get that money?
17  A.  I don't know who.  They said the money was
18  stolen.
19  Q.  Did Akinyele get it?
20  A.  I don't know who.
21  Q.  You don't know who got it?
22  A.  I didn't get it.
23  MR. TOBIN:  Nothing else at this time, Your
24  Honor.
25  THE ARBITRATOR:  There won't be another time,

Page 74

1   Mr. Tobin, I don't think, unless you call her on
2   your case.  Anything further on redirect?
3   MR. AKEMON:  A couple redirect, yes.
4   REDIRECT EXAMINATION
5   BY MR. AKEMON:
6   Q.  Ms. Holmes, you earlier testified that you had
7   a diary or journal of some type.  Do you remember that
8   testimony?
9   A.  Yes.
10  Q.  Did you destroy that diary?
11  A.  No.  It was lost.
12  Q.  So you didn't purposely get rid of the
13  information?
14  A.  No.  That was so long ago.
15  Q.  And you're not asking the Court -- are you
16  asking the Court to give you the exact number for every
17  night that you worked at King of Diamonds?
18  A.  No.
19  Q.  Are you asking the Court to give you the
20  average amount that you paid King of Diamonds?
21  A.  Yes.
22  Q.  You were also asked some questions about the
23  minimum wage.  Would it help to refresh your memory with
24  respect to your calculations if I showed you Exhibit
25  23A?

Page 75

1   A.  Yes.
2   MR. AKEMON:  Your Honor, may I approach?
3   THE ARBITRATOR:  Yes.
4   MR. BRODSKY:  Your Honor, the exhibit says
5   what it says.
6   THE ARBITRATOR:  It's in evidence, and you've
7   already indicated minimum wage, but if you feel
8   like you want her to look at it, that's okay.
9   MR. AKEMON:  Thank you, Your Honor.
10  THE ARBITRATOR:  Mr. Tobin asked her, and
11  maybe he wants to know.
12  MR. BRODSKY:  And we're referring to
13  Exhibit --
14  THE ARBITRATOR:  23A.
15  MR. AKEMON:  23A, second page.
16  BY MR. AKEMON:
17  Q.  Would it help to refresh your memory with
18  respect to what the minimum wage was in the years that
19  you're asking for damages?
20  A.  Yes.
21  Q.  And just for purposes of clarity, can you tell
22  the Court what the minimum wage was in 2010?
23  A.  $7.25.
24  Q.  And did you use that number to calculate the
25  average number of hours times that number to come up

Page 76

1   with your amount of damages?
2   A.  Yes.
3   Q.  And so when calculating the amount of house
4   fees, you don't -- is it very difficult for you to
5   recall the exact date and house fees from three -- I'm
6   sorry, from approximately eight years ago?
7   A.  Yes.  It's -- yes.
8   Q.  But you're asking the Court to reimburse you
9   or award you the average amount in house fees?
10  A.  Yes.
11  THE ARBITRATOR:  I take it there's no debate
12  among counsels as to what the minimum wage was to each
13  of these years, is that right?  That's a published
14  number?
15  MR. BRODSKY:  That's correct.
16  THE ARBITRATOR:  Okay.  Very good.
17  BY MR. AKEMON:
18  Q.  And you earlier testified that you saw Ms.
19  Galardi at the King of Diamonds?
20  A.  Yes.
21  Q.  Where did you see her at?
22  A.  Behind the bar.  Behind the bar area.
23  Q.  And was this during -- was she meeting with
24  anyone?
25  MR. BRODSKY:  Your Honor, can we get a time

Page 77

1  frame here?  Objection.
2      THE ARBITRATOR:  Well, there wasn't -- Mr.
3  Tobin asked her the question generally and didn't
4  specify a time frame, and she's now responding
5  generally without a time frame, so I'm not sure
6  whether time frames are really going to matter
7  because no one has really pinned that down.
8      But if it's important, you should pin down a
9  time frame.  Because, otherwise, I have no idea
10 whether this was before the relevant time period or
11 after the relevant time period.
12     So Mr. Brodsky makes a good point, but I should
13 note that Mr. Tobin didn't pin down a time period
14 either.  But go ahead, Mr. Akemon.
15 BY MR. AKEMON:
16     Q.  And when you saw her, was she located inside
17 the club?
18     A.  Yes.
19     Q.  Where was she located at?
20     A.  Inside the club by the bar, like by the
21 office.
22     Q.  To the best of your knowledge, was she meeting
23 with anyone?
24     A.  Yes.
25     Q.  Who was she meeting with?

Page 78

1      A.  Akinyele.
2      Q.  And you saw that that day?
3      A.  Yes.
4      THE ARBITRATOR:  Now you're getting specific,
5  Mr. Akemon, so you probably ought to try to come up
6  with a time period.
7      MR. AKEMON:  Yes, Your Honor.
8  BY MR. AKEMON:
9      Q.  Was this during the time frame in which you're
10 asking for damages, between 2010 and 2014?
11     A.  Yes.
12     MR. AKEMON:  No further questions.
13     MR. BRODSKY:  Judge, that's not a time --
14     THE ARBITRATOR:  It's enough of an answer, and
15 she's answered the way she's answered that she saw
16 this.  I don't know, when was Mr. Adams there?  I
17 think that's another way to look at this because I
18 don't think -- didn't he come in a little bit
19 later?
20     MR. AKEMON:  Yes, Your Honor.  I'll ask one
21 additional question.
22 BY MR. AKEMON:
23     Q.  Do you know when Mr. Adams came on board at
24 the King of Diamonds?
25     A.  He had to come -- he had to be there 2011.

Page 79

1  I'm not really sure.  It's too far back in my head.
2      Q.  Okay.  And when you would speak to Akinyele
3  Adams, you said he would volunteer some information to
4  you?
5      THE ARBITRATOR:  That's not the testimony,
6  though.  She said she heard him on the phone.  He
7  talked a lot.
8      THE WITNESS:  No, no.  No.  He told me
9  personally what she was there for, because I asked
10 him who she was.  That's how I got to know.  But
11 when I hear him on the phone talking about other
12 stuff about --
13     THE ARBITRATOR:  Sorry.  You need to be more
14 specific in your question, Mr. Akemon.
15     MR. AKEMON:  Yes, Your Honor.
16 BY MR. AKEMON:
17     Q.  Did Akinyele ever discuss with you his
18 relationship with Ms. Galardi?
19     A.  Yes.
20     Q.  Did Akinyele Adams ever tell you that he
21 reported directly to Ms. Galardi?
22     A.  Yes.
23     MR. BRODSKY:  Objection, hearsay.
24     THE ARBITRATOR:  No, you can answer the
25 question.  Go ahead.

Page 80

1      THE WITNESS:  Yes.
2  BY MR. AKEMON:
3      Q.  Did Mr. Adams ever tell you that he was
4  reporting directly to Ms. Galardi?
5      A.  Yes.
6      Q.  And did he also tell you that he spoke with
7  Ms. Galardi?
8      A.  Yes.
9      Q.  And did he also tell you that he had an
10 arrangement with Ms. Galardi?
11     A.  Yes.
12     Q.  And did he also tell you some of the policies
13 and procedures that were implemented were a result of
14 Ms. Galardi's direction?
15     A.  Yes.
16     MR. AKEMON:  No further questions, Your Honor.
17     THE ARBITRATOR:  Next witness?  Thank you very
18 much.  You're excused for now.
19     MR. AKEMON:  Your Honor --
20     THE ARBITRATOR:  Need a break?
21     MR. AKEMON:  No.  I was going to call my next
22 witness, if you would like.
23     THE ARBITRATOR:  Yes.  It's 11:30.  Let's hear
24 from Ms. Griffen, and then we'll see if we can
25 break for lunch.  And then we'll start the cross

Page 81

1  after lunch.  You okay, Stephanie?
2      THE COURT REPORTER:  I'm okay.  Thank you.
3      MR. AKEMON:  Your Honor, are we stipulating
4  that 34B has been admitted as well, or just 34A?
5      THE ARBITRATOR:  I'm sorry, I don't know what
6  you're talking about.  23?
7      MR. AKEMON:  Yes, 23.  I'm sorry.
8      THE ARBITRATOR:  Yes, I'll admit both
9  documents, 23A.  I don't have 23 -- I guess I have
10  it but it's not marked.  Do you want to mark this,
11  please?
12      THE COURT REPORTER:  Please state your first
13  and last name?
14      THE WITNESS:  Elliadria Griffen,
15  E-L-L-I-A-D-R-I-A Griffen, G-R-I-F-F-E-N.
16      (Thereupon, the witness was duly sworn in
17  accordance with the law.)
18      THE ARBITRATOR:  You may proceed.
19          DIRECT EXAMINATION
20  BY MR. AKEMON:
21      Q.  Good morning, Ms. Griffen.
22      A.  Good morning.
23      Q.  Were you a dancer at the King of Diamonds
24  Gentlemen's Club?
25      A.  Yes.

Page 82

1      Q.  And do you remember when you were hired at
2  King of Diamonds?
3      A.  Yes.
4      Q.  Can you tell the Court when you were hired at
5  King of Diamonds?
6      A.  Around 2010.  A few weeks before Memorial
7  Weekend was my first time coming out here.
8      Q.  And do you remember how you were hired at King
9  of Diamonds?
10      A.  One of the managers at that time had me
11  audition.  I did three songs, one with my clothes on,
12  one with my top off, and my third song, I was fully
13  naked.
14      Q.  And that was the audition process?
15      A.  Yes.
16      Q.  And how long -- after the audition, how long
17  did it take for you to begin working at King of
18  Diamonds?
19      A.  They hired me right on the spot.  I came back
20  the next night.
21      Q.  And when you began working at King of
22  Diamonds, did they give you a set of rules and
23  regulations?
24      A.  Yes.  I had to be on the floor at a certain
25  time, I had to pay house fees before I could come to

Page 83

1  work, I was -- that was about it.  I mean, of course,
2  you know, leaving after your shift, the ten percent,
3  tipping out the DJ, the house mom and security.
4      Q.  And when you -- did they also have rules
5  posted in places throughout the club, including the
6  locker room?
7      A.  If they did, I wasn't paying attention, I
8  already kind of knew the rules because I had been there
9  for so long.
10      Q.  And they would give you an entertainer packet
11  when you first began or an application and --
12      A.  I didn't sign no application.  I didn't fill
13  out no paperwork.
14      Q.  If I show you a copy of -- if I show you a
15  document titled rules, would you recognize that
16  document?
17      THE ARBITRATOR:  Mr. Akemon, that's not the
18  way to do this.  If you want to show her the
19  document, you can ask her.
20      MR. AKEMON:  I'm sorry.
21  BY MR. AKEMON:
22      Q.  Do you remember any of the other rules and
23  regulations at the King of Diamonds?
24      A.  Just the main -- the main important one was
25  the house fee, ten percent and security, and me tipping

Page 84

1  out everybody.  Those were the main rules that really
2  concerned me at that time.
3      Q.  And have you on occasion been disciplined for
4  breaking one of those rules?
5      A.  Yes.
6      Q.  And can you tell this Court what that
7  discipline would consist of?
8      A.  I mean, I got fined before for not tipping out
9  security or not paying the DJ.
10      Q.  And how much -- can you give the Court an
11  approximation of what that fine was?
12      A.  Between $250 and $500.  It depends how the
13  manager was feeling that day.
14      Q.  Have you been fined more than once?
15      A.  I have been fined, like, three times.  One of
16  them was for fighting -- no, two of them was for
17  fighting, and one was for not tipping the DJ.
18      Q.  For not -- can you say that again?
19      A.  For not tipping the DJ.
20      Q.  I'm going to show you what has been marked as
21  Claimant's 12.
22      A.  Okay.
23      MR. BRODSKY:  Can I see --
24      MR. AKEMON:  I'm sorry.
25      MR. BRODSKY:  And then have an opportunity

dc30f17f-b97f-48ba-958f-c7bbecceab27



Page 85

1  to find it in the notebook, please.
2      MR. AKEMON:  It's Number 12, Mr. Tobin -- I'm
3  sorry, Mr. Brodsky.
4      THE ARBITRATOR:  All right.  My notebook is
5  blank for 12.  Okay.  Let's have the court reporter
6  put a Claimant's Exhibit 12 on here so we don't get
7  confused.  If you want to show that to the witness,
8  you may.
9      THE WITNESS:  I remember this --
10     MR. AKEMON:  Hold on, Ms. Griffen.  Mr.
11  Brodsky, do you have it?
12     MR. BRODSKY:  Yes.
13  BY MR. AKEMON:
14     Q.  Do you recognize that document, Ms. Griffen?
15     A.  I remember this when -- around the time
16  Akinyele took over.  I didn't attend that meeting, but
17  I -- when I came to work that night, I remember the
18  girls talking about this.
19     Q.  Have you seen that document before?
20     A.  Yes, but I didn't sign it.
21     MR. AKEMON:  Your Honor, I move to admit
22  Claimant's 12.
23     THE ARBITRATOR:  I'll allow it.
24  BY MR. AKEMON:
25     Q.  And can you tell the Court what the top of

Page 86

1  that document says?
2      A.  Galardi South Enterprises Consulting, Inc. and
3  Its Affiliate Clubs, Rules and Conduct for Contractors
4  and Employees.
5      THE ARBITRATOR:  What's the date of the
6  document?  Is it dated?
7      THE WITNESS:  It's not dated.
8      MR. BRODSKY:  It's not dated, nor is it
9  signed.
10  BY MR. AKEMON:
11     Q.  And can you go to Number 8 of Page 1?
12     A.  Our entertainers are responsible to dance each
13  and every song on each of their stage sets.  If you want
14  another entertainer to cover your set, you must find the
15  entertainer, pay her a minimum of $10 and notify the DJ
16  immediately.  Do not give the DJ the money, find the
17  cover.
18     Q.  And can you also read Number 1 on Page 1?
19     A.  All entertainers will be expected on
20  performance days that they will be needed to work.  If
21  you're not able to perform for legitimate reasons,
22  you're asked to call and speak to -- speak only to your
23  house mom or manager.  You will be subject to fines or
24  other appropriate discipline for no call, no shows.
25     Q.  Thank you.

Page 87

1      THE ARBITRATOR:  I'll take a look at what she
2  just read.
3      MR. AKEMON:  In addition, I'm going to show
4  you what's previously been marked as C6.
5      THE ARBITRATOR:  I'm sorry, what is this now?
6      THE WITNESS:  C6.
7      MR. AKEMON:  C6.
8      THE ARBITRATOR:  C?
9      MR. AKEMON:  As in Claimant's 6, Your Honor.
10  I'm sorry.  It will be in the white notebook.
11     THE ARBITRATOR:  This is the arbitration
12  policy?
13     MR. AKEMON:  Yes, Your Honor.  Mr. Brodsky, do
14  you need to see it?
15     MR. BRODSKY:  Let me see.
16     THE ARBITRATOR:  Would you just hand this to
17  the reporter and have her put the right exhibit
18  number on it for me?
19     THE COURT REPORTER:  6?
20     MR. BRODSKY:  I have a blank arbitration
21  policy it looks like.  Is that what that is?
22     MR. AKEMON:  Yes.
23     MR. BRODSKY:  Okay.  I have it.  And it's not
24  signed, right?
25     MR. AKEMON:  Right.

Page 88

1      THE ARBITRATOR:  Okay.
2  BY MR. AKEMON:
3      Q.  Ms. Griffen, do you recognize that document?
4      A.  Yes.
5      Q.  And do you remember when you received that
6  document, approximately when you received that document?
7      A.  I don't remember, but I remember coming into
8  work and they saying that we had to fill out these
9  packages before we could work, and --
10     Q.  Was that -- I'm sorry.
11     A.  -- I didn't do it.
12     Q.  Was that around the time that Akinyele came
13  aboard?
14     A.  Yes.
15     Q.  And is that a true and accurate copy of what
16  you saw that day?
17     A.  Yes.
18     MR. AKEMON:  Your Honor, move to admit C6.
19     THE ARBITRATOR:  Okay.  I'll allow it.
20  BY MR. AKEMON:
21     Q.  Ms. Griffen, do you recognize the young lady
22  sitting there?
23     A.  Yes.
24     Q.  Do you know her real name?
25     A.  No.

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 89

1    Q.  Do you know her dancer name?
2    A.  Yes.
3    Q.  Can you tell the Court what her dancer name
4  was?
5    A.  Vanity.
6    Q.  And how do you know this?
7    A.  We worked together for years.
8    Q.  And when you say you worked together for
9  years, can you tell the Court what years you believe you
10  worked together?
11    A.  Well, I started working there around 2010.
12  Vanity was already there.  So all the way up until I
13  stopped working there in 2014.
14    Q.  Okay.  And when did you stop working there in
15  2014?
16    A.  It was around I want to say June, but I'm not
17  really sure; I just know it was 2014 because I moved
18  back to Texas.
19    THE ARBITRATOR:  I'm sorry, moved back to
20  where?
21    THE WITNESS:  To Texas that year.
22    THE ARBITRATOR:  Texas?
23    THE WITNESS:  Yes, sir.
24  BY MR. AKEMON:
25    Q.  And did Ms. Holmes -- you heard -- did you

Page 90

1  hear Ms. Holmes' testimony?
2    A.  Yes.
3    Q.  And to the best of your knowledge, did Ms.
4  Holmes work the times that she testified to?
5    A.  Yes.  She was at work just as much as me.
6    Q.  Okay.  Can you tell the Court how many days
7  per week on average that you worked at King of Diamonds?
8    A.  I worked about five days a week.  I gave
9  myself two days off during the week sometimes.
10    Q.  And can you also tell the Court -- I'm sorry,
11  strike that.
12    THE ARBITRATOR:  Just so it's clear, Ms.
13  Griffen, I'm not a judge, this is not a court.
14  Mr. Akemon is used to saying the word --
15    THE WITNESS:  Your Honor, I know.  I say sir.
16  I know.
17    THE ARBITRATOR:  You can call me whatever you
18  want, because it's easier for me just to not bother
19  to take up the time to say I've never been a judge,
20  I'm not a Your Honor, but it's just easier to do it
21  that way.
22    I just want you to understand this is not a
23  courtroom, this is an arbitration.  I'm not going
24  to stop Mr. Akemon because that's his habit.  He
25  has been in courtrooms all his life.  He's used to

Page 91

1  saying it.
2    THE WITNESS:  Yes, sir.
3    THE ARBITRATOR:  But I don't want you to be
4  misled that somehow you're in a courtroom.
5    THE WITNESS:  I totally understand.
6  BY MR. AKEMON:
7    Q.  And would you be -- strike that.
8    Let's talk about the beginning of a shift.
9    A.  Okay.
10    Q.  Typically, on average, what time would you
11  arrive at King of Diamonds?
12    A.  About 10:00, because, like Ms. Holmes said, we
13  would get alerts about how much house fees would be, and
14  it would go up every hour before 12:00 or before 11:00,
15  and then after 12:00 or 12:30; it would go up every 30
16  minutes.
17    Q.  And when you say alerts, what do you mean
18  alerts?
19    A.  Like we get text messages to let us know how
20  much house fees would be.  That's the reason they took
21  our numbers at the beginning of our shifts.
22    Q.  Okay.  And it would explain what the house fee
23  would be?
24    A.  Yes.
25    Q.  Would it also promote or would they also ask

Page 92

1  you to promote the events for that night as well?
2    A.  Yes, they send it with a flyer.
3    Q.  And on occasion -- I'm sorry, strike that.
4    From 2010 to 2014, during your employment,
5  would the club hire celebrities to host event nights?
6    A.  I guess that wouldn't come from the club; it
7  would be from the promoters who would be in the club.
8  So --
9    Q.  Is there any -- I'm sorry.  Go ahead.
10    A.  I guess they would, yes.
11    Q.  And during these event nights, would you be
12  expected to pay a higher house fee?
13    A.  Yes, of course.
14    Q.  And was there an event titled Floyd Mayweather
15  Memorial Day Weekend sometime in 2012 or 2013?
16    A.  Yes.
17    Q.  Okay.  And do you remember that night?
18    A.  Yes, verbatim actually.
19    Q.  And do you remember what the house fee was
20  that night?
21    A.  I paid $450, if I'm not mistaken.
22    Q.  Was that typical of any other event nights?
23    A.  I mean, if you had been working -- if you're a
24  house girl at King of Diamonds and it's an event night,
25  you automatically know that the tip-out is going to be

Choice - United

Page 93

1    crazy -- I mean the house fee.
2         Let me correct that. When I say tip-out, house
3    fee is going to be crazy. So in your mind, all you're
4    doing is asking yourself, well, how much is it going to
5    start at? Because if it starts at $300 at 10:00, it's
6    going to go up every hour, and by 12:00, it's going to
7    go up every 30 minutes.
8        Q. And what's the highest amount of house fee
9    that you paid while working at King of Diamonds?
10    A. The most I've paid is $500.
11    Q. And what's the lowest you ever paid?
12    A. An average?
13    Q. Not average, what's the lowest?
14    A. The lowest, when I first started working back
15    in 2010, I paid $100.
16    Q. And can you --
17    A. It was like on a Tuesday.
18    Q. And can you tell the Court what your average
19    house fee during your employment at KOD was?
20    A. $250.
21    Q. And when you say $250, you just mean the house
22    fee, or are you talking about the house fee and the
23    tip-outs for the DJs, house mom, security, et cetera?
24    A. You could put it all together, but it is kind
25    of separate.

Page 94

1    Q. Okay. And were you required to pay the house
2    mom?
3    A. Yes.
4    Q. What about the DJ?
5    A. Requirement.
6    Q. And the security?
7    A. Requirement.
8    Q. And on average -- strike that.
9        So when you would arrive at KOD, would you
10    have to sign in with someone by the name of Tan?
11    A. Yes.
12    Q. And was there a sign-in sheet for you as well?
13    A. Yes.
14    Q. And did you also attend some mandatory
15    meetings at King of Diamonds?
16    A. Sometimes I did.
17    Q. Okay. And what would they discuss at these
18    mandatory meetings?
19    A. One meeting I remember they discussed how
20    security was stealing from us. We discussed how tip-out
21    was too high. We discussed how house fee was too high.
22    Once Akinyele got there, the rules just became totally
23    different.
24    Q. Did they become more difficult or stringent?
25    A. Yes.

Page 95

1    Q. Can you describe how?
2    A. He just came with his own way of how he wanted
3    the club ran, and how Rick and Mr. Teri was running it
4    before. It just made all the girls who were house girls
5    uncomfortable.
6    Q. And in addition to that, were you also --
7    strike that.
8        Were there people located at the club that
9    were called sweepers?
10    A. Yes.
11    THE ARBITRATOR: I'm sorry, called what?
12    MR. AKEMON: Sweepers.
13    THE WITNESS: Sweepers. The money men.
14    THE ARBITRATOR: S-W-E-E-P-E-R-S, sweepers?
15    THE WITNESS: Yes, sir.
16    BY MR. AKEMON:
17    Q. And what was their job?
18    A. To pick up our money off the floor.
19    Q. And --
20    A. To pick up all the money off the stages.
21    Q. And did you hire those money men -- I'm sorry,
22    not money men, those sweepers, or did the club hire
23    sweepers?
24    A. The club.
25    Q. And were you required to tip the sweepers?

Page 96

1    A. Yes.
2    Q. And would the sweepers be around during
3    your -- I'll ask you about two separate issues. Were
4    the sweepers around when you would do lap dances or
5    table dances for a customer?
6    A. It depends. If the customer was throwing your
7    money in the air and it was falling on the floor, then
8    they would be around because they are the ones picking
9    up your money off the floor. Because if we were naked,
10    they didn't want us on our hands and knees picking up
11    money.
12    Q. And they would also be there when it was a
13    stage set?
14    A. Yes.
15    Q. And they would collect the money on the stage
16    as well as the money that fell on the floor?
17    A. Yes.
18    Q. And when they collected the money, where did
19    the money go?
20    A. In the money room.
21    Q. And when they went to the money room, did they
22    take it to the money room or did you take it to the
23    money room?
24    A. They held it in they hands, but if you was
25    smart, you would follow your money to the money room.

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 97

1    Q.  Right.  And after they would take it to the
2  money room, would the money remain there all night?
3    A.  It would get counted at some point by
4  somebody.
5    Q.  Would you be allowed to stay in the money room
6  all night with your money?
7    A.  I mean, if that's the only money you want to
8  make for the night, yes.
9    Q.  Were you allowed to take the money from the
10  sweepers and not send it to the money room?
11    A.  No.
12    Q.  If you attempted to take the money from the
13  sweepers and put it into a -- I'm sorry, strike that.
14    Did you have your own locker?
15    A.  I had my own room.
16    Q.  Okay.  And where you had your own room, did
17  you have a locker inside that room?
18    A.  No.
19    Q.  If you attempted to take the money that the
20  sweepers collected off the floor and attempted to take
21  it to the -- to your locker -- I mean not your locker,
22  your room, would you be allowed to do so?
23    A.  No.
24    Q.  Have you attempted to do so before?
25    A.  Yes.

Page 98

1    Q.  And what was the result?
2    A.  I got cussed out, yelled at.
3    Q.  Were you ever fined or disciplined or
4  suspended for that?
5    A.  They just took my money and put it in the
6  money room, and they give you these bands with a number
7  on it, and they put the number on your back.  So when
8  they count it, they exactly know whose money it is,
9  where it's going and all that.  They wrote down
10  everything.
11    Q.  And then with the ten percent, did they take
12  ten percent out of those bags?
13    A.  Yes.  I wanted to clarify what Ms. Holmes had
14  said.  Our ten percent came out of every money you made.
15  So my stage money, that's ten percent that they taking
16  out.  My money that I'm making in the pow that I'm
17  dancing with, me and four other girls, they taking ten
18  percent out of that.
19    So any loose money as far as dollar bills if
20  you give me in groups, they are taking ten percent out
21  of each of your money; so at the end of the night, I'm
22  paying the club way more than ten percent of all my
23  money.  I'm basically giving them ten percent of
24  everything I've made all night.
25    Q.  And this was a requirement?

Page 99

1    A.  A requirement.
2    Q.  And when they would take the ten percent out,
3  would they count it first and inform you how much they
4  were taking every time?
5    A.  Well, you wouldn't see it until the end of the
6  night.  They will give you an envelope and say, you
7  know, this is what you made, we already took your ten
8  percent out.  But if I had five envelopes of money, they
9  taking ten percent out of each of my envelopes.
10    They are not adding it together and taking my
11  ten percent out because I'm not giving them my money all
12  at the same time.  I'm giving it to them in lump sums.
13  So they are coming and taking ten percent out of
14  everything I'm making.
15    Q.  And you would also have to tip out the DJ?
16    A.  Yes.
17    Q.  And did you have the opportunity to choose the
18  songs that were played during your set?
19    A.  No.
20    Q.  And did you hire -- sorry.  Let me ask that,
21  again.  You did not hire the DJ?
22    A.  No.
23    Q.  He was hired -- to the best of your knowledge,
24  was he hired by the club?
25    A.  Yes.

Page 100

1    Q.  What about the house mom?  Did you have to tip
2  her out?
3    A.  Yes.
4    Q.  And when you tipped the house mom out, was
5  that also a requirement?
6    A.  Yes.
7    Q.  Did you hire the house mom?
8    A.  No.
9    Q.  Did you have any input on what the house mom
10  did?
11    A.  No.
12    Q.  Can you tell the Court, describe to the Court
13  what is a house mom?
14    A.  She has all your essentials like wipes, towels.
15  Sometimes -- there was showers there, so sometimes some of
16  us took a shower at the end of the night, or before the night
17  started, we would take a shower.  She has dance outfits
18  that we have to pay for.  She has basically snacks,
19  drinks.  All this stuff we have to pay for and tip her
20  all in the same time.
21    Q.  So in the event you didn't buy any of these
22  products or costumes, were you still required to tip her
23  at night?
24    A.  Yes.
25    Q.  And with respect to the security, did you hire

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 101

1  or did you have any input with hiring anyone from
2  security?
3      A.  No.
4      Q.  And to the best of your knowledge, what was
5  the purpose of security?  What was their purpose at the
6  club?
7      A.  To watch us, but that wasn't their doing.  You
8  know what I'm saying?  Like you hire security to pick up
9  our money and watch over us, but nine times out of ten,
10  if you're not tipping them, they are not watching over
11  you.
12      Q.  And can you tell the Court on average how many
13  hours per week -- not hours per week, hours per day you
14  would work per shift?
15      A.  About nine.
16      Q.  Nine hours?
17      A.  Yes.
18      Q.  And are you asking this Court to reimburse you
19  minimum wages from the time that you worked from 2010 to
20  the end of your work in 2014?
21      A.  Yes.
22      Q.  And did you attempt to calculate the amount of
23  damages that you think you're entitled to in this case?
24      A.  Yes.
25      Q.  And can you tell the Court how you arrived at

Page 102

1  those numbers?  I'm sorry, strike that.
2      Can you tell the Court how you arrived at what
3  you think you're entitled to in terms of wages?
4      A.  I took the minimum wage at that time, timesed
5  it by how many hours I worked and how many hours per
6  shift I worked that day -- I mean that week, and then I
7  multiplied it all together.
8      Q.  And you came up with a final number?
9      A.  Yes.
10      Q.  And can you tell the Court the total
11  wages you're asking for?
12      A.  $318,248.
13      Q.  Okay.  Are you talking wages or total damages?
14      A.  Which one?
15      MR. BRODSKY:  Let the record reflect that the
16  witness is looking at a document as opposed to
17  just --
18      THE ARBITRATOR:  What are we looking at, Mr.
19  Akemon?  Is this 23B?
20      MR. AKEMON:  23B, Your Honor.
21      THE ARBITRATOR:  My 23B says for that number
22  $340,000.  Where do you see $318,000?
23      THE WITNESS:  Well, that's hers.
24      THE ARBITRATOR:  Is that Marquisha?
25      THE WITNESS:  That's Marquisha.

Page 103

1      THE ARBITRATOR:  Sorry.  Did I give you the
2  wrong one, Stephanie?  I might have.  One second.
3  One second.
4      THE WITNESS:  The front page is the same.
5      THE ARBITRATOR:  Holmes, Holmes, Holmes.  My
6  first page says Griffen, but the second page says
7  Holmes.  I didn't realize that until just now.
8      MR. AKEMON:  I didn't realize it either.
9      THE ARBITRATOR:  No problem.  So I don't have
10  the correct second page.  Let me just take a look,
11  see what the difference is.
12      Okay.  When we break for lunch, I'll get this
13  fixed.  I was wondering how you can start by
14  Memorial Day and have 44 weeks looking at this
15  page.  Now I understand.  I had the wrong page.
16  You definitely were administratively challenged
17  this week, Mr. Akemon, I want you to know.
18      MR. AKEMON:  Your Honor, for the record, I did
19  all this in eight hours because FedEx never
20  delivered my exhibits.
21      THE ARBITRATOR:  It's hard.  COVID has been
22  hard on everyone.
23  BY MR. AKEMON:
24      Q.  Can you tell the Court what you're asking the
25  Court -- can you tell the Court what you're asking for

Page 104

1  in total damages?
2      A.  So that's my total.  It's $318,000.
3      Q.  And are you also asking for an equal amount in
4  liquidated damages?
5      A.  Yes.
6      Q.  And can you also tell the Court what time
7  would you typically leave King of Diamonds after your
8  shift?  I'm sorry.
9      A.  Well, the club close at 6:00.
10      THE ARBITRATOR:  I'm sorry, the club closed at
11  what time?
12      THE WITNESS:  6:00 a.m.
13      THE ARBITRATOR:  6:00 a.m.?
14      THE WITNESS:  Yes, sir.
15  BY MR. AKEMON:
16      Q.  And was there on occasion times where you
17  would --
18      THE ARBITRATOR:  Wait.  She didn't answer the
19  question.  The club closes at 6:00 a.m., but what
20  was the answer to the question, when would you
21  leave?
22  BY MR. AKEMON:
23      Q.  When would you typically leave the club?
24      A.  It depends on what type of night I had.  If I
25  made a lot of money that night, I wasn't leaving until

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 105

1   around 9:00, 10:00 that morning, because the money was
2   too much. They couldn't count it in the money room in
3   time, so they will wait until the end of the night.
4       Q.  And have you on occasion left work sometimes
5   at 11:00 or 12:00 the next day -- the following day?
6       A.  Yes.
7       Q.  I mean 11:00 or 12:00 a.m. the following day?
8       A.  Yes.
9       Q.  And when you attended these -- when you
10  attended these mandatory meetings, were you paid for
11  those meetings?
12      A.  No.
13      Q.  And can you also describe for the Court the
14  ten percent that -- I'm sorry, can you describe for the
15  Court how you would leave after you paid ten percent at
16  the end of your shift?
17      A.  After you pay the last person, everybody has
18  to sign off on your little slip, and when you go to the
19  front door, they ask you for your slip, they check your
20  bag, make sure you don't have no money because you're
21  not walking out with no ones, and --
22      THE ARBITRATOR:  Walking out with no what?
23      THE WITNESS:  No ones, no one dollar bills,
24  because they had a --
25      THE ARBITRATOR:  No ones.  Okay.  Sorry.

Page 106

1       THE WITNESS:  We had to recycle all the ones
2   throughout the night.  So they check our bag for that,
3   give them our slip, and we can leave.
4   BY MR. AKEMON:
5       Q.  And can you describe what the slip would look
6   like?
7       A.  A pink little slip, and everybody will sign
8   it, the DJ, the house mom and the security.
9       Q.  I'm going to show you what has been marked as
10  C24.  Your Honor, I handed it to you right before.
11      THE ARBITRATOR:  Right, I know.  It's just
12  these notebooks are a bit unwieldy.  I can't move
13  it around.  So this is one, two, three -- a
14  five-page exhibit?
15      MR. AKEMON:  Yes, Your Honor.
16      THE ARBITRATOR:  Excuse me, a six-page
17  exhibit.
18      MR. AKEMON:  Yes, Your Honor.
19      THE ARBITRATOR:  Okay.  Let's give this to
20  Stephanie.  I'll bring a stapler in at the lunch
21  hour and we'll get these stapled as well.
22      MR. BRODSKY:  Could you please identify what
23  it is that --
24      MR. AKEMON:  C24.
25      MR. BRODSKY:  But can you please identify what

Page 107

1   your document is?
2       MR. AKEMON:  Copies of the slips.
3       THE ARBITRATOR:  I'll have you put that on the
4   record as soon as it's marked.  So we're looking at
5   a six-page exhibit.  The first four pages are the
6   slips that you're going to explain, and the last
7   two pages are a series of columns, handwritten
8   column numbers dated starting March --
9       MR. AKEMON:  I'm sorry, those don't belong in
10  there, Your Honor.
11      THE ARBITRATOR:  Ending July 16th.
12      MR. AKEMON:  Just these.
13      THE ARBITRATOR:  So we're not using these two?
14      MR. AKEMON:  No.  Just the slips, C24.
15      MR. BRODSKY:  So in the book I have, C24 is
16  claimant Lygia Simmons' response to --
17      THE ARBITRATOR:  It's apparently attached to
18  that document.
19      MR. AKEMON:  It's attached to that.  And I
20  explained to you yesterday that everything was
21  Lygia -- not yesterday, but --
22      THE ARBITRATOR:  So you can get rid of
23  everything but these four pages, Mr. Brodsky.
24      MR. BRODSKY:  But what I'm trying to
25  understand is this is for Ms. Holmes?

Page 108

1       MR. AKEMON:  This is for Ms. Griffen.
2       MR. BRODSKY:  Ms. Griffen.  I'm sorry.
3       MR. AKEMON:  Yes.
4       MR. BRODSKY:  This is her response to the
5   request for production?
6       MR. AKEMON:  No.  I'm using it as an exhibit.
7   It's not her response to the request for
8   production.
9       MR. BRODSKY:  Are those what were contained
10  within her response?
11      MR. AKEMON:  No, but they were part of the
12  exhibit list and exhibit tabs.
13      MR. BRODSKY:  Not in my book.
14      MR. AKEMON:  It's right there.
15      MR. BRODSKY:  Please come and show me.
16      (Off the record.)
17      THE ARBITRATOR:  Did you find what you're --
18  did you guys reach an agreement here?
19      MR. BRODSKY:  No, not yet.  We're trying.
20      THE ARBITRATOR:  Are these four pages in his
21  exhibit book?
22      MR. AKEMON:  Yes, they are, Your Honor.
23      THE ARBITRATOR:  Do you have the four pages?
24      MR. BRODSKY:  I do, but they were under
25  another claimant's name.

Page 109

1    THE ARBITRATOR:  No, that I understand, but
2  these are apparently documents that the witness is
3  going to identify.
4    MR. AKEMON:  Yes, Your Honor.
5    THE ARBITRATOR:  Okay.  Let's hear what she
6  has to say.  So Exhibit 24 is four pages of the
7  slips that each slip has five entries, date, dancer
8  name, ten percent tip-out, dancer signature,
9  manager; and you're going to describe these
10  apparently?
11    MR. AKEMON:  Yes, Your Honor.
12    THE ARBITRATOR:  Let's hear from Ms. Griffen.
13  BY MR. AKEMON:
14    Q.  Ms. Griffen, do you recognize those slips?
15    A.  Yes.
16    Q.  Are those the types of slips that you would --
17  I'm sorry, strike that.
18      Are those the types of slips that you would be
19  required to present to security before leaving?
20    A.  Yes.
21    Q.  And you have to present these slips every
22  night before leaving?  I mean, are these the types of
23  slips that you use to pay the ten percent every night?
24    A.  Yes.
25    Q.  Okay.

Page 110

1    MR. AKEMON:  Your Honor, this has been admitted,
2  correct?
3    THE ARBITRATOR:  Yes, I'll admit these.  But
4  let me just ask, I'm just curious, so when it says
5  10 percent, tip out 20, does that mean it was
6  $200?
7    THE WITNESS:  Yes.  That means that that
8  dancer, she only turned in $200 in ones.  So we
9  kind of started to get smart on the whole ten
10  percent process, because they were taking so much
11  of our money.
12      So we would tell our customers pay us in big
13  bills because they couldn't calculate our big
14  bills because we were able to keep that money.
15  Anything that was a dollar, they wanted it, and
16  they wanted to count it and take their 10 percent.
17    THE ARBITRATOR:  I just want to understand how
18  to read these.
19    MR. BRODSKY:  Your Honor, I think what I was
20  trying to say before is correct.  The witness -- or
21  the claimant just identified those slips I believe
22  as from another --
23    THE ARBITRATOR:  I understand they are not
24  from her.  They are just slips that she said this
25  is the type of slip.  Mr. Akemon asked if this was

Page 111

1  the type of slip that got turned in, and I
2  appreciate that.  I just want to understand what
3  the information on this slip represented.  It looks
4  like the name of a dancer, the amount of the
5  tip-out, and signed with initials by a manager.
6    THE WITNESS:  Yes.
7    THE ARBITRATOR:  I got it.  Okay.
8  BY MR. AKEMON:
9    Q.  And who would you give the slip to at the end
10  of the night?
11    A.  Whoever was at the front door, security.
12    Q.  Have you ever attempted to leave the club
13  premises without providing this slip to security?
14    A.  Yes.
15    Q.  And can you tell the Court what would happen
16  on occasion when you tried to leave without presenting
17  this slip?
18    A.  Get a fine or they tell you not to come back.
19    Q.  And who would sign off on this slip, on these
20  types of slips?
21    A.  Either Rick or Akinyele or whoever was the
22  manager at that time.
23    Q.  And you also talked about the rules earlier.
24  Were those rules for you and every other dancer at the
25  club?

Page 112

1    A.  Yes.
2    Q.  And on occasion, were you able to -- strike
3  that.  When you came to work, there was a sign-in list
4  at the club, correct?
5    A.  Yes.
6    Q.  I'm sorry.  I didn't mean to do a leading
7  question.  Did that sign-in list determine stage sets?
8    THE ARBITRATOR:  I'm sorry, determine what?
9    MR. AKEMON:  Stage sets.
10    A.  It depends.  Like Tan, she knew how many girls
11  it took for it to be, like, a real good stage set.  So
12  on top of me paying on average $250 in my house fee, I
13  could tip Tan an extra $100 to put me on the list to
14  where I didn't have to go on stage so early.
15    Q.  Okay.  Let's describe King of Diamonds.  You
16  heard testimony earlier that it was a pretty big club?
17    A.  Yes, sir.
18    Q.  How many stages were at King of Diamonds?  How
19  many stages did King of Diamonds have?
20    A.  Well, we only used two of them, but there were
21  four or five.
22    Q.  Five what?  Five stages?
23    A.  Five stages.  There was the big one in the
24  middle, the two on the side, and it was two stages
25  connected to sections in the back.

Choice - United

Page 113

1    Q.  And with respect to those stages, did you get
2  to determine which stages you were going to perform on?
3    A.  No, because we only used two.  So they would
4  have basically two lists.  They have one list, but they
5  split it up because we have two stages.  So they will
6  keep both stages running because we had so many girls.
7    Q.  And then did you keep track of all your tips at
8  King of Diamonds?
9    A.  No.
10    Q.  And did you pay taxes during your time at King
11  of Diamonds?
12    A.  I did pay taxes, but I didn't use KOD as a job
13  I could write off.
14    Q.  And why not?
15    A.  I didn't know dancers could file taxes like
16  that.
17    Q.  And so did you write off your house fees or
18  tip-outs?
19    A.  No.
20    Q.  Why not?
21    A.  I had no record of none of that.
22    Q.  Now, you don't have any documentation about
23  the time that you arrived at King of Diamonds, do you?
24    A.  No, but the club should.
25    Q.  And do you have any documentation about how

Page 114

1  you paid house fees?
2    A.  No, but the club should.
3    Q.  And can you tell the Court how you would know
4  how many days per week that you worked at King of
5  Diamonds?
6    A.  I mean, I worked there for years, so it's like
7  pretty normal of my schedule throughout the day.  I'm
8  cleaning up my house or I'm running errands.  By 9:00,
9  10:00, I know I need to be on my way to work.  So it was
10  kind of a routine for me, so there was no need for me to
11  document everything because it was a part of my
12  routine.
13    Q.  So from 2010 to 2014, this is pretty -- this
14  is like a schedule for you, it's part of your life?
15    A.  Yes.
16    Q.  And with respect to the house fees, how can
17  you explain -- please explain to me how you know
18  that the number that you're giving us is the average
19  number in house fees.
20    A.  Can you rephrase it again?
21    Q.  I'm sorry.  You earlier testified you paid an
22  average amount of house fees.  Can you explain to the
23  Court how you arrived at that number?  Was it part of
24  your routine as well to pay a certain amount?
25    A.  Yes.  I mean, of course it fluctuated because

Page 115

1  of the events, but on average, I know for sure I'm
2  paying $250.
3    Q.  Okay.  And this was throughout the time that
4  you worked at King of Diamonds?
5    A.  Yes.
6    Q.  And the same with the house mom, DJ and
7  security?
8    A.  Yes.
9    Q.  Was this part of your normal routine with
10  working?
11    A.  Yes.
12    Q.  So when you would arrive at King of Diamonds,
13  you pretty much knew that either, A, your house fees
14  were going to fluctuate, but you had to pay them?
15    A.  Right.
16    Q.  And you knew that it was mandatory to pay the
17  house mom, the DJ and security?
18    A.  Correct.
19    Q.  And did you protest at any time about paying
20  house fees or tipping out security, house mom and DJ?
21    A.  No.  I mean, I stated my opinion about it and
22  how I felt when we had our meetings and stuff, but like
23  Ms. Holmes said, if -- we could express how we felt, but
24  that didn't mean it was going to change.
25    Q.  And during this time when you expressed it,

Page 116

1  were your concerns addressed by management?
2    A.  No, nothing was fixed.
3    Q.  Was it addressed by Akinyele?
4    A.  He didn't fix it because nothing changed.
5    Q.  And so the policy -- let's go back to 2010.
6  You were required to pay house fees in 2010 and 2011,
7  correct?
8    A.  Right.  I don't think Akinyele was there at
9  that time, if I'm not mistaken.
10    Q.  And then after Akinyele came on board in 2012
11  or 2013 --
12    A.  It just got more strict as far as it was
13  mandatory to pay the ten percent.  Like you couldn't
14  walk out the door without paying the ten percent.
15    Q.  Hold on one second.  Let me ask my question.
16  After Akinyele came on board, you still had to pay house
17  fees?
18    A.  Right.
19    Q.  Were you labeled an independent contractor in
20  2010 or 2011 by the club?
21    A.  I mean, they didn't say nothing, but I knew I
22  was an independent contractor.
23    Q.  Okay.  And then after Akinyele came on board,
24  did they continue a policy of maintaining the house mom,
25  DJ and security tip-outs?

Page 117

1  A.  Yes, it was still mandatory.

2  **Q.  So nothing changed from 2010 to 2014?**

3  A.  Not necessarily, besides the slip and

4  basically locking us in there until we paid.

5  **Q.  Okay.  And the documents that we previously**

6  **identified --**

7  A.  Right.  The slips.

8  **Q.  -- the arbitration policy, that came after**

9  **Akinyele came on board?**

10  A.  Yes.

11  **Q.  Okay.  No further questions, Your Honor.**

12  THE ARBITRATOR:  Okay.  So it's 12:12.  My

13  suggestion is we break now for lunch.  Given how

14  long the cross took for Ms. Holmes, I assume it

15  will be roughly similar, Mr. Tobin, is that fair?

16  MR. TOBIN:  Yes.

17  THE ARBITRATOR:  And then were you going to

18  call Ms. Galardi?

19  MR. AKEMON:  No, Your Honor.

20  THE ARBITRATOR:  Okay.  And you're going to

21  call Ms. Galardi?

22  MR. BRODSKY:  Yes.

23  THE ARBITRATOR:  And so we'll have -- and how

24  long do you think that direct will go?

25  MR. BRODSKY:  Our direct will not be that

Page 118

1  long.

2  THE ARBITRATOR:  Okay.  So I think we'll have

3  plenty of time to finish before 5:00 today quite

4  easily.  So why don't we come back at 1:15.  That

5  gives everybody an hour and three minutes.  Does

6  that work?  Or is 1:30 more --

7  MR. BRODSKY:  1:15 is good.  Also, Your Honor,

8  just housekeeping, from the comments at the

9  inception where we're talking about opening, and

10  then we have already previously agreed that we're

11  going to do the post-hearing briefs, we're not

12  going to do closings today, right?

13  THE ARBITRATOR:  No need for closings.  No

14  need for closings.  The hearing will not be closed

15  until the post-hearing briefs are submitted.

16  But I'll get a stapler and staple these, and

17  we have to make sure that we -- I'm a little

18  concerned, Mr. Akemon, that all these exhibit books

19  match up.

20  Your clerical abilities were challenged this

21  week, so I just want to make sure that I'm going to

22  staple the right page onto -- it's the second page

23  I need to fix.

24  MR. BRODSKY:  And also by way of housekeeping,

25  all of the exhibits that I've seen so far are being

Page 119

1  actually introduced separate into evidence?

2  THE ARBITRATOR:  Yes.  I'm going to admit all

3  the exhibits subject to any objections I've not

4  heard yet as to an exhibit I was not aware of

5  because I was working with a different list.

6  But if there are any objections to these

7  exhibits, you need to raise them at some point.

8  But, otherwise, it's my general rule of thumb where

9  I accept whether I -- I could have done much is a

10  different story.

11  MR. BRODSKY:  Yeah.  You've already made that

12  very clear by e-mail.  But my question is a lot

13  simpler than that.

14  THE ARBITRATOR:  Okay.  I'm going to admit all

15  the exhibits unless somebody else has an objection.

16  MR. BRODSKY:  But what I'm seeing so far is

17  they are being admitted individually, correct?

18  THE ARBITRATOR:  That's only because of the

19  way of his questioning.  I'm going to admit all the

20  exhibits.  Part of the reason is they are not

21  premarked.

22  MR. BRODSKY:  But is that the way we're going

23  to continue to do this?

24  THE ARBITRATOR:  You don't have to, as long

25  as yours are premarked.  That's my concern.  I have

Page 120

1  numbers on all these, and if I lose this notebook

2  somehow and they fall out of order, I don't know

3  what number they belong to, and they are not -- I'm

4  just concerned that we make sure we have the right

5  exhibit labels on the right exhibits, so I'm not

6  stopping Mr. Akemon from doing what he's doing.

7  But do not worry, your exhibits will be

8  admitted, his exhibits are admitted.  I just want

9  to make sure we get them all marked correctly.

10  MR. BRODSKY:  But I don't think I'm making my

11  point clear.  I'm sorry.  I'm doing the best I can.

12  THE ARBITRATOR:  No, I'm dense sometimes.  Go

13  ahead.

14  MR. BRODSKY:  No, no, please.  So far during

15  this hearing, individual exhibits have been marked

16  by the court reporter and given to -- and moved in

17  and given to Your Honor.  My question is that

18  the way we're going to continue this process?

19  THE ARBITRATOR:  You don't have to do it that

20  way because you can simply say it's already been

21  admitted.  That's fine with me, too.  But if you

22  wish to do what Mr. Akemon did following protocol,

23  that's okay with me.

24  MR. BRODSKY:  In order to show obviously --

25  THE ARBITRATOR:  I'm not going to stop you.

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 121

1     But they have already been -- they are not
2 premarked is my concern.
3     That's why I didn't interfere with the way he
4 was doing it. Because we need to have numbers when
5 the witness is looking at a document, because some
6 of these exhibits have different numbers on them.
7 And I was worried that the witness would say the
8 number and the court reporter -- and we would all
9 get confused.
10     MR. BRODSKY: And, I think we've all seen that
11 the numbers on the exhibit list do not correspond
12 to the numbers --
13     THE ARBITRATOR: We're getting all those
14 fixed.
15     MR. AKEMON: Yeah. From the March 15th
16 e-mail, they match.
17     MR. BRODSKY: They do?
18     MR. AKEMON: Yes. The e-mail that you
19 received, they match.
20     THE ARBITRATOR: Why don't we come back --
21     MR. AKEMON: I'll fix all that.
22     THE ARBITRATOR: Let's come back at 1:30.
23 Let's come back at 1:30.
24     (Thereupon, a lunch recess was held.)
25     THE ARBITRATOR: Okay. We're back on the

Page 122

1 record. Mr. Tobin, you may proceed.
2     MR. TOBIN: Thank you.
3             CROSS-EXAMINATION
4 BY MR. TOBIN:
5     Q.  Good afternoon, Ms. Griffen.
6     A.  Good afternoon.
7     Q.  When you were employed at King of Diamonds,
8 were you self-employed?
9     A.  From my knowledge, yes, sir.
10     Q.  Do you know anything at all about Teri
11 Galardi?
12     A.  I've heard of her name, but I've never met her
13 personally.
14     Q.  Have you ever seen her?
15     A.  No, sir.
16     Q.  During the years in question -- strike that.
17     Are you still attending mortuary school?
18     A.  Not right now, not anymore. I just had a
19 daughter. I just had a baby a year ago, so I had to
20 take a break after Christmas.
21     Q.  You can take that mask off, by the way.
22     A.  Okay. Thank you. I just had a daughter in
23 March of 2020, so I stopped school in December of 2020.
24     Q.  Are you doing anything at all right now?
25     A.  No, I'm not. I get VA checks.

Page 123

1     Q.  When was the last time you were employed?
2     A.  Before I had my daughter.
3     Q.  How long ago was that?
4     A.  I got pregnant in June.
5     Q.  About?
6     A.  I got pregnant in June 2019.
7     Q.  So you haven't worked since June of 2019?
8     A.  Yes, sir.
9     Q.  How are you supporting yourself?
10     MR. AKEMON: Objection, Your Honor, relevance.
11     THE ARBITRATOR: It's off afield here, Mr.
12 Tobin. What's the relevance of that one? What
13 difference does it make how she's supporting
14 herself today?
15     MR. TOBIN: It's going to relate back to how
16 much money she made at KOD that she's able to --
17     THE ARBITRATOR: Mr. Tobin, we're talking
18 about 2019 versus 2014. I'll sustain the
19 objection.
20 BY MR. TOBIN:
21     Q.  When did you work at Allure?
22     A.  I worked at Allure 2018 -- no --
23     Q.  After you left KOD?
24     A.  Yeah, but years after I left KOD.
25     Q.  What year did you leave KOD?

Page 124

1     A.  I left KOD in 2014.
2     Q.  Between 2014 and 2018, where did you work?
3     MR. AKEMON: Again, Your Honor, objection,
4 relevance.
5     THE ARBITRATOR: We'll see how she answers
6 this question first, and then I'll -- I may agree
7 with you. But let's see where this is going.
8     A.  I had somebody taking care of me.
9     Q.  You had somebody taking care of you?
10     A.  Yes.
11     Q.  Do you know what Teri Galardi had to do with
12 KOD?
13     A.  I never asked, so no.
14     Q.  Did you ever ask anybody about her?
15     A.  All I know is that when the club got turned
16 over to new management, that the dancers were aware of
17 it. But anything of her requirements of what she's
18 done, I didn't ask.
19     Q.  You paid your house fees to Tan?
20     A.  Yes, who was employed by the club.
21     Q.  How much were the fees that you paid to Tan?
22     A.  It fluctuated, so it depends if it was an
23 event night or if it was a normal night.
24     Q.  Did the club provide you with a stage to work
25 on?

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 125

1    A.  Of course.
2    Q.  Did they charge you -- did they provide you
3  with music?
4    A.  Yes, sir.
5    Q.  They provided you with a building to work in?
6    A.  Yes, sir.
7    Q.  Did you pay for any of that?
8    A.  I mean, as in what sense?
9    Q.  Did you contribute to the mortgage on the
10  building?
11    MR. AKEMON:  Objection, Your Honor, relevance.
12    THE ARBITRATOR:  Well, I allowed these
13  questions for Ms. Holmes.  I'll allow these
14  questions for Ms. Griffen.  I assume I know the
15  answer to that, but you can answer it.
16    A.  I mean, I don't know where my money was going
17  to.  All I know is that I was obligated to pay a certain
18  amount of fees when I came into work.  When I gave
19  them the money, what they did with the money I have no
20  idea.
21    Q.  Was the money used to give you a place to earn
22  more money, to entertain?
23    A.  I can't answer that because I have no idea
24  what the money was used for when it left my hands.
25    Q.  Do you have anything that would establish that

Page 126

1  you worked at KOD?
2    A.  I do not personally, no.
3    Q.  You ever appear in photos?
4    A.  I mean, if you look back on the internet, I
5  might.
6    Q.  But you don't know of any?  Did you file any
7  federal income tax returns that would show that you
8  worked at KOD?
9    A.  I did file tax returns, but I did not file tax
10  returns as a dancer.
11    Q.  You didn't file tax returns as a dancer?
12    A.  No, I did not.
13    Q.  What did you file tax returns as?
14    A.  Excuse me.  I filed taxes to make sure that I
15  did not owe the IRS any money.
16    Q.  When did you file tax returns?
17    A.  I have been filing taxes ever since I came out
18  of the military in 2000 --
19    Q.  I'm sorry, ma'am, you're speaking too fast for
20  me.
21    A.  I'm sorry.  I have been filing taxes; ever
22  since I came out of the military in 2009, I have been
23  filing taxes.
24    Q.  You started filing tax returns in 2009?
25    A.  Yes, sir.

Page 127

1    Q.  But you never included any of the income from
2  KOD?
3    A.  I didn't know that dancers, which were
4  independent contractors, could.  I wasn't informed of
5  that information.
6    Q.  You were an independent contractor?  Is that
7  what you're telling me?
8    A.  I mean, that's what I was told.
9    Q.  And that's why you didn't file the information
10  about what you earned at KOD?
11    A.  Yes, sir, but KOD wasn't giving out W-2s to
12  the strippers.
13    Q.  The meetings that you had monthly, did you
14  attend those meetings?
15    A.  Sometimes.
16    Q.  Sometimes?
17    A.  Yes, sir.
18    Q.  It wasn't mandatory, was it?
19    A.  They were mandatory, but if I chose not to
20  come, I chose to get fined.  So if I chose to pay that
21  money, I just didn't want to come to the meeting because
22  my needs weren't getting met at the meeting, so there
23  was no need for me to come.
24    Q.  Wasn't it the purpose of those meetings so
25  that everybody could improve what they were doing and

Page 128

1  earn more money?
2    A.  I mean, but these meetings weren't new, they
3  are old.  So, therefore, if I'm going to a meeting that's
4  constantly saying the same thing and there's nothing
5  getting fixed, why do I need to keep going?
6    The owner of the club, the managers of the
7  club, they are not listening to their workers.  So there
8  was no need for me to go to a meeting and state my
9  opinion of how I felt I was being treated because it
10  wasn't getting fixed.  This wasn't the first meeting.
11    Q.  Who from management attended those meetings?
12    A.  Akinyele, Rick, the managers at that time.
13    Q.  Akinyele was the boss, wasn't he?
14    A.  No, he was not the boss.
15    Q.  He was not your boss?
16    A.  He was my boss, but he had a boss.
17    Q.  He was your boss?
18    A.  He was my boss.
19    Q.  Did you ever see Teri Galardi at any of those
20  meetings?
21    A.  I don't know what she look like.
22    Q.  Did you and Ms. Holmes work the same days?
23    A.  Sometimes.
24    Q.  You're friends?
25    A.  I wouldn't say we're friends.  We're

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 129

1  coworkers.
2      Q.  Where do you live now?
3      A.  I live in Atlanta, Georgia.
4      Q.  And Ms. Holmes lives where?
5      A.  I have no idea.
6      Q.  How often do you speak to each other?
7      A.  We don't.  This is our first time seeing each
8  other in years.
9      Q.  You were talking about heavy bags, and you
10  stayed extra because you had to count the bags.  You
11  want to tell me about that?
12      A.  Okay.  Well, if I were dancing in a section
13  that had five girls, me and four other girls, they
14  wouldn't -- the club wouldn't count that money until the
15  end of the night because it was so much.  So they would
16  wait until the end of the night.
17      Q.  Teri Galardi never got the bag with your
18  money, did she?
19      A.  I have no idea, sir.
20      Q.  Who hired the house mom?
21      A.  From my recollection, the club, but I don't
22  know who personally hired the house mom.  She was
23  already hired before I got hired.
24      Q.  Were there nights that you worked late into
25  the morning because it was too much money to count?

Page 130

1      A.  I mean, what do you mean by that?
2      Q.  You testified that you generally got off at
3  9:00 in the morning, but when there was too much money
4  to count, you stayed until 10:00 or 11:00.
5      A.  Well, when I say that, I mean it's because I'm
6  not the only one who made a lot of money that night.  So,
7  therefore, the people who are counting our money, they
8  have to put us in order.
9          So if I come to you and I'm 50 in line, and I
10  have $10,000, and there's three of us, you're not going
11  to count that by yourself.  You're going to wait for the
12  girls who danced in that money to come count their money
13  to straighten it out to make sure that we give the
14  proper ten percent.
15      Q.  So there were nights that you counted $10,000?
16      A.  There was nights that I counted $30,000,
17  $40,000.
18      Q.  There were nights that you counted $40,000?
19  Is that what you said?
20      A.  Yes, sir.
21      Q.  And how much of that $40,000 was yours?
22      A.  It depends on how many girls was in the
23  section.  I'm not dancing for $40,000 on my own.
24      Q.  Approximately how much of the $40,000 would
25  you get?

Page 131

1      A.  On average, I have no idea, because it
2  depends on how many girls was in that section.  I can't
3  pinpoint how much I got because I'm not the only one
4  dancing in that section.  I'm not the only one working
5  in that section.  The club makes us split our money.
6  We're not obligated to nothing on our own.
7      Q.  Who -- how many times were you fined in the
8  years that you worked there?
9      A.  Four times, three or four times.
10      Q.  In how many years?
11      A.  From 2010 to 2004 --
12      Q.  From -- I'm sorry, ma'am?
13      A.  From 2010 to 2004 --
14          THE ARBITRATOR:  '14.
15          THE WITNESS:  Sorry.  I'm off.  2014.  I
16  apologize.
17  BY MR. TOBIN:
18      Q.  Perhaps once a year, correct?
19      A.  I mean, I could have went a year without
20  getting in trouble, so yeah.
21      Q.  And how much were you fined average?
22      A.  Between $250 and $500.  It depends on what I
23  did.
24      Q.  How much?
25      A.  Between $250 and $500.  It depends on what I

Page 132

1  did.
2      Q.  Specifically, could you tell me when Akinyele
3  took over?
4      A.  I don't know the exact year or month or
5  anything like that, but I know it was around -- between
6  2011 to 2012.  I'm really not for sure.
7      Q.  In 2012 or 2013, Floyd Maryweather (sic) came
8  in.  How much did you pay to work when he was there?
9      A.  I don't know a specific amount.
10      Q.  You don't remember?
11      A.  I don't remember a specific amount.
12      Q.  The Exhibit 24, the slips --
13      A.  Yes, sir.
14      Q.  -- have you seen them?
15      A.  That was before we had our break, correct?
16      Q.  Yes.
17      A.  Yes, I've seen those.
18      Q.  Did Teri Galardi have anything to do with
19  those slips?
20          MR. AKEMON:  Objection, calls for speculation.
21          THE ARBITRATOR:  I'm sorry, what's the
22  objection?
23          MR. AKEMON:  Calls for speculation.
24          THE ARBITRATOR:  Speculation?  That question
25  is a fair question.  Did Ms. Galardi have anything

Choice - United

Page 133

1   to do with the slips as far as you know?
2       THE WITNESS:  I have no recollection of that.
3       MR. TOBIN:  May I have a moment, Your Honor?
4       THE ARBITRATOR:  Sure.
5       MR. TOBIN:  Mr. Barkett.
6       THE ARBITRATOR:  Whatever you wish to call me.
7   You're the only Your Honor in the room.
8       MR. BRODSKY:  Do you have a preference?
9       THE ARBITRATOR:  No, I don't care.  Whatever
10  you call me.
11      MR. BRODSKY:  I just by nature do that.
12      THE ARBITRATOR:  I know, it's a habit.  That's
13  why I don't say anything.  It's just easier for
14  lawyers.  Mr. Tobin is the only Your Honor in the
15  room.
16      THE WITNESS:  He's a judge?
17      THE ARBITRATOR:  Former judge.
18      THE WITNESS:  Okay.  Former judge.
19      THE ARBITRATOR:  But whatever is best for you
20  guys is fine for me.  Mr. Arbitrator, Mr. Barkett,
21  Your Honor, whatever you wish.
22      MR. BRODSKY:  I'm just going to go with what's
23  comfortable.
24      THE ARBITRATOR:  Whatever comes out of your
25  mouth is going to be fine.

Page 134

1       MR. BRODSKY:  Because that's how it's going to
2   be.  We'll be right back, okay?
3       THE ARBITRATOR:  Yes.
4       (Off the record.)
5       THE ARBITRATOR:  Back on the record.  You may
6   proceed.
7   BY MR. TOBIN:
8       Q.  In the year 2010, could you tell me how much
9   money you earned?
10      A.  I cannot be specific with the amount, not at
11  this very moment.  If you allow me to look it up, I
12  can.
13      Q.  In 2010, did you have one job or two jobs?
14      A.  I had one job.
15      Q.  King of Diamonds?
16      A.  Yes, sir.
17      Q.  Earlier, you testified that you had filed
18  income tax returns for your other job.
19      A.  I never said it was for my other job.  I said I
20  filed so I wouldn't owe the IRS any money, but I never
21  filed because I have another job.
22      Q.  So did you file in 2010?
23      A.  I filed every year after I got out of the
24  military.
25      Q.  You filed a tax return in 2010, but you don't

Page 135

1   know how much you earned, correct?
2       A.  No, I didn't get any money back on my tax
3   returns because I didn't have a job.  I was told that
4   I'm supposed to file taxes regardless if I have a job or
5   not because I don't want to owe the IRS any money.  So
6   I always filed.
7       Q.  Okay.  So we understand that in the year 2010,
8   you did not declare any of the money you earned at KOD,
9   correct?
10      A.  Correct.
11      Q.  But you don't remember how much you earned at
12  KOD that year?
13      A.  No.
14      Q.  Do you remember how much you earned at KOD in
15  2010?
16      A.  No, sir, I do not remember the number amount.
17      Q.  Was it more than $50,000?
18      A.  Yes, sir.
19      Q.  Was it more than $60,000?
20      A.  Probably around there.
21      MR. AKEMON:  Objection, Your Honor, relevance
22  to this line of questioning.
23      THE ARBITRATOR:  I'll hold onto testimony, and
24  we'll see whether they can connect it up in their
25  post-hearing submissions.

Page 136

1   BY MR. TOBIN:
2       Q.  How much did you earn in 2011 at KOD?
3       A.  I couldn't give you a specific number.
4       Q.  Approximate it for me.
5       A.  I don't want to guess for you.  That would --
6       Q.  You don't want to guess?
7       A.  I don't want to guess.
8       Q.  What about 2012?
9       A.  I still don't want to guess.
10      Q.  What is it that you have in your hand that
11  you're looking at?
12      A.  I can pull up my files that I have.
13      Q.  I'm sorry?
14      A.  I can pull up my files that I have on my phone
15  if you want me to.  Do you want me to?
16      Q.  You can pull up what?
17      A.  I can pull up my files that I have.
18      THE ARBITRATOR:  Her files.
19      THE WITNESS:  Files, my documents.
20  BY MR. TOBIN:
21      Q.  You have those documents?
22      A.  Yes, sir.
23      Q.  Okay.  Pull them up.
24      A.  Okay.  Yes, sir.  No problem.
25      Q.  Would you tell me what document that is?

Page 137

1    A.  If you got Exhibit 24C or 24B.
2        THE ARBITRATOR: I can just hand it to you if
3    that's easier.
4        THE WITNESS: Yes, please.  Thank you so much.
5        MR. TOBIN:  May I look at that document to see
6    what it is?
7        THE ARBITRATOR: It's the one that she
8    testified to earlier.
9        THE WITNESS:  There's no WiFi up here, so it's
10   not pulling up.
11       THE ARBITRATOR:  That's okay.  We have it here
12   as an exhibit.  None of us were quite sure what you
13   were talking about, so now we know.
14       MR. TOBIN:  Do you have an extra copy of this
15   that I can look at?
16       THE ARBITRATOR:  You can show the witness.
17   You need one while you're talking to the witness?
18   Do you have another one?
19       MR. AKEMON:  It's in his binder, that
20   document.  I believe that's the presuit notice.  Is
21   that what you're looking at?
22       THE ARBITRATOR:  Yes, that's the presuit
23   notice.
24       MR. AKEMON:  Yeah.  They have it in their
25   binder.

Page 138

1        MR. BRODSKY:  What exhibit number is it?
2        MR. AKEMON:  23B.
3        THE ARBITRATOR:  23B.
4    BY MR. TOBIN:
5        Q.  Do you know who prepared this document for
6    you?
7        A.  Me and my lawyer.
8        Q.  You and your lawyer?
9        A.  Yes, sir.
10       Q.  Mr. Akemon?
11       A.  Yes, sir.
12       Q.  In the year 2010, you worked 30 weeks?
13       A.  Yes, sir.
14       Q.  Do you have records to establish which during
15   that year the 30 weeks are that you worked?
16       A.  No, but I'm sure the club does because they
17   have --
18       Q.  I'm sorry?
19       A.  I said, no, I do not, but the club does.  They
20   document every time we come into work.
21       Q.  The clerk does?
22       A.  The club.
23       THE ARBITRATOR:  The club.
24   BY MR. TOBIN:
25       Q.  The club has documents?

Page 139

1        A.  Yes, sir.
2        Q.  Well, do you have anything that would
3    establish the 30 weeks that you worked?
4        A.  I do not personally, no.
5        Q.  Do you have anything that would establish the
6    shifts that you worked per week in the year 2010?
7        A.  No, but as I said, the club should, because we
8    have to sign in before we can even walk into the club.
9        Q.  You're saying the club has records?
10       A.  The club should --
11       Q.  How do you know that?
12       A.  I mean, because Tan was the door girl, and she
13   took our money.  She wrote down our names.
14       Q.  Did you see Tan write it down?
15       A.  Yes, I did.
16       Q.  Do you know what Tan did with those papers?
17       A.  I have no idea where those documents went to.
18       Q.  And that was in 2010 that Tan did that?
19       A.  It was 2010 until I stopped working in 2014.
20       Q.  And that would show that you worked nine hours
21   per shift?
22       A.  Yes, sir.
23       Q.  And that was every day?
24       A.  It wasn't every day.  I worked on an average
25   of five days a week.  Sometimes I took off three days.

Page 140

1    Sometimes I took off two days.  But on the average, I
2    worked five days a week.
3        Q.  Where is that reflected in the records how
4    many days you took off per week?
5        A.  I mean, it's not reflected in the records if
6    they didn't document it down.
7        Q.  Actually, it's nothing more than a guess on
8    your part, is it?
9        A.  A guess on what?
10       Q.  On your part, is it?
11       A.  On what determination?
12       Q.  The hours and days and weeks?
13       A.  To whose knowledge, me or yours?
14       Q.  Do you have any records?
15       A.  No, I do not.
16       Q.  Forgetting Tan and anybody else, do you have
17   any records?
18       A.  No, sir, I do not.
19       Q.  So this is a creation of you and your lawyer,
20   correct?
21       A.  I mean, it's -- you could call it that, but
22   it's -- it was my routine for four to five years.  So
23   there was no way I could deflect from my schedule.  It's
24   just like you waking up to be a lawyer every morning.  I
25   woke up every morning to be a stripper for King of

Page 141

1  Diamonds for four to five years.  It was part of my
2  routine.  There was no reason for me to document that.
3      Q.  There are 52 weeks in a year.
4      A.  Yes, sir.
5      Q.  In the year 2010, you only worked 30 weeks?
6      A.  Right, because I started in the middle of the
7  year.
8      Q.  And you have no records of your own to
9  support?
10     A.  Not my own, no, sir.
11     Q.  The year 2011, you worked 18 weeks more than
12  you did in 2010.  How do you know that?
13     A.  Because I have to deduct my birthday --
14     Q.  I'm sorry?
15     A.  I have to deduct my birthday, I have to deduct
16  holidays and the times that I went home.  I'm not from
17  Florida, so my family is originally from Texas.
18         So I went home to visit family, I went home
19  for birthdays.  So I'm not going to count that I worked
20  the whole year every day for seven days a week.  That's
21  not logical and that's not believable either.
22     Q.  You didn't have a daily calendar to
23  mark off the days that you worked?
24     A.  Honestly, sir, I didn't feel like there was
25  a need to do that.

Page 142

1      Q.  Say it again, I'm sorry.
2      A.  I'm sorry.  I didn't feel there was a need to
3  document my work schedule.
4      Q.  Why were you thinking that back then?  Were
5  you planning on some kind of a lawsuit back then?
6      A.  I'm saying I didn't think it was necessary for
7  me to track my work schedule because I wasn't thinking
8  about anything like this at that time.
9      Q.  It would have been a lot easier to figure out
10  the difference if you had records, wouldn't it be?
11     A.  I mean, if I had preplanned suing somebody,
12  then yes.  But I didn't preplan this.
13     Q.  So what it boils down to is this is your best
14  guess as to what the weeks were, correct?
15     A.  It's a guess, but it's also a fact, because I
16  did it every day almost for five years.  So of course I
17  know what I've done.
18     Q.  The same would apply to 2012, '13 and '14, am
19  I right?
20     A.  Yes, sir.
21     Q.  You spoke about tip-outs.
22     A.  Yes, sir.
23     Q.  Is that what you paid when you left?
24     A.  Yes, sir.
25     Q.  You were saying that if you didn't pay, you

Page 143

1  couldn't leave; is that your testimony?
2      A.  Yes, sir.
3      Q.  Did you call the police?
4      A.  No, sir.
5      Q.  Why did you stay at King of Diamonds?
6         THE ARBITRATOR:  What was your question?
7  BY MR. TOBIN:
8      Q.  Why did she stay at King of Diamonds?
9      A.  I'm not from Florida, so from my knowledge,
10  the best club to work at was King of Diamonds at that
11  time.
12     Q.  So you're a Texas girl?
13     A.  Yes, sir.
14     Q.  Aren't there adult clubs in Texas?
15     A.  My family lives there, so there was no reason
16  for me to dance.
17     Q.  But that's not an answer to my question.
18  Weren't there clubs in Texas?
19     A.  Yes, but it's ran differently.  I've danced in
20  Texas before, but it's completely different.  Our house
21  fees in Texas is nowhere near how much we pay in
22  Florida.
23     Q.  Well, any of the clubs in Texas that you know
24  of where the girls earn 20,000 bucks in a night?
25         MR. AKEMON:  Objection, Your Honor, calls for

Page 144

1  speculation.
2         THE ARBITRATOR:  Well, the question may not
3  have anything to do with what she's already said,
4  but you have to -- I'm not sure what it has to do
5  with anything.  It's not so much speculation as to
6  relevance.  What difference does it make what
7  happened at a Texas club, Mr. Tobin?  Tell me how
8  that's relevant to this case.
9         MR. TOBIN:  What I'm attempting to establish
10  is that King of Diamonds was probably the best club
11  in the United States, and every girl that did adult
12  dancing wanted to work there.
13        THE WITNESS:  I wouldn't say that.
14        MR. TOBIN:  It was a privilege to work there.
15        THE ARBITRATOR:  You can ask her those
16  questions.
17  BY MR. TOBIN:
18     Q.  Wasn't it a privilege to work at King of
19  Diamonds?
20     A.  When you say privilege, do you mean I was
21  honored to work there or were they honored to have me
22  work there?
23     Q.  Both.
24     A.  It was an honor for them to have me work
25  there.

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 145

1    Q.  Both.
2    A.  No, it wasn't a privilege for me to be there
3  because I could have took --
4    Q.  So it was an honor for them to have you, but
5  it wasn't an honor for you to work there?
6    A.  I mean, I was paying them --
7    Q.  Is that what you're saying?
8    A.  I mean, I'm paying them to be there.
9    Q.  Why did you stay?
10   A.  I mean, in Florida, that was the club you were
11 supposed to work at as a new dancer.  And me not knowing
12 anything about South Florida and how it works, I'm going
13 to go where I hear the most chatter at.  I'm new, I'm
14 fresh to the city, to the state, everything.  So I'm
15 just going to go where I know -- where I hear people are
16 going to be at.
17   Q.  But is it fair to say that you could have gone
18 to work at any place and did not have to stay at KOD if
19 you felt abused in any way?
20       MR. AKEMON:  Objection, Your Honor,
21 mischaracterizes her previous testimony.  I don't
22 think she's ever mentioned --
23       THE ARBITRATOR:  I'll allow the question.  The
24   question essentially is why did you stay for year
25   two, year three, year four.  I'm not so sure about

Page 146

1  the abuse part.  But the question is why did you
2  stay.  You still haven't answered that question.
3       THE WITNESS:  Okay.  I will.
4       THE ARBITRATOR:  I understand why you started.
5  I understand why you started.
6       THE WITNESS:  I was confused.
7       THE ARBITRATOR:  Let me -- I understand why
8  you started.  You answered that.  But you still
9  haven't answered why you stayed.
10      THE WITNESS:  Okay.  I stayed because it was a
11 part of my normal routine.  I didn't know anything
12 about any other club until I completely stopped
13 working at KOD, which was in 2014.
14      I had to completely give it up because it
15 wasn't working in my favor.  So I had to figure out
16 a new way, but I stayed that long because that was
17 all I knew.  When it's all you know, you're going
18 to stay, even though it's difficult to deal with.
19 BY MR. TOBIN:
20   Q.  You worked at Allure, didn't you?
21   A.  Allure was after the fact, yes, sir.
22   Q.  Did you earn more at Allure than you earned
23 at KOD?
24      MR. AKEMON:  Objection, Your Honor, relevance.
25      THE ARBITRATOR:  I'll allow the question.

Page 147

1    A.  I worked at Allure at a lesser time than I did
2  at KOD.  I worked at KOD for years.  I worked at Allure
3  for a year.
4    Q.  And during that year --
5    A.  Within that year --
6    Q.  -- did you earn more than you did at KOD?
7    A.  My first year working at KOD and my first year
8  compared to Allure, yes, I did make more money at Allure
9  than I did KOD.
10   Q.  You did?
11   A.  Yes, I did.
12   Q.  Why didn't you stay?
13      MR. AKEMON:  Again, Your Honor, we're talking
14   about a whole other club in --
15      THE ARBITRATOR:  But it has potential
16   relevance from an earning standpoint relative to
17   how their comparison works.
18   A.  I also don't see how it makes the comparison
19 because it's two different times.
20      MR. AKEMON:  Ms. Griffen, just answer the
21   question.
22      THE ARBITRATOR:  Why she stayed at Allure is
23   not relevant, Mr. Tobin.  The question is -- you
24   asked her whether she earned more at Allure than at
25   KOD the first year, and she said comparing both

Page 148

1  first years, the answer was yes.  That's my
2  understanding, is that right?
3       THE WITNESS:  Yes, sir.
4  BY MR. TOBIN:
5    Q.  How much did you earn at Allure in your first
6  year, your only year?
7    A.  I can't put in a number.  I have no idea.
8    Q.  So how do you know you earned more at Allure?
9    A.  Because Allure house fees and the calculations
10 of how everything worked was nowhere near how KOD was.
11 I mean, my house fees, my tip-out, tipping security,
12 tipping the DJ, it didn't deflect how much money I was
13 taking home.  Like it didn't put a dent in my pocket.
14 Walking out of KOD was a difference.  I'm paying out
15 more than I was paid to work.
16   Q.  Do you know whether or not Teri Galardi had
17 anything to do with the preparation of the rules that
18 everybody lived under at KOD?
19   A.  No, I do not.
20   Q.  Do you recall when Akinyele Adams started at
21 KOD?
22   A.  I don't remember the specific time.
23      THE ARBITRATOR:  You asked her that question
24   already, Mr. Tobin.
25      MR. TOBIN:  I did.  I know I did.

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 149

1    THE ARBITRATOR:  2012, 2013, somewhere in
2  there.  That's what you said.
3    THE WITNESS:  It was around 2011, 2012.
4    THE ARBITRATOR:  So we're not going to have
5  her repeat answers she's already given.
6  BY MR. TOBIN:
7    **Q.  By the way, at Allure, did you file a tax**
8  **return and declare that income?**
9    MR. AKEMON:  Objection, Your Honor, relevance.
10    THE ARBITRATOR:  I'll allow the question.
11    A.  Like I said, I filed taxes just to make sure I
12  don't owe the IRS any money.  The club at that time,
13  Allure had just opened, so they wasn't giving out W-2s.
14  I don't know what they are doing as of now, but it was a
15  new club the first year I started working.
16    **Q.  You only worked there one year, I thought.**
17    A.  Right.  Meaning by the time I had to file my
18  taxes, I was pregnant, so I wasn't working.
19    **Q.  Did you declare on a tax return the income you**
20  **earned in the one year you worked at Allure, yes or no?**
21    A.  I never filed taxes -- I never filed taxes as
22  being a stripper, no, I have not.  I said that.
23    THE ARBITRATOR:  She's answered your question.
24    MR. TOBIN:  I have no other questions.
25    MR. BRODSKY:  Actually, can we just consult

Page 150

1  for a second?
2    THE ARBITRATOR:  You may.
3    MR. BRODSKY:  Or I can just get up and ask the
4  three questions.
5    THE ARBITRATOR:  That's okay.  You can
6  consult.  We'll have one questioner.  You can
7  consult with Mr. Tobin.
8    (Off the record.)
9    THE ARBITRATOR:  You may proceed.
10  BY MR. TOBIN:
11    **Q.  Specifically, can you tell me when you were**
12  **fined and by whom?**
13    A.  I can't say specifically.  I can tell you why
14  I was fined.
15    THE ARBITRATOR:  And you answered that
16  already.  We heard that on direct.
17    **Q.  But you can't tell me specifically when that**
18  **was?**
19    A.  No, I can't.
20    **Q.  Can you tell me by whom you were fined?**
21    A.  Akinyele.
22    **Q.  Only by Akinyele?**
23    A.  Akinyele or Rick.  It had to be those two.
24  But mostly, Akinyele, because I was in trouble.
25    **Q.  We asked you about the year 2010 and what you**

Page 151

1  earned.
2    A.  Uh-huh.
3    **Q.  And your testimony was in the range of**
4  **$60,000, correct?**
5    A.  It could have been.
6    **Q.  I'm sorry?**
7    A.  It could have been, yes.
8    **Q.  In the year 2011, how much did you earn?**
9    MR. AKEMON:  Objection, asked and answered.
10    THE ARBITRATOR:  I don't know that he asked
11  about 2011.  Go ahead.  You can answer the
12  question.
13    A.  I mean --
14    **Q.  If you know.**
15    A.  I mean, a specific amount I have on my paper
16  and that I could just guess off the top of my head, I
17  can't just give you a number and guess.  But what I've
18  calculated from my -- from my notes is on my paper.
19    MR. BRODSKY:  Judge, I think there's some
20  confusion here, if I may?
21    THE ARBITRATOR:  No, you may not.  We can hear
22  from Mr. Tobin.
23    MR. TOBIN:  Thank you.
24  BY MR. TOBIN:
25    **Q.  You calculated from your notes?**

Page 152

1    A.  Yes, from when I went over with my attorney
2  minimum wage at that time, the hours that I worked, the
3  days that I worked, and I just multiplied it.
4    **Q.  Where are your notes now?**
5    A.  It's your subject 23.  Is it 23?  Is it 23B?
6  Do you have that?
7    **Q.  The calculations that I see are what you**
8  **should have been paid in minimum wages.  That's not what**
9  **I'm asking you.**
10    A.  So what are you asking me, sir?
11    **Q.  What I'm asking you is what did you earn in**
12  **the year 2011?**
13    A.  I can't give you a specific number, because I
14  don't want to guess and just give you an answer.
15    **Q.  In the year 2010, you calculated approximately**
16  **$60,000?**
17    A.  It could have been, yes, sir.  I still
18  don't --
19    **Q.  Could it have been the same in 2011?**
20    A.  It could have been that amount, it could have
21  been less.  I can't give you --
22    **Q.  Could it have been more?**
23    A.  It could have been more, but I can't give you
24  an exact number.  I don't want to guess.
25    **Q.  It would not have been outrageous if it was**

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 153

1  more, would it?
2      A.  I mean, it couldn't have been outrageous.  It
3  depends on what type of night it was at the club.
4      Q.  You did pretty well at the King of Diamonds,
5  didn't you?
6      A.  I did well, yes.
7      Q.  That $20,000 that was earned that night, how
8  much of it was yours?
9      A.  I mean, it depends on how many girls was
10 dancing with me that night.
11     Q.  I'm sorry?
12     A.  It depends on how many girls was in that
13 section.
14     Q.  You don't remember how much of that $20,000
15 you took home that night?
16     A.  No.
17     Q.  But you remember it was $20,000?
18     A.  I mean, I remember how much the customers
19 made.  I remember a lot about how much money the
20 customers made, but as far as the breakdown of what I
21 got specifically, I couldn't give you that, because it
22 wasn't just me dancing.
23     Q.  How much did you earn in the year 2012?
24     A.  I don't want to give you a specific number and
25 just be wrong.

Page 154

1      Q.  But it could have been $60,000 or more?
2      A.  Yes, sir.
3      Q.  It could have been $70,000 also, right?
4      A.  It could have, but I don't want to just say
5  yes, that's right.
6      Q.  There were years that you earned $70,000, and
7  years that you earned $80,000, right?
8      A.  I don't want to guess that and give you that
9  specific number, so I don't want to say, yes, that's
10 right, or, no, that's wrong.
11     Q.  But it wouldn't have been an outrageous number,
12 would it?
13     A.  I mean, no, it wouldn't have been outrageous,
14 but I don't think I made that much.
15     Q.  What about the year 2013?
16     A.  Do you want me to guess?  Again, I don't want
17 to guess for you.  I want to be able to give you a
18 specific number, but I don't want to say, yes, I made
19 that amount that year or I didn't.
20     MR. BRODSKY:  May I approach my colleague for
21 a second?
22     THE ARBITRATOR:  I think we need to bring this
23 to an end, gentlemen.  I've already allowed you
24 three sessions.
25     MR. BRODSKY:  It will take ten seconds.

Page 155

1      THE ARBITRATOR:  Ten seconds?
2      MR. BRODSKY:  Yes.
3      THE ARBITRATOR:  I'm counting.
4      MR. BRODSKY:  I don't know that I can get
5  there in ten seconds.
6      MR. TOBIN:  I'm also counting.
7      MR. BRODSKY:  That was less than ten seconds.
8      THE ARBITRATOR:  Not by my watch, Mr. Brodsky,
9  but that's okay.
10     MR. BRODSKY:  That I was up there?
11 BY MR. TOBIN:
12     Q.  Did you earn more than $50,000 in the year
13 2013?
14     A.  Yes, I could have.
15     Q.  I'm sorry?
16     A.  I could have.
17     Q.  Say it again.
18     A.  I could have.
19     Q.  What about the year 2014?
20     A.  Yes and no.  I don't want to guess and just
21 make you feel like I knew exactly the number amount.
22     Q.  But you could have earned more than $50,000 in
23 the year 2014, right?
24     A.  Well, the year 2014 was a short year because
25 I stopped working there, so it's not a full year.

Page 156

1      Q.  Last question.  You testified that the
2  night of the Floyd Mayweather night, you paid $450 in
3  house fees, and you specifically recalled --
4      THE ARBITRATOR:  I didn't hear that, Mr.
5  Tobin.
6      THE WITNESS:  I said it.
7      MR. TOBIN:  Yes, she did testify to that.
8      MR. BRODSKY:  And she just acknowledged that
9  she did.
10     THE WITNESS:  I did.
11     MR. AKEMON:  Stop talking.
12     THE ARBITRATOR:  I heard I do not recall the
13 amount is in my notes -- what my notes reflect.  I
14 do not recall that --
15     MR. TOBIN:  She just testified that she did.
16     THE ARBITRATOR:  Well, that's a different
17 story.  If she wants to respond now, she can,
18 but --
19     MR. BRODSKY:  Your Honor, that was on direct
20 that she testified to that.
21     THE ARBITRATOR:  Oh, okay.
22 BY MR. TOBIN:
23     Q.  How much did you earn that night?
24     A.  I don't remember the specific number --
25     Q.  I'm sorry?

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 157

1    A.  I don't remember the number amount that night
2  because it was a lot of confrontation that night.  The
3  only reason why I remember the night is because I had to
4  fight for my money.  So, honestly, I can't remember the
5  exact amount of money I made.
6    **Q.  Who did you fight?**
7    A.  The club itself.  They took my money.
8    **Q.  Who?**
9    A.  They stole my money that night.
10    **Q.  Who stole your money?**
11    A.  I have no idea.  All I know is I gave my money
12  to the money room like I'm supposed to, like I do every
13  night, and my money got missing.
14    **Q.  You don't know how much you left the club with**
15  **that night?**
16    A.  I mean, it was in a trash bag, so no.
17    **Q.  You didn't get checks, you got cash, right?**
18    A.  What do you mean?
19    **Q.  You weren't paid by check, you were paid in**
20  **cash?  At the end of the night, you took home cash,**
21  **correct?**
22    A.  No, no, no.  This money that I'm talking
23  about got missing from a customer that was given to me
24  before the end of the night.  That's the only reason why
25  I remember that night so verbatim because I had money

Page 158

1  stolen from me.
2    **Q.  Was it a good night?**
3    A.  It would have been a good night if my money
4  wouldn't have gotten stolen.
5    **Q.  It would have been a better night, but how**
6  **much did --**
7    A.  No, it would have been a good night if my
8  money wouldn't have got stolen.
9    THE ARBITRATOR:  Let's not argue.  Let's not
10  argue.
11  BY MR. TOBIN:
12    **Q.  When you walked out the front door, how much**
13  **did you walk out with?**
14    A.  I don't remember.  It could have been more
15  because I got stolen from.
16    **Q.  What year was that fight?**
17    A.  The Mayweather?
18    **Q.  Yes.**
19    A.  I don't think it was a fight.  I think it was
20  Memorial weekend.  I don't think it was a fight.
21    **Q.  What Memorial weekend?  What year?**
22    A.  If I'm not mistaken, Floyd came a lot Memorial
23  weekend, so I can't say specific times, because
24  Memorial weekend when I was there, Floyd -- it was
25  normal for him to come Memorial weekend.

Page 159

1    MR. TOBIN:  I have nothing else.
2    THE ARBITRATOR:  You turned one question, Mr.
3  Tobin, into about seven, I want you to know.
4    THE WITNESS:  Yeah.
5    MR. TOBIN:  But they were short.
6    THE ARBITRATOR:  You may redirect, but before
7  you redirect, I did want to ask you, Ms. Griffen,
8  do you know what a 1099 form is, a form, a 1099?
9    THE WITNESS:  I've heard of that form from the
10  military, but not from the club.
11    THE ARBITRATOR:  Did you get any form 1099s
12  from the King of Diamonds?
13    THE WITNESS:  Not that I know of, no, sir.
14    THE ARBITRATOR:  Okay.  Mr. Akemon, you may
15  redirect.
16    MR. AKEMON:  Thank you.
17    REDIRECT EXAMINATION
18  BY MR. AKEMON:
19    **Q.  Ms. Griffen, you stated that on occasion, you**
20  **have large amounts of money in bags?**
21    A.  Right.
22    **Q.  And those bags would go up to the money room?**
23    A.  Right.
24    **Q.  And you also testified about an occasion where**
25  **there was a number of young ladies that danced in the**

Page 160

1  **pow with approximately, please correct me if I'm wrong,**
2  **$20,000 or $30,000?**
3    A.  Right.
4    **Q.  When those young ladies danced in a pow with**
5  **you, it wasn't just you in that pow, was it?**
6    A.  No, it was me plus the other girls that was in
7  there.  So at the end of the night, we would split it.
8  But before we could split it, they would take their ten
9  percent out of that money.
10    **Q.  And on that night, you didn't get an exact**
11  **accounting of what exactly went inside that money room,**
12  **did you?**
13    A.  No, because they just gave us envelopes and
14  say, hey, this is your money from this Mayweather pow.
15    **Q.  And can you please describe how the money**
16  **was -- strike that.**
17    **Please describe where the money appeared**
18  **during that money pow.  Can you describe for everyone**
19  **how it appeared?  Was it thrown in the air, was it**
20  **handed to you?**
21    A.  So that night specifically, I was picked
22  first.  I remember it because it was -- it was a lot of
23  chaos.  Because the rules in King of Diamonds the
24  first dollar that hits the ground, whatever dancer is
25  there, that's her money.  But that's not always how it

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 161

1   worked.
2        So at that time, Mayweather was throwing money
3   on me, and the first $5,000 that hit the floor, it
4   should have been mine, but it wasn't.  They made me
5   split it with the other girls.  So I want to say he
6   spent like $30,000 or $40,000 that night, but there was
7   five or six of us.
8        So they had to take their ten percent out, and
9   then we got our cut.  But we didn't specifically sit
10  there and count that money at that time, they did.
11      Q.   And you didn't pick that money up, did you?
12      A.   No, security picked it up.
13      Q.   And when they picked it up, they collected it
14  for you?
15      A.   Yes.
16      Q.   And then they transported it to the money
17  room?
18      A.   Yes.
19      Q.   And before they collected it, you didn't get a
20  chance to sort it out?
21      A.   No.
22      Q.   So you can't verify if it was actually
23  $30,000?
24      A.   No, not at all.
25      Q.   And, again, your testimony is that they took

Page 162

1   ten percent out before --
2       A.   Before we even got our cut.
3       Q.   Okay.  So you didn't actually take $30,000
4   home that night?
5       A.   No, I did not.
6       Q.   Or $40,000?
7       A.   No, I did not.
8       Q.   Were there other occasions where money went to
9   the money room and it became quote, unquote, lost or
10  stolen?
11      A.   Yes, plenty of times.
12      Q.   Okay.  And on those occasions, would the club
13  reimburse you or anybody from the club reimburse you?
14      A.   I can't recollect on how Akinyele ran it, but
15  I can speak on how it was ran before he took over the
16  club, only because I got money stolen from me before he
17  got there.
18      Q.   Did you have money stolen after he got there?
19      A.   Yes, but it wasn't taken care of like how it
20  would have been before.
21      Q.   Okay.  Can you describe the difference between
22  the two?
23      A.   Yes.  Mr. Teri, when Meek Mills came into King
24  of Diamonds, it was when his dream was -- his dream
25  and nightmare song came out when he first mentioned King

Page 163

1   of Diamonds in his club -- I mean in his song.  I was
2   the first girl there.  That money got completely
3   missing.
4        So Mr. Teri decided to say who was the first
5   girl there dancing.  All the girls vouched for me and
6   said I was the first girl there, so I got the first
7   $5,000.
8        And, then after that, we had to split the rest
9   of the money.  When that happened with Floyd and
10  Akinyele was there, the money just went missing, and we
11  just didn't get nothing at all.
12      Q.   So you had worked and performed, but you
13  didn't receive --
14      A.   Right.  We danced, they picked up the money
15  and put it in the trash bag, but there was still more
16  hours in the night, so there was still more customers to
17  dance for.
18        So whatever happened in between them taking
19  our money to the money room and us still working
20  throughout the night, it went missing.  So nothing got
21  confirmed.
22      Q.   And not just on that night, just on the
23  typical KOD night, the money that you earned, did that
24  come directly from customers?
25      A.   Everything came directly from customers.

Page 164

1       Q.   So nothing came directly from KOD?
2       A.   No.
3       Q.   It didn't come from management?
4       A.   No.
5       Q.   It didn't come from security?
6       A.   No.
7       Q.   It didn't come from the house mom?
8       A.   No.
9       Q.   So everything you got, did you perceive it as
10  a tip or did you perceive it as a wage?
11      A.   I perceived it as I worked for it.
12      Q.   Okay.  Was it -- strike that.
13        Did those customers tip you?
14      A.   Yes.
15      Q.   Okay.  In addition to that, when you speak
16  about the collection efforts in the money room, were
17  there any other times that you worked at King of
18  Diamonds and didn't earn anything?
19      A.   Yes.
20      Q.   So did you pay a house fee on those nights
21  that you didn't earn anything?
22      A.   Yes.
23      Q.   And did you tip out the house mom, DJ and
24  security on those nights?
25      A.   Yes.

Page 165

1    Q.  And so did you go home in the negative on
2  those nights?
3    A.  Yes.
4    Q.  And would that occur -- how often would that
5  occur?
6    A.  Tuesdays, Wednesdays, Thursdays.  Only reason
7  why I say those specific days is because those were the
8  slow days throughout the week, and Sundays.
9    Q.  And were you required to work slow days?
10    A.  Yes, at least two throughout the week.
11    Q.  And that was a club policy?
12    A.  Yes.
13    Q.  And on the slow days, you wouldn't earn
14  anything?
15    A.  The club was so big, nobody was coming in
16  there unless it was something going on.
17    Q.  And on those days that you worked -- so on
18  those days that you worked but didn't earn anything --
19  strike that, Your Honor.  No more questions.  I'm sorry.
20    THE ARBITRATOR:  You're excused.  Thank you
21  very much.  I've already -- for the record, I've
22  admitted all the exhibits on the exhibit list of
23  both parties that were submitted to me.  The
24  claimant's proposed exhibit list, which has been
25  modified so that instead of 23 being Teri Galardi

Page 166

1  transcript -- deposition transcript, 23A is the one
2  letter to Ms. Galardi via Mr. Fuchs.
3    The other is -- 23B is the other letter to Ms.
4  Galardi via Fuchs, one for Ms. Holmes, one for Ms.
5  Griffen.  Is this Number 23, Teri Galardi
6  deposition transcript -- that's now the four slips,
7  right?
8    MR. AKEMON:  I'm sorry?
9    THE ARBITRATOR:  Number 23, Teri Galardi
10  deposition transcript is now this document here,
11  the four slips?
12    MR. AKEMON:  Yes, Your Honor.
13    THE ARBITRATOR:  Is there a Teri Galardi
14  transcript in this notebook?
15    MR. AKEMON:  It is in that notebook, Your
16  Honor.
17    THE ARBITRATOR:  It is?
18    MR. AKEMON:  Yes, Your Honor.
19    THE ARBITRATOR:  What number?
20    MR. AKEMON:  Give me a second.  It's -- just
21  for clarification's sake, Your Honor, the large
22  notebook, the large red notebook is the trial
23  transcript, so that will be Exhibit 4.
24    THE ARBITRATOR:  Very good.  But where is what
25  was originally labeled as 23?  Where is that?

Page 167

1    MR. AKEMON:  I'm pulling it now, Your Honor.
2  I'm sorry.
3    THE ARBITRATOR:  And if we do have that in
4  here, we have to give it a number.
5    MR. AKEMON:  Well, what was originally marked
6  as 23 was the presuit notices.  That was the
7  original.
8    THE ARBITRATOR:  I'm sorry, I'm just looking
9  at what I have here.  23, Teri Galardi transcript.
10    MR. AKEMON:  Your Honor, are you looking at --
11    THE ARBITRATOR:  I apologize.  Where is the
12  right one?  I keep picking this thing up and
13  putting it down.  Sorry.  I apologize.  So 23, 24
14  we got, and 25, I have diary in 25, but it's marked
15  26 here.
16    MR. AKEMON:  25 is Teri Galardi personal
17  diary.
18    THE ARBITRATOR:  Right.  But this says 26.
19    MR. BRODSKY:  Wait.  I must be looking at a
20  different list, and I'm totally confused.
21    THE ARBITRATOR:  Let's try to straighten this
22  out.  So now I'm looking at the right one.  What
23  does your C26 say, Mr. Akemon?  C26, what does that
24  say?
25    MR. AKEMON:  Order on motion for summary

Page 168

1  judgment.  I'm sorry.  Yes, order on cross-motion
2  for summary judgment.
3    THE ARBITRATOR:  Mine says C27 for order on
4  cross-motions.
5    MR. AKEMON:  You're right.  I'm sorry.  27
6  is -- because we switched it.
7    THE ARBITRATOR:  What does your 26 say?
8    MR. AKEMON:  My 26 is -- 27 is order on
9  cross-motion for summary judgment.  26 is Teri
10  Galardi personal diary.
11    THE ARBITRATOR:  Okay.  Come look here, Mr.
12  Akemon, because 25 is where the diary exhibit
13  appears.  This says 25, and that's the diary.  Is
14  that right?
15    MR. AKEMON:  Yes, Your Honor.
16    THE ARBITRATOR:  So 25 here says claimant's
17  responses to --
18    MR. AKEMON:  That's the slip, so --
19    THE ARBITRATOR:  The slips are 24.
20    MR. AKEMON:  So we should scratch that one
21  out.
22    THE ARBITRATOR:  Okay.  That's what I want to
23  understand.  So we have no Exhibit 25?
24    MR. BRODSKY:  So I should cross out Exhibit 25
25  on the exhibit list --

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 169

1     MR. AKEMON: Yes.
2     MR. BRODSKY: -- that's dated March 15th of
3   2021?
4     THE ARBITRATOR: That's correct.
5     MR. BRODSKY: Just cross it off?
6     THE ARBITRATOR: That's correct. 23A and B
7   are the two presuit notices. 24 is the ten percent
8   slips. There is no longer a 25. So now with that,
9   is this complete, Mr. Akemon?
10     MR. AKEMON: Yes, Your Honor. Can you confirm
11   26 and 27, order on cross-motion for summary
12   judgment?
13     MR. BRODSKY: Yes.
14     MR. AKEMON: 27 was the Rule 23 order.
15     THE ARBITRATOR: Okay. So I'm accepting all
16   of the exhibits. Is there anything else you wish
17   to add to your case, Mr. Akemon?
18     MR. AKEMON: No, Your Honor.
19     THE ARBITRATOR: Okay. So you're resting.
20   Mr. Tobin or Mr. Brodsky, you may proceed with your
21   case.
22     MR. BRODSKY: Judge, before we do that, other
23   than the changes that we just made on the exhibit
24   list, are there any other changes on your list?
25     THE ARBITRATOR: No, not on my list.

Page 170

1     MR. BRODSKY: We're ready to proceed. Can we
2   have a moment just to talk to our client real
3   quick?
4     THE ARBITRATOR: Why do you need to do that?
5     MR. BRODSKY: I just want to ask her a
6   question before I put her on the stand. That's
7   all.
8     THE ARBITRATOR: Okay. You can do that.
9   Hurry up. You've had three breaks, you had lunch.
10   But go ahead.
11     (Off the record.)
12     DIRECT EXAMINATION
13   BY MR. BRODSKY:
14     Q. Good afternoon, ma'am. Please state your
15   name.
16     A. Teri Galardi.
17     Q. Where do you live?
18     THE COURT REPORTER: Do you want me to swear
19   her in?
20     MR. BRODSKY: What's that?
21     THE COURT REPORTER: I have to swear her in.
22     THE ARBITRATOR: Swear her in first.
23     THE COURT REPORTER: Please raise your right
24   hand. Please state your first and last name.
25     THE WITNESS: Teri Galardi.

Page 171

1     (Thereupon, the witness was duly sworn in
2   accordance with the law.)
3   BY MR. BRODSKY:
4     Q. Please state your name.
5     A. Teri Galardi.
6     Q. Where do you reside, Ms. Galardi?
7     A. In Flovilla, Georgia.
8     Q. And tell us something about your educational
9   background, please.
10     A. I completed an associate's degree in
11   merchandising, marketing.
12     Q. And when was that?
13     A. I graduated in 1982.
14     Q. What was your father's name?
15     A. Jack Galardi.
16     Q. And did he pass away at some point?
17     A. He passed away December 1st, 2012.
18     Q. Prior to December 1st, 2012, where did you
19   live?
20     A. In -- well, I lived in Florida from 2009, and
21   before that, Las Vegas, and before that, California.
22     Q. Let's talk about when you resided in Las
23   Vegas. What was that time frame?
24     A. From 1987 to 2009.
25     Q. So you left Las Vegas in 2009?

Page 172

1     A. Yes.
2     Q. Where did you go from Las Vegas in 2009 to
3   reside?
4     A. Southwest Ranches, Florida.
5     Q. And who did you go there with to reside?
6     A. My husband and our two daughters.
7     Q. Is there a reason why you moved to Southwest
8   Ranches, Florida in 2009 from Las Vegas?
9     A. Yes. My father had pharyngeal cancer in 2005
10   and was treated at Cleveland Clinic. And I came here --
11     Q. Cleveland Clinic where? I'm sorry to
12   interrupt you.
13     A. I'm sorry. In Florida, Weston.
14     Q. Okay.
15     A. And I came for three months in I think it was
16   June, July, August and September while he was doing his
17   radiation and helped him and was there for support.
18     Q. And what year was that?
19     A. It was 2005.
20     Q. Okay. So regarding your father's health from
21   2005, let's say, to 2009, explain to His Honor what
22   happened with his health.
23     A. When you have a radiated head, your nerves
24   have a life span, and so some of the nerves started to
25   deteriorate. It affected his hearing, it affected

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 173

1   his -- he could see.
2           It didn't affect his eyesight, per se, but he
3   got strabismus in some of the nerves -- so one eye
4   started to cross, so he would wear an eye patch so he
5   didn't see double.  His epiglottis stopped working
6   properly, so he would aspirate food into his lungs
7   sometimes.
8           And at one point, they thought he might have
9   lung cancer, that it might have metastasized, but it
10  didn't.  It ended up being -- they went in to do a
11  biopsy and ended up removing his upper left lobe.  So
12  there were complications there.
13          Q.  So then coming back to 2009, you moved here
14  for what reason?
15          A.  Well, there were a few reasons, but the main
16  reason was to be closer in the east to my father,
17  because I was all the way in Vegas, and his doctors were
18  here.
19          So with his, you know, different things
20  happening to him -- but I also wanted to wait for my
21  son, Nicholas, to graduate from high school before we
22  left, and he went off to college, and my grandson was
23  here.
24          Q.  Going back to Las Vegas, did you have any
25  business interests in Las Vegas?

Page 174

1           A.  I did.  I sold a small bar in 2008.
2           Q.  And was that the extent of your business
3   interest in Las Vegas?
4           A.  I also had a small bar called Beers and
5   Cheers, but I had closed that a few year before then.
6           Q.  Then when you moved here in 2009, did you have
7   any business interests in South Florida?
8           A.  Yes.  When I sold my bar there in 2008, it was
9   with the intention of buying another business here and
10  my husband and I buying a home.  So we bought a book
11  store in Key West and we bought the Cubby Hole, which is
12  a very small men's gay bar in Fort Lauderdale.
13          Q.  So when you moved here in 2009, the business
14  interests that you had were the Cubby Hole in Fort
15  Lauderdale, I believe, is that right?
16          A.  Yes.
17          Q.  And the book store in Key West?
18          A.  Yes.
19          Q.  Okay.  Now, in 2009 when you moved here, what
20  was your dad's health at that point?
21          A.  He was going along pretty good.  I mean, he
22  still went back and forth from here to Vegas at times
23  and to Atlanta.  He spent most of his time in Atlanta.
24  But he still came back and forth.  He came down to
25  doctors.

Page 175

1           Q.  Did there come a time -- a point in time
2   between 2009 or 2012 where his health continued to
3   deteriorate?
4           A.  It started in 2012, May, specifically in May
5   2012.  I went up to my cousin's graduation in Chicago,
6   and I got a call that my father took a turn for the
7   worst, so I came down, and he was -- at that point, he
8   was at St. Joseph Hospital, Atlanta, and he came around
9   and came out of that and, you know, went back to
10  business.
11          But it kind of -- I think having his lung
12  removed in 2010 kind of took the wind out of his sails,
13  but he still conducted business.
14          Q.  Prior to December 1st, 2012, were you
15  ever involved in any way in any of your father's
16  businesses?
17          A.  Never.
18          Q.  Were you in any way, shape or form involved
19  in the King of Diamonds prior to December 1st of 2012?
20          A.  No.
21          Q.  Did there come a time when your father prior
22  to his death stopped conducting business?
23          A.  No.
24          Q.  So are you saying that he conducted business
25  up until the time he passed away?

Page 176

1           A.  Pretty much.  He actually came out to the
2   Thanksgiving table, which I was really surprised, a few
3   weeks before he died.  I was kind of shocked about it.
4           And he closed on the Gold Rush in downtown
5   Miami while he was in his last few months of his life.
6   So he conducted business I would say up until the day he
7   died.
8           Q.  Did you, while your dad's health was
9   deteriorating, assist him in communicating?
10          A.  Well, because he had a hard time hearing on
11  the phone and his voice was very, very raspy from the
12  radiated throat.  And if you were face to face with him,
13  you could understand him, and then you would -- could
14  yell at him so that he could hear you.
15          But on the phone, it was compromised.  So
16  sometimes when I was with him, he would, you know, hand
17  me the phone and say tell me what he's saying or, you
18  know -- so I would word for word tell him what they
19  said, and he would tell me what he wanted me to tell
20  them, and I would repeat that word for word to whoever
21  it was he was talking to.
22          Q.  So what you were doing is you were helping him
23  communicate over the phone?
24          A.  Yes.
25          Q.  Were you involved in those discussions between

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 177

1  your father and whomever else he was speaking to on the
2  other line other than relaying information by way of
3  what was said back and forth?
4      A.  That's it, just what was said word for word.
5      Q.  Did you have any conversations during this
6  time or prior to this time with your father with regard
7  to him and his businesses?
8      A.  No.
9      Q.  Can you describe for His Honor your father's
10  personality?
11      A.  My father had a pretty big personality.  He
12  kind of took command of a room.  Nobody told my dad what
13  to do, whether he was sick or not.  He was always in
14  charge.  He was well-loved, and he's well-missed.  But
15  he was his own man.  He was a self-made man --
16      Q.  So I gather --
17      A.  -- entirely.
18      Q.  I'm sorry.  Go ahead.
19      A.  That's okay.
20      Q.  I gather from what you're saying that you
21  weren't giving your father any advice on the running of
22  any of his businesses?
23      A.  No.
24      Q.  Prior to December 1st of 2012, did you have
25  anything to do specifically with the King of Diamonds?

Page 178

1      A.  No.
2      Q.  When you moved to South Florida in 2009 to
3  Southwest Ranches, you testified that you had two
4  businesses here, which was the Cubby Hole and the book
5  store in Key West, is that right?
6      A.  Correct.
7      Q.  Did there come a point in time prior to your
8  father's passing that you utilized an office space in
9  the building that housed the King of Diamonds?
10      A.  Yes.  When --
11      Q.  Please explain to the arbitrator, His Honor,
12  what that was about.
13      A.  I actually bought the businesses before we
14  moved here in preparation.  The Cubby Hole was a small
15  bar, about 1,500 square feet.  There was really no
16  office space for me and my cousin, my cousin, Kelly
17  Galardi, being my right-hand person, my secretary.
18      You know, she would do bookkeeping and things
19  like that.  There was no office for us.  We really
20  couldn't afford to rent office space.  The King of
21  Diamonds was a huge building, and the King of Diamonds
22  only inhabited maybe half of that building.
23      The rest of it was this huge warehouse.  I
24  really don't remember what business was conducted there
25  before he bought this monster building, but there was

Page 179

1  some ancillary warehouse offices that I asked him if we
2  could utilize for Kelly and I.  And, you know, he said
3  yes, and he was very generous and even put in some air
4  conditioning for us completely separate.
5      If we wanted to go see him in his office, we
6  had to go out of ours down the stairs and around the
7  front, and it wasn't a part of his office at all.
8      Q.  Prior to December 1st of 2012, did you ever go
9  into the King of Diamonds club?
10      A.  No.
11      Q.  Then your father passed, again, on December 1st
12  of 2012.  When he passed, did you have a grieving and
13  mourning process for yourself?
14      A.  Of course.
15      Q.  About how long did that take?
16      A.  I don't think that kind of thing ends very
17  soon, but it was about a month before I tried -- started
18  to try to wrap my mind around his businesses and his
19  properties and the LLCs and corporations, so I visited
20  down here in January sometime of '13.
21      Q.  And based upon your experience in business and
22  your educational background, in your mind, did you have
23  the ability to operate the King of Diamonds after your
24  father passed?
25      A.  Absolutely not.  I only ever had small bars.

Page 180

1      Q.  So as a result of everything that had
2  transpired, what did you endeavor to do in the beginning
3  of 2013 with regard to the King of Diamonds?
4      A.  Get it ready for sale.  I wanted to sell it.
5  I couldn't even see myself tackling that monster.
6      Q.  If you can, could you tell His Honor
7  approximately how big the building was?
8      A.  I'm not really good at square feet, but it's
9  at least 50,000 square feet.  I'm not -- it was a huge
10  warehouse when he bought it.
11      Q.  In your endeavor to sell the King of Diamonds
12  in the beginning of 2013, were there any steps that you
13  undertook to do so?
14      A.  Yes.  My husband and I when we came down here
15  in January, we did a walk-through at the King of
16  Diamonds during the day to -- with all the lights up so
17  that we could see carpet and the booths if they needed
18  reupholstering, if it needed painting, anything we could
19  do to make it presentable for a sale.
20      Q.  And as a result of going into the King of
21  Diamonds and doing the inspection that you did, what did
22  you think needed to be done in order for you to be able
23  to sell the King of Diamonds?
24      A.  The carpet was horrible, the upholstery had
25  high heel holes from when the girls would put their foot

Page 181

up on the couches.  There was holes in all of that.  So
we had to redo all of the booths, all the carpeting had
to be replaced.  It was really gross.  I don't even
think you could tell what colors were there.  And I
don't know what else.  I think there was some stuff that
they did to the stages, but --
    Q.  Now, as a result of doing these repairs or
whatever it is that you would like to characterize them
as, approximately how much money did you spend?
    A.  It was about $300,000.
    Q.  And, again, not to belabor the point, the
purpose of investing that money into that club, King of
Diamonds, was to get it ready for sale, correct?
    A.  Absolutely.  That's all I wanted to do was
get it ready for sale.
    Q.  Did it -- did you ultimately sell the King of
Diamonds?
    A.  I did.
    Q.  And when was that?
    A.  July of 2014.
    Q.  So in the beginning of 2013, knowing that you
wanted to sell the club, what did you do -- did you do
anything as it relates to -- strike that.
        Have you heard the name Akinyele Adams?
    A.  Yes.  I met Akinyele in maybe March or April

Page 182

of 2013.  He wanted to buy -- he came -- he was a friend
of my -- or my son knew of him.  He was a friend of my
son's, and he had been an artist with records, CDs, and
he was a promoter, and I heard he was a very good report
promoter, and he wanted to buy the King of Diamonds.
        But he didn't have all the money to buy King
of Diamonds, and I didn't want -- I wanted to be bought
out of King of Diamonds.  I didn't want anything to do
with it.  So he wanted a chance to, you know, find
investors.
        So I entered into a management agreement with
Akinyele that he could have operations of the club, find
an investor, and I told -- I had Jennifer make a list of
all the expenses such as mortgage, electricity, taxes,
insurance, anything that went along with operating that
building and the club, because everything was in Fly
Low, and that would be the amount he would pay me broke
down into weekly payment.
        And then we didn't -- I didn't do a written
lease or anything like that.  I just -- because he wanted
to find a buyer, which he did.
    Q.  Okay.  So when and -- can you tell me
approximately when in 2013 you entered into this
management agreement with Akinyele Adams?
    A.  It was probably April of 2013.

Page 183

    Q.  And, so would it be a fair statement that he
operated the club from approximately April of 2013 until
the time it was sold in July of 2014?
    A.  Yes.
    Q.  Now, let's back up to approximately April of
2013.  Once Akinyele started managing the club based on
the agreement that you and he had, did -- strike that.
        The amount of money in the agreement between
you and Akinyele was enough to cover the expenses, is
that what I heard you say?
    A.  Yes.
    Q.  Was there anything contemplated where you
would put any of that money into your pocket?
    A.  No.
    Q.  Can you tell His Honor if you have ever
received one penny from the King of Diamonds?
    A.  Not from any of the business at all, only the
sale of the building.
    Q.  Okay.  But I'm talking about from the
operations.
    A.  No.  Not --
    Q.  Ever?
    A.  Never.  Never.
    Q.  But you did receive proceeds when ultimately
the business and the building were sold?

Page 184

    A.  Correct.
    Q.  During the time from the beginning or -- let's
call it the beginning of 2013 through the time it was
sold in July of 2014, did you have any involvement in
the day-to-day operation of the King of Diamonds?
    A.  No, I never had any involvement in the
operations of King of Diamonds.
    Q.  You have -- you saw -- I can't remember which
of the claimants here today said she saw you in the
club by the bar.  Do you remember hearing that
testimony?
    A.  Yes.
    Q.  Is that true?
    A.  No.  I think she was mistaken.
    Q.  Because you were never in there by the bar
with Akinyele, correct?
    A.  No.  If I saw Akinyele, he came into the main
offices, and I don't even know if or where he had an
office inside the club.
    Q.  After your dad passed and you came here to do
the renovations in 2013, were you living here still or
did you go back to Georgia?
    A.  No, I lived in Georgia full-time.
    Q.  Starting when after your dad's passing?
    A.  Well, I actually was living there from May

Page 185

1  2012 because I wanted to be near to him because he was
2  having, you know, problems with just the deterioration
3  of nerves.  And so I just felt like I needed to be with
4  my father.
5      Q.  Okay.  So then at that point in May of 2012,
6  you and your father both were in Georgia?
7      A.  Yes.  And then my husband came up also to help
8  with my father.
9      Q.  And he passed in Georgia?
10     A.  Yes.  He passed in Georgia at home.
11     Q.  Prior to December 1st of 2012, did you receive
12 any proceeds from any of your father's other businesses
13 other than the King of Diamonds?
14     A.  No, absolutely not.
15     Q.  And I think we've already established that
16 you've had absolutely nothing to do with owning or
17 running any of those businesses prior to December 1st of
18 2012, is that correct?
19     A.  No, absolutely not.  I never got into my dad's
20 business.
21     Q.  You saw the various exhibits that were
22 introduced today.  May I approach to --
23         THE ARBITRATOR:  You may.  Which ones would
24     you like to show her?
25         MR. BRODSKY:  That one there.

Page 186

1         THE ARBITRATOR:  I'll give you all the ones I
2     have, and you can pick and choose.
3         MR. BRODSKY:  Thank you.
4         THE ARBITRATOR:  Sure.
5  BY MR. BRODSKY:
6      Q.  I'm going to show you what has been marked as
7  Claimant's Exhibit 24 and ask you to look at it, please.
8      A.  Okay.
9      Q.  Are you familiar with those slips or forms?
10     A.  No.
11     Q.  Did you have anything to do with preparing
12 them or inventing them?
13     A.  No.
14     Q.  I'm going to show you what has been marked as
15 Claimant's Exhibit 12 and ask you to look at it.
16         THE ARBITRATOR:  These are the rules and
17     regulations?
18         MR. BRODSKY:  Yes.
19     A.  Okay.
20     Q.  Did you have anything to do with the
21 preparation or implementation of those rules?
22     A.  No, none.
23     Q.  At any time?
24     A.  At any time.
25     Q.  Same thing with -- I can't see the number.

Page 187

1         THE ARBITRATOR:  It's Number 24.
2  BY MR. BRODSKY:
3      Q.  Same thing with the slips in Number 24,
4  correct?
5      A.  Right.  Correct.
6         MR. BRODSKY:  May I just leave these here for
7     a moment?
8         THE ARBITRATOR:  You may.
9  BY MR. BRODSKY:
10     Q.  You're going to hear today I believe that you
11 were listed with the Florida Department or Division of
12 Corporations as the president, secretary and treasurer
13 of I believe Fly Low, Inc. doing business as King of
14 Diamonds.  You've heard that before, right?
15     A.  Yes.
16     Q.  You've seen those documents, correct?
17     A.  Yes.
18     Q.  And they start at maybe 2008 and go through
19 2000 -- well, for the relevant period anyway in 2014,
20 correct?
21     A.  Right.
22     Q.  Prior to your father's passing on December 1st
23 of 2012, did you have any idea that you were named as
24 president, secretary and treasurer on those documents?
25     A.  Not earlier.  I did find out around 2011 or

Page 188

1  '12, but I wasn't told by my father.  I didn't know a
2  lot of things until after he passed.  But I did know --
3  I didn't know in the beginning.  It was surprising to
4  me.
5      Q.  For what years did you not know?
6      A.  I didn't know 2008, 2009, 2010.
7      Q.  Okay.  And then in 2011 and '12, you may have
8  learned about that?
9      A.  Around then.  Around then.  Somebody else told
10 me that I was the president.  I was like, what?
11     Q.  But you never exercised any --
12     A.  No, of course not.
13     Q.  -- anything to do with the King -- we've already
14 established that.
15     A.  Right.
16         THE ARBITRATOR:  Yeah, you've gone over that
17     already.  You don't need to ask her again.
18 BY MR. BRODSKY:
19     Q.  All right.  Did you ever have any meetings
20 with any of the entertainers?
21     A.  No.
22     Q.  Did you ever have any meetings with the staff
23 members?
24     A.  No.
25         MR. BRODSKY:  If I may have a moment, Your

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 189

1    Honor, I'm almost done.

2    THE ARBITRATOR:  You may.

3    (Off the record.)

4    MR. BRODSKY:  Just a couple more questions,

5   Your Honor.

6  BY MR. BRODSKY:

7    **Q.  Ms. Galardi, I'm now going to show you what**

8  **has been marked as Claimant's Exhibit 6 titled**

9  **arbitration policy to the club, and I'm going to ask you**

10  **some questions about it, but I want you to look at it**

11  **first.**

12    A.  Okay.

13    **Q.  Are you familiar with that document?**

14    A.  Yes, I know about this document.

15    **Q.  What is it that you know about the document?**

16    A.  Well, it's an arbitration agreement that was

17  distributed company-wide to office workers, bartenders,

18  entertainers, everyone that worked.

19    **Q.  And how did that come to be?**

20    A.  Dennis Williams in discussions -- I guess in

21  discussions with lawyers came to me one day and

22  presented the idea of an arbitration policy for the

23  company.  And in weighing the pros and cons of different

24  lawsuits or -- that could come up, we decided to go with

25  the arbitration policy.

Page 190

1    **Q.  And was this after your father's passing?**

2    A.  Yes.  I don't remember exactly when we did it.

3    **Q.  Do you remember the year?**

4    A.  Maybe '14.

5    **Q.  But you don't remember for sure?**

6    A.  It could have been '15.  There's a lot of

7  things that happened.

8    THE ARBITRATOR:  I'm sorry, did you say it

9  could have been '15?

10    THE WITNESS:  It could have been '15.

11    THE ARBITRATOR:  When did you say you sold the

12  business?

13    THE WITNESS:  '14.  July of '14.  We could

14  have done this in '14.

15  BY MR. BRODSKY:

16    **Q.  Right.  I don't think it makes sense that you**

17  **did it in '15 after.**

18    A.  No.  It was '14 now that I think about it.

19  Yeah.

20    **Q.  Okay.**

21    A.  Because they distributed it at King of

22  Diamonds.  So if I had -- if it would have been '15, I

23  would already have sold it.

24    **Q.  Okay.  Did you -- have you ever reviewed that**

25  **agreement carefully?  Strike that.**

Page 191

1    **During the process of coming up with that**

2  **agreement, did you ever read it carefully?**

3    A.  No.

4    **Q.  Who was handling that?**

5    A.  Dennis Williams.

6    **Q.  And who is Dennis Williams?**

7    A.  Dennis Williams is a CFO for Galardi South

8  Enterprises, which took care of all the clubs that my

9  father owned.

10    **Q.  Was it a corporation or was it a way of a**

11  **name?**

12    A.  No, it's just the office name and the way they

13  answer the phone.  It just made it easier than when the

14  girls would answer the phone at the office; instead of

15  saying Pink Pony, Gold Rush, Cheetahs, Masters, they

16  would answer Galardi South.

17    **Q.  So regarding that arbitration policy, it was**

18  **brought to your attention by Dennis Williams after he**

19  **may have consulted with lawyers, right?**

20    A.  Yes.

21    **Q.  And you agreed to implement that arbitration**

22  **policy?**

23    A.  Yes.  I thought it was a good idea.

24    **Q.  And it was -- after your father's passing,**

25  **besides the King of Diamonds, how many other businesses**

Page 192

1  did he leave to you?

2    A.  There's the Pink Pony here, Doral, Pink Pony

3  Atlanta, Cheetahs Las Vegas, Gold Rush Atlanta, Masters

4  South Carolina.

5    **Q.  You're going a little too fast, so slow down a**

6  **little bit.  Pink Pony Doral, Pink Pony Miami --**

7    A.  Well, Pink Pony Doral is Miami.

8    **Q.  Okay.  Pink Pony --**

9    THE ARBITRATOR:  Atlanta, she said.

10    THE WITNESS:  And Atlanta.

11    THE ARBITRATOR:  It was Doral that I didn't

12  hear.  What's that?

13    THE WITNESS:  Doral.  Doral.

14    THE ARBITRATOR:  Oh, Pink Pony Doral. That's

15  Miami.

16  BY MR. BRODSKY:

17    **Q.  All rights. Continue with the list, but do it slow.**

18    A.  Okay.  Gold Rush Atlanta, and there was some

19  other properties in Atlanta, but --

20    **Q.  Okay.  Were there any other clubs?**

21    A.  There was -- Onyx was a club, but we didn't

22  own the property.  And --

23    **Q.  Where was that located?**

24    A.  In Atlanta.  And Masters in South Carolina,

25  Myrtle Beach.  And Cheetahs in Las Vegas.  As far as

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 193

1   clubs, I think that's it.
2      Q.   And was the arbitration agreement that is
3   sitting in front of you -- it's too far for me to see.
4   It's Claimant's exhibit what?
5      A.   6.
6      Q.   Was that arbitration agreement implemented in
7   all of these adult clubs that you've just identified?
8      A.   Yes.
9      Q.   And it was across the board with all the
10  people that -- waiters, waitresses, bar backs?
11     A.   Office workers, everybody.
12     Q.   Including dancers, correct?
13     A.   Yes.
14     Q.   Did there come a time where you heard about
15  two dancers being terminated because they were already
16  dancing at a particular club, and they didn't want to
17  sign the arbitration agreements, and they were
18  terminated?  Do you remember anything of that sort?
19     A.   I really don't remember.
20     Q.   Were you involved in the hiring or firing of
21  any of the adult entertainers?
22     A.   No.
23     Q.   The staff, the waiters, the waitresses, the
24  bar backs, any of those folks?  Cooks?
25     A.   No, not in any of the cities, no.

Page 194

1      Q.   Or in any of the clubs?
2      A.   No.
3      Q.   Before or after --
4      A.   Before or after.
5      Q.   -- your father's passing?
6      A.   Correct.
7      MR. BRODSKY:   I have no further questions.
8      THE ARBITRATOR:   Thank you very much.  Mr.
9   Akemon?
10     MR. AKEMON:   Yes, Your Honor.
11          CROSS-EXAMINATION
12  BY MR. AKEMON:
13     Q.   Good morning, Ms. Galardi.  How are you?
14     A.   Good afternoon.
15     Q.   I'm sorry.  Good afternoon.  I'm sorry.  My
16  name is Attorney Mutepe Akemon.  You may remember me
17  from -- as lead counsel in --
18     A.   Yesterday.
19     Q.   Not just yesterday, but lead counsel in the
20  Jeter v. Galardi case.  Are you familiar with that case?
21     A.   Yeah.  It's fuzzy, but I remember you sitting
22  next to Harlan Miller.
23     Q.   Yeah.  And that Jeter case was a wage and hour
24  case, wasn't it?
25     A.   Yeah, I think so.

Page 195

1      THE ARBITRATOR:   Just get to the -- let's get
2   organized, and then you can --
3   BY MR. AKEMON:
4      Q.   And that case involved exotic dancers employed
5   at the King of Diamonds, correct?
6      A.   I think so, yeah.
7      Q.   You just testified about this arbitration
8   agreement.  This was a company-wide policy?
9      A.   Yes.
10     Q.   And you had the ability to determine that
11  policy, correct?
12     A.   I'm not the one who came up with it, but I
13  helped in the decision-making of implementing it, yes.
14     Q.   Okay.  That wasn't my question.  My question
15  was you had ultimate final decision in implementing that
16  policy company-wide, correct?
17     A.   When you say it like that, I don't think I --
18  I don't think I ever had a final decision or anything.
19  I always consult with or collaborate with --
20     Q.   Okay.  I'll rephrase the question.  Can anyone
21  else in the Galardi organization -- can anyone else
22  implement a company-wide policy like this without your
23  authority?
24     A.   They would probably tell me about it, yeah.
25     Q.   That wasn't my question.  Again, my question

Page 196

1   is could anybody else in the Galardi South Enterprises
2   universe, I mean anyone in the office in Atlanta, did
3   they have the authority to implement a policy like this
4   company-wide?
5      A.   I don't think so.
6      Q.   And this policy came after your father passed
7   away, correct?
8      A.   Yes.
9      Q.   So you changed this policy at all of the clubs
10  under the Galardi South umbrella?
11     A.   I didn't change policy, I just implemented an
12  arbitration agreement.
13     Q.   So prior to this, there was no arbitration
14  agreement at any of the clubs?
15     A.   Correct.
16     Q.   And you also testified about numerous
17  businesses that you've owned and numerous businesses
18  that you inherited.  And some of these other businesses
19  that you mentioned, Masters Club, that's an adult
20  entertainment club?
21     A.   Yes.
22     Q.   And Onyx is an adult entertainment club?
23     A.   Yes.
24     Q.   King of Diamonds was an adult entertainment
25  club?

Page 197

1    A.  Yes.
2    Q.  I'm trying to remember all of them.  Onyx,
3  King of Diamonds, Masters --
4    A.  Cheetahs.
5    Q.  Cheetahs.  And what was the other?
6    A.  Gold Rush.
7    Q.  Gold Rush.  Pink Pony.
8    A.  Pink Pony.
9    THE ARBITRATOR:  You've got all of them now,
10  Mr. Akemon.  You've listed them all.
11    MR. AKEMON:  Yes, Your Honor.
12  BY MR. AKEMON:
13    Q.  And there's also a Pink Pony South?
14    A.  Yeah.  It was closed.  So it never opened
15  again as Pink Pony South.
16    Q.  Did it open again as something else?
17    A.  It opened up as -- I think we opened it as
18  Crazy Horse after -- it was involved in some litigation
19  with the city, and after the settlement, they allowed
20  two licenses in the city, so we lost one and were
21  granted that one.
22    Q.  Okay.  And, currently, Pink Pony South, or what
23  it used to be known as, is currently known as King of
24  Diamonds Atlanta, is that true?
25    A.  Right now, yeah.

Page 198

1    Q.  Okay.  And Akinyele Adams is currently running
2  that club; isn't that also true?
3    A.  He's leased the property from me.
4    Q.  Isn't it also true that Akinyele Adams is
5  involved in King of Diamonds Atlanta?
6    MR. BRODSKY:  Objection, Your Honor.  What's
7  going on in 2000 -- this is 2021, seven years
8  beyond --
9    THE ARBITRATOR:  What's the relevance of this,
10  Mr. Akemon?
11    MR. AKEMON:  I'm going to show the
12  relevance -- sorry.  I'm going to show the
13  company-wide policy of how King of Diamonds in
14  Atlanta is the same as the company-wide policy of
15  King of Diamonds --
16    THE WITNESS:  No.
17    THE ARBITRATOR:  Well, let him finish.  He can
18  ask you questions.  You're not being asked a
19  question yet.
20    THE WITNESS:  Okay.
21    MR. AKEMON:  The policy at King of Diamonds
22  Atlanta is similar to the policy at King of
23  Diamonds Florida.  Even though they were different
24  time periods, they still have the same management,
25  they still have the same policies.

Page 199

1    MR. BRODSKY:  Same objection.  We've done
2  seven --
3    THE ARBITRATOR:  I'll let you go for a little
4  bit to see where this is going.
5    MR. AKEMON:  Thank you, Your Honor.
6  BY MR. AKEMON:
7    Q.  And you let him lease the property, or you let
8  him lease the name?
9    A.  No, it's a lease.  Oh, I licensed the name.  I
10  own the trademark.
11    Q.  And so you allowed him to lease the name and
12  the property?
13    A.  And I licensed the trademark.  It's a lease.
14  It's strictly a lease.  I have nothing to do with that
15  business.
16    THE ARBITRATOR:  Let me just pause for a
17  second to make sure I understand.  This is in
18  Atlanta, Georgia, not in Florida?
19    MR. AKEMON:  Yes.
20    THE ARBITRATOR:  Okay.  But it's the same
21  name?
22    THE WITNESS:  It's the same name.  I own the
23  trademark.
24    THE ARBITRATOR:  But you own the -- okay.  Got
25  it now.  I think it will technically be a service

Page 200

1  mark actually, but that's a legal comment.
2    THE WITNESS:  Yeah.  It's a trademark.  I have
3  a trademark lawyer.  It's a trademark.
4    THE ARBITRATOR:  Right.  I understand.
5  BY MR. AKEMON:
6    Q.  And this lease agreement, is it a written
7  agreement?
8    A.  Yes.
9    Q.  And you didn't enter into a written agreement
10  with Akinyele Adams back in 2013?
11    A.  No, because he was looking for an investor.
12  So I didn't want to hinder any of that for him.
13    Q.  I'm going to show you what has been marked as
14  I believe -- not what I believe, but Claimant's 1, Ms.
15  Galardi.  I apologize, Your Honor.  This podium is a
16  little small.  Let me move around a little bit here.
17    THE ARBITRATOR:  No need to apologize.  But
18  for COVID, I would have you sitting at the table.
19  This is Number 1?
20    MR. AKEMON:  C1, Your Honor.  It's the first
21  document in the binder.
22    THE ARBITRATOR:  This is the business
23  corporation?
24    MR. AKEMON:  Yes, Your Honor.
25    THE ARBITRATOR:  Okay.  What does your

Page 201

1   document -- does that document have a number on it?
2   The one that you're going to show her, does it have
3   a number on it?
4       MR. AKEMON: Yes. It says Claimant's 1.
5       THE ARBITRATOR: So why don't we go ahead and
6   put a Claimant's 1 on there, please.
7       MR. AKEMON: It has one on here, it just says
8   Plaintiff's 1.
9       THE ARBITRATOR: It says Plaintiff's. I'm
10  sorry. I just want to be sure. You're not a
11  plaintiff. We're not in court.
12      MR. AKEMON: Yes, Your Honor.
13      MR. BRODSKY: How many -- just because I
14  haven't seen it, how many different -- is it one
15  document or several?
16      MR. AKEMON: It's several. It goes from 2008
17  to 2016.
18      THE ARBITRATOR: Just describe it for the
19  record, Mr. Akemon.
20      MR. AKEMON: I'm sorry.
21      THE ARBITRATOR: These are the Florida
22  Business Corporation --
23      MR. AKEMON: These are the Florida business
24  corporation annual reports from State of Florida,
25  which are from Fly Low from 2008 to 2018.

Page 202

1       THE ARBITRATOR: For the company called --
2       MR. AKEMON: Fly Low, incorporated.
3       THE WITNESS: Fly Low.
4       THE ARBITRATOR: Fly Low. Okay. So we have
5   that.
6   BY MR. AKEMON:
7       Q. Do you recognize that document, Ms. Galardi?
8       A. It's a corporation annual report for Fly Low.
9       Q. And isn't it true that you're listed as the
10  president, the treasurer and secretary of this Fly Low,
11  Incorporated?
12      MR. BRODSKY: Objection, Your Honor, as to
13  which document? There's several documents in
14  there.
15      THE ARBITRATOR: Well, let's go ahead and take
16  a look then. Is that the case for every one of
17  these?
18      THE WITNESS: They are all -- as far as I can
19  see, they are all annual reports.
20      THE ARBITRATOR: And are you listed as the
21  president, secretary and treasurer on all of them?
22  Was that right, president, secretary and
23  treasurer?
24      MR. AKEMON: Yes, Your Honor.
25      THE ARBITRATOR: Are you listed?

Page 203

1       THE WITNESS: I already told them that my
2   father put me on before I knew it.
3       THE ARBITRATOR: We understand that. The
4   question is whether you're listed on all the
5   documents as the president, secretary and
6   treasure, because Mr. Brodsky made an objection.
7   But if you're listed on all of them --
8       THE WITNESS: This one actually has John
9   Ennis, which is Steve.
10      THE ARBITRATOR: And for what position?
11      THE WITNESS: President, secretary, treasurer
12  and director.
13      THE ARBITRATOR: Okay. So you'll have to be
14  more specific, Mr. Akemon.
15      MR. AKEMON: I will, Your Honor.
16  BY MR. AKEMON:
17      Q. Can we go to the first page of that document,
18  Ms. Galardi?
19      A. This?
20      Q. Yes.
21      A. Yes.
22      Q. Could you go to where it says additions,
23  changes to officers and directors?
24      A. Yes, he changed it to me.
25      Q. I'm sorry, let me ask my question first, Ms.

Page 204

1   Galardi. Can you tell the Court -- I'm sorry, tell the
2   arbitrator what is -- who is listed as president,
3   treasurer and secretary in 2008?
4       A. There's -- it's John Steve Ennis, but then
5   there are additional changes to officers and directors.
6   And then PST, so president, secretary, treasurer, it has
7   an X where it says change, so it's me. And then it
8   makes Steve Ennis vice president, and that's in
9   addition, because he used to be president.
10      Q. And can you go down to 2009 and can you tell
11  the Court --
12      A. It's me and Steve.
13      Q. Let me ask my question first, Ms. Galardi.
14  Can you tell the Court who is listed as president,
15  treasurer and secretary?
16      A. I am.
17      Q. And 2010?
18      A. I am with Steve as vice president.
19      Q. And can you tell us the signature on the
20  bottom of 2010?
21      A. It's just an electronic signature. It's not
22  my signature.
23      Q. And the same with 2011, who is listed as the
24  president, treasurer and secretary?
25      A. I am with Steve.

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 205

1    Q.  And is there a signature there?
2    A.  Yes.
3    Q.  What kind of signature is that?
4    A.  It's an electronic signature, and it's mine.
5    Q.  And what about 2012?
6    A.  2012 is John Ennis, his signature in 2012, and
7    it's an electronic signature.
8    Q.  And who is listed as the president, secretary
9    and treasurer?
10   A.  I am.
11   Q.  And what about 2013?
12   A.  It's me with the electronic signature.
13   Q.  And who is listed as president, treasurer and
14   secretary?
15   A.  I am, and Steve is the vice president.
16   Q.  And your father passed away in December of
17   2012?
18   A.  Yes.
19   Q.  And even after his passing, you didn't use a
20   regular signature, you used an electronic signature?
21   A.  I'm sure they just filed it like they used to.
22   Q.  Okay.  Is there anyone else who would have the
23   ability to sign your name on this document without your
24   authority?
25   A.  Well, they did it for years without my

Page 206

1    authority.
2    Q.  Well, it's your contention that your
3    father's -- let me finish my question.  It's your
4    contention that your father signed your name up prior to
5    his death without your knowledge.  Who would you -- who
6    in the organization would have the authority to sign
7    your name after your father's death?
8    A.  I never said my father signed my name.  I said
9    he put me on the corporation.  My father never signed my
10   name.
11   Q.  I'll rephrase it.  Who would have the
12   authority after your father's death to put your name on
13   those documents?
14   A.  Pat Burnside.
15   Q.  You gave her that authority?
16   A.  Well, she's the one who did the corporations.
17   Q.  I'm saying did you give her that authority,
18   Ms. Galardi?
19   A.  After he died?
20   Q.  Yes.
21   A.  Yeah, I probably did.  If she called me and
22   said do you want to renew the corporation, I would say
23   yes.
24   Q.  And did you also give the authority in 2014?
25   A.  I would think that she would -- yeah, I guess

Page 207

1    I did.
2    Q.  And continuing to 2015, '16, '17 and '18?
3    A.  She did all of our corporations in Florida.
4    Q.  And even in those subsequent years, '16, '17,
5    '18, those are also electronic signatures, Ms. Galardi?
6        MR. BRODSKY:  Objection, Your Honor.  It's the
7    same objection as before.  We're talking about '16,
8    '17 and '18, and this ends --
9        THE ARBITRATOR:  Let's take them one at a
10   time.
11   A.  In '14, it was John Ennis.  It was his
12   electronic signature.
13   Q.  What about '15, Ms. Galardi?
14   A.  Do you want me to go on to '15, '16, '17?
15   Q.  Yes, I do.
16   A.  Then it was signed me, but electronic
17   signature.  This was filed by Ms. Pat Burnside, and then
18   the same thing on '16, filed by Ms. Pat Burnside.
19       THE ARBITRATOR:  Who signed in '16, Ms.
20   Galardi?
21       THE WITNESS:  It was me, electronic.
22       MR. BRODSKY:  My objection is to after '14,
23   the relevance of the --
24       THE ARBITRATOR:  It's a fair objection, Mr.
25   Akemon.  Why are we going through '15, '16, '17?

Page 208

1    The business has been sold.
2        MR. AKEMON:  Only to establish that -- well,
3    two things, Your Honor.  One, that although she
4    claims that her father signed her up for -- put
5    her on these documents, the same signature, the
6    same type of signature was used before and after
7    his death.
8        MR. BRODSKY:  It's just an electronic
9    signature.
10       THE ARBITRATOR:  Okay.  Well, the documents in
11   evidence are going to speak for themselves unless
12   there's something you want to draw on.
13       MR. AKEMON:  No, Your Honor.  I'll move on.
14       THE ARBITRATOR:  Very good.  I would like to
15   see the document, though.  Thank you.
16       THE WITNESS:  Of course.  Can I look at this
17   to renew my --
18       THE ARBITRATOR:  Your parking?
19       THE WITNESS:  Yeah.  I'm on zero now.
20       THE ARBITRATOR:  Yes, sure.  By all means.  I
21   don't want you to get a parking ticket.  They are
22   expensive in Florida.
23       THE WITNESS:  I hope I didn't get a ticket
24   already.
25       THE ARBITRATOR:  I doubt it.

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 209

1       MR. BRODSKY: Judge, and a little bit before
2   4:00 I need to go, because I parked on the street.
3       THE ARBITRATOR:  We'll see how long Mr. Akemon
4   goes.  We may be done by then.  But speak up.
5       THE WITNESS:  I'm safe until 5:30.
6       MR. BRODSKY:  You're good until 5:30?
7       THE WITNESS:  Yes.  I just put two hours on.
8       MR. AKEMON:  Ms. Galardi -- are you ready, Mr.
9   Brodsky?
10      MR. BRODSKY:  Yes.
11  BY MR. AKEMON:
12      Q.   Ms. Galardi, who is Dennis Williams?
13      A.   Dennis Williams is the CFO of Galardi South.
14      Q.   And Bob Hilton?
15      A.   Bob Hilton was an employee of Fly Low, I
16  believe.
17      Q.   And what about John Ennis -- Steve Ennis, I'm
18  sorry.
19      A.   Steve.  Steve was my father's main manager in
20  Florida.
21      Q.   And Jennifer Sonders?
22      A.   She's a secretary.
23      Q.   And Mary Albanez?
24      A.   She was a secretary.  I'm not sure what her
25  duties were.

Page 210

1       Q.   And isn't it true that all the individuals
2   that I just mentioned were all employees of Fly Low,
3   Incorporated doing business as King of Diamonds?
4       A.   I'm not sure what corporation they were under.
5   I can assume it was Fly Low.
6       Q.   Okay.  And isn't it true that those
7   individuals reported directly to you?
8       A.   After my father died, they would have.
9       Q.   And isn't it true that you supervised and gave
10  directions to them after your father died?
11      A.   In the office, yes.
12      Q.   And isn't it also true that you maintained the
13  office now at Fly Low -- I'm sorry, in the building or
14  building adjacent to King of Diamonds?
15      MR. BRODSKY:  Objection, time frame.
16  BY MR. AKEMON:
17      Q.   During the relevant time frame in this case,
18  2009 to 2014.
19      A.   Before my father died, I had an office in the
20  warehouse with my cousin to conduct business for the
21  Cubby Hole and Truman Book Store.
22      Q.   So you did have an office?
23      A.   In the warehouse, not in my father's office
24  and not in the club.
25      Q.   And from time to time --

Page 211

1       A.   It was space that I could utilize.
2       Q.   And from time to time, you would speak to Mr.
3   Williams about wage and hour compliance like FLSA?
4       A.   In what time are you talking about?
5       Q.   I'm sorry, my questions now would be from 2009
6   to 2014.
7       A.   No, I never spoke with Dennis Williams in 2009,
8   2010, 2011 or 2012.  It would have only been 2013 and
9   on.
10      Q.   And what -- isn't it true that Mr. Williams
11  was responsible for insuring wage and hour compliance
12  for the Galardi clubs?
13      A.   He dealt with a lot of -- a lot of the
14  employees I guess, but --
15      Q.   Okay.  I need you -- I'm going to ask you the
16  question again.  Isn't it true that Mr. Williams was
17  responsible for insuring wage and hour compliance for
18  the Galardi clubs?
19      A.   And what time are you talking about?
20      Q.   2009 to 2014?
21      A.   I cannot speak for 2009, 2010, 2011 or 2012.
22  In 2013, he may have been one of the people that
23  would --
24      MR. TOBIN:  You can finish.  Finish your
25  answer.

Page 212

1       THE WITNESS:  -- that would come up with
2   policy for the clubs in Atlanta.
3   BY MR. AKEMON:
4       Q.   Okay.  I'm going to show you -- let's go to
5   the trial notebook, Your Honor, which is the red
6   notebook you have there, the Espinoza trial transcript,
7   day one, Page 47.  Could you please read Line 11 please,
8   Ms. Galardi?
9       MR. BRODSKY:  Your Honor, before that, I have
10  an objection, because there's a specific time frame
11  that's at issue here, and none of that is contained
12  on this transcript.  So we have no idea what time
13  frame this question surrounds.
14      MR. AKEMON:  Your Honor --
15      THE ARBITRATOR:  The question at seven reads
16  Ms. Galardi, Mr. Williams has been the chief
17  financial officer at Galardi since 2012 at least,
18  has he not?
19      Answer, yes.
20      And what you were just asked to read, and
21  since this is in evidence, I can read it as well,
22  he's responsible for insuring FLSA compliance
23  through your strip clubs, is that right?
24      Answer, yes.
25      E-mails, the communications with the lawyers

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 213

1  regarding FLSA compliance, is that right?
2      Answer, yes.
3      Question, that would Mr. Fuchs here, correct?
4      Answer, yes.
5      So that's what you were bringing out.  Now,
6  does that -- do you want to follow up on that now?
7      MR. AKEMON:  Yes, Your Honor.
8      THE ARBITRATOR:  That's the testimony that you
9  gave in court, Ms. Galardi, and Mr. Akemon is going
10  to follow up with you.
11  BY MR. AKEMON:
12      Q.  Isn't it also true that Mr. Williams was
13  instructed by you to negotiate settlements for various
14  FLSA cases, including --
15      A.  From 2013 on.
16      Q.  Let me finish my question, Ms. Galardi.
17  -- including cases involving Fly Low, Incorporated
18  doing business as King of Diamonds?
19      A.  I would only have given him that authority
20  from 2013 on because I had no authority to give him
21  before that.
22      Q.  My question is did you give him authority to
23  negotiate settlements on behalf of Fly Low?
24      MR. BRODSKY:  She's answered the question
25  twice, Your Honor.

Page 214

1      THE WITNESS:  In 2013.
2      MR. TOBIN:  It's argumentative.
3  BY MR. AKEMON:
4      Q.  Let's talk about those various companies.
5  Those companies, Masters, Inc., Onyx, Pink Pony,
6  Pink Pony South from 2009 to 2014, specifically after
7  your father died in 2012 and 2014, isn't it true that
8  they all had the same business model?  And what I
9  mean by business model, isn't it true that they all
10  labeled exotic dancers at those clubs as
11  a --
12      A.  They were all adult clubs.
13      Q.  Let me finish my question, Ms. Galardi.  That
14  they labeled the dancers there as independent
15  contractors?
16      A.  I think so.
17      Q.  And isn't it also true that in order to work
18  at those clubs during 2012 and 2014 that those dancers
19  were required to pay house fees for the --
20      A.  Yes.
21      Q.  Okay.  And Fly Low, Incorporated owned and
22  operated KOD?
23      A.  Yes.
24      Q.  And which clubs are you currently -- I'm
25  sorry, 2012 and 2014, you owned each and every last one

Page 215

1  of those clubs 100 percent?
2      A.  Yes, from December -- well, from day of death.
3  The distributions, they weren't finished with that until
4  well into 2015 and '16, but --
5      Q.  But you did own them 100 percent?
6      A.  Yes.
7      Q.  Each of these clubs featured nude or semi-nude
8  dancers?
9      A.  Yes.
10      Q.  And each of these clubs sold beer, wine,
11  liquor and food?
12      A.  Yes.
13      Q.  And each of these dancers were required to
14  sign independent contractor agreements?
15      A.  I think they did.
16      Q.  And it was the same at every club, correct?
17      A.  It would have been.
18      Q.  All right.  During this time period,
19  specifically 2012 to 2014, none of the general managers
20  and none of the management at any of those other clubs,
21  including King of Diamonds, their general managers, they
22  weren't free to disregard that business model, were
23  they?
24      A.  I think every club operated a little bit
25  differently.

Page 216

1      Q.  But I'm talking specifically about the
2  business model.  Was anyone outside of yourself given --
3  did anyone else besides yourself, including Mr. Williams
4  or anyone of that nature --
5      MR. BRODSKY:  Judge -- I'm sorry.  Go ahead.
6  Finish.
7  BY MR. AKEMON:
8      Q.  -- were they free to disregard the business
9  model of labeling dancers independent contractors and/or
10  require house fees for dancers to work?
11      MR. BRODSKY:  Judge, my objection is this.
12  I'm just trying to -- because I think we all can
13  agree that the time frames in this case are very
14  important.
15      THE ARBITRATOR:  It doesn't matter.  He said
16  2012 to 2014.  Is that what I heard?
17      MR. AKEMON:  That's what I said, Your Honor.
18      THE ARBITRATOR:  Okay.  So she's able -- she's
19  been quite capable of answering questions and
20  narrowing where appropriate.
21      So the question is in 2012, '13 and '14, did
22  any of the general managers have the authority to
23  disregard the business model of either the exotic
24  dancers signing independent contractor agreements or
25  paying house fees?  That's the question that I heard.

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 217

1    MR. AKEMON: Yes, Your Honor.
2    THE ARBITRATOR: Okay. So that's the question
3 that's pending.
4    A. From December 1st, 2012 and '13 and '14, the
5 business model being that the dancers were hired under
6 independent contracts? Is that what you're asking me?
7    Q. No. I'm asking were any -- outside of
8 yourself, was anybody -- were any of the general
9 managers given the authority to change the business
10 models at any of those clubs, including King of
11 Diamonds, labeling dancers independent contractors
12 and/or requiring them to pay house fees? Did they have
13 the authority to change that business model?
14    A. No, they would have asked me. They would have
15 gone over it with me.
16    Q. And because you labeled the dancers -- I'm
17 sorry, strike that.
18    Because the dancers were labeled as
19 independent contractors, KOD didn't pay any benefits
20 like health insurance?
21    A. Not on the independent contractors, no.
22    Q. And you didn't pay federal taxes either?
23    A. Not on the -- I paid federal taxes --
24    Q. With respect to the dancers?
25    A. Not on the independent contractors.

Page 218

1    Q. Or Social Security?
2    A. No.
3    Q. What about workman's comp?
4    A. No.
5    Q. Unemployment insurance?
6    A. No.
7    Q. And, again, all these questions are
8 regarding -- or related to dancers.
9    A. From December 1st, 2012, 2013.
10    Q. And even after your father died, did you
11 change the business model?
12    A. Yes, after --
13    Q. What part of the business model did you
14 change?
15    A. You know, it's kind of a touchy thing, because
16 you change the business model, and we tried to implement
17 W-2s and nobody would work there. They would leave. So,
18 you know, we would have to come up with a system where
19 they were employees and made sure they got minimum wage.
20    Q. So you tried to change the business model at
21 King of Diamonds?
22    A. Well, King of Diamonds was already gone.
23    Q. In 2012 to 2014, did you change the business
24 model at King of Diamonds?
25    A. Akinyele Adams -- I was under a business

Page 219

1 management agreement with him. I would not have
2 interfered in his business.
3    Q. Again, Ms. Galardi, this is my question.
4    A. No, I did not.
5    Q. My question is did you change the business
6 model after your father died in King of Diamonds?
7    A. No.
8    Q. Okay. Thank you. There was a lawsuit filed
9 against a Galardi controlled club in Atlanta styled Clincy
10 versus Galardi South Enterprises. Are you familiar with
11 that case?
12    A. Only through these hearings and depositions.
13 It was my father's at the time.
14    Q. And this occurred sometime back in 2011,
15 correct?
16    A. I really don't know when it occurred.
17    Q. And isn't it true that in that case, the judge
18 held that Galardi South Enterprises had misclassified
19 dancers as independent contractors instead of employees?
20    THE ARBITRATOR: Hold on one second. What's
21 your objection?
22    MR. BRODSKY: Objection, relevance.
23    THE ARBITRATOR: No, I'll allow the question.
24    A. I really don't know the specifics of that
25 case. I was not involved at all.

Page 220

1    Q. Okay. That wasn't my question. Isn't it true
2 that the judge in that case held that Galardi control --
3 that that particular club that was a Galardi controlled
4 club misclassified dancers as independent contractors
5 instead of employees?
6    A. I don't know.
7    Q. Isn't it also true that decision came out
8 sometime around 2011?
9    A. I don't know what time it came out.
10    Q. And prior -- I'm sorry. Sometime in 2013,
11 April 2013, isn't it true that another FLSA lawsuit was
12 filed against the King of Diamonds staff, Ochoa v. Fly
13 Low, Incorporated?
14    A. I don't know. It sounds familiar.
15    Q. And isn't it true that that lawsuit was
16 settled?
17    A. It could have been.
18    Q. And isn't it true --
19    A. Dennis probably negotiated a settlement. I'm
20 not sure.
21    Q. And isn't it also true that you signed the
22 settlement agreement?
23    A. If there was a settlement, I would have signed
24 it.
25    Q. And isn't it also true that that lawsuit,

Choice - United

Page 221

1  Ochoa v. Fly Low, was a wage and hour suit with one of
2  the employees there?
3      A. Probably.
4      Q. And they alleged that King of Diamonds did not
5  pay them minimum wage?
6      A. Probably.
7      Q. And there was another lawsuit styled Henderson
8  v. Fly Low, and that was another wage and hour lawsuit.
9  Are you familiar with that one?
10     A. It's familiar.
11     Q. And in that case, they also allege they
12 weren't paid minimum wage?
13     A. Probably.
14     Q. And you settled that case as well?
15     A. If I signed a settlement agreement.
16     Q. And you also testified earlier about the
17 remodel. You selected the vendors to complete that
18 remodel?
19     A. No, I didn't select the vendors.
20     Q. How are the vendors selected?
21     A. Steve knew a carpet guy, so --
22     Q. And you paid the invoices?
23     A. Yeah, the club would -- Fly Low would pay the
24 invoices, not me.
25     Q. You didn't personally pay for the remodel?

Page 222

1      A. Yeah, I did.
2      Q. Okay. So you paid -- you personally paid for
3  the remodel?
4      A. Yeah, I probably would have put the money into
5  Fly Low.
6      Q. So you took some of your personal funds and
7  put them into Fly Low?
8      A. It was my father's funds. I don't have
9  personal funds.
10     Q. And so after your father died -- strike that.
11        Your earlier testimony is that Akinyele
12 Adams came on sometime around March or April of 2013,
13 correct?
14     A. Right.
15     Q. And he -- you interviewed Mr. Adams for this
16 position; is that also true?
17     A. No, I did not. I did not interview Mr. Adams.
18     Q. How did he come about this position?
19     A. He wanted to buy the club, and he didn't have
20 all the money to buy me out of the club. He was a
21 promoter. So I went into a management agreement with
22 him.
23     Q. And even after you went into this management
24 agreement, you testified that it wasn't on -- it wasn't
25 a signed contract, correct?

Page 223

1      A. That's right. It was a handshake deal.
2      Q. Okay. And even after that signed contract,
3  Bob -- I'm sorry, Robert Hilton was still an employee of
4  Fly Low, correct?
5      MR. BRODSKY: Objection, the testimony was an
6  unsigned contract. He just said signed.
7  BY MR. AKEMON:
8      Q. I'm sorry. I'll strike that. Even after the
9  alleged agreement between yourself and Mr. Adams, Bob
10 Hilton was still an employee of Fly Low, Incorporated?
11     A. Even after I went into a management agreement
12 with Akinyele Adams, Bob Hilton I believe was still an
13 employee of Fly Low.
14     THE ARBITRATOR: Pause for just one second.
15 We just have to make sure you finish your question
16 before you respond and you finish your answer
17 before you say anything.
18     So just pause, if you would, because you're --
19 every now and then, you're talking over each other.
20 I'm trying not to interrupt, but let's just try to
21 be more disciplined.
22     Let him finish the question, and you answer,
23 let her finish the answer. You're revved up, and
24 she's revved up. Just calm down. Calm down.
25 BY MR. AKEMON:

Page 224

1      Q. And Steve Ennis, he was still an employee of
2  Fly Low after Akinyele Adams came on as general manager?
3      A. Yes.
4      Q. And Jennifer Sonders was still an employee of
5  Fly Low after he came on as general manager?
6      A. Yes.
7      Q. What about Mary Albanez? Was she still an
8  employee of Fly Low?
9      A. For a time.
10     Q. And they still worked in or around the
11 premises at King of Diamonds, is that correct?
12     A. They worked in the office specifically.
13     Q. And they reported directly to you, is that
14 also true, after Akinyele came on as general manager?
15     A. Yes, because they weren't employed by
16 Akinyele.
17     Q. And isn't it also true that Akinyele would
18 give the daily sales reports to Bob Hilton, who would
19 then relay that information to you?
20     A. No. After Akinyele took over, I never looked
21 at sales reports.
22     Q. So then sometime later, Liz Cedeno was still
23 employed at King of Diamonds, isn't that also true,
24 after Akinyele came on in 2013?
25     A. I believe so.

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 225

1    Q.  And isn't it true that even though Akinyele
2  Adams was the general manager and you entered into this
3  agreement with him, that you ordered her firing as the
4  manager of the King of Diamonds?
5    A.  They say I did.  I really don't remember doing
6  that, but I guess I did.
7    Q.  If I show you your --
8    A.  I understand.
9    Q.  So you acknowledge that you did order her
10 firing?
11   A.  I do acknowledge that; I just don't recall it.
12   Q.  Isn't it also true that you ordered the firing
13 of other managers during that time frame after Akinyele
14 Adams was the general manager?
15   A.  No.
16   Q.  If I showed you a document, would it help
17 refresh your memory?
18       THE ARBITRATOR:  Well, she's answered the
19 question no, Mr. Akemon, so are you going to show
20 her the document?
21       MR. AKEMON:  Yes, Your Honor.
22 BY MR. AKEMON:
23   Q.  I'm going to show you what has been marked as
24 Claimant's 18.
25       THE ARBITRATOR:  Another one I do not have,

Page 226

1  Mr. Akemon.  I don't have anything after --
2       MR. AKEMON:  You can have mine, Your Honor.
3       THE ARBITRATOR:  Mr. Brodsky, it's getting
4  close to 4:00.  Are you nervous?
5       MR. BRODSKY:  I wouldn't say nervous, but --
6       THE ARBITRATOR:  I don't want you to get a
7  ticket either.
8       MR. AKEMON:  I would like to go pay my
9  parking.
10      MR. AKEMON:  It's the request for admissions.
11      THE ARBITRATOR:  No problem.  Have the court
12 reporter mark this so I know what it is since I
13 have nothing here.
14      MR. AKEMON:  This is 18, Claimant's 18.
15      THE ARBITRATOR:  We'll finish this document,
16 and then we'll let Mr. Brodsky go feed the meter
17 and then you can continue after that, Mr. Akemon.
18      THE WITNESS:  Can I use the rest room while --
19      THE ARBITRATOR:  Absolutely.  Do you want a
20 break now?
21      THE WITNESS:  Sure.
22      (Off the record.)
23      THE ARBITRATOR:  Back on the record.
24      MR. AKEMON:  I believe we left off with the
25 introduction of Claimant's 18.

Page 227

1       THE ARBITRATOR:  Request for admissions.
2       MR. AKEMON:  Yes, Your Honor.
3  BY MR. AKEMON:
4    Q.  Ms. Galardi, isn't it true that you made the
5  decision to wholesale change KOD club management after
6  Mr. Adams was hired as GM?
7    A.  No.
8    Q.  I'll refer you --
9    A.  I don't know what wholesale change means.  I
10 think I told you that yesterday or the day before.
11   Q.  Well, I want to show you what has been marked
12 as C18.  Mr. Brodsky, it's the request for admissions.
13      MR. BRODSKY:  Understood, thank you.
14 BY MR. AKEMON:
15   Q.  And for the record, could you please read
16 number 13?
17   A.  You made the decision to wholesale change KOD
18 club management, and my response was admitted.
19   Q.  And isn't it also true that you ordered the
20 firing of Liz Cedeno after Akinyele Adams was installed
21 as the general manager?
22      MR. BRODSKY:  Your Honor, I have one
23 objection, and that is in the request for
24 production, I --
25      THE ARBITRATOR:  Request for admissions.

Page 228

1       MR. BRODSKY:  Yes, sir.  It refers to a
2  Galardi deposition Page 39, which is not part of
3  this.
4       THE ARBITRATOR:  I don't have it in front of
5  me, so let me see what you're talking about.
6       MR. AKEMON:  He's talking about this, Your
7  Honor.
8       THE ARBITRATOR:  What's the issue there?  Can
9  we clear this up?
10      MR. AKEMON:  After -- it says you made the
11 decision to wholesale change KOD club management,
12 but in parentheses, it says Galardi deposition.
13      THE ARBITRATOR:  Okay.  It's just a reference,
14 but the point is that the request itself is
15 admitted?
16      MR. BRODSKY:  I agree with that, but what I'm
17 saying is there's no context in the sense of the
18 way it's presented.
19      THE ARBITRATOR:  Okay.  I can ignore the
20 parenthetical.  It doesn't seem like it's
21 particularly relevant.
22      MR. AKEMON:  Say that again, Your Honor.  I'm
23 sorry.
24      THE ARBITRATOR:  I said I can ignore the
25 parenthetical.  I'm assuming that's a question and

Page 229

1    an answer in a deposition, but if it's not
2    otherwise in the record, I'll ignore the
3    parenthetical.
4    BY MR. AKEMON:
5        Q.  And you also ordered the firing of manager Liz
6    Cedeno?
7        A.  They say I did.  I don't remember, so I
8    admitted it.  Yes.
9        Q.  Okay.  And you also may have caused the firing
10   of other KOD employees at the same time you ordered the
11   firing of Ms. Cedeno?
12       A.  No.  I say admitted here, but I really don't
13   remember firing anyone else.
14       Q.  For the purposes of the record, can you read
15   number two please?
16       A.  The record says I admitted it.
17       Q.  And you also selected Akinyele Adams to
18   replace Ms. Cedeno and manage KOB on behalf of Fly Low.
19   Isn't that also true?
20       A.  It says admitted, but I didn't do it to
21   replace her.  But I do have the responses.
22       Q.  And these are your responses to the requests
23   for admissions?
24       A.  Yes.  Yes.
25       Q.  I have no further questions from this exhibit,

Page 230

1    Ms. Galardi.
2        A.  You're not going to ask me that one?
3        Q.  No, I'm not.  Thank you.
4        THE ARBITRATOR:  That's all of it?
5        MR. AKEMON:  Yes, Your Honor.
6        THE ARBITRATOR:  What requests were these,
7    which numbers?
8        MR. AKEMON:  This was C --
9        THE ARBITRATOR:  No, what were the requests?
10   I don't know if you actually referred to the
11   request number.
12       MR. AKEMON:  Numbers 13 --
13       THE ARBITRATOR:  So it's 13, 14 --
14       MR. AKEMON:  -- 14, 15 and 16.
15       THE ARBITRATOR:  Got it.
16   BY MR. AKEMON:
17       Q.  And even after this, after your -- after you
18   installed -- I'm sorry, strike that.
19           Even after you hired Akinyele Adams as the
20   general manager of the King of Diamonds, isn't it also
21   true that you implemented this arbitration policy while
22   he's the general manager?
23       A.  I didn't hire him.  He wasn't my employee.
24   But the arbitration agreement probably came after him,
25   yeah.

Page 231

1        Q.  Okay.  And when the arbitration came in, it
2    was your testimony earlier that you had nothing to do
3    with King of Diamonds, correct?
4        A.  Correct.
5        Q.  How is it that you were able to install a
6    company-wide policy related to King of Diamonds if you
7    had nothing to do with King of Diamonds?
8        A.  Because it was still operating under Fly Low,
9    which I still owned.  Actually, I still own Fly Low,
10   which owns the trademark.  So because of that, it just
11   went company-wide.  I had a management agreement with
12   him, but it was still in my name, so --
13       Q.  And so you believed you had the authority to
14   implement this policy at the King of Diamonds?
15       A.  I believed I had the authority to do it
16   company-wide, and that was part of -- still part of the
17   company because it was in my name.  But I did have a
18   management agreement with him.
19       Q.  So the answer is you believe you had the
20   authority to implement this policy at King of Diamonds?
21       A.  Yes.
22       Q.  Even after Akinyele Adams was hired?
23       A.  Yes.  I didn't hire him.
24       Q.  Even after Akinyele Adams became general
25   manager?

Page 232

1        A.  Well, I really wouldn't consider him general
2    manager either.  He didn't have a position.  He wasn't
3    an employee of Fly Low.
4        THE ARBITRATOR:  I understand the distinction
5    here between your position and what you're asking,
6    so when you use the word hire, let's just accept it
7    as being under this management agreement that
8    you've referred to so we don't get into this back
9    and forth on the word hire.
10          I appreciate the distinction that you're
11   making, Ms. Galardi.  Don't worry that I will
12   interpret hire to mean that you're changing your
13   testimony.
14       THE WITNESS:  Thank you.
15   BY MR. AKEMON:
16       Q.  And even after this policy was -- strike that.
17   I mentioned a number of lawsuits that were
18   filed against King of Diamonds, specifically Anderson v.
19   King of Diamonds -- well, I'm sorry, Fly Low,
20   Incorporated, Ochoa v. Fly Low, Incorporated.  Those
21   were wage and hour lawsuits.  Do you remember those
22   questions I asked you earlier?
23       A.  Anderson?
24       Q.  I believe so, Anderson.  I know Ochoa v. Fly
25   Low, Incorporated.  Do you remember that question?

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 233

1    A.  Yes.
2    Q.  And do you remember that case?
3    A.  I don't remember the details of the case, no.
4    Q.  But it was a wage and hour case?
5    MR. BRODSKY:  Objection, asked and answered.
6    THE ARBITRATOR:  We've covered that already,
7    Mr. Akemon.
8    MR. AKEMON:  I'm setting a foundation for the
9    next question, Your Honor.  I apologize.
10   THE ARBITRATOR:  Okay.  What's the next
11   question?
12   BY MR. AKEMON:
13   Q.  And they allege that even after these wage and
14   hour lawsuits --
15   THE ARBITRATOR:  Who is the they?
16   BY MR. AKEMON:
17   Q.  I'm sorry.  Even after the wage and hour
18   lawsuits, Fly Low did not change the policy of not
19   paying dancers minimum wages.  Isn't that also true?
20   A.  Technically, yes.  I wouldn't have changed
21   policy at King of Diamonds because I felt that I had a
22   management agreement with Akinyele, so I would not have
23   gotten into his business.
24   Q.  And even after Akinyele came on board between
25   December and let's say March or April of 2013, isn't it

Page 234

1    also true that you didn't attempt to change the policy
2    at King of Diamonds?
3    A.  I didn't have my mind on any policy or
4    arbitration agreements.  I was dealing with my father's
5    death and his estate, so I really wasn't thinking about
6    that.  So no.
7    Q.  And you had signatory authority on the bank
8    accounts listed with Fly Low, Incorporated, isn't that
9    true?
10   A.  I probably had a -- I'm not sure if I had a
11   signature card or not.  I think Steve did all the
12   signing of the checks --
13   Q.  But you had the -- I'm sorry.  Go ahead.
14   A.  -- at the office.  Steve signed all the
15   checks.
16   Q.  But did you have the authority and ability to
17   sign the checks as the president, secretary and
18   treasurer of Fly Low, Incorporated?
19   A.  Probably.
20   Q.  And these house fees, let's talk about those
21   for a minute.  Did you include the house fees or did Fly
22   Low, Incorporated include the house fees in its
23   corporate taxes?
24   A.  I don't know if -- when I took over, if any
25   house fees were ever received by Fly Low.  I can't

Page 235

1    answer that.  I don't think we received house fees.
2    Q.  My question was were they reported on Fly
3    Low's taxes?
4    A.  If I didn't receive them, if Fly Low didn't
5    receive them, I would have to look at my taxes.  I don't
6    think that house fees ever came into Fly Low.
7    Q.  Did you keep track or did Fly Low keep track
8    of the amount of house fees that came in?
9    A.  No.  It wasn't my business.
10   Q.  Did Fly Low keep track of the amount of tips
11   that the dancers made?
12   A.  No, not my business.
13   Q.  Did Fly Low ever inform the dancers that they
14   were entitled to a tip credit?
15   A.  If they were wage and hourly, if -- they would
16   have to be a W-2 for a tip credit.
17   Q.  Did Fly Low inform the dancers that they were
18   entitled to a tip credit?
19   A.  Not to my knowledge.
20   Q.  And did Fly Low keep track of the amount of
21   lap dances or lap dance fees that were paid to the
22   dancers?
23   MR. BRODSKY:  Again, Your Honor, I would just
24   want to make sure that we're dealing with a time
25   frame.

Page 236

1    MR. AKEMON:  2012 to 2014.  I'm sorry.
2    MR. BRODSKY:  When we say 2012, are we talking
3    about December 1st, 2012 on?
4    MR. AKEMON:  December 1st, 2012 to 2014.
5    THE ARBITRATOR:  Very good.
6    A.  No.
7    Q.  And did Fly Low incorporate those lap
8    dance fees into their taxes?
9    A.  I just said we didn't keep track of those
10   things, so no.  Not my business.
11   Q.  And you earlier testified that you had nothing
12   to do with the hiring or firing of dancers at King of
13   Diamonds?
14   A.  Correct.
15   Q.  Isn't it true that the arbitration policy was
16   a requirement for all of the dancers currently working
17   at King of Diamonds?
18   A.  It was a requirement for everyone that worked
19   for any of the companies.
20   Q.  I'm not asking about any of the other
21   companies.  Was it a requirement at King of Diamonds?
22   A.  Yes, that would have been a requirement for
23   them as well.
24   Q.  Okay.  And if anyone, specifically the dancers
25   during the time this arbitration policy was implemented,

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 237

1  isn't it true that if they did not sign it, they were
2  not allowed to work at King of Diamonds?
3      A.  Not to my knowledge.
4      Q.  Isn't it true that a couple of the -- a few
5  young ladies refused to sign the arbitration policy and
6  they were terminated?
7      A.  Well, I've heard that now through all that,
8  but I don't know why they were terminated.
9      Q.  And isn't it also true that after they were
10 terminated, you instructed your attorney at the time,
11 Dane Fuchs, to ensure that they were rehired at King of
12 Diamonds?
13     A.  Yeah.  I don't remember that.
14     Q.  I'm going to show you what has been marked as
15 C10 and 11.
16     THE ARBITRATOR:  Okay.  Let me take these out.
17     MR. AKEMON:  I'll have these marked for Your
18 Honor.
19     THE ARBITRATOR:  Okay.  I'm going to give
20 these to you so you can have them back, and I have
21 the one marked Exhibit 48.
22     MR. AKEMON:  So this is 10, and this is 11.
23     THE ARBITRATOR:  I'll trade with you.
24     MR. AKEMON:  Yes, Your Honor.
25     THE ARBITRATOR:  And this is going to be

Page 238

1  Claimant's 11?  Or, I'm sorry, this is Claimant's --
2      MR. AKEMON:  The one that says VP is going to
3  be 11.
4      THE ARBITRATOR:  That's claimant's.  Yeah.
5  You can use these, but that way, I can look at them
6  while you're asking questions.
7  BY MR. AKEMON:
8      Q.  Isn't it true that around the time that the
9  arbitration agreements were circulated, your attorney
10 responded to a letter from attorney Harlan Miller
11 reinstating those young ladies who were terminated for
12 refusing to sign the arbitration agreement?
13     MR. BRODSKY:  Your Honor, I have an objection
14 to these.  These are hearsay, number one.  Number
15 two, Mr. Miller is no longer with us.  Number
16 three, I don't want to get into the attorney/client
17 privilege between -- I mean, I and her lawyer, but
18 possibly between my client and her lawyer, Mr.
19 Fuchs.
20     THE ARBITRATOR:  Your hearsay objection is
21 overruled.  I'm not sure what you mean about Mr.
22 Fuchs no longer -- Mr. Miller not being with us.
23 What does that --
24     MR. BRODSKY:  He's deceased.
25     THE ARBITRATOR:  Mr. Miller is deceased?

Page 239

1      MR. BRODSKY:  Yes.
2      MR. AKEMON:  He passed away about a month ago,
3  Your Honor.
4      THE ARBITRATOR:  Poor guy.  He wasn't that
5  old, was he?
6      MR. AKEMON:  No.
7      MR. TOBIN:  He had a bran aneurysm.
8      THE ARBITRATOR:  Sad.  So sad.  Sorry.
9      MR. BRODSKY:  And you're talking about
10 dialogue between two lawyers that -- and not --
11     THE ARBITRATOR:  The objection is overruled.
12 I've allowed these exhibits in.  You may ask the
13 questions.
14     MR. AKEMON:  Madam Reporter, can you please
15 read the question back?
16     THE ARBITRATOR:  Ms. Galardi said she didn't
17 remember this event.  You've now shown her these
18 documents.  Does this refresh your recollection at
19 all, Ms. Galardi?
20     THE WITNESS:  No.  I don't -- I wasn't in
21 this.  This looks like it was between Dean and
22 Harlan.  I really don't -- I don't remember this.
23 BY MR. AKEMON:
24     Q.  So you don't recall instructing those dancers
25 to be reinstated after they were terminated?

Page 240

1      A.  It doesn't say that I instructed that; it's
2  just Dean saying that.
3      Q.  My question is do you recall asking those --
4  that those young ladies be reinstated?
5      A.  No, but that would have been nice if I did.
6      Q.  And then there was another lawsuit filed in
7  2014 styled Espinoza v. Galardi.  Isn't it also true
8  that the reason for the arbitration policy was a result
9  of all of the lawsuits that occurred against yourself
10 and the Galardi controlled clubs?
11     A.  You asked me about Espinoza and all of the
12 lawsuits.  It was not a result of Espinoza.  But with --
13 in regards to other lawsuits, I felt like the
14 arbitration, like as we're doing here, I could answer
15 individually to complaints, and, really, I hoped that
16 people would come to me instead of running to a lawyer,
17 but nobody did.
18     Q.  Okay.  And isn't it also true that Espinoza
19 was filed sometime in 2014, it was certified as a Rule
20 23 class action?
21     A.  Yeah.  I'm not sure when it was filed.
22     Q.  Okay.  Isn't it true that it was a --
23     A.  I know it was 2014, but I don't know what
24 month or anything.
25     Q.  Isn't it true it was a Rule 23 class action?

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 241

1    A. I guess it was.
2       MR. AKEMON: I'll move to admit it, Your
3    Honor, even though she's already answered.
4       THE WITNESS: I don't know what Rule 23 means.
5       MR. AKEMON: I move to admit it because
6    she --
7       THE ARBITRATOR: Admit what?
8       MR. AKEMON: The next exhibit, Your Honor.
9       THE ARBITRATOR: I admitted all your exhibits.
10   You don't have to move to admit anything. They are
11   all admitted.
12      MR. AKEMON: Okay. All right.
13      THE ARBITRATOR: What weight I give them is
14   something that you can argue, but I will receive
15   the exhibits.
16   BY MR. AKEMON:
17      Q. And isn't it also true that you described your
18   involvement in King of Diamonds as quote, unquote
19   steering the wheel? That you were steering the wheel?
20      A. I think that was when I was going through my
21   father's estates and dealt with everything. I don't
22   think I was steering the wheel at King of Diamonds
23   specifically.
24      Q. I'm going to show you -- you have the
25   binder in front of you, Ms. Galardi. I want you to

Page 242

1    read -- I'm sorry. I'll get to that, because the binder
2    is pretty voluminous. Your Honor, I'm looking at day
3    two.
4       THE ARBITRATOR: Okay. What page?
5       MR. AKEMON: Day two, Page 30. And day two
6    would be the second color there. At the top, it
7    will be 354.
8       THE ARBITRATOR: Well, the pages at the very
9    top right-hand corner, what is that page number?
10      MR. AKEMON: That's the page number -- yeah,
11   that's the page number.
12      THE ARBITRATOR: I know, but what page should
13   I look for?
14      MR. AKEMON: Page 30.
15      THE ARBITRATOR: Page 30 of 302?
16      MR. AKEMON: Yes, Your Honor.
17      THE ARBITRATOR: I have page 30 of 302.
18   BY MR. AKEMON:
19      Q. Line 11. And during that time period, Mr.
20   Harlan Miller was asking you about a deposition
21   testimony that you had previously given, and he asked
22   you whether or not -- he asked you about your
23   involvement in King of Diamonds. And can you read Line
24   11 of Page 30, please? Line 11 through 14.
25      MR. BRODSKY: Judge, I object to this. It's

Page 243

1    improper impeachment. She's being asked about a
2    transcript that refers to a deposition that we
3    don't know what it says, that's not here or
4    attached hereto for her to look at in answering the
5    question.
6       THE ARBITRATOR: Let me read this. So at Line
7    6, the Court actually raised something similar.
8    I'll need to see the transcript in order to rule on
9    that. Do you have an extra copy for me? This is
10   Line 22 on Page 29 of 302.
11      Mr. Miller, said yes, Your Honor, this is the
12   copy that I'm working on. This is the excerpt.
13   And we're talking about Line 22.
14      Mr. Miller, the highlighted portions are what
15   I've already talked about -- talked with her about.
16      The Court, objection overruled.
17      So Mr. Miller then says so, Ms. Galardi, let's
18   kind of do it again so it's clear for the jury.
19      The question at Line 15 was referring to the
20   transcript, okay, and now since December 1st, you
21   tell me your involvement, your answer at Line 17
22   was what?
23      And, apparently, Ms. Galardi, your answer was
24   I'm completely involved now.
25      Question, and then you were asked a question,

Page 244

1    what does that mean.
2       And your answer at Line 18 was what -- and
3    apparently you said in the transcript, I'm
4    completely involved, I'm like at a steering wheel
5    now, so -- and so --
6       THE WITNESS: My father had --
7       THE ARBITRATOR: The actual transcript
8    references are in here, Mr. Brodsky, so your
9    objection is overruled.
10      MR. BRODSKY: So is this December of 2012
11   we're talking about?
12      THE ARBITRATOR: That's what this says.
13      MR. BRODSKY: It doesn't have a year I don't
14   think.
15      THE ARBITRATOR: And it says okay, and now since
16   December 1st, you tell me your involvement.
17      MR. BRODSKY: So we're --
18      THE ARBITRATOR: That's exactly what that
19   says.
20      MR. BRODSKY: What we're saying is that means
21   2012, the year.
22      THE ARBITRATOR: Well, that's presumed,
23   because that's when he died. I don't know why he
24   would pick that date otherwise.
25      MR. BRODSKY: And that's the purpose of why

Page 245

1    I'm saying we don't have the transcript here which
2    may have involved that type of issue.  It's like --
3        THE ARBITRATOR:  I think the context is quite
4    clear, Mr. Brodsky, that it's 2012.
5        MR. BRODSKY:  Okay.
6        THE ARBITRATOR:  Now, what's your question?
7    BY MR. AKEMON:
8        Q.  My question was do you remember making that
9    statement that you were steering the wheel of your -- at
10   King of Diamonds?
11       A.  I did not say at King of Diamonds.  It does
12   not say that here.  It says my father had an extensive
13   estate and I needed to get a flow chart to keep it all
14   together, which is why I was totally involved, because
15   he had names like Bella Mia for Pink Pony here and Mia
16   Luna for something else, and I just -- it was a lot for
17   me and my cousin and even Mike and Dennis to just put
18   everything together.
19            And we had to have extensive valuations of
20   this estate to do a 706 for the IRS. So, yes, it was -- I
21   was in a whirlwind of things, not for King of Diamonds.
22   This does not say I was a steering wheel for King of
23   Diamonds.  So that's my answer.
24       Q.  Okay.  Ms. Galardi, as president of Fly Low,
25   couldn't you change the business model between December

Page 246

1    1st, 2012 and 2014?
2        MR. BRODSKY:  Objection, asked and answered.
3        MR. AKEMON:  I don't believe I asked her if
4    she could change it.
5        THE ARBITRATOR:  I'll allow this question.
6        A.  You did ask me, but I said that wouldn't have
7    been something I would have done, but because Akinyele
8    was -- I had a business arrangement with him, so I
9    wouldn't have interfered.
10       Q.  And in your experience in running these
11   various exotic dancer clubs, the funds -- the way the
12   young ladies would make money is tips directly from the
13   customers?
14       A.  I really don't run the clubs even now, so I
15   don't have experience in operating the clubs.
16       Q.  I'll rephrase.  To the best of your knowledge,
17   the money that these young ladies -- the exotic dancers
18   who work at these clubs, to the best of your knowledge,
19   is the money that they make given to them directly from
20   the customers?
21       A.  I would think so.
22       Q.  They don't get any money or did not receive
23   any money directly from Fly Low, Incorporated or --
24   doing business as King of Diamonds?
25       A.  That's right.

Page 247

1        Q.  And a couple other questions and I'll be
2    done, Your Honor.  There was also a case styled Beck v.
3    Galardi.  Are you familiar with that case?
4        A.  I'm not really familiar, no.  I've heard of
5    it, but I'm not familiar with it.
6        Q.  And that was an arbitration involving other
7    dancers who alleged that King of Diamonds did not pay
8    them minimum wage.  Does that refresh your memory?
9        A.  I don't remember an arbitration with Beck.
10       Q.  Isn't it true that --
11       A.  Was I present?
12       Q.  I was about to get to that.  Isn't it true
13   that you did not attend the final hearing at that Beck
14   arbitration?
15       A.  That's probably why I don't remember it.  I
16   don't know.
17       Q.  Isn't it also true that you did not present
18   any defenses at that arbitration?
19       A.  I don't know.
20       Q.  What, if any, research did you do regarding wage
21   and hour compliance at the King of Diamonds or for any
22   of your clubs during December 1st, 2012 and July of
23   2014?
24       A.  None.
25       Q.  Did you do any research -- did you contact the

Page 248

1    Department of Labor?
2        A.  No.
3        Q.  Did you consult with an attorney about wage
4    an hour?
5        A.  No.
6        Q.  So you didn't do anything --
7        A.  Not during that time, no.
8        Q.  So you didn't do anything to figure out
9    whether or not you were in compliance with the law?
10       A.  No.  Honestly, it wasn't what I was working on
11   at that time.
12       Q.  So you just decided to keep the business model
13   that the ladies were independent contractors and they
14   must pay house fees?
15       A.  My dad was in business for decades.
16       Q.  And you chose to keep his business model?
17       A.  I left things as they were until, you know, it
18   became an epidemic of lawsuits, so -- and, you know, we
19   explored changes.
20       Q.  So after, as you described it --
21       A.  I don't know what year.
22       Q.  What?
23       A.  I don't know what year.  I don't know what
24   year we started changing things.
25       Q.  But it was after 2014?

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 249

1    A.  Yes.
2    **Q.  It wasn't from 2012 to 2014?**
3    A.  No.
4        MR. AKEMON:  Okay.  No further questions, Your
5    Honor.
6        THE ARBITRATOR:  Okay.  Mr. Brodsky?
7        MR. BRODSKY:  Let me have a minute with my
8    colleague here.  I think we're done, but I just
9    want to check.
10       (Off the record.)
11       MR. BRODSKY:  Your Honor, we have no further
12   questions.
13       THE ARBITRATOR:  Very good.  You're excused,
14   Ms. Galardi.
15       THE WITNESS:  Thank you.
16       THE ARBITRATOR:  So let's talk about
17   housekeeping going forward.  I would like to get --
18   Mr. Akemon, if you could stay and just put exhibit
19   numbers on these documents, claimant's exhibits,
20   the ones that we haven't marked so that in case
21   anything happens to this notebook, which is already
22   falling apart, we know what's what.
23       And I'm going to bring in some alligator clips
24   as well to clip these things so we keep them
25   together.  Your agreement on -- well, how long will

Page 250

1    it take you to get a transcript prepared?
2        THE COURT REPORTER:  Seven to ten days,
3    business days.
4        THE ARBITRATOR:  Seven to ten days you'll have
5    a transcript.
6        MR. BRODSKY:  Did you say business days?
7        THE COURT REPORTER:  Business days.
8        THE ARBITRATOR:  Business days, right.  And
9    then you asked for -- was it 30 days?
10       MR. BRODSKY:  Yes.
11       THE ARBITRATOR:  So let's just pick out --
12   pull out a calendar here.  So from the time you get
13   the transcript, when would you like to make your
14   submission?
15       MR. BRODSKY:  30 days.
16       MR. AKEMON:  30 days after we receive the
17   transcripts.
18       THE ARBITRATOR:  So if you get the transcript
19   by April 1st, then we're talking about essentially
20   April 30th?
21       MR. AKEMON:  Yes, Your Honor.
22       THE ARBITRATOR:  Will that work for you guys?
23       MR. BRODSKY:  Yes.
24       THE ARBITRATOR:  Okay.  Post-hearing
25   submissions, you'll address the questions that were

Page 251

1    raised in my e-mail factually and legally, and we
2    will not have replies.
3        You -- is the form -- I forget whether we
4    talked about this.  Do you plan to submit proposed
5    findings of fact and conclusions of law or simply
6    take the questions and make your arguments as to
7    each question?
8        MR. BRODSKY:  That's what we agreed to.
9        MR. AKEMON:  Yeah.  We agreed that we would
10   let Your Honor do that.
11       THE ARBITRATOR:  Okay.  So I'll just receive
12   your legal argument.  And so what I'm expecting is
13   you'll tell me under Article 10 what you think the
14   outcome should be and why, under Section 448 what
15   you think the outcome should be and why.
16       On the willfulness question, the liquidated
17   damages question, whether you think the claimant
18   prevails or whether the respondent prevails, and
19   you'll go through the testimony and explain to me
20   why.
21       And then you'll explain whether this last
22   question that you just asked about tips from
23   customers, whether that's to be taken into account
24   or not taken into account in any calculations.  Now,
25   have I left anything out?

Page 252

1        MR. AKEMON:  Yes, Your Honor.  One other -- I
2    believe the time that you asked us to --
3        THE ARBITRATOR:  Oh, yes.  Whether it relates
4    back to prior to December 1st, 2012.  And that's
5    the other issue.  So those are the issues that I
6    expect to see addressed.  Everyone is clear on
7    that?
8        MR. BRODSKY:  Yes, it's in your order.
9        THE ARBITRATOR:  Yeah.  No, I just want to be
10   sure. If you have anything to raise, you can raise it
11   now.
12       So, number one, thank you ladies, all ladies.
13   All of our witnesses were ladies.  It's women's
14   history month, so thank you very much for your
15   time.
16       Counsel, thank you very much for being so
17   professional and being so prompt and efficient.  I
18   appreciate that.  We got a late start, but we got
19   an early finish, which is always good.  The hearing
20   will remain open until I receive your post-hearing
21   submissions, and that will start the clock for me
22   to get out my order under the AAA rules.  I think I
23   have either 30 or 60 days.  I forgot the time
24   frame.
25       But we'll start that clock from when I get

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 253

1    your submissions.  Now, does anybody have anything
2    else, going to claimant's side?
3          MR. AKEMON:  A couple quick questions, Your
4    Honor.
5          THE ARBITRATOR:  Yes.
6          MR. AKEMON:  Should we address attorney's fees
7    as well in this post --
8          THE ARBITRATOR:  Yes, we need to talk about
9    that.  My -- what I would prefer is that you
10   make -- you -- well, you prepare your claim, I
11   would provide it to the other side and find out
12   where there's objections or not objections, and
13   then you need to confer over that.
14         And then include in your submissions whatever
15   your differences are on any claim for attorney's
16   fees.  I know that the respondents have asked for
17   a hearing on that.  It's very unlikely that I'll
18   have a hearing on attorney's fees, but I'll reserve
19   judgment on that.  I just don't think I have
20   the time, honestly, to deal with a hearing for
21   attorney's fees.  And it's just going to
22   add to your costs, which I don't think it
23   will make that much difference, honestly, in my
24   experience.
25         Attorney's fees in arbitrations, I have yet to

Page 254

1    hold a hearing, and I really think it would run up
2    both of your expenses.  So my inclination is not to
3    hold a hearing.  How long will it take you to
4    prepare whatever it is that you believe you would
5    be entitled to, Mr. Akemon?
6          MR. AKEMON:  Well, if I could get a little
7    clarification, would you like me to include it in
8    the post-hearing brief or --
9          THE ARBITRATOR:  Yes, I'm afraid you have
10   to do that as well.
11         MR. AKEMON:  Okay.  I'll include it in the
12   post-hearing brief then.
13         THE ARBITRATOR:  Yeah.  You can put in a
14   placeholder there, but it's not going to be -- at
15   the end of the day, that's not going to be that
16   material compared to all the times for the hearing
17   and prehearing.
18         So I would put something together that
19   explains to counsel on the other side what it is
20   that you've done, what rate that you think you're
21   entitled to.  I would compile your costs and submit
22   it.
23         Obviously, there will be issues over how much
24   you prevail on or don't prevail on.  I'll take that
25   into account, obviously, when I issue my award.  But

Page 255

1    I would like to do this once, frankly.
2          So I don't -- while you're waiting for the
3    transcript to come, maybe that would be a good
4    exercise for you to put together your attorney's
5    fees claim and get it over to Mr. Tobin and Mr.
6    Brodsky.  And if they have questions, they can
7    inquire, obviously, and I would encourage you to
8    talk those things out, because the more that you
9    communicate with each other, the less you'll have
10   to argue about it, or at least the more focused
11   your argument will be.
12         And then you can cover in your post-hearing
13   submissions what those claims are.  If you have any
14   difficulty with this --
15         MR. AKEMON:  No, Your Honor.  May I include an
16   affidavit from an attorney regarding fees?
17         THE ARBITRATOR:  You may, but if you have any
18   issues -- you want to get that to them in case they
19   want to have a counter-affidavit.  But if there are
20   any issues on the process, send me an e-mail and
21   we'll get on the phone if you're having any
22   difficulty.
23         Because I don't want this to be something that
24   you argue over.  You have your conversations, your
25   communications.  If you have differences, state

Page 256

1    your differences.  It seems like you guys get along
2    pretty well.
3          But if the process requires you to talk to me,
4    shoot me an e-mail and we'll get on the phone.  I'm
5    just trying to truncate this so that we build all
6    this into your post-hearing submission and not have
7    to do another submission after that.  That's my
8    goal.
9          And I believe from just being with you guys
10   today that you seem to get along well enough that
11   you can have those communications, as long as you
12   can get the information to them.
13         MR. AKEMON:  Yes, Your Honor.
14         THE ARBITRATOR:  And let me then reflect on it,
15   ask you questions, and if you have an affiant, by
16   all means, share that with them.  If they have a
17   counter-affiant, they can have one prepared, and
18   I'll receive your affidavits, I'll receive your
19   submissions as part of your post-hearing
20   submissions.
21         In terms of numbers of pages, I don't really
22   believe in page limits for something like this, so
23   whatever it takes you guys to write is fine with
24   me.  I just ask you to be as succinct as you
25   possibly can; that's my only request is just be

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 257

1   succinct.
2       You know, if you need the pages, take the
3   pages, but try to be succinct. I'm not going to be
4   critical if you end up writing 40 pages. I'll be
5   really happy if you write 20, but if it takes you
6   40, it takes you 40. I'm not going to be difficult
7   over the length. You've worked very hard. The
8   case is important to both sides, I recognize that.
9       So I'll give you every opportunity to make all
10  of your arguments, and I'll study them quite
11  carefully. So, ladies, however I rule, I want you
12  to know that I enjoyed being with you-all today.
13  But I'll deal with the evidence, and I'll deal with
14  it as fairly as I possibly can. And that's my
15  commitment. Anything else? Did you have another
16  issue, Mr. Akemon?
17      MR. AKEMON: No, Your Honor.
18      MR. BRODSKY: I have two questions.
19      THE ARBITRATOR: Sure.
20      MR. BRODSKY: And one relates to the
21  attorney's fees issue. So Mr. Akemon is going to
22  give me -- or give us, within when I don't know, a
23  request for attorney's fees, basically, from you,
24  for your award to him, and then we're to respond to
25  that in the final submission?

Page 258

1       THE ARBITRATOR: Yeah. To the extent there's
2   disagreement, address whatever you disagree about.
3       MR. BRODSKY: Okay.
4       MR. AKEMON: So to piggyback on that question,
5   so would you prefer after I send it to him that
6   we discuss whatever disagreements first --
7       THE ARBITRATOR: Yes, please discuss your
8   disagreements, and then whatever your differences
9   are, that will allow you to focus in your
10  post-hearing submissions. For example, you pick a
11  rate, an hourly rate.
12      You think it's too high, you guys talk. And if
13  you can't agree, then I know that the rate is going
14  to be an issue that you'll address and you'll
15  address in your post-hearing submission. There may
16  be a debate over hours, the number of hours spent.
17  Mr. Brodsky may feel it was excessive, you may feel
18  it was quite appropriate.
19      I will take into account in evaluating your
20  claim, Mr. Akemon, where you succeeded and where
21  you have not succeeded, so you may need to take
22  that into account as you present your request. But
23  these are things that you guys can talk about. You
24  may agree, which would be great if you could
25  agree. But if you can't, that's what I'm for.

Page 259

1   But I just want you to be focused in your
2   submission on whatever it is that you can't agree
3   on. You may disagree on everything, which is okay
4   also.
5       And just make your arguments. That's okay,
6   too. I'm not asking you to give in on anything. I
7   just want you to get the information to them, let
8   them look at it, communicate, confer. If there's
9   agreement, great. If there's disagreement, so be
10  it.
11      Then you at least know what you're going to be
12  writing about. And if you need me to help you
13  with that process, let me know, and I'll get on the
14  phone with you. I don't want you to spend time
15  arguing; I want you to spend time talking and
16  seeing if you can agree.
17      MR. BRODSKY: The only other issue I have
18  is when I walk out of here today, I just want
19  to know what exhibits are in evidence,
20  and --
21      THE ARBITRATOR: All the ones in your
22  notebook, assuming they are the same ones in my
23  notebook.
24      MR. BRODSKY: I don't mean it that -- I'm
25  talking about the ones specifically -- that

Page 260

1   specifically were marked.
2       THE ARBITRATOR: They are all going to be
3   marked after the hearing. I'm going to mark them
4   all carefully.
5       The ones that are labeled with these tabs are
6   going to be marked with the same number, and they
7   are going to match the claimant's exhibit list C
8   whatever through C27 with the understanding that
9   there is no 25. And your exhibits will be marked
10  as -- well, are these the same letters? I guess
11  they are.
12      So your Respondent's Exhibit 1, 1A, 2A, 3 and
13  3A, have all been admitted.
14      MR. BRODSKY: So, in other words, I can take
15  the claimant's proposed exhibit list under
16  certificate of service March 15th with the
17  understanding that C23 is there's an A and a B,
18  which are the presuit notices, and there's no 25?
19      THE ARBITRATOR: That's correct.
20      MR. BRODSKY: I can refer if I need to to
21  those exhibits the way they are otherwise in that
22  exhibit book?
23      THE ARBITRATOR: They are the same as your
24  Respondent's Exhibits 1 and 1A. So you can pick
25  which ones you want to refer to. They are the same

dc30f17f-b97f-48ba-958f-c7bbecceab27

Page 261

1   exhibits.

2       MR. BRODSKY:  I'm talking about, for instance,

3   if I want to refer to C18, I can just refer to C18

4   as it is in the exhibit list?

5       THE ARBITRATOR:  That's right.

6       MR. BRODSKY:  Okay.  That's what I wanted to

7   know.  Thank you.

8       THE ARBITRATOR:  Okay.  We're adjourned for

9   now until I receive the post-hearing submissions.

10       MR. BRODSKY:  Thank you.

11       THE ARBITRATOR:  And I'll formally close the

12   hearing, assuming nobody has anything further.

13       MR. TOBIN:  Thank you for your time.

14       MR. AKEMON:  Thank you for your time, Your

15   Honor.

16       (Thereupon, the proceeding was concluded.)

17

18

19

20

21

22

23

24

25

Page 262

1       CERTIFICATE OF REPORTER

2          - - -

3

4       I, Stephanie Anez-Arriechi, Court

5   Reporter, certify that I was authorized to and did

6   report the foregoing proceedings and that the

7   transcript, Pages 1 through 262, is a true and complete

8   record of my notes.

9       I further certify that I am not a

10   relative, employee, attorney or counsel of any of the

11   parties, nor am I a relative or employee of any of the

12   parties' attorneys or counsel connected with the action,

13   nor am I financially interested in the action.

14

15

16       Dated this 20th day of April, 2021.

17

18

19

20

21

22     _____

       Stephanie Anez-Arriechi

23       Court Reporter

24

25



**A**

A-K 65:20
A-K-I-N-Y-E-L-E
  65:24
a.m 1:16 104:12,13
  104:19 105:7
AAA 252:22
abide 51:9
abilities 118:20
ability 5:6 18:11
  30:12 179:23
  195:10 205:23
  234:16
able 4:12 21:13,23
  86:21 110:14 112:2
  123:16 154:17
  180:22 216:18
  231:5
aboard 88:13
absolutely 179:25
  181:14 185:14,16
  185:19 226:19
abuse 146:1
abused 145:19
accept 119:9 232:6
accepting 169:15
accidentally 38:9
account 60:8,9 61:1,3
  61:17,21 62:10,10
  251:23,24 254:25
  258:19,22
accounting 160:11
accounts 234:8
accurate 31:2 88:15
acknowledge 225:9
  225:11
acknowledged 156:8
action 240:20,25
  262:12,13
actual 26:12 56:11
  244:7
Adams 65:12 67:6
  78:16,23 79:3,20
  80:3 148:20 181:24
  182:24 198:1,4
  200:10 218:25
  222:12,15,17 223:9
  223:12 224:2 225:2
  225:14 227:6,20
  229:17 230:19
  231:22,24
add 7:10 29:13 50:10

54:10,13 58:13
  169:17 253:22
added 40:17 48:25
  68:24
adding 57:18 99:10
addition 25:19 87:3
  95:6 164:15 204:9
additional 78:21
  204:5
additions 203:22
address 6:5 250:25
  253:6 258:2,14,15
addressed 116:1,3
  252:6
adjacent 210:14
adjourned 261:8
administratively
  103:16
admissions 226:10
  227:1,12,25 229:23
admit 81:8 85:21
  88:18 110:3 119:2
  119:14,19 241:2,5,7
  241:10
admitted 81:4 110:1
  119:17 120:8,8,21
  165:22 227:18
  228:15 229:8,12,16
  229:20 241:9,11
  260:13
adult 143:14 144:11
  193:7,21 196:19,22
  196:24 214:12
advance 12:22
advertise 55:3
advertising 54:25
advice 177:21
affect 62:19 173:2
affiant 256:15
affidavit 255:16
affidavits 256:18
Affiliate 86:3
afford 178:20
afield 123:11
afraid 254:9
afternoon 122:5,6
  170:14 194:14,15
ago 23:25 50:24,25
  51:13 52:6 56:5
  71:4,6 74:14 76:6
  122:19 123:3 239:2
agree 124:6 216:13

228:16 258:13,24
  258:25 259:2,16
agreed 3:24 118:10
  191:21 251:8,9
agreement 68:8,21
  108:18 182:11,24
  183:7,8 189:16
  190:25 191:2 193:2
  193:6 195:8 196:12
  196:14 200:6,7,9
  219:1 220:22
  221:15 222:21,24
  223:9,11 225:3
  230:24 231:11,18
  232:7 233:22
  238:12 249:25
  259:9
agreements 193:17
  215:14 216:24
  234:4 238:9
ahead 5:8,23 7:11
  13:7 29:5 39:3
  66:12,21,22 77:14
  79:25 92:9 120:13
  151:11 170:10
  177:18 201:5
  202:15 216:5
  234:13
air 73:11 96:7 160:19
  179:3
Akemon 2:4,14,15,17
  2:18,20 3:9,9,20 4:6
  5:12,24 6:8,13,20
  7:8,12,22,25 8:17
  10:25 11:23 14:16
  14:25 16:14 18:4
  23:19 25:6,8 26:23
  27:13 29:21 30:20
  30:22 31:5,8,13,18
  31:25 32:9,14,19,25
  33:8,17,21,23 34:2
  34:13,19,21 35:1,4
  35:11,18,24 36:3,6
  36:13,18 37:2,5,7
  37:11,16,19 38:5,9
  38:12 39:4,20 40:1
  40:3,6,10,13,18,23
  46:22 49:15 55:20
  55:22 59:4 61:7,10
  62:16,24 63:9 64:9
  64:22,25 65:5,22,25
  66:14 69:17 70:4

74:3,5 75:2,9,15,16
  76:17 77:14,15 78:5
  78:7,8,12,20,22
  79:14,15,16 80:2,16
  80:19,21 81:3,7,20
  83:17,20,21 84:24
  85:2,10,13,21,24
  86:10 87:3,7,9,13
  87:22,25 88:2,18,20
  89:24 90:14,24 91:6
  95:12,16 102:19,20
  103:8,17,18,23
  104:15,22 106:4,15
  106:18,24 107:2,9
  107:12,14,19 108:1
  108:3,6,11,14,22
  109:4,11,13 110:1
  110:25 111:8 112:9
  117:19 118:18
  120:6,22 121:15,18
  121:21 123:10
  124:3 125:11
  132:20,23 135:21
  137:19,24 138:2,10
  143:25 145:20
  146:24 147:13,20
  149:9 151:9 156:11
  159:14,16,18 166:8
  166:12,15,18,20
  167:1,5,10,16,23,25
  168:5,8,12,15,18,20
  169:1,9,10,14,17,18
  194:9,10,12,16
  195:3 197:10,11,12
  198:10,11,21 199:5
  199:6,19 200:5,20
  200:24 201:4,7,12
  201:16,19,20,23
  202:2,6,24 203:14
  203:15,16 207:25
  208:2,13 209:3,8,11
  210:16 212:3,14
  213:7,9,11 214:3
  216:7,17 217:1
  223:7,25 225:19,21
  225:22 226:1,2,10
  226:14,17,24 227:2
  227:3,14 228:6,10
  228:22 229:4 230:5
  230:8,12,14,16
  232:15 233:7,8,12
  233:16 236:1,4

237:17,22,24 238:2
  238:7 239:2,6,14,23
  241:2,5,8,12,16
  242:5,10,14,16,18
  245:7 246:3 249:4
  249:18 250:16,21
  251:9 252:1 253:3,6
  254:5,6,11 255:15
  256:13 257:16,17
  257:21 258:4,20
  261:14
Akinyele 60:24 65:12
  65:14 67:16,24 68:3
  73:19 78:1 79:2,17
  79:20 85:16 88:12
  94:22 111:21 116:3
  116:8,10,16,23
  117:9 128:12,13
  132:2 148:20
  150:21,22,23,24
  162:14 163:10
  181:24,25 182:12
  182:24 183:6,9
  184:16,17 198:1,4
  200:10 218:25
  222:11 223:12
  224:2,14,16,17,20
  224:24 225:1,13
  227:20 229:17
  230:19 231:22,24
  233:22,24 246:7
al 5:25
Albanez 209:23 224:7
alerts 91:13,17,18
allege 221:11 233:13
alleged 221:4 223:9
  247:7
alligator 249:23
allow 6:7 55:23 59:5
  59:7,22 64:12,14
  65:3 69:18 85:23
  88:19 125:13
  134:11 145:23
  146:25 149:10
  219:23 246:5 258:9
allowed 16:10 45:20
  47:1 59:17 67:23
  97:5,9,22 125:12
  154:23 197:19
  199:11 237:2
  239:12
Allure 123:21,22

146:20,21,22 147:1
147:2,8,8,22,24
148:5,8,9 149:7,13
149:20
**America** 61:24
**AMERICAN** 1:1
**amount** 10:14 14:1,4
15:2 16:1 22:13
40:7 45:1 68:15
74:20 76:1,3,9 93:8
101:22 104:3 111:4
114:22,24 125:18
132:9,11 134:10
135:16 151:15
152:20 154:19
155:21 156:13
157:1,5 182:17
183:8 235:8,10,20
**amounts** 30:2 159:20
**ancillary** 179:1
**and/or** 23:24 216:9
217:12
**Anderson** 232:18,23
232:24
**aneurysm** 239:7
**Anez-Arriechi** 262:4
262:22
**annoying** 42:1
**annual** 201:24 202:8
202:19
**answer** 59:6 61:18,20
61:23 62:22 69:20
78:14 79:24 104:18
104:20 125:15,15
125:23 143:17
147:20 148:1
151:11 152:14
191:13,14,16
211:25 212:19,24
213:2,4 223:16,22
223:23 229:1
231:19 235:1
240:14 243:21,23
244:2 245:23
**answered** 70:5 78:15
78:15 146:2,8,9
149:23 150:15
151:9 213:24
225:18 233:5 241:3
246:2
**answering** 49:25
216:19 243:4

**answers** 7:6,20 61:25
124:5 149:5
**anybody** 4:25 40:23
64:4 124:14 140:16
162:13 196:1 217:8
253:1
**anymore** 122:18
**anyplace** 48:7
**anyway** 187:19
**apart** 249:22
**apologize** 131:16
167:11,13 200:15
200:17 233:9
**apparently** 38:23
107:17 109:2,10
243:23 244:3
**appear** 126:3
**appearances** 2:1 3:7
**appeared** 160:17,19
**appears** 14:15 168:13
**application** 83:11,12
**applied** 46:18
**apply** 46:19 142:18
**appreciate** 7:15
111:2 232:10
252:18
**approach** 30:20
38:19 75:2 154:20
185:22
**appropriate** 86:24
216:20 258:18
**approximate** 39:21
39:22 136:4
**approximately** 8:19
14:14 28:22 44:1
76:6 88:6 130:24
152:15 160:1 180:7
181:9 182:23 183:2
183:5
**approximation** 84:11
**April** 33:20 34:6 41:6
181:25 182:25
183:2,5 220:11
222:12 233:25
250:19,20 262:16
**arbitration** 1:1,2,13
15:16 87:11,20
90:23 117:8 189:9
189:16,22,25
191:17,21 193:2,6
193:17 195:7
196:12,13 230:21

230:24 231:1 234:4
236:15,25 237:5
238:9,12 240:8,14
247:6,9,14,18
**arbitrations** 253:25
**arbitrator** 3:3,6,11
3:16,22 4:8 5:3,5,8
5:14,20 6:8,15,21
7:9,14,23 8:10,13
10:19,21 11:4,7,12
14:10,20 16:5 17:8
17:11,14 23:12 25:5
25:7 26:5,9,14,18
26:21 27:11 29:12
29:17 30:21 31:15
31:20 32:5,10,16,22
33:3,11,19,22,24
34:4,11,16,20,22
35:10 36:1,5,12,14
36:20 37:3,6,8,13
37:21,24 38:7,11,14
38:17,20 39:13,15
39:17,24 40:2,4,11
40:15,19 41:2,4
46:24 49:13,23
55:21,23 56:22 57:3
59:5 60:13 61:9,12
62:17,25 63:10
64:12,24 65:6,17,24
66:1,6,8,10 69:13
69:18,24 70:7 72:17
72:22,24 73:3,25
75:3,6,10,14 76:11
76:16 77:2 78:4,14
79:5,13,24 80:17,20
80:23 81:5,8,18
83:17 85:4,23 86:5
87:1,5,8,11,16 88:1
88:19 89:19,22
90:12,17 91:3 95:11
95:14 102:18,21,24
103:1,5,9,21 104:10
104:13,18 105:22
105:25 106:11,16
106:19 107:3,11,13
107:17,22 108:17
108:20,23 109:1,5
109:12 110:3,17,23
111:7 112:8 117:12
117:17,20,23 118:2
118:13 119:2,14,18
119:24 120:12,19

120:25 121:13,20
121:22,25 123:11
123:17 124:5
125:12 131:14
132:21,24 133:4,6,9
133:12,17,19,20,24
134:3,5 135:23
136:18 137:2,7,11
137:16,22 138:3,23
143:6 144:2,15
145:23 146:4,7,25
147:15,22 148:23
149:1,4,10,23 150:2
150:5,9,15 151:10
151:21 154:22
155:1,3,8 156:4,12
156:16,21 158:9
159:2,6,11,14
165:20 166:9,13,17
166:19,24 167:3,8
167:11,18,21 168:3
168:7,11,16,19,22
169:4,6,15,19,25
170:4,8,22 178:11
185:23 186:1,4,16
187:1,8 188:16
189:2 190:8,11
192:9,11,14 194:8
195:1 197:9 198:9
198:17 199:3,16,20
199:24 200:4,17,22
200:25 201:5,9,18
201:21 202:1,4,15
202:20,25 203:3,10
203:13 204:2 207:9
207:19,24 208:10
208:14,18,20,25
209:3 212:15 213:8
216:15,18 217:2
219:20,23 223:14
225:18,25 226:3,6
226:11,15,19,23
227:1,25 228:4,8,13
228:19,24 230:4,6,9
230:13,15 232:4
233:6,10,15 236:5
237:16,19,23,25
238:4,20,25 239:4,8
239:11,16 241:7,9
241:13 242:4,8,12
242:15,17 243:6
244:7,12,15,18,22

245:3,6 246:5 249:6
249:13,16 250:4,8
250:11,18,22,24
251:11 252:3,9
253:5,8 254:9,13
255:17 256:14
257:19 258:1,7
259:21 260:2,19,23
261:5,8,11
**area** 65:3 76:22
**argue** 158:9,10
241:14 255:10,24
**arguing** 259:15
**argument** 251:12
255:11
**argumentative** 214:2
**arguments** 7:4 65:2
251:6 257:10 259:5
**arrangement** 80:10
246:8
**arrive** 10:8 91:11
94:9 115:12
**arrived** 11:25 30:4
101:25 102:2
113:23 114:23
**Article** 251:13
**artist** 182:3
**asked** 6:5 14:20
56:25 62:3,4,6 70:4
70:17 74:22 75:10
77:3 79:9 86:22
110:25 124:13
147:24 148:23
150:25 151:9,10
179:1 198:18
212:20 217:14
232:22 233:5
240:11 242:21,22
243:1,25 246:2,3
250:9 251:22 252:2
253:16
**asking** 27:24 28:5,8
29:22 30:14 39:6,8
40:7 44:14 58:15
62:8 70:11 74:15,16
74:19 75:19 76:8
78:10 93:4 101:18
102:11 103:24,25
104:3 152:9,10,11
217:6,7 232:5
236:20 238:6 240:3
242:20 259:6

aspirate 173:6
assign 12:17
assigned 44:22 48:21
assist 18:12 176:9
associate's 171:10
ASSOCIATION 1:1
assume 61:12 117:14
    125:14 210:5
assuming 228:25
    259:22 261:12
Atlanta 129:3 174:23
    174:23 175:8 192:3
    192:3,9,10,18,19,24
    196:2 197:24 198:5
    198:14,22 199:18
    212:2 219:9
attached 107:17,19
    243:4
attempt 28:11 30:1
    101:22 234:1
attempted 21:11,25
    97:12,19,20,24
    111:12
attempting 144:9
attend 85:16 94:14
    127:14 247:13
attended 105:9,10
    128:11
attending 122:17
attention 83:7 191:18
attorney 3:9 31:3
    152:1 194:16
    237:10 238:9,10
    248:3 255:16
    262:10
attorney's 253:6,15
    253:18,21,25 255:4
    257:21,23
attorney/client
    238:16
attorneys 262:12
audition 10:3 82:11
    82:14,16
auditions 10:5
August 29:19,20 49:9
    49:14 172:16
authority 195:23
    196:3 205:24 206:1
    206:6,12,15,17,24
    213:19,20,22
    216:22 217:9,13
    231:13,15,20 234:7

234:16
authorized 262:5
automatically 92:25
average 14:13 15:2,4
    22:13,15,16 23:6
    24:15 48:23 74:20
    75:25 76:9 90:7
    91:10 93:12,13,18
    94:8 101:12 112:12
    114:18,22 115:1
    131:1,21 139:24
    140:1
avoid 6:7
award 30:14 39:8
    76:9 254:25 257:24
aware 6:2 38:24
    62:19 119:4 124:16

───────
B
B 37:6 169:6 260:17
baby 122:19
back 11:24 16:13
    18:22,22 20:16
    21:17,23 22:12,18
    28:25 29:7,7 31:9,9
    38:18 41:4 42:17
    49:23 50:4,5,19,23
    60:17,22,25 62:11
    62:13 65:9 67:18
    68:10,18 70:9 79:1
    82:19 89:18,19
    93:14 98:7 111:18
    112:25 116:5 118:4
    121:20,22,23,25
    123:15 126:4 134:2
    134:5 135:2 142:4,5
    173:13,24 174:22
    174:24 175:9 177:3
    183:5 184:22
    200:10 219:14
    226:23 232:8
    237:20 239:15
    252:4
background 171:9
    179:22
backs 193:10,24
bag 105:20 106:2
    129:17 157:16
    163:15
bags 13:24 73:14
    98:12 129:9,10
    159:20,22

bands 98:6
bank 60:8,9 61:1,3,16
    61:19,21,23,24 62:1
    62:2,10,10 234:7
bar 67:18,19 76:22
    76:22 77:20 174:1,4
    174:8,12 178:15
    184:10,15 193:10
    193:24
Barkett 1:13 3:6
    133:5,20
bars 179:25
bartenders 189:17
based 179:21 183:6
basically 22:8,24
    40:14 98:23 100:18
    113:4 117:4 257:23
Beach 68:3 192:25
Beck 247:2,9,13
beer 215:10
Beers 174:4
began 10:7 82:21
    83:11
beginning 12:5 91:8
    91:21 180:2,12
    181:21 184:2,3
    188:3
behalf 2:2,5 3:14 41:8
    41:9 213:23 229:18
belabor 181:11
believable 141:21
believe 11:3 25:13
    33:8 38:13 89:9
    110:21 137:20
    174:15 187:10,13
    200:14,14 209:16
    223:12 224:25
    226:24 231:19
    232:24 246:3 252:2
    254:4 256:9,22
believed 231:13,15
Bella 245:15
belong 107:9 120:3
benefit 44:19,20,22
benefits 217:19
best 4:24 15:21,25
    16:15,17 19:20,23
    55:7 77:22 90:3
    99:23 101:4 120:11
    133:19 142:13
    143:10 144:10
    246:16,18

better 158:5
Beyonce 49:12
beyond 198:8
big 52:20,20 110:12
    110:13 112:16,23
    165:15 177:11
    180:7
bill 63:4,12
bills 68:22 98:19
    105:23 110:13,14
binder 36:11 137:19
    137:25 200:21
    241:25 242:1
binders 36:9,10
biopsy 173:11
birthday 29:18
    141:13,15
birthdays 141:19
bit 19:4 78:18 106:12
    192:6 199:4 200:16
    209:1 215:24
black 42:23 60:10,15
blank 85:5 87:20
board 78:23 116:10
    116:16,23 117:9
    193:9 233:24
Bob 209:14,15 223:3
    223:9,12 224:18
boils 142:13
book 34:9,12 70:25
    71:3,6,8,11,13,14
    107:15 108:13,21
    174:10,17 178:4
    210:21 260:22
bookkeeping 178:18
books 118:18
booths 180:17 181:2
boss 128:13,14,15,16
    128:16,17,18
bother 90:18
bottom 204:20
bought 174:10,11
    178:13,25 180:10
    182:7
Boulevard 2:6
bran 239:7
break 13:2,3 38:1
    40:21,23 41:5 58:16
    80:20,25 103:12
    117:13 122:20
    132:15 226:20
breakdown 153:20

breaking 84:4
breaks 170:9
brief 5:12 7:7 254:8
    254:12
briefs 7:18 118:11,15
bring 37:25 106:20
    154:22 249:23
bringing 213:5
Brodsky 2:8,19 3:13
    3:13,17,21 5:2,4,19
    31:6,7,11 32:3,20
    32:23 33:10 34:9,25
    35:3,6,16,20 37:10
    37:17,23 38:3,6,16
    38:19 40:25 65:17
    65:19 69:12 75:4,12
    76:15,25 77:12
    78:13 79:23 84:23
    84:25 85:3,11,12
    86:8 87:13,15,20,23
    102:15 106:22,25
    107:15,23,24 108:2
    108:4,9,13,15,19,24
    110:19 117:22,25
    118:7,24 119:11,16
    119:22 120:10,14
    120:24 121:10,17
    133:8,11,22 134:1
    138:1 149:25 150:3
    151:19 154:20,25
    155:2,4,7,8,10
    156:8,19 167:19
    168:24 169:2,5,13
    170:13,20 171:3
    185:25 186:3,5,18
    187:2,6,9 188:18,25
    189:4,6 190:15
    192:16 194:7 198:6
    199:1 201:13
    202:12 203:6 207:6
    207:22 208:8 209:1
    209:6,9,10 210:15
    212:9 213:24 216:5
    216:11 219:22
    223:5 226:3,5,8,16
    227:12,13,22 228:1
    228:16 233:5
    235:23 236:2
    238:13,24 239:1,9
    242:25 244:8,10,13
    244:17,20,25 245:4

245:5 246:2 249:6,7
249:11 250:6,10,15
250:23 251:8 252:8
255:6 257:18,20
258:3,17 259:17,24
260:14,20 261:2,6
261:10
**broke** 182:17
**brought** 191:18
**bucket** 16:9 21:5,6
**bucks** 143:24
**build** 256:5
**building** 63:19 64:7,8
125:5,10 178:9,21
178:22,25 180:7
182:16 183:18,25
210:13,14
**Burnside** 206:14
207:17,18
**business** 64:17 69:23
69:24 173:25 174:2
174:7,9,13 175:10
175:13,22,24 176:6
178:24 179:21
183:17,25 185:20
187:13 190:12
199:15 200:22
201:22,23 208:1
210:3,20 213:18
214:8,9 215:22
216:2,8,23 217:5,9
217:13 218:11,13
218:16,20,23,25
219:2,5 233:23
235:9,12 236:10
245:25 246:8,24
248:12,15,16 250:3
250:6,7,8
**businesses** 175:16
177:7,22 178:4,13
179:18 185:12,17
191:25 196:17,17
196:18
**buy** 100:21 182:1,5,6
222:19,20
**buyer** 182:21
**buying** 174:9,10

**C**

**C** 87:8 230:8 260:7
**C1** 200:20
**C10** 237:15

**C18** 227:12 261:3,3
**C23** 260:17
**C24** 106:10,24
107:14,15
**C26** 167:23,23
**C27** 168:3 260:8
**C6** 87:4,6,7 88:18
**calculate** 28:12 30:1
30:2 54:5 75:24
101:22 110:13
**calculated** 28:16,18
30:11 54:6 151:18
151:25 152:15
**calculating** 76:3
**calculations** 58:14
74:24 148:9 152:7
251:24
**calculator** 54:5
**calendar** 48:23 50:4
54:11 141:22
250:12
**calendars** 50:16
**California** 171:21
**call** 4:6 11:9,11 15:16
46:20 47:2,5,10
74:1 80:21 86:22,24
90:17 117:18,21
133:6,10 140:21
143:3 175:6 184:3
**called** 12:3 95:9,11
174:4 202:1 206:21
**calls** 132:20,23
143:25
**calm** 223:24,24
**cancer** 172:9 173:9
**capable** 216:19
**car** 24:22
**card** 234:11
**cards** 60:10,10,11,15
**care** 23:1 68:24 124:8
124:9 133:9 162:19
191:8
**carefully** 190:25
191:2 257:11 260:4
**Carolina** 192:4,24
**carpet** 180:17,24
221:21
**carpeting** 181:2
**case** 1:3 5:23 6:14,18
7:15 8:11 28:5 36:2
36:8 58:9 62:20
74:2 101:23 144:8

169:17,21 194:20
194:20,23,24 195:4
202:16 210:17
216:13 219:11,17
219:25 220:2
221:11,14 233:2,3,4
247:2,3 249:20
255:18 257:8
**cases** 213:14,17
**cash** 60:11,17,21
61:16 157:17,20,20
**cashing** 60:16
**caused** 229:9
**CDs** 182:3
**Cedeno** 224:22
227:20 229:6,11,18
**celebrities** 92:5
**celebrity** 13:17,18
**certain** 10:14 11:18
11:19 19:24 45:1
59:18 68:15 82:24
114:24 125:17
**certainly** 5:20
**certificate** 260:16
262:1
**certified** 240:19
**certify** 262:5,9
**cetera** 93:23
**CFO** 191:7 209:13
**chair** 4:9
**challenged** 103:16
118:20
**chance** 30:1 46:17
161:20 182:9
**change** 12:25 115:24
196:11 204:7 217:9
217:13 218:11,14
218:16,20,23 219:5
227:5,9,17 228:11
233:18 234:1
245:25 246:4
**changed** 20:22 35:13
41:7 58:11,12 116:4
117:2 196:9 203:24
233:20
**changes** 169:23,24
203:23 204:5
248:19
**changing** 232:12
248:24
**chaos** 160:23
**characterize** 181:8

**charge** 30:7 68:9
125:2 177:14
**charging** 45:25
**charitable** 59:3,11,12
**chart** 245:13
**Chase** 61:24
**chatter** 145:13
**check** 13:23 60:16
105:19 106:2
157:19 249:9
**checks** 122:25 157:17
234:12,15,17
**Cheers** 174:5
**Cheetahs** 191:15
192:3,25 197:4,5
**Chicago** 175:5
**chief** 212:16
**choose** 18:8,11 99:17
127:20 186:2
**chose** 127:19,20
248:16
**Christmas** 122:20
**circulated** 238:9
**cities** 193:25
**city** 145:14 197:19,20
**claim** 4:4 55:15,16
253:10,15 255:5
258:20
**claimant** 1:5 35:7,21
107:16 110:21
251:17
**claimant's** 34:23
84:21 85:6,22 87:9
108:25 165:24
168:16 186:7,15
189:8 193:4 200:14
201:4,6 225:24
226:14,25 238:1,1,4
249:19 253:2 260:7
260:15
**claimants** 2:2 3:5,8
4:6 184:9
**claiming** 55:17 57:24
**claims** 4:1 208:4
255:13
**clarification** 32:4
254:7
**clarification's** 166:21
**clarify** 35:24 98:13
**clarity** 75:21
**class** 240:20,25
**cleaning** 114:8

**clear** 31:12 90:12
119:12 120:11
228:9 243:18 245:4
252:6
**clerical** 118:20
**clerk** 138:21
**Cleveland** 172:10,11
**client** 40:25 170:2
238:18
**Clincy** 219:9
**Clinic** 172:10,11
**clip** 249:24
**clips** 249:23
**clock** 252:21,25
**close** 13:4 42:4 104:9
226:4 261:11
**closed** 8:23 25:14,15
42:5,6,7 104:10
118:14 174:5 176:4
197:14
**closer** 173:16
**closes** 104:19
**closings** 118:12,13,14
**clothes** 20:4 82:11
**club** 8:19 9:24 10:23
11:16 12:20 15:21
16:1 19:8,11,21
20:11 21:12 22:23
23:24 24:24,25 25:3
25:9,14 26:1,2,11
26:14 27:22 42:23
43:3,9,18 45:2,22
46:5,9,15 47:13
51:2,22 52:1 58:23
60:24 66:17 67:7,9
67:13,20,25 68:4,7
68:7 71:21 77:17,20
81:24 83:5 92:5,6,7
95:3,8,22,24 98:22
99:24 101:6 104:9
104:10,19,23
111:12,25 112:4,16
113:24 114:2
116:20 124:15,20
124:24 128:6,7
129:14,21 131:5
138:16,19,22,23,25
139:7,8,9,10 143:10
144:7,10 145:10
146:12 147:14
149:12,15 153:3
157:7,14 159:10

162:12,13,16 163:1
165:11,15 179:9
181:12,22 182:12
182:16 183:2,6
184:10,19 189:9
192:21 193:16
196:19,20,22,25
198:2 210:24
215:16,24 219:9
220:3,4 221:23
222:19,20 227:5,18
228:11
clubs 42:19 47:14,15
86:3 143:14,18,23
191:8 192:20 193:1
193:7 194:1 196:9
196:14 211:12,18
212:2,23 214:10,12
214:18,24 215:1,7
215:10,20 217:10
240:10 246:11,14
246:15,18 247:22
collaborate 195:19
colleague 154:20
249:8
collect 96:15
collected 69:2,6 96:18
97:20 161:13,19
collection 164:16
college 173:22
color 242:6
colors 181:4
column 107:8
columns 107:7
come 10:5,12 12:19
13:9,10,23 18:22,22
22:10,24 24:10,18
26:8 29:7 42:15
45:2,2,25 53:22
71:20 75:25 78:5,18
78:25 82:25 92:6
108:15 111:18
118:4 121:20,22,23
127:20,21,23 130:9
130:12 138:20
158:25 163:24
164:3,5,7 168:11
175:1,21 178:7
189:19,24 193:14
212:1 218:18
222:18 240:16
255:3

comes 19:16 133:24
comfortable 4:22
41:25 133:23
coming 4:19 26:2
35:13,14 46:4 82:7
88:7 99:13 165:15
173:13 191:1
command 177:12
comment 200:1
comments 118:8
commitment 257:15
communicate 176:23
255:9 259:8
communicating 176:9
communications
212:25 255:25
256:11
comp 218:3
companies 214:4,5
236:19,21
company 189:23
202:1 231:17
company-wide
189:17 195:8,16,22
196:4 198:13,14
231:6,11,16
compared 147:8
254:16
comparing 147:25
comparison 147:17
147:18
compilation 70:10
compile 254:21
complaints 240:15
complete 169:9
221:17 262:7
completed 171:10
completely 143:20
146:12,14 163:2
179:4 243:24 244:4
compliance 211:3,11
211:17 212:22
213:1 247:21 248:9
complications 173:12
compromised 176:15
computed 49:24
concern 119:25 121:2
concerned 84:2
118:18 120:4
concerns 116:1
concluded 261:16
conclusions 251:5

conditioning 179:4
conduct 86:3 210:20
conducted 175:13,24
176:6 178:24
conducting 175:22
confer 253:13 259:8
conferred 41:5
confirm 169:10
confirmed 163:21
confrontation 157:2
confused 33:16 35:17
85:7 121:9 146:6
167:20
confusing 31:16
confusion 151:20
connect 135:24
connected 112:25
262:12
cons 189:23
consent 36:10
consider 232:1
consist 20:20 84:7
consistent 29:2
consistently 9:20 23:4
constantly 128:4
construction 43:17
consult 149:25 150:6
150:7 195:19 248:3
consulted 191:19
Consulting 86:2
contact 247:25
contained 108:9
212:11
contemplate 49:5
contemplated 183:12
contention 206:2,4
context 228:17 245:3
continue 116:24
119:23 120:18
192:17 226:17
continued 175:2
continuing 207:2
contract 222:25
223:2,6
contractor 116:19,22
127:6 215:14
216:24
contractors 86:3
127:4 214:15 216:9
217:11,19,21,25
219:19 220:4
248:13

contracts 217:6
contribute 125:9
control 220:2
controlled 219:9
220:3 240:10
conversations 177:5
255:24
Cooks 193:24
Copies 107:2
copy 32:1 38:11 61:8
61:10 83:14 88:15
137:14 243:9,12
Coral 2:6
corner 242:9
corporate 234:23
corporation 191:10
200:23 201:22,24
202:8 206:9,22
210:4
corporations 179:19
187:12 206:16
207:3
correct 43:5,21,24
58:23 59:1 60:8
62:23 71:16 76:15
93:2 103:10 110:2
110:20 112:4
115:18 116:7
119:17 131:18
132:15 135:1,9,10
140:20 142:14
151:4 157:21 160:1
169:4,6 178:6
181:13 184:1,16
185:18 187:4,5,16
187:20 193:12
194:6 195:5,11,16
196:7,15 213:3
215:16 219:15
222:13,25 223:4
224:11 231:3,4
236:14 260:19
correctly 120:9
correspond 121:11
costs 253:22 254:21
costumes 100:22
couches 181:1
counsel 3:7,11 33:9
36:7 38:10 41:5
194:17,19 252:16
254:19 262:10,12
counsels 76:12

count 16:10 98:8 99:3
105:2 110:16
129:10,14,25 130:4
130:11,12 141:19
161:10
counted 97:3 130:15
130:16,18
counter-affiant
256:17
counter-affidavit
255:19
counting 130:7 155:3
155:6
couple 24:23 29:19
69:11 74:3 189:4
237:4 247:1 253:3
course 28:2 38:20,20
83:1 92:13 114:25
125:1 142:16
179:14 188:12
208:16
court 4:11,20 6:2,4
9:2,8 10:22 11:8,13
19:6 20:2,20 22:16
27:6 29:22 30:4,13
30:14 34:22 39:5,7
39:8 40:22 65:9,14
74:15,16,19 75:22
76:8 81:2,12 82:4
84:6,10 85:5,25
87:19 89:3,9 90:6
90:10,13 93:18
100:12,12 101:12
101:18,25 102:2,10
103:24,25,25 104:6
105:13,15 111:15
114:3,17,23 120:16
121:8 170:18,21,23
201:11 204:1,11,14
213:9 226:11 243:7
243:16 250:2,7
262:4,23
Court's 14:8
courtroom 90:23
91:4
courtrooms 90:25
cousin 178:16,16
210:20 245:17
cousin's 175:5
cover 86:14,17 183:9
255:12
covered 233:6

**COVID** 103:21
  200:18
**coworkers** 129:1
**crazy** 9:5 22:9 29:4
  42:20 44:8 51:4
  93:1,3 197:18
**creation** 140:19
**credit** 235:14,16,18
**critical** 257:4
**cross** 17:22 41:11
  59:8 80:25 117:14
  168:24 169:5 173:4
**Cross-Examination**
  2:15,17,20 41:12
  122:3 194:11
**cross-motion** 168:1,9
  169:11
**cross-motions** 168:4
**Cubby** 174:11,14
  178:4,14 210:21
**curious** 110:4
**currently** 197:22,23
  198:1 214:24
  236:16
**cusp** 49:10,12
**cussed** 98:2
**customer** 15:17 96:5
  96:6 157:23
**customers** 15:7,11
  25:16 26:2,12
  110:12 153:18,20
  163:16,24,25
  164:13 246:13,20
  251:23
**cut** 161:9 162:2
**cutoff** 13:11

—————

**D**

**D** 21:21
**dad** 177:12 184:20
  248:15
**dad's** 174:20 176:8
  184:24 185:19
**daily** 141:22 224:18
**damages** 4:1 5:25 6:7
  28:5,6,8,12 30:15
  40:8 75:19 76:1
  78:10 101:23
  102:13 104:1,4
  251:17
**dance** 27:4,6 42:9
  45:9,10 86:12

100:17 143:16
  163:17 235:21
  236:8
**danced** 15:17 45:13
  45:15 51:1 130:12
  143:19 159:25
  160:4 163:14
**dancer** 8:18 9:2 41:18
  42:10,11 51:2,3
  81:23 89:1,3 109:7
  109:8 110:8 111:4
  111:24 126:10,11
  145:11 160:24
  246:11
**dancers** 54:18 113:15
  124:16 127:3
  193:12,15 195:4
  214:10,14,18 215:8
  215:13 216:9,10,24
  217:5,11,16,18,24
  218:8 219:19 220:4
  233:19 235:11,13
  235:17,22 236:12
  236:16,24 239:24
  246:17 247:7
**dances** 15:16,19,22
  96:4,5 235:21
**dancing** 8:21 43:2
  50:24 55:15 98:17
  129:12 130:23
  131:4 144:12
  153:10,22 163:5
  193:16
**Dane** 237:11
**Darden** 5:25 31:10
**Daryl** 68:1
**date** 76:5 86:5 109:7
  244:24
**dated** 32:24 34:6 41:6
  86:6,7,8 107:8
  169:2 262:16
**dates** 24:4 28:15
**daughter** 122:19,22
  123:2
**daughters** 172:6
**day** 6:17 10:8 11:21
  14:19 24:15 27:20
  42:6 48:1,1,2 49:18
  50:16,16 51:7,7,8
  51:10 52:13 53:6,8
  54:13 69:21 71:2,16
  72:4 73:14 78:2

84:13 88:16 92:15
  101:13 102:6
  103:14 105:5,5,7
  114:7 139:23,24
  141:20 142:16
  176:6 180:16
  189:21 212:7 215:2
  227:10 242:2,5,5
  254:15 262:16
**day-to-day** 184:5
**days** 23:6,8,10,10,11
  23:12,16,16,17
  24:18,19,20 25:11
  28:16,22 29:9,9,19
  30:10 50:3,8,8
  52:20 53:12 54:11
  71:22,22 86:20 90:6
  90:8,9 114:4 128:22
  139:25,25 140:1,2,4
  140:12 141:20,23
  152:3 165:7,8,9,13
  165:17,18 250:2,3,4
  250:6,7,8,9,15,16
  252:23
**de** 2:6
**deal** 46:11 67:25
  68:24 146:18 223:1
  253:20 257:13,13
**dealing** 234:4 235:24
**dealt** 33:15 211:13
  241:21
**Dean** 239:21 240:2
**death** 175:22 206:5,7
  206:12 208:7 215:2
  234:5
**debate** 76:11 258:16
**decades** 248:15
**deceased** 238:24,25
**December** 122:23
  171:17,18 175:14
  175:19 177:24
  179:8,11 185:11,17
  187:22 205:16
  215:2 217:4 218:9
  233:25 236:3,4
  243:20 244:10,16
  245:25 247:22
  252:4
**decide** 6:21 31:22
  65:2
**decided** 163:4 189:24
  248:12

**decision** 195:15,18
  220:7 227:5,17
  228:11
**decision-making**
  195:13
**declaration** 14:6,7,15
  32:6,12,17 40:12,13
  40:16
**declarations** 3:25
**declare** 135:8 149:8
  149:19
**deduct** 141:13,15,15
**defenses** 247:18
**definitely** 103:16
**deflect** 140:23 148:12
**degree** 171:10
**delivered** 103:20
**Dennis** 189:20 191:5
  191:6,7,18 209:12
  209:13 211:7
  220:19 245:17
**dense** 120:12
**dent** 148:13
**Department** 187:11
  248:1
**depends** 53:22 84:12
  96:6 104:24 112:10
  124:22 130:22
  131:2,22,25 153:3,9
  153:12
**deposit** 61:16
**deposition** 61:5,9
  62:5,9 166:1,6,10
  228:2,12 229:1
  242:20 243:2
**depositions** 219:12
**describe** 9:1 10:2
  12:1 20:2,17,19
  22:15 30:4,13 39:7
  43:7 95:1 100:12
  105:13,14 106:5
  109:9 112:15
  160:15,17,18
  162:21 177:9
  201:18
**described** 20:10
  241:17 248:20
**destroy** 74:10
**details** 233:3
**deteriorate** 172:25
  175:3
**deteriorating** 176:9

**deterioration** 185:2
**determination** 17:1
  140:11
**determine** 16:23
  48:20,21 57:16 58:7
  112:7,8 113:2
  195:10
**determined** 19:24
  50:3,9 57:18
**dialogue** 239:10
**Diamonds** 8:18,22
  9:3,6,20 10:4,8,9
  14:2 15:3,8 16:2
  17:4 18:6,9 23:7,23
  24:5 27:15,18 28:20
  29:24 39:9 42:20,22
  43:3,5,7 44:8 46:3
  47:19,19,20,25,25
  48:3,6,6 51:4 74:17
  74:20 76:19 78:24
  81:23 82:2,5,9,18
  82:22 83:23 90:7
  91:11 92:24 93:9
  94:15 104:7 112:15
  112:18,19 113:8,11
  113:23 114:5 115:4
  115:12 122:7
  134:15 141:1 143:5
  143:8,10 144:10,19
  153:4 159:12
  160:23 162:24
  163:1 164:18
  175:19 177:25
  178:9,21,21 179:9
  179:23 180:3,11,16
  180:21,23 181:13
  181:17 182:5,7,8
  183:16 184:5,7
  185:13 187:14
  190:22 191:25
  195:5 196:24 197:3
  197:24 198:5,13,15
  198:21,23 210:3,14
  213:18 215:21
  217:11 218:21,22
  218:24 219:6
  220:12 221:4
  224:11,23 225:4
  230:20 231:3,6,7,14
  231:20 232:18,19
  233:21 234:2
  236:13,17,21 237:2

237:12 241:18,22
242:23 245:10,11
245:21,23 246:24
247:7,21
**diary** 51:5,12,15 74:7
74:10 167:14,17
168:10,12,13
**died** 67:4 176:3,7
206:19 210:8,10,19
214:7 218:10 219:6
222:10 244:23
**difference** 103:11
123:13 142:10
144:6 148:14
162:21 253:23
**differences** 253:15
255:25 256:1 258:8
**different** 12:18 13:1,6
13:6,8 39:17 43:1
45:10 46:12 48:3,4
48:15 50:19 58:14
60:23 94:23 119:5
119:10 121:6
143:20 147:19
156:16 167:20
173:19 189:23
198:23 201:14
**differently** 143:19
215:25
**difficult** 76:4 94:24
146:18 257:6
**difficulty** 4:17 255:14
255:22
**direct** 2:14,17,19
7:24 81:19 117:24
117:25 150:16
156:19 170:12
**directed** 64:16
**direction** 65:1 80:14
**directions** 210:10
**directly** 79:21 80:4
163:24,25 164:1
210:7 224:13
246:12,19,23
**director** 203:12
**directors** 203:23
204:5
**disagree** 258:2 259:3
**disagreement** 258:2
259:9
**disagreements** 258:6
258:8

**discipline** 84:7 86:24
**disciplined** 18:18
19:13 84:3 98:3
223:21
**disco** 54:17
**discuss** 79:17 94:17
258:6,7
**discussed** 94:19,20
94:21
**discussions** 176:25
189:20,21
**disregard** 215:22
216:8,23
**distanced** 4:25
**distancing** 4:23
**distinction** 232:4,10
**distributed** 189:17
190:21
**distributions** 215:3
**Division** 187:11
**DJ** 17:5,8 18:15,19
19:7,7,7,13,15,15
19:17,18,20,23 20:6
21:3,21 22:15 83:3
84:9,17,19 86:15,16
94:4 99:15,21 106:8
115:6,17,20 116:25
148:12 164:23
**DJs** 19:16 93:23
**doctors** 173:17
174:25
**document** 30:17,23
83:15,16,19 85:14
85:19 86:1,6 88:3,6
88:6 102:16 107:1
107:18 114:11
121:5 136:25 137:5
137:20 138:5,20
140:6 141:2 142:3
166:10 189:13,14
189:15 200:21
201:1,1,15 202:7,13
203:17 205:23
208:15 225:16,20
226:15
**documentation**
113:22,25
**documents** 81:9
109:2 117:5 136:19
136:21 138:25
139:17 187:16,24
202:13 203:5

206:13 208:5,10
239:18 249:19
**doing** 32:5 40:11
46:12 68:5 93:4
101:7 120:6,6,11
121:4 122:24
127:25 149:14
172:16 176:22
180:21 181:7
187:13 210:3
213:18 225:5
240:14 246:24
**dollar** 98:19 105:23
110:15 160:24
**door** 6:15 22:24
52:15 105:19
111:11 116:14
139:12 158:12
**doors** 22:8 25:25
**Doral** 192:2,6,7,11,13
192:13,14
**double** 173:5
**doubt** 208:25
**downtown** 176:4
**draw** 208:12
**dream** 162:24,24
**dressed** 10:13 20:23
**drinks** 100:19
**drug** 68:11
**duly** 5:10 81:16 171:1
**duplicate** 36:11
**duties** 209:25

**E**

**E-L-L-I-A-D-R-I-A**
81:15
**e-mail** 12:10,10 33:6
36:7,19,20 119:12
121:16,18 251:1
255:20 256:4
**e-mailed** 33:8 35:12
38:12
**E-mails** 212:25
**E-S-H-A** 8:13
**earlier** 24:18 56:24
74:6 76:18 111:23
112:16 114:21
134:17 137:8
187:25 221:16
222:11 231:2
232:22 236:11
**early** 112:14 252:19

**earn** 51:19 52:8 56:1
70:18 71:25 72:4,12
73:7 125:21 128:1
136:2 143:24
146:22 147:6 148:5
151:8 152:11
153:23 155:12
156:23 164:18,21
165:13,18
**earned** 16:2 52:10
55:18 57:11 69:8
70:3,12 71:15,23
72:2 127:10 134:9
135:1,8,11,14
146:22 147:24
148:8 149:20 151:1
153:7 154:6,7
155:22 163:23
**earning** 147:16
**easier** 90:18,20
133:13 137:3 142:9
191:13
**easily** 118:4
**east** 173:16
**educational** 171:8
179:22
**efficient** 252:17
**efforts** 164:16
**eight** 46:8 57:18,20
76:6 103:19
**either** 11:10 25:24
26:19 69:7 77:14
103:8 111:21
115:13 141:21
216:23 217:22
226:7 232:2 252:23
**electric** 63:4
**electricity** 182:14
**electronic** 204:21
205:4,7,12,20 207:5
207:12,16,21 208:8
**Elliadria** 2:16 81:14
**Elliandria** 1:4 3:4
**emphasize** 14:11
**employed** 122:7
123:1 124:20 195:4
224:15,23
**employee** 1:2 209:15
223:3,10,13 224:1,4
224:8 230:23 232:3
262:10,11
**employees** 86:4 210:2

211:14 218:19
219:19 220:5 221:2
229:10
**employer** 6:4
**employment** 23:22
24:1 92:4 93:19
**encourage** 255:7
**endeavor** 180:2,11
**ended** 173:10,11
**ends** 179:16 207:8
**engage** 15:15 25:17
**enjoy** 26:2
**enjoyed** 257:12
**Ennis** 203:9 204:4,8
205:6 207:11
209:17,17 224:1
**ensure** 237:11
**enter** 200:9
**entered** 14:6 182:11
182:23 225:2
**Enterprises** 86:2
191:8 196:1 219:10
219:18
**entertain** 15:7 125:22
**entertainer** 59:14
83:10 86:14,15
**entertainers** 86:12,19
188:20 189:18
193:21
**entertainment** 196:20
196:22,24
**entire** 8:11
**entirely** 177:17
**entitled** 101:23 102:3
235:14,18 254:5,21
**entries** 109:7
**envelope** 99:6
**envelopes** 16:12 99:8
99:9 160:13
**epidemic** 248:18
**epiglottis** 173:5
**equal** 40:7 104:3
**errands** 114:8
**Espinoza** 212:6 240:7
240:11,12,18
**Esquire** 2:4,8,9 34:7
**essentially** 145:24
250:19
**essentials** 100:14
**establish** 125:25
138:14 139:3,5
144:9 208:2

established 64:10
185:15 188:14
estate 234:5 245:13
245:20
estates 241:21
et 5:25 93:23
evaluating 258:19
event 52:21 53:11
92:5,11,14,22,24
100:21 124:23
239:17
events 92:1 115:1
everybody 4:22
20:25 23:2 84:1
105:17 106:7 118:5
127:25 148:18
193:11
evidence 7:20 14:22
75:6 119:1 208:11
212:21 257:13
259:19
exact 14:4 74:16 76:5
132:4 152:24 157:5
160:10
exactly 32:7 53:18,19
98:8 155:21 160:11
190:2 244:18
Examination 2:14,15
2:17,18,19 7:24
74:4 81:19 159:17
170:12
example 258:10
Excellent 3:22
excerpt 243:12
excessive 258:17
exchange 68:1
Excuse 106:16
126:14
excused 80:18 165:20
249:13
exercise 255:4
exercised 188:11
exhibit 31:7,8,12,16
31:17,18,21 32:2,23
33:2,3,5,6,9,14,25
34:5,9,13,18,20,21
34:23,24 36:19,25
38:24 70:10 74:24
75:4,13 85:6 87:17
106:14,17 107:5
108:6,12,12,21
109:6 118:18 119:4

120:5 121:11
132:12 137:1,12
138:1 165:22,24
166:23 168:12,23
168:24,25 169:23
186:7,15 189:8
193:4 229:25
237:21 241:8
249:18 260:7,12,15
260:22 261:4
exhibits 4:2 34:15
36:9 103:20 118:25
119:3,7,15,20 120:5
120:7,8,15 121:6
165:22 169:16
185:21 239:12
241:9,15 249:19
259:19 260:9,21,24
261:1
exotic 195:4 214:10
216:23 246:11,17
expect 252:6
expected 86:19 92:12
expecting 251:12
expedite 3:23 6:23
expenses 63:19
182:14 183:9 254:2
expensive 208:22
experience 179:21
246:10,15 253:24
explain 60:13 91:22
107:6 114:17,17,22
172:21 178:11
251:19,21
explained 107:20
explains 254:19
explore 16:19
explored 248:19
express 115:23
expressed 115:25
extensive 245:12,19
extent 174:2 258:1
extra 54:13 112:13
129:10 137:14
243:9
eye 173:3,4
eyesight 173:2

——————
F
——————
face 176:12,12
fact 4:4 45:25 62:15
142:15 146:21

251:5
facts 7:2
factually 251:1
fair 117:15 132:25
145:17 183:1
207:24
fairly 257:14
fall 120:2
falling 96:7 249:22
familiar 7:17 186:9
189:13 194:20
219:10 220:14
221:9,10 247:3,4,5
family 28:25,25 29:7
141:17,18 143:15
famous 72:24 73:2
far 79:1 98:19 116:12
118:25 119:16
120:14 133:1
153:20 192:25
193:3 202:18
fast 8:5 60:20 126:19
192:5
father 67:1 172:9
173:16 175:6,21
177:1,6,11,21
179:11,24 185:4,6,8
188:1 191:9 196:6
203:2 205:16 206:4
206:8,9 208:4 210:8
210:10,19 214:7
218:10 219:6
222:10 244:6
245:12
father's 171:14
172:20 175:15
177:9 178:8 185:12
187:22 190:1
191:24 194:5 206:3
206:7,12 209:19
210:23 219:13
222:8 234:4 241:21
fault 66:10
favor 146:15
fear 47:11
featured 215:7
February 33:4
federal 126:7 217:22
217:23
FedEx 103:19
fee 12:2,3,8,18,19,24
14:1 15:2 22:22

30:7,8 51:25 71:18
71:19,20 83:25
91:22 92:12,19 93:1
93:3,8,19,22,22
94:21 112:12
164:20
feed 226:16
feel 75:7 141:24
142:2 155:21
258:17,17
feeling 84:13
fees 12:22 13:21,25
14:14 22:21 23:24
27:21,23,23 29:23
47:13,14,22,23
52:12 53:7,18,25
54:1,3 55:17 63:22
71:16 76:4,5,9
82:25 91:13,20
113:17 114:1,16,19
114:22 115:13,20
116:6,17 124:19,21
125:18 143:21
148:9,11 156:3
214:19 216:10,25
217:12 234:20,21
234:22,25 235:1,6,8
235:21 236:8
248:14 253:6,16,18
253:21,25 255:5,16
257:21,23
feet 43:15,16 178:15
180:8,9
fell 96:16
felt 115:22,23 128:9
145:19 185:3
233:21 240:13
female 66:11
fight 157:4,6 158:16
158:19,20
fighting 84:16,17
figure 142:9 146:15
248:8
figured 71:12
file 55:2,8,11 113:15
126:6,9,9,11,13,16
127:9 134:22 135:4
149:7,17
filed 126:14 134:17
134:20,21,23,25
135:6 149:11,21,21
205:21 207:17,18

219:8 220:12
232:18 240:6,19,21
files 136:12,14,17,18
136:19
filing 126:17,21,23,24
fill 83:12 88:8
final 3:3 6:6 102:8
195:15,18 247:13
257:25
financial 212:17
financially 262:13
find 85:1 86:14,16
108:17 182:9,12,21
187:25 253:11
findings 251:5
fine 5:2 6:16 14:10,23
17:14 19:1 21:14
36:12 41:15 84:11
111:18 120:21
133:20,25 256:23
fined 84:8,14,15 98:3
127:20 131:7,21
150:12,14,20
fines 86:23
finish 6:16 13:7 118:3
198:17 206:3
211:24,24 213:16
214:13 216:6
223:15,16,22,23
226:15 252:19
finished 215:3
firing 193:20 225:3
225:10,12 227:20
229:5,9,11,13
236:12
first 4:5 7:21 10:11
20:4 50:24 67:17
81:12 82:7 83:11
93:14 99:3 103:6
107:5 124:6 128:10
129:7 147:7,7,25
148:1,5 149:15
160:22,24 161:3
162:25 163:2,4,6,6
170:22,24 189:11
200:20 203:17,25
204:13 258:6
five 13:5 23:8,17 26:3
28:16 50:3 54:10,11
57:23 90:8 99:8
109:7 112:21,22,22
112:23 129:13

139:25 140:2,22
141:1 142:16 161:7
**five-page** 106:14
**fix** 33:17 34:2 116:4
118:23 121:21
**fixed** 103:13 116:2
121:14 128:5,10
**flat** 48:1
**flick** 49:21
**floor** 17:6,7,10,11,14
18:5,9,12,15,20
21:2,22 22:6 45:9
45:10,15 48:16,19
82:24 95:18 96:7,9
96:16 97:20 161:3
**Florida** 2:6 42:16,18
141:17 143:9,22
145:10,12 171:20
172:4,8,13 174:7
178:2 187:11
198:23 199:18
201:21,23,24 207:3
208:22 209:20
**Flovilla** 171:7
**flow** 245:13
**Floyd** 92:14 132:7
156:2 158:22,24
163:9
**FLSA** 211:3 212:22
213:1,14 220:11
**fluctuate** 13:6 23:9,20
24:17 115:14
**fluctuated** 114:25
124:22
**fly** 9:15 182:16
187:13 201:25
202:2,3,4,8,10
209:15 210:2,5,13
213:17,23 214:21
220:12 221:1,8,23
222:5,7 223:4,10,13
224:2,5,8 229:18
231:8,9 232:3,19,20
232:24 233:18
234:8,18,21,25
235:2,4,6,7,10,13
235:17,20 236:7
245:24 246:23
**flyer** 92:2
**focus** 258:9
**focused** 255:10 259:1
**folks** 193:24

**follow** 9:21 96:25
213:6,10
**following** 105:5,7
120:22
**food** 173:6 215:11
**foot** 180:25
**foregoing** 262:6
**forever** 54:22
**forget** 18:22,23 36:20
251:3
**Forgetting** 140:16
**forgot** 5:14 252:23
**form** 159:8,8,9,11
175:18 251:3
**formality** 7:15
**formally** 261:11
**Former** 133:17,18
**forms** 186:9
**Fort** 174:12,14
**forth** 4:1 6:18 42:17
68:18 174:22,24
177:3 232:9
**forward** 7:18 249:17
**foundation** 233:8
**four** 6:5 50:8 57:22
98:17 107:5,23
108:20,23 109:6
112:21 129:13
131:9,9 140:22
141:1 145:25 166:6
166:11
**frame** 77:1,4,5,9 78:9
171:23 210:15,17
212:10,13 225:13
235:25 252:24
**frames** 77:6 216:13
**frankly** 255:1
**free** 215:22 216:8
**fresh** 145:14
**friend** 182:1,2
**friends** 128:24,25
**front** 13:23 39:1
67:18 103:4 105:19
111:11 158:12
179:7 193:3 228:4
241:25
**Fuchs** 166:2,4 213:3
237:11 238:19,22
**full** 155:25
**full-time** 184:23
**fully** 20:23 82:12
**funds** 23:3,4 222:6,8

222:9 246:11
**further** 40:10 69:19
74:2 78:12 80:16
117:11 194:7
229:25 249:4,11
261:12 262:9
**fuzzy** 194:21

### G

**G-R-I-F-F-E-N** 81:15
**G5** 47:16,17,18,25
**Gables** 2:6
**Galardi** 1:8 2:19 3:5
3:14,16 6:1,4 34:7
41:6 59:24 60:2,4,6
63:25 64:2 67:12
68:12 69:1,8 70:9
73:16 76:19 79:18
79:21 80:4,7,10
86:2 117:18,21
122:11 124:11
128:19 129:17
132:18,25 148:16
165:25 166:2,4,5,9
166:13 167:9,16
168:10 170:16,25
171:5,6,15 178:17
189:7 191:7,16
194:13,20 195:21
196:1,10 200:15
202:7 203:18 204:1
204:13 206:18
207:5,13,20 209:8
209:12,13 211:12
211:18 212:8,16,17
213:9,16 214:13
219:3,9,10,18 220:2
220:3 227:4 228:2
228:12 230:1
232:11 239:16,19
240:7,10 241:25
243:17,23 245:24
247:3 249:14
**Galardi's** 35:8,22
67:1 80:14
**gather** 177:16,20
**gay** 174:12
**general** 119:8 215:19
215:21 216:22
217:8 224:2,5,14
225:2,14 227:21
230:20,22 231:24

232:1
**generally** 77:3,5
130:2
**generous** 179:3
**generously** 45:3
**Gentleman's** 8:19
**gentlemen** 5:22
154:23
**Gentlemen's** 81:24
**Georgia** 129:3 171:7
184:22,23 185:6,9
185:10 199:18
**Gerald** 2:5,9 3:13
**geraldtobinpa@aol.**
2:8
**getting** 36:18 78:4
121:13 127:22
128:5,10 131:20
226:3
**giant** 43:9 45:17
**girl** 9:8,10,19 17:18
43:21 92:24 139:12
143:12 144:11
163:2,5,6
**girls** 9:7,12,13,13,14
9:18 10:1 12:11,19
13:5,19 17:25 24:24
44:5,7 45:13,15
55:3 59:16,17,18
73:8,10 85:18 95:4
95:4 98:17 112:10
113:6 129:13,13
130:12,22 131:2
143:24 153:9,12
160:6 161:5 163:5
180:25 191:14
**give** 5:12 20:6,14,15
20:16 21:7,17,23
28:2 45:4,6 54:4
60:6 62:12,14 63:25
74:16,19 82:22
83:10 84:10 86:16
98:6,20 99:6 103:1
106:3,19 111:9
125:21 130:13
136:3 146:14
151:17 152:13,14
152:21,23 153:21
153:24 154:8,17
166:20 167:4 186:1
206:17,24 213:20
213:22 224:18

237:19 241:13
257:9,22,22 259:6
**given** 15:23 18:11
117:13 120:16,17
149:5 157:23
213:19 216:2 217:9
242:21 246:19
**gives** 20:24 118:5
**giving** 4:22 70:10
98:23 99:11,12
114:18 127:11
149:13 177:21
**glad** 8:14
**GM** 227:6
**go** 5:8,23 6:9,25 7:10
10:7,11,13,15 11:16
11:16,20,21 13:7,14
13:22 14:17,23 15:5
17:18 20:15,18,21
20:23 21:2 22:5,18
24:8 28:25 29:5,6
37:11 39:3 41:4
47:9 49:23 50:4
51:9 58:10 59:19
60:21,22 66:11 70:7
77:14 79:25 86:11
91:14,15 92:9 93:6
93:7 96:19 105:18
112:14 116:5
117:24 120:12
128:8 133:22
145:13,15 151:11
159:22 165:1
170:10 172:2,5
177:18 179:5,6,8
184:22 187:18
189:24 199:3 201:5
202:15 203:17,22
204:10 207:14
209:2 212:4 216:5
226:8,16 234:13
251:19
**go-go** 42:10,11 43:2
51:2,3
**goal** 256:8
**goes** 61:14 201:16
209:4
**going** 3:19 6:11,18,21
7:4 11:22 12:23
13:3,4,14,18,19
14:7,8,17,18 19:14
19:18 21:16,17 22:5

22:7,9,10 32:25
33:12 36:21,24,25
37:3,17 38:7 39:2
45:4 46:1,13 47:8,9
47:9 50:5 54:22
60:17 61:5,11,11,12
62:19 63:11 64:13
64:25 68:10 77:6
80:21 84:20 87:3
90:23 92:25 93:3,4
93:6,6 98:9 106:9
107:6 109:3,9 113:2
115:14,24 117:17
117:20 118:11,12
118:21 119:2,14,19
119:22 120:18,25
123:15 124:7
125:16 128:3,5
130:10,11 133:22
133:25 134:1
141:19 145:12,15
145:16 146:17
149:4 165:16
173:24 174:21
180:20 186:6,14
187:10 189:7,9
192:5 198:7,11,12
199:4 200:13 201:2
207:25 208:11
211:15 212:4 213:9
225:19,23 230:2
237:14,19,25 238:2
241:20,24 249:17
249:23 253:2,21
254:14,15 257:3,6
257:21 258:13
259:11 260:2,3,6,7
**Gold** 176:4 191:15
192:3,18 197:6,7
**good** 3:16,22 5:3 7:14
7:16 38:17 39:24
40:20 41:14 49:2,4
66:1 76:16 77:12
81:21,22 112:11
118:7 122:5,6 158:2
158:3,7 166:24
170:14 174:21
180:8 182:4 191:23
194:13,14,15
208:14 209:6 236:5
249:13 252:19
255:3

**gotten** 38:22 158:4
233:23
**graduate** 173:21
**graduated** 171:13
**graduation** 175:5
**grandson** 173:22
**granted** 6:2 197:21
**great** 258:24 259:9
**grieving** 179:12
**Griffen** 2:16 3:4,18
3:25 33:23 35:2,4
35:14 37:19,21 41:9
80:24 81:14,15,21
85:10,14 88:3,21
90:13 103:6 108:1,2
109:12,14 122:5
125:14 147:20
159:7,19 166:5
**Griffen's** 37:10,11
**GRIFFIN** 1:4
**gross** 181:3
**ground** 160:24
**groups** 98:20
**guarding** 22:8
**guess** 67:23,24 81:9
92:6,10 136:5,6,7,9
140:7,9 142:14,15
151:16,17 152:14
152:24 154:8,16,17
155:20 189:20
206:25 211:14
225:6 241:1 260:10
**guy** 66:7 221:21
239:4
**guys** 18:1 33:8
108:18 133:20
250:22 256:1,9,23
258:12,23

**H**

**H-O-L-M-E-S** 8:9
**habit** 90:24 133:12
**hair** 60:23
**half** 178:22
**hand** 15:12 87:16
136:10 137:2
170:24 176:16
**handed** 34:17 38:9,10
106:10 160:20
**handling** 191:4
**hands** 96:10,24
125:24

**handshake** 223:1
**handwritten** 107:7
**happen** 21:11 23:23
72:9 111:15
**happened** 36:3 72:10
144:7 163:9,18
172:22 190:7
**happening** 173:20
**happens** 22:25
249:21
**happy** 6:12,17 257:5
**hard** 103:21,22
176:10 257:7
**Harlan** 34:7 194:22
238:10 239:22
242:20
**hate** 27:10
**haunt** 54:22
**head** 51:15,16,17
56:21 66:15,16,19
66:23,24 71:9 79:1
151:16 172:23
**headset** 68:18
**health** 172:20,22
174:20 175:2 176:8
217:20
**hear** 5:7 6:11,17 7:3
7:20 68:16 79:11
80:23 90:1 109:5,12
145:13,15 151:21
156:4 176:14
187:10 192:12
**heard** 62:25 79:6
89:25 112:16 119:4
122:12 150:16
156:12 159:9
181:24 182:4
183:10 187:14
193:14 216:16,25
237:7 247:4
**hearing** 3:4 4:17 6:6
118:14 120:15
172:25 176:10
184:10 247:13
252:19 253:17,18
253:20 254:1,3,16
260:3 261:12
**hearings** 219:12
**hearsay** 79:23 238:14
238:20
**heavy** 129:9
**heel** 180:25

**held** 46:20 96:24
121:24 219:18
220:2
**help** 17:7 30:17 74:23
75:17 185:7 225:16
259:12
**helped** 172:17 195:13
**helping** 176:22
**Henderson** 221:7
**hereto** 243:4
**hey** 160:14
**high** 47:24 94:21,21
173:21 180:25
258:12
**higher** 12:19 13:3
92:12
**highest** 14:1 93:8
**highlight** 50:6
**highlighted** 243:14
**highlighter** 50:6
**Hilton** 209:14,15
223:3,10,12 224:18
**hinder** 200:12
**hire** 10:6 19:7 92:5
95:21,22 99:20,21
100:7,25 101:8
230:23 231:23
232:6,9,12
**hired** 10:3 19:21
42:23 48:17 82:1,4
82:8,19 99:23,24
129:20,22,23,23
217:5 227:6 230:19
231:22
**hiring** 101:1 193:20
236:12
**history** 252:14
**hit** 161:3
**hits** 160:24
**hold** 38:14 85:10
116:15 135:23
219:20 254:1,3
**hole** 38:1 174:11,14
178:4,14 210:21
**holes** 180:25 181:1
**holidays** 141:16
**Holmes** 2:14 3:5,18
3:25 4:7,9,15,19 8:2
8:21 25:6 26:24
30:23 31:10 35:1,2
35:4,14 36:25 37:22
37:23 41:9,14,18

70:9 74:6 89:25
90:4 91:12 98:13
103:5,5,5,7 107:25
115:23 117:14
125:13 128:22
129:4 166:4
**Holmes'** 37:14 90:1
**home** 50:17 72:7
141:16,18,18
148:13 153:15
157:20 162:4 165:1
174:10 185:10
**honestly** 141:24
157:4 248:10
253:20,23
**honor** 3:20,21 4:6
5:12,24 6:13 7:8,12
7:22 14:5,16 22:19
23:15 30:20 31:5,11
31:13,19 32:1,9,19
32:20,23 33:18,21
34:2,13,19 35:24
36:4 37:16 38:19
40:10,18 61:7 62:16
62:24 63:9 64:9,22
65:5,23,25 70:4
73:24 75:2,4,9
76:25 78:7,20 79:15
80:16,19 81:3 85:21
87:9,13 88:18 90:15
90:20 102:20
103:18 106:10,15
106:18 107:10
108:22 109:4,11
110:1,19 117:11,19
118:7 120:17
123:10 124:3
125:11 133:3,7,14
133:21 135:21
143:25 144:24
145:4,5,20 146:24
147:13 149:9
156:19 165:19
166:12,16,18,21
167:1,10 168:15
169:10,18 172:21
177:9 178:11 180:6
183:15 189:1,5
194:10 197:11
198:6 199:5 200:15
200:20,24 201:12
202:12,24 203:15

207:6 208:3,13
212:5,9,14 213:7,25
216:17 217:1
225:21 226:2 227:2
227:22 228:7,22
230:5 233:9 235:23
237:18,24 238:13
239:3 241:3,8 242:2
242:16 243:11
247:2 249:5,11
250:21 251:10
252:1 253:4 255:15
256:13 257:17
261:15
**Honorable** 6:2
**honored** 144:21,21
**hope** 208:23
**hoped** 240:15
**horrible** 180:24
**Horse** 9:5 42:20 44:8
51:4 197:18
**Hospital** 175:8
**host** 17:6,7,10,11
18:5,9,12,15,20
21:2 22:6 92:5
**hostage** 46:20
**hosts** 21:22 48:16
**hour** 91:14 93:6
106:21 118:5
194:23 211:3,11,17
221:1,8 232:21
233:4,14,17 247:21
248:4
**hourly** 58:1,2,4
235:15 258:11
**hours** 9:22 24:15,16
24:19,20 26:3 48:24
51:6,7 75:25 101:13
101:13,13,16 102:5
102:5 103:19
139:20 140:12
152:2 163:16 209:7
258:16,16
**house** 9:7,8,10,12,14
9:16,18,19 10:1
11:17 12:2,3,8,16
12:22,24 13:19,21
14:1,14 15:2 17:5,8
17:14 18:14,19
20:23 21:1,21 22:14
22:21,22 23:24 28:1
29:23 30:7,8 43:21

44:11,13,15,16
48:12 51:25 52:12
53:7,18 59:18 64:19
71:17,19,20 76:3,5
76:9 82:25 83:3,25
86:23 91:13,20,22
92:12,19,24 93:1,2
93:8,19,21,22,23
94:1,21 95:4 100:1
100:4,7,9,13 106:8
112:12 113:17
114:1,8,16,19,22
115:6,13,17,20,20
116:6,16,24 124:19
129:20,22 143:20
148:9,11 156:3
164:7,20,23 214:19
216:10,25 217:12
234:20,21,22,25
235:1,6,8 248:14
**housed** 178:9
**housekeeping** 32:21
118:8,24 249:17
**Howard** 2:8 3:13
**howardbrodskyesq...**
2:7
**huge** 43:10,12,13
178:21,23 180:9
**hurry** 36:1 170:9
**husband** 172:6
174:10 180:14
185:7
**hype** 28:2

**I**

**I-S-H-A** 8:10
**ID** 10:5
**idea** 77:9 125:20,23
129:5,19 131:1
139:17 148:7
157:11 187:23
189:22 191:23
212:12
**identical** 32:17
**identified** 110:21
117:6 193:7
**identify** 106:22,25
109:3
**ignore** 228:19,24
229:2
**Illinois** 42:12,14,15
**immediately** 86:16

**impeach** 61:13
**impeachment** 243:1
**implement** 191:21
195:22 196:3
218:16 231:14,20
**implementation**
186:21
**implemented** 80:13
193:6 196:11
230:21 236:25
**implementing** 195:13
195:15
**important** 19:17 77:8
83:24 216:14 257:8
**improper** 243:1
**improve** 127:25
**inception** 118:9
**inclination** 254:2
**include** 234:21,22
253:14 254:7,11
255:15
**included** 127:1
**including** 22:20 30:7
30:8,8 71:17,19
83:5 193:12 213:14
213:17 215:21
216:3 217:10
**income** 55:8,8,11
126:7 127:1 134:18
149:8,19
**incorporate** 236:7
**incorporated** 202:2
202:11 210:3
213:17 214:21
220:13 223:10
232:20,20,25 234:8
234:18,22 246:23
**independent** 116:19
116:22 127:4,6
214:14 215:14
216:9,24 217:6,11
217:19,21,25
219:19 220:4
248:13
**INDEX** 2:13
**indicate** 4:21
**indicated** 14:13 75:7
**individual** 1:8 120:15
**individually** 119:17
240:15
**individuals** 18:14,19
210:1,7

**inform** 99:3 235:13
235:17
**information** 74:13
79:3 111:3 127:5,9
177:2 224:19
256:12 259:7
**informed** 36:13 127:4
**informing** 36:7
**inhabited** 178:22
**inherited** 196:18
**initials** 111:5
**input** 100:9 101:1
**inquire** 255:7
**insert** 37:24
**inside** 77:16,20 97:17
160:11 184:19
**inspection** 180:21
**Instagram** 12:12,13
12:14 54:24
**install** 231:5
**installed** 227:20
230:18
**instance** 261:2
**instructed** 62:22 63:1
213:13 237:10
240:1
**instructing** 239:24
**instructions** 20:6
**insurance** 182:15
217:20 218:5
**insuring** 211:11,17
212:22
**intention** 174:9
**interest** 174:3
**interested** 262:13
**interests** 173:25
174:7,14
**interfere** 121:3
**interfered** 219:2
246:9
**internet** 54:21 126:4
**interpret** 232:12
**interpretation** 45:7
**interrupt** 172:12
223:20
**interview** 222:17
**interviewed** 222:15
**introduced** 119:1
185:22
**introduction** 226:25
**inventing** 186:12
**investing** 181:12

**investor** 182:13
200:11
**investors** 182:10
**invoices** 221:22,24
**involved** 175:15,18
176:25 193:20
195:4 197:18 198:5
219:25 243:24
244:4 245:2,14
**involvement** 19:10
184:4,6 241:18
242:23 243:21
244:16
**involving** 213:17
247:6
**IRS** 55:18 126:15
134:20 135:5
149:12 245:20
**issue** 5:25 6:3 64:24
212:11 228:8 245:2
252:5 254:25
257:16,21 258:14
259:17
**issues** 6:5,6,10 36:8
96:3 252:5 254:23
255:18,20

**J**

**J** 2:5,9
**J-E-E-Z-Y** 72:21
73:5
**Jack** 171:15
**Jamaican** 24:22
**January** 179:20
180:15
**Jay-Z** 73:3
**Jeezy** 72:14,15,20,22
72:23 73:5,7
**Jennifer** 182:13
209:21 224:4
**Jeter** 194:20,23
**job** 47:11 95:17
113:12 134:13,14
134:18,19,21 135:3
135:4
**jobs** 134:13
**John** 1:13 3:6 203:8
204:4 205:6 207:11
209:17
**Joseph** 175:8
**journal** 74:7
**judge** 78:13 90:13,19

133:16,17,18
151:19 169:22
209:1 216:5,11
219:17 220:2
242:25
**judgment** 6:3 34:15
168:1,2,9 169:12
253:19
**July** 52:23,24,25 53:1
53:2,3 107:11
172:16 181:20
183:3 184:4 190:13
247:22
**June** 89:16 123:4,6,7
172:16
**jury** 243:18

**K**

**keep** 15:22 16:1 51:5
51:8,15,17 70:24
110:14 113:6,7
128:5 167:12 235:7
235:7,10,20 236:9
245:13 248:12,16
249:24
**Kelly** 178:16 179:2
**kept** 69:5
**Key** 174:11,17 178:5
**kind** 42:25 68:8 83:8
93:24 110:9 114:10
142:5 175:11,12
176:3 177:12
179:16 205:3
218:15 243:18
**King** 8:18,21 9:2,6,20
10:3,8,9 14:2 15:2,7
16:2 17:4 18:6,8
23:7,23 24:4 27:14
27:17 28:20 29:23
39:9 42:20,22 43:3
43:4,7 44:7 46:3
48:3,5,6 51:4 74:17
74:20 76:19 78:24
81:23 82:2,5,8,17
82:21 83:23 90:7
91:11 92:24 93:9
94:15 104:7 112:15
112:18,19 113:8,10
113:23 114:4 115:4
115:12 122:7
134:15 140:25
143:5,8,10 144:10

144:18 153:4
159:12 160:23
162:23,25 164:17
175:19 177:25
178:9,20,21 179:9
179:23 180:3,11,15
180:20,23 181:12
181:16 182:5,6,8
183:16 184:5,7
185:13 187:13
188:13 190:21
191:25 195:5
196:24 197:3,23
198:5,13,15,21,22
210:3,14 213:18
215:21 217:10
218:21,22,24 219:6
220:12 221:4
224:11,23 225:4
230:20 231:3,6,7,14
231:20 232:18,19
233:21 234:2
236:12,17,21 237:2
237:11 241:18,22
242:23 245:10,11
245:21,22 246:24
247:7,21
**knees** 96:10
**knew** 83:8 112:10
115:13,16 116:21
146:17 155:21
182:2 203:2 221:21
**know** 5:14 6:9,9 7:16
8:5,14,24 9:13,14
9:24,25 10:24 12:20
14:3,4 17:12,19
18:25,25 22:5,12
23:16,18 24:10 27:2
27:4 29:18 36:15,16
38:16,23 43:17 44:3
44:5 46:2,4,5,16
47:12,15 48:8 50:5
50:19,22 51:8,20
52:4,5,24 53:1,3,4,6
53:14,18,19 54:4,16
55:7,16,25 56:3,7,9
56:10,11,13,16,19
58:2,4 59:6,19,24
59:25,25 60:1,11,12
60:12,20 63:4,12,12
63:14,18,24 64:4,5
64:5,7,16,19 65:12

65:19,20,22 66:3,8
67:1,4,6,9,12,15,19
68:8,10,15,19,22,23
68:23,25 69:1,3,3,4
69:5,7,8,10 70:19
70:21,22 71:8,9,24
72:1,24 73:17,20,21
75:11 78:16,23
79:10 81:5 83:2
88:24 89:1,6,17
90:15,16 91:19
92:25 98:8 99:7
101:8 103:17
106:11 113:15
114:3,9,17 115:1
120:2 122:10
124:11,15 125:14
125:16,17 126:6
127:3 128:21
129:22 132:4,5,9
133:1,12 135:1
137:13 138:5
139:11,16 141:12
142:17 143:23
145:15 146:11,17
148:8,16,25 149:14
151:10,14 155:4
157:11,14 159:3,8
159:13 173:19
175:9 176:16,18
178:18 179:2 181:5
182:9 184:18 185:2
188:1,2,3,5,6
189:14,15 218:15
218:18 219:16,24
220:6,9,14 226:12
227:9 230:10
232:24 234:24
237:8 238:17
240:23,23 241:4
242:12 243:3
244:23 247:16,19
248:17,18,21,23,23
249:22 253:16
257:2,12,22 258:13
259:11,13,19 261:7
**knowing** 46:1 145:11
181:21
**knowledge** 15:21,25
16:15,17 19:20,23
77:22 90:3 99:23
101:4 122:9 140:13

143:9 206:5 235:19
237:3 246:16,18
**known** 197:23,23
**knows** 64:5
**KOB** 229:18
**KOD** 41:19 42:9,10
43:19 44:9,9 45:9
54:14,19 55:1,8
56:2 58:10 59:3,12
66:5 70:3 93:19
94:9 113:12 123:16
123:23,24,25 124:1
124:12 126:1,8
127:2,10,11 135:8
135:12,14 136:2
145:18 146:13,23
147:2,2,6,7,9,25
148:10,14,18,21
163:23 164:1
214:22 217:19
227:5,17 228:11
229:10
**KOD's** 63:4

**L**

**label** 12:15
**labeled** 116:19
166:25 214:10,14
217:16,18 260:5
**labeling** 216:9 217:11
**labels** 120:5
**Labor** 248:1
**ladies** 44:1 159:25
160:4 237:5 238:11
240:4 246:12,17
248:13 252:12,12
252:13 257:11
**lady** 26:24 68:12
88:21
**lap** 15:16 96:4 235:21
235:21 236:7
**large** 8:4 43:19 45:9
159:20 166:21,22
**Las** 171:21,22,25
172:2,8 173:24,25
174:3 192:3,25
**late** 129:24 252:18
**Lauderdale** 174:12
174:15
**law** 5:11 6:14,18 7:5
7:17 32:15 81:17
171:2 248:9 251:5

**lawsuit** 142:5 219:8
220:11,15,25 221:7
221:8 240:6
**lawsuits** 189:24
232:17,21 233:14
233:18 240:9,12,13
248:18
**lawyer** 40:4 62:14
138:7,8 140:19,24
200:3 238:18
240:16
**lawyers** 4:14 133:14
189:21 191:19
212:25 239:10
**layout** 67:19
**lead** 194:17,19
**leading** 112:6
**learned** 188:8
**lease** 182:20 199:7,8
199:9,11,13,14
200:6
**leased** 198:3
**leave** 17:23 18:3 21:5
21:8,12,15,18,24,25
22:5,7,10 24:18
45:20 47:1 52:16,21
53:19 104:7,21,23
105:15 106:3
111:12,16 123:25
143:1 187:6 192:1
218:17
**leaving** 47:8 83:2
104:25 109:19,22
**leeway** 64:12,14
**left** 46:9 67:19 105:4
123:23,24 124:1
125:24 142:23
157:14 171:25
173:11,22 226:24
248:17 251:25
**legal** 2:3 6:22 34:7
41:7 200:1 251:12
**legally** 251:1
**legitimate** 86:21
**length** 257:7
**Leon** 2:6
**lesser** 147:1
**let's** 3:6 7:23 10:7
11:24 15:5 16:19
20:17,18 33:11
34:22 49:23 50:1
61:6,13 63:2 80:23

85:5 91:8 106:19
109:5,12 112:15
116:5 121:22,23
124:7 158:9,9
167:21 171:22
172:21 183:5 184:2
195:1 202:15 207:9
212:4 214:4 223:20
232:6 233:25
234:20 243:17
249:16 250:11
**letter** 32:18 34:6
36:15,23 37:14 39:2
40:12 41:6,8 166:2
166:3 238:10
**letters** 32:7,13 33:19
260:10
**letting** 13:24
**liability** 6:4
**licensed** 199:9,13
**licenses** 197:20
**lie** 18:2
**life** 90:25 114:14
172:24 176:5
**lights** 180:16
**limits** 256:22
**line** 61:6 130:9
135:22 177:2 212:7
242:19,23,24 243:6
243:10,13,19,21
244:2
**liquidated** 40:8 104:4
251:16
**liquor** 215:11
**list** 12:8 17:19,24
20:24 31:17,18,21
31:24 32:2,23 33:2
33:3,5,6,9,15 34:10
38:24 41:20 54:17
108:12 112:3,7,13
113:4 119:5 121:11
165:22,24 167:20
168:25 169:24,24
169:25 182:13
192:17 260:7,15
261:4
**listed** 54:18 187:11
197:10 202:9,20,25
203:4,7 204:2,14,23
205:8,13 234:8
**listen** 6:12,22
**listening** 128:7

**lists** 20:25 113:4
**literally** 26:1
**litigating** 36:8
**litigation** 197:18
**little** 19:4 23:20 33:16
50:5 60:10,15 70:25
78:18 105:18 106:7
118:17 192:5,6
199:3 200:16,16
209:1 215:24 254:6
**live** 9:16 129:2,3
170:17 171:19
**lived** 43:23 148:18
171:20 184:23
**lives** 129:4 143:15
**living** 184:21,25
**Liz** 224:22 227:20
229:5
**LLCs** 179:19
**load** 60:21
**lobe** 173:11
**located** 77:16,19 95:8
192:23
**lock** 25:25
**locker** 20:22 83:6
97:14,17,21,21
**locking** 117:4
**log** 23:23
**logical** 141:21
**long** 17:14 23:25
25:22 26:3,13 46:6
50:24,25 51:13 52:6
56:5 67:6 71:4,6
74:14 82:16,16 83:9
117:14,24 118:1
119:24 123:3
146:16 179:15
209:3 249:25 254:3
256:11
**longer** 25:1 169:8
238:15,22
**longest** 9:14
**look** 48:10 59:18 75:8
78:17 87:1 103:10
106:5 126:4 128:21
134:11 137:5,15
168:11 186:7,15
189:10 202:16
208:16 235:5 238:5
242:13 243:4 259:8
**looked** 42:19 224:20
**looking** 7:18 34:5

49:18 62:9 102:16
102:18 103:14
107:4 121:5 136:11
137:21 167:8,10,19
167:22 200:11
242:2
**looks** 87:21 111:3
239:21
**loose** 98:19
**lose** 47:10 120:1
**lost** 26:5 74:11 162:9
197:20
**lot** 14:3 28:13 44:5
45:24 51:23 52:2,7
67:16 73:13 79:7
104:25 119:12
130:6 142:9 153:19
157:2 158:22
160:22 188:2 190:6
211:13,13 245:16
**Lots** 44:4
**louder** 27:9
**Low** 182:17 187:13
201:25 202:2,3,4,8
202:10 209:15
210:2,5,13 213:17
213:23 214:21
220:13 221:1,8,23
222:5,7 223:4,10,13
224:2,5,8 229:18
231:8,9 232:3,19,20
232:25 233:18
234:8,18,22,25
235:4,6,7,10,13,17
235:20 236:7
245:24 246:23
**Low's** 235:3
**lowest** 13:13 14:21
93:11,13,14
**lump** 99:12
**Luna** 245:16
**lunch** 80:25 81:1
103:12 106:20
117:13 121:24
170:9
**lung** 173:9 175:11
**lungs** 173:6
**Lygia** 35:7,19,21
37:12 107:16,21

**M**

M-A-R-Q-U-I-S-H-A

8:8
**M-U-T-E-P-E** 3:10
**ma'am** 59:10 126:19
131:12 170:14
**Madam** 65:8 239:14
**main** 9:13 67:22
83:24,24 84:1
173:15 184:17
209:19
**maintain** 37:15
**maintained** 210:12
**maintaining** 116:24
**making** 45:3 68:9
98:16 99:14 120:10
232:11 245:8
**male** 66:11
**man** 17:13 28:3 48:16
48:19 66:9 177:15
177:25
**manage** 229:18
**management** 116:1
124:16 128:11
164:3 182:11,24
198:24 215:20
219:1 222:21,23
223:11 227:5,18
228:11 231:11,18
232:7 233:22
**manager** 66:13,15,16
66:18,23,25 84:13
86:23 109:9 111:5
111:22 209:19
224:2,5,14 225:2,4
225:14 227:21
229:5 230:20,22
231:25 232:2
**managers** 16:25 17:1
28:2,3 66:19 69:2,5
82:10 128:6,12
215:19,21 216:22
217:9 225:13
**managing** 183:6
**mandatory** 13:21
17:6,18 18:16 20:10
20:12 25:3,5,6,9,20
25:22 27:22,23 28:4
94:14,18 105:10
115:16 116:13
117:1 127:18,19
**March** 1:15 32:24
33:1,4 107:8 121:15
122:23 169:2

181:25 222:12
233:25 260:16
**mark** 34:23 37:8
81:10 141:23 200:1
226:12 260:3
**marked** 21:4,4 34:11
36:16,23 81:10
84:20 87:4 106:9
107:4 120:9,15
167:5,14 186:6,14
189:8 200:13
225:23 227:11
237:14,17,21
249:20 260:1,3,6,9
**marker** 33:25
**marketing** 117:11
**Marky** 21:21
**Marquisha** 2:14 3:5
4:7 8:2,5 35:1
102:24,25
**Mary** 209:23 224:7
**Maryweather** 132:7
**mask** 27:10 41:25
122:21
**Masters** 191:15
192:3,24 196:19
197:3 214:5
**match** 32:6,7 118:19
121:16,19 260:7
**material** 254:16
**matter** 3:4 5:25 62:15
77:6 216:15
**matters** 3:23 6:23
**Mayweather** 13:15
13:16 92:14 156:2
158:17 160:14
161:2
**mean** 21:19 55:24
59:25 70:9 83:1
84:8 91:17 92:23
93:1,21 97:7,21
102:6 105:7 109:22
110:5 112:6 114:6
114:25 115:21,24
116:21 125:8,16
126:4 127:8 128:2
130:1,1,5 131:19
139:12 140:5,21
142:11 144:20
145:6,8,10 148:11
151:13,15 153:2,9
153:18 154:13

157:16,18 163:1
174:21 196:2 214:9
232:12 238:17,21
244:1 259:24
**Meaning** 149:17
**means** 5:21 17:10
60:14 110:7 208:20
227:9 241:4 244:20
256:16
**media** 54:23,24
**Meek** 162:23
**meet** 60:2
**meeting** 25:25 76:23
77:22,25 85:16
94:19 127:21,22
128:3,8,10
**meetings** 25:3,6,7,9
25:12,20,22 26:3,7
26:8,11,19 94:15,18
105:10,11 115:22
127:13,14,24 128:2
128:11,20 188:19
188:22
**members** 188:23
**Memorial** 82:6 92:15
103:14 158:20,21
158:22,24,25
**memory** 30:18 74:23
75:17 225:17 247:8
**men** 95:13,21,22
**men's** 174:12
**mentioned** 145:22
162:25 196:19
210:2 232:17
**merchandising**
171:11
**messages** 91:19
**met** 122:12 127:22
181:25
**metastasized** 173:9
**meter** 226:16
**Mia** 245:15,15
**Miami** 176:5 192:6,7
192:15
**middle** 112:24 141:6
**midnight** 13:11
**Mike** 245:17
**military** 126:18,22
134:24 159:10
**Miller** 34:7 41:7
194:22 238:10,15
238:22,25 242:20

243:11,14,17
**Mills** 162:23
**mind** 4:19 49:6 93:3
179:18,22 234:3
**mine** 161:4 168:3
205:4 226:2
**minimum** 28:15,17
48:22 50:2 54:10,11
58:1,2,4,11,18
74:23 75:7,18,22
76:12 86:15 101:19
102:4 152:2,8
218:19 221:5,12
233:19 247:8
**minus** 50:10
**minute** 234:21 249:7
**minutes** 6:24 69:11
91:16 93:7 118:5
**mischaracterizes**
46:22 145:21
**misclassified** 219:18
220:4
**misled** 91:4
**missing** 157:13,23
163:3,10,20
**mistaken** 92:21 116:9
158:22 184:14
**mixed** 42:25
**model** 214:8,9 215:22
216:2,9,23 217:5,13
218:11,13,16,20,24
219:6 245:25
248:12,16
**models** 217:10
**modified** 165:25
**mom** 11:17 17:5,8
18:14,20 20:23 21:1
21:21 22:14 28:1
48:12 83:3 86:23
93:23 94:2 100:1,4
100:7,9,13 106:8
115:6,17,20 116:24
129:20,22 164:7,23
**moment** 41:2 133:3
134:11 170:2 187:7
188:25
**momento** 60:10,11
**Monday** 13:2 36:6
49:3
**monetary** 28:6
**money** 10:14,17 11:2
14:3 15:12 16:8,9

16:10,11 18:12,24
18:25,25 19:3,16,17
20:13 21:5,14,17,23
22:12,14 45:3,4,5,5
45:6,6 47:9,10 48:6
48:16 50:21,21 51:6
51:20,21,22 52:1,2
52:22 60:6 68:15
69:2,6 73:9,11,13
73:16,17 86:16
95:13,18,20,21,22
96:7,9,11,15,16,18
96:19,20,21,22,23
96:25,25 97:2,2,5,6
97:7,9,10,12,19
98:5,6,8,14,15,16
98:19,21,23 99:8,11
101:9 104:25 105:1
105:2,20 110:11,14
123:16 125:16,19
125:19,21,22,24
126:15 127:21
128:1 129:14,18,25
130:3,6,7,12,12
131:5 134:9,20
135:2,5,8 139:13
147:8 148:12
149:12 153:19
157:4,5,7,9,10,11
157:12,13,22,25
158:3,8 159:20,22
160:9,11,14,15,17
160:18,25 161:2,10
161:11,16 162:8,9
162:16,18 163:2,9
163:10,14,19,19,23
164:16 181:9,12
182:6 183:8,13
222:4,20 246:12,17
246:19,22,23
**monitor** 15:22 16:1
**monster** 178:25
180:5
**month** 8:24 28:24
29:13,15,16,20 50:8
50:9 54:12 63:5,7
63:16 68:15 132:4
179:17 239:2
240:24 252:14
**monthly** 127:13
**months** 9:23 28:14,15
28:17 29:6 50:5

172:15 176:5
**morning** 24:25 41:14
81:21,22 105:1
129:25 130:3
140:24,25 194:13
**mortgage** 63:13,14
68:22 125:9 182:14
**mortuary** 122:17
**motion** 6:3 34:14
167:25
**mourning** 179:13
**mouth** 133:25
**move** 5:4 63:2 85:21
88:18 106:12
200:16 208:13
241:2,5,10
**moved** 43:2 89:17,19
120:16 172:7
173:13 174:6,13,19
178:2,14
**multiplied** 102:7
152:3
**music** 125:3
**Mutepe** 2:4 3:9
194:16
**mutepe.akemon@r...**
2:3
**Myrtle** 192:25

_____

## N
**naked** 82:13 96:9
**name** 8:1,8 11:1 12:8
16:12 17:21 20:24
27:2,4,7 81:13
88:24 89:1,3 94:10
108:25 109:8 111:4
122:12 170:15,24
171:4,14 181:24
191:11,12 194:16
199:8,9,11,21,22
205:23 206:4,7,8,10
206:12 231:12,17
**named** 187:23
**names** 11:8 139:13
235:15
**narrowing** 216:20
**nature** 133:11 216:4
**near** 143:21 148:10
185:1
**necessarily** 117:3
**necessary** 5:19 142:6
**need** 5:16,23 6:8 24:6

32:11 40:21,23
44:21 62:17 79:13
80:20 87:14 114:9
114:10 118:13,14
118:23 119:7 121:4
127:23 128:5,8
137:17 141:25
142:2 154:22 170:4
188:17 200:17
209:2 211:15 243:8
253:8,13 257:2
258:21 259:12
260:20
**needed** 86:20 180:17
180:18,22 185:3
245:13
**needs** 11:14 21:22
36:16 40:25 127:22
**negative** 165:1
**negotiate** 213:13,23
**negotiated** 220:19
**nerves** 172:23,24
173:3 185:3
**nervous** 5:1 226:4,5
**never** 43:20 46:17
47:15 54:22 55:2
61:3 62:10 90:19
103:19 122:12
124:13 127:1
129:17 134:19,20
149:21,21 175:17
183:23,23 184:6,15
185:19 188:11
197:14 206:8,9
211:7 224:20
**new** 124:16 128:2
145:11,13 146:16
149:15
**nice** 41:16 240:5
**Nicholas** 173:21
**nickname** 11:13
**night** 8:23 10:14
13:10,13 16:13,16
16:21 17:20 19:11
20:9,18,18,21 22:16
22:17,20 24:9,24
48:2 50:20 53:11
71:9,12,24 72:5,7,8
72:12 74:17 82:20
85:17 92:1,17,20,24
97:2,6,8 98:21,24
99:6 100:16,16,23

104:24,25 105:3
106:2 109:22,23
111:10 124:23,23
129:15,16 130:6
143:24 153:3,7,10
153:15 156:2,2,23
157:1,2,3,9,13,15
157:20,24,25 158:2
158:3,5,7 160:7,10
160:21 161:6 162:4
163:16,20,22,23
**nightmare** 162:25
**nights** 13:9 52:21
92:5,11,22 129:24
130:15,16,18
164:20,24 165:2
**nine** 24:16 57:19,20
101:9,15,16 139:20
**normal** 114:7 115:9
124:23 146:11
158:25
**normally** 11:9
**north** 43:2
**note** 3:23 77:13
**notebook** 31:12,17,23
31:25 34:17,25 35:6
35:21 36:22 37:15
37:25 38:2,23 85:1
85:4 87:10 120:1
166:14,15,22,22
212:5,6 249:21
259:22,23
**notebooks** 106:12
**noted** 3:17
**notepad** 30:16 50:20
**notes** 45:19 151:18
151:25 152:4
156:13,13 262:8
**notice** 31:6 32:14
40:14 137:20,23
**notices** 167:6 169:7
260:18
**notify** 12:22,24 86:15
**nude** 20:5 215:7
**number** 12:9 15:22
30:5 31:3,7,9 34:18
34:20 35:7,16,18,20
36:15,23,25 39:18
39:21,22 48:20
56:25 57:1,16 62:4
62:7,13,18 70:25
74:16 75:24,25,25

76:14 85:2 86:11,18
87:18 98:6,7 102:8
102:21 114:18,19
114:23 120:3 121:8
135:16 136:3 138:1
148:7 151:17
152:13,24 153:24
154:9,11,18 155:21
156:24 157:1
159:25 166:5,9,19
167:4 186:25 187:1
187:3 200:19 201:1
201:3 227:16
229:15 230:11
232:17 238:14,14
238:15 242:9,10,11
252:12 258:16
260:6
**numbering** 31:23
33:14
**numbers** 14:9 32:6,9
39:23 49:2,4,8
51:16 56:11 70:11
91:21 102:1 107:8
120:1 121:4,6,11,12
230:7,12 249:19
256:21
**numerous** 196:16,17

---

## O

**oaths** 4:22
**object** 242:25
**objection** 46:22,24
55:20,21 59:4 62:16
63:9 64:9,23 69:17
70:4 77:1 79:23
119:15 123:10,19
124:3 125:11
132:20,22 135:21
143:25 145:20
146:24 149:9 151:9
198:6 199:1 202:12
203:6 207:6,7,22,24
210:15 212:10
216:11 219:21,22
223:5 227:23 233:5
238:13,20 239:11
243:16 244:9 246:2
**objections** 33:15
119:3,6 253:12,12
**obligated** 125:17
131:6

**obviously** 120:24
254:23,25 255:7
**occasion** 12:21 28:11
28:19 29:8 84:3
92:3 104:16 105:4
111:16 112:2
159:19,24
**occasions** 162:8,12
**occur** 165:4,5
**occurred** 219:14,16
240:9
**Ochoa** 220:12 221:1
232:20,24
**office** 60:25 67:18,21
67:21,22,22,22,23
73:13 77:21 178:8
178:16,19,20 179:5
179:7 184:19
189:17 191:12,14
193:11 196:2
210:11,13,19,22,23
224:12 234:14
**officer** 212:17
**officers** 48:17 203:23
204:5
**offices** 179:1 184:18
**oh** 10:13 11:3,4 13:15
17:11,16,25 18:2,21
18:24,25 19:1 21:3
22:4 28:2 45:24
53:4 61:23 66:6
69:21 72:9,22
156:21 192:14
199:9 252:3
**okay** 4:8 5:1 8:16
10:2 15:5,12 20:17
21:8 23:3 26:18
28:19 29:17 31:2
32:10 37:17 38:14
38:17 40:11,20,22
40:24 41:1,2,23
42:1 46:6 49:1 50:2
62:25 69:25 72:24
75:8 76:16 79:2
81:1,2 84:22 85:5
87:23 88:1,19 89:14
90:6 91:9,22 92:17
94:1,17 97:16
102:13 103:12
105:25 106:19
109:5,25 111:7
112:15 115:3

116:23 117:5,11,12
117:20 118:2
119:14 120:23
121:25 122:22
129:12 133:18
134:2 135:7 136:23
136:24 137:11
146:3,10 150:5
155:9 156:21
159:14 162:3,12,21
164:12,15 168:11
168:22 169:15,19
170:8 172:14,20
174:19 177:19
182:22 183:19
185:5 186:8,19
188:7 189:12
190:20,24 192:8,18
192:20 195:14,20
197:22 198:1,20
199:20,24 200:25
202:4 203:13
205:22 208:10
210:6 211:15 212:4
214:21 216:18
217:2 219:8 220:1
222:2 223:2 228:13
228:19 229:9 231:1
233:10 236:24
237:16,19 240:18
240:22 241:12
242:4 243:20
244:15 245:5,24
249:4,6 250:24
251:11 254:11
258:3 259:3,5 261:6
261:8
**old** 68:10 128:3 239:5
**once** 4:3 29:3 84:14
94:22 131:18 183:6
255:1
**ones** 96:8 105:21,23
105:25 106:1 110:8
185:23 186:1
249:20 259:21,22
259:25 260:5,25
**Onyx** 192:21 196:22
197:2 214:5
**open** 24:25 25:14
26:15 197:16
252:20
**opened** 26:11 149:13

197:14,17,17
**opening** 5:13,18
118:9
**openings** 5:15
**operate** 179:23
**operated** 67:6 183:2
214:22 215:24
**operating** 182:15
231:8 246:15
**operation** 64:17
184:5
**operations** 182:12
183:20 184:7
**opinion** 44:14,15,16
115:21 128:9
**opportunity** 84:25
99:17 257:9
**opposed** 102:16
**opposing** 33:9 36:7
38:10
**order** 120:2,24 130:8
167:25 168:1,3,8
169:11,14 180:22
214:17 225:9 243:8
252:8,22
**ordered** 225:3,12
227:19 229:5,10
**organization** 59:3,12
195:21 206:6
**organized** 195:2
**original** 167:7
**originally** 141:17
166:25 167:5
**ought** 78:5
**outcome** 251:14,15
**outfits** 100:17
**outrageous** 152:25
153:2 154:11,13
**outside** 9:25 24:22
48:17 216:2 217:7
**overruled** 63:11
238:21 239:11
243:16 244:9
**owe** 126:15 134:20
135:5 149:12
**owed** 57:13,14 58:7
58:17
**owned** 191:9 196:17
214:21,25 231:9
**owner** 64:8 128:6
**owning** 185:16
**owns** 231:10

**P**

p.m 1:16 26:9,10
PA 2:5
packages 88:9
packet 83:10
page 34:8 61:6 75:15
  86:11,18 103:4,6,6
  103:10,15,15
  118:22,22 203:17
  212:7 228:2 242:4,5
  242:9,10,11,12,14
  242:15,17,24
  243:10 256:22
pages 107:5,7,23
  108:20,23 109:6
  242:8 256:21 257:2
  257:3,4 262:7
paid 10:19 11:2,25
  14:2 15:2,7,10,19
  18:1,1,12 22:14
  23:24 25:19 29:23
  47:13 48:12,14
  52:10,19 53:6,12,14
  53:16,17,18 59:19
  63:22 68:13,20,21
  71:1,2,8,9,16,23
  73:10,14 74:20
  92:21 93:9,10,11,15
  105:10,15 114:1,21
  117:4 124:19,21
  142:23 148:15
  152:8 156:2 157:19
  157:19 217:23
  221:12,22 222:2,2
  235:21
painting 180:18
paper 151:15,18
papers 139:16
paperwork 83:13
paragraph 14:12
parentheses 228:12
parenthetical 228:20
  228:25 229:3
parked 209:2
parking 208:18,21
  226:9
part 18:5 34:14
  108:11 114:11,14
  114:23 115:9
  119:20 140:8,10
  141:1 146:1,11
  179:7 218:13 228:2

231:16,16 256:19
participated 15:23
particular 193:16
  220:3
particularly 228:21
parties 3:24 165:23
  262:11
parties' 262:12
party 24:22 25:1
pass 38:7,17 171:16
passed 171:17 175:25
  179:11,12,24
  184:20 185:9,10
  188:2 196:6 205:16
  239:2
passing 67:3 178:8
  184:24 187:22
  190:1 191:24 194:5
  205:19
Pat 206:14 207:17,18
patch 173:4
pause 199:16 223:14
  223:18
pay 9:25 10:12,12,13
  10:14,15,16,23
  11:15,17,18,19,20
  11:21 12:15,18 13:5
  13:10,10,12,14,22
  13:23,24 14:13
  16:20 17:17,22,23
  18:2,2,3 19:18
  20:25 21:1,3,3
  22:11,11,22,25 23:1
  23:3,4 30:6 44:19
  45:1 52:1,11,16,16
  53:19,20,21,22,23
  53:24 54:2,12 59:20
  68:14,15 70:25
  71:21 82:25 86:15
  92:12 94:1 100:18
  100:19 105:17
  109:23 110:12
  113:10,12 114:24
  115:14,16 116:6,13
  116:16 125:7,17
  127:20 132:8
  142:25 143:21
  164:20 182:17
  214:19 217:12,19
  217:22 221:5,23,25
  226:8 247:7 248:14
paying 13:4,13,15

19:17 21:8,12,16
  51:25 52:1,2 63:23
  83:7 84:9 98:22
  112:12 115:2,19
  116:14 145:6,8
  148:14 216:25
  233:19
payment 12:1 20:11
  63:13,14 182:18
PC 34:7 41:7
pending 217:3
penny 63:25 69:9
  183:16
people 65:2 95:8
  130:7 145:15
  193:10 211:22
  240:16
perceive 164:9,10
perceived 164:11
percent 16:3,8,11,19
  16:20,23 20:10 21:5
  21:6,9,12 22:15
  28:1 52:16,18 83:2
  83:25 98:11,12,14
  98:15,18,20,22,23
  99:2,8,9,11,13
  105:14,15 109:8,23
  110:5,10,16 116:13
  116:14 130:14
  160:9 161:8 162:1
  169:7 215:1,5
perform 58:25 59:15
  86:21 113:2
performance 86:20
performed 163:12
period 14:5 77:10,11
  77:13 78:6 187:19
  215:18 242:19
periods 198:24
person 11:1 73:4
  105:17 178:17
personal 167:16
  168:10 222:6,9
personality 177:10
  177:11
personally 15:13,17
  79:9 122:13 126:2
  129:22 139:4
  221:25 222:2
Persuasion 27:8,10
  27:11,12,14,17
pharyngeal 172:9

phone 12:9 68:17,17
  79:6,11 136:14
  176:11,15,17,23
  191:13,14 255:21
  256:4 259:14
photos 54:19 126:3
pick 4:12 18:12 19:7
  95:18,20 101:8
  161:11 186:2
  244:24 250:11
  258:10 260:24
picked 160:21 161:12
  161:13 163:14
picking 96:8,10
  167:12
piggyback 258:4
pin 77:8,13
pink 106:7 191:15
  192:2,2,6,6,7,8,14
  197:7,8,13,15,22
  214:5,6 245:15
pinned 77:7
pinpoint 131:3
place 25:12,23 58:25
  60:11 125:21
  145:18
placeholder 254:14
places 48:9 83:5
plaintiff 201:11
Plaintiff's 201:8,9
plan 4:8 251:4
planning 142:5
plastic 73:14
played 19:11,24 65:9
  99:18
please 8:1,1,3 9:1,11
  39:7,11 58:18 60:19
  65:18 70:2 81:11,12
  85:1 106:22,25
  108:15 114:17
  120:14 137:4 160:1
  160:15,17 170:14
  170:23,24 171:4,9
  178:11 186:7 201:6
  212:7,7 227:15
  229:15 239:14
  242:24 258:7
plenty 118:3 162:11
plus 30:10 40:17
  52:19 54:12 160:6
pocket 148:13 183:13
podium 200:15

point 23:22 41:24,24
  47:7 59:8 77:12
  97:3 119:7 120:11
  171:16 173:8
  174:20 175:1,7
  178:7 181:11 185:5
  228:14
police 46:21 47:2,5
  47:10 143:3
policies 80:12 198:25
policy 87:12,21 116:5
  116:24 117:8
  165:11 189:9,22,25
  191:17,22 195:8,11
  195:16,22 196:3,6,9
  196:11 198:13,14
  198:21,22 212:2
  230:21 231:6,14,20
  232:16 233:18,21
  234:1,3 236:15,25
  237:5 240:8
Ponce 2:6
Pony 191:15 192:2,2
  192:6,6,7,8,14
  197:7,8,13,15,22
  214:5,6 245:15
pool 25:1
Poor 239:4
popped 56:21
portions 243:14
posed 7:6
position 6:14 203:10
  222:16,18 232:2,5
possibly 238:18
  256:25 257:14
post 12:12,13,14
  253:7
post-hearing 6:19
  118:11,15 135:25
  250:24 252:20
  254:8,12 255:12
  256:6,19 258:10,15
  261:9
posted 83:5
pot 20:13
potential 147:15
pow 98:16 160:1,4,5
  160:14,18
prefer 253:9 258:5
preference 133:8
pregnant 123:4,6
  149:18

prehearing 254:17
premarked 119:21,25
  121:2
premises 111:13
  224:11
preparation 148:17
  178:14 186:21
prepare 3:25 253:10
  254:4
prepared 138:5 250:1
  256:17
preparing 186:11
preplan 142:12
preplanned 142:11
present 3:15,17,18
  109:19,21 247:11
  247:17 258:22
presentable 180:19
presented 189:22
  228:18
presenting 111:16
president 187:12,24
  188:10 202:10,21
  202:22 203:5,11
  204:2,6,8,9,14,18
  204:24 205:8,13,15
  234:17 245:24
presuit 31:5 32:14
  40:14 137:20,22
  167:6 169:7 260:18
presumed 244:22
pretend 65:1
pretty 8:4 112:16
  114:7,13 115:13
  153:4 174:21 176:1
  177:11 242:2 256:2
prevail 254:24,24
prevails 251:18,18
previous 64:22
  145:21
previously 20:9 87:4
  117:5 118:10
  242:21
price 48:2,3 53:9,10
  53:13
Prince 21:21
printed 33:1
prior 21:8 171:18
  175:14,19,21 177:6
  177:24 178:7 179:8
  185:11,17 187:22
  196:13 206:4

220:10 252:4
privilege 144:14,18
  144:20 145:2
  238:17
probably 13:9 43:15
  46:13,16 49:9 60:12
  72:17 78:5 135:20
  144:10 182:25
  195:24 206:21
  220:19 221:3,6,13
  222:4 230:24
  234:10,19 247:15
problem 8:14 46:13
  103:9 136:24
  226:11
problems 185:2
procedures 80:13
proceed 4:18 41:10
  81:18 122:1 134:6
  150:9 169:20 170:1
proceeding 261:16
proceedings 3:1
  262:6
proceeds 183:24
  185:12
process 10:3 82:14
  110:10 120:18
  179:13 191:1
  255:20 256:3
  259:13
production 35:9,22
  108:5,8 227:24
products 100:22
professional 252:17
promote 91:25 92:1
promoter 182:4,5
  222:21
promoters 92:7
prompt 252:17
proper 130:14
properly 4:25 173:6
properties 179:19
  192:19
property 63:14
  192:22 198:3 199:7
  199:12
proposed 33:15
  165:24 251:4
  260:15
pros 189:23
protest 115:19
protocol 120:22

provide 124:24 125:2
  253:11
provided 31:21 58:23
  58:25 61:10 125:5
providing 111:13
proving 55:7
PST 204:6
published 76:13
pull 136:12,14,16,17
  136:23 250:12
pulling 137:10 167:1
punch 38:1
punchhole 38:3
punchholer 37:25
purpose 101:5,5
  127:24 181:12
  244:25
purposely 74:12
purposes 15:15 32:4
  44:13 75:21 229:14
put 4:9 12:8,9 14:22
  16:12 28:14 30:9
  31:3 36:16,22 60:17
  85:6 87:17 93:24
  97:13 98:5,7 107:3
  112:13 130:8 148:7
  148:13 163:15
  170:6 179:3 180:25
  183:13 201:6 203:2
  206:9,12 208:4
  209:7 222:4,7
  245:17 249:18
  254:13,18 255:4
putting 167:13

───────────

        Q

question 14:21 32:3
  32:21 49:24,24
  55:23 58:3 59:6,6,7
  59:11 61:13,19,21
  63:1 65:7,10 69:18
  69:20 70:12 77:3
  78:21 79:14,25
  104:19,20 112:7
  116:15 119:12
  120:17 122:16
  124:6 132:24,25
  143:6,17 144:2
  145:23,24 146:1,2
  146:25 147:21,23
  148:23 149:10,23
  151:12 156:1 159:2

170:6 195:14,14,20
  195:25,25 198:19
  203:4,25 204:13
  206:3 211:16
  212:13,15 213:3,16
  213:22,24 214:13
  216:21,25 217:2
  219:3,5,23 220:1
  223:15,22 225:19
  228:25 232:25
  233:9,11 235:2
  239:15 240:3 243:5
  243:19,25,25 245:6
  245:8 246:5 251:7
  251:16,17,22 258:4
questioner 150:6
questioning 7:1
  119:19 135:22
questions 4:10 6:22
  7:6,13,19 40:10
  61:25 65:4 70:17
  74:22 78:12 80:16
  117:11 125:13,14
  144:16 149:24
  150:4 165:19 189:4
  189:10 194:7
  198:18 211:5
  216:19 218:7
  229:25 232:22
  238:6 239:13 247:1
  249:4,12 250:25
  251:6 253:3 255:6
  256:15 257:18
quick 170:3 253:3
quite 7:17 40:15
  118:3 137:12
  216:19 245:3
  257:10 258:18
quote 162:9 241:18

───────────

        R

radiated 172:23
  176:12
radiation 172:17
raise 119:7 170:23
  252:10,10
raised 243:7 251:1
ran 66:17 95:3
  143:19 162:14,15
Ranches 172:4,8
  178:3
range 151:3

rarely 72:9,10
raspy 176:11
rate 9:25 48:1 254:20
  258:11,11,13
rates 12:14
reach 108:18
read 86:18 87:2
  110:18 191:2 212:7
  212:20,21 227:15
  229:14 239:15
  242:1,23 243:6
reads 212:15
ready 42:2 170:1
  180:4 181:13,15
  209:8
real 27:2 88:24
  112:11 170:2
realize 103:7,8
really 14:4 24:12
  53:14 54:14 73:2
  77:6,7 79:1 84:1
  89:17 132:6 176:2
  178:15,19,24 180:8
  181:3 193:19
  219:16,24 225:5
  229:12 232:1 234:5
  239:22 240:15
  246:14 247:4 254:1
  256:21 257:5
reason 6:16 91:20
  119:20 141:2
  143:15 157:3,24
  165:6 172:7 173:14
  173:16 240:8
reasons 86:21 173:15
recall 76:5 148:20
  156:12,14 225:11
  239:24 240:3
recalled 156:3
receive 163:13
  183:24 185:11
  235:4,5 241:14
  246:22 250:16
  251:11 252:20
  256:18,18 261:9
received 14:22 69:1
  88:5,6 121:19
  183:16 234:25
  235:1
recess 121:24
recognize 26:24
  30:23,24 83:15

85:14 88:3,21
109:14 202:7 257:8
**recollect** 162:14
**recollection** 129:21
133:2 239:18
**record** 3:7,23 8:1
41:3,4 69:14 102:15
103:18 107:4
108:16 113:21
122:1 134:4,5 150:8
165:21 170:11
189:3 201:19
226:22,23 227:15
229:2,14,16 249:10
262:8
**records** 8:14 138:14
139:9 140:3,5,14,17
141:8 142:10 182:3
**recycle** 106:1
**red** 166:22 212:5
**redirect** 2:15,18 74:2
74:3,4 159:6,7,15
159:17
**redo** 181:2
**refer** 61:5 227:8
260:20,25 261:3,3
**reference** 228:13
**references** 244:8
**referred** 230:10
232:8
**referring** 13:16 31:12
70:9 75:12 243:19
**refers** 40:16 228:1
243:2
**reflect** 102:15 156:13
256:14
**reflected** 140:3,5
**reflection** 31:2
**refresh** 30:18 74:23
75:17 225:17
239:18 247:8
**refused** 62:12 237:5
**refusing** 238:12
**regard** 177:6 180:3
**regarding** 172:20
191:17 213:1 218:8
247:20 255:16
**regardless** 135:4
**regards** 240:13
**regular** 13:13 53:12
53:12,12 205:20
**regulations** 82:23

83:23 186:17
**rehab** 68:2
**rehabilitation** 68:6
**rehired** 237:11
**reimburse** 29:22 76:8
101:18 162:13,13
**reinstated** 239:25
240:4
**reinstating** 238:11
**relate** 123:15
**related** 218:8 231:6
**relates** 181:23 252:3
257:20
**relationship** 79:18
**relative** 147:16
262:10,11
**relay** 224:19
**relaying** 177:2
**relevance** 55:20,22
59:4 62:16 63:9
64:9,11 69:17
123:10,12 124:4
125:11 135:21
144:6 146:24
147:16 149:9 198:9
198:12 207:23
219:22
**relevant** 77:10,11
144:8 147:23
187:19 210:17
228:21
**rely** 43:24
**remain** 36:9 97:2
252:20
**remember** 10:16 19:1
34:15 54:8,9 56:4
58:2 61:18,19,25
62:2,3 66:11 72:3
73:14 74:7 82:1,8
83:22 85:9,15,17
88:5,7,7 92:17,19
94:19 132:10,11
135:11,14,16
148:22 153:14,17
153:18,19 156:24
157:1,3,4,25 158:14
160:22 178:24
184:8,10 190:2,3,5
193:18,19 194:16
194:21 197:2 225:5
229:7,13 232:21,25
233:2,3 237:13

239:17,22 245:8
247:9,15
**reminded** 7:16
**remodel** 221:17,18,25
222:3
**removed** 175:12
**removing** 173:11
**renew** 206:22 208:17
**renovations** 184:21
**rent** 68:13,20,22
178:20
**repairs** 181:7
**repeat** 149:5 176:20
**rephrase** 114:20
195:20 206:11
246:16
**replace** 229:18,21
**replaced** 181:3
**replies** 251:2
**report** 182:4 202:8
262:6
**reported** 79:21 210:7
224:13 235:2
**reporter** 4:11,20
10:22 11:8,13 19:6
34:22 40:22 65:8,9
65:15 81:2,12 85:5
87:17,19 120:16
121:8 170:18,21,23
226:12 239:14
250:2,7 262:1,5,23
**reporting** 55:18 80:4
**reports** 201:24
202:19 224:18,21
**represented** 111:3
**request** 35:8,22 108:5
108:7 226:10 227:1
227:12,23,25
228:14 230:11
256:25 257:23
258:22
**requests** 229:22
230:6,9
**require** 216:10
**required** 11:17,18
14:13 15:5 16:20
17:3 32:15 94:1
95:25 100:22
109:19 116:6 165:9
214:19 215:13
**requirement** 94:5,7
98:25 99:1 100:5

236:16,18,21,22
**requirements** 124:17
**requires** 256:3
**requiring** 217:12
**research** 247:20,25
**reserve** 253:18
**reside** 171:6 172:3,5
**resided** 171:22
**respect** 19:7 74:24
75:18 100:25 113:1
114:16 217:24
**respond** 5:22 156:17
223:16 257:24
**responded** 238:10
**respondent** 1:9 2:5
3:6,14 6:7 35:8,22
251:18
**respondent's** 4:14
260:12,24
**respondents** 3:12
253:16
**responding** 77:4
**response** 35:8,21
107:16 108:4,7,10
227:18
**responses** 168:17
229:21,22
**responsible** 86:12
211:11,17 212:22
**rest** 15:6 21:7 41:1
163:8 178:23
226:18
**restate** 62:24 64:22
**resting** 169:19
**result** 80:13 98:1
180:1,20 181:7
240:8,12
**return** 134:25 149:8
149:19
**returns** 55:8,9,11
126:7,9,10,11,13,16
126:24 134:18
135:3
**reupholstering**
180:18
**reviewed** 190:24
**revved** 223:23,24
**RICHARDS** 2:3
**Rick** 28:3,3 54:17
66:18,19,20,20,21
66:22,24 95:3
111:21 128:12

150:23
**rid** 74:12 107:22
**right** 4:11 5:21 6:25
11:7,8,10,12,14,15
29:24 31:13,15
33:11 34:4,18 36:1
37:8 38:22 39:1
40:15,19 46:10
49:13,17 50:3 58:11
71:20 72:3 76:13
82:19 85:4 87:17,24
87:25 97:1 106:10
106:11 108:14
115:15 116:8,18
117:7 118:12,22
120:4,5 122:18,24
134:2 141:6 142:19
148:2 149:17 154:3
154:5,7,10 155:23
157:17 159:21,23
160:3 163:14 166:7
167:12,18,22 168:5
168:14 170:23
174:15 178:5 187:5
187:14,21 188:15
188:19 190:16
191:19 197:25
200:4 202:22
212:23 213:1
215:18 222:14
223:1 241:12
246:25 250:8 261:5
**right-hand** 178:17
242:9
**rights** 192:17
**Robert** 223:3
**role** 66:5,12
**room** 4:24 8:3 20:22
41:1 83:6 96:20,21
96:22,23,25 97:2,5
97:10,15,16,17,22
98:6 105:2 133:7,15
157:12 159:22
160:11 161:17
162:9 163:19
164:16 177:12
226:18
**roughly** 117:15
**routine** 114:10,12,24
115:9 140:22 141:2
146:11
**rule** 119:8 169:14

240:19,25 241:4
243:8 257:11
**rules** 9:22 44:11,13
44:15,17,21,21,22
44:25 45:1,7 64:19
64:20 82:22 83:4,8
83:15,22 84:1,4
86:3 94:22 111:23
111:24 148:17
160:23 186:16,21
252:22
**run** 67:25 68:7
246:14 254:1
**running** 17:13,25
67:13 68:7 95:3
113:6 114:8 177:21
185:17 198:1
240:16 246:10
**rush** 34:4 176:4
191:15 192:3,18
197:6,7
**Russians** 42:25

**S**

**S-W-E-E-P-E-R-S**
95:14
**sad** 239:8,8
**safe** 209:5
**sails** 175:12
**sake** 166:21
**sale** 180:4,19 181:13
181:15 183:18
**sales** 224:18,21
**save** 7:6
**saw** 76:18 77:16 78:2
78:15 88:16 184:8,9
184:17 185:21
**saying** 11:5 17:25
29:12,14 31:22
32:17 47:8 88:8
90:14 91:1 101:8
128:4 139:9 142:6
142:25 145:7
175:24 176:17
177:20 191:15
206:17 228:17
240:2 244:20 245:1
**says** 21:2 35:21 75:4
75:5 86:1 102:21
103:6,6 110:4
167:18 168:3,13,16
201:4,7,9 203:22

204:7 228:10,12
229:16,20 238:2
243:3,17 244:12,15
244:19 245:12
**schedule** 9:21 51:9
114:7,14 140:23
142:3,7
**school** 42:18 122:17
122:23 173:21
**scratch** 168:20
**se** 173:2
**second** 11:24 16:20
20:5 34:8 75:15
103:2,3,6,10 116:15
118:22 150:1
154:21 166:20
199:17 219:20
223:14 242:6
**seconds** 154:25 155:1
155:5,7
**secretary** 178:17
187:12,24 202:10
202:21,22 203:5,11
204:3,6,15,24 205:8
205:14 209:22,24
234:17
**section** 129:12 130:23
131:2,4,5 153:13
251:14
**sections** 112:25
**securities** 48:15
**security** 18:6,8 22:6
22:14 48:14,16,19
62:4,6,13,18 83:3
83:25 84:9 93:23
94:6,20 100:25
101:2,5,8 106:8
109:19 111:11,13
115:7,17,20 116:25
148:11 161:12
164:5,24 218:1
**see** 7:19 27:17,20
28:25 29:6 31:18
32:5,10 40:16,19
41:8 44:15 45:3
49:16 61:13 63:10
76:21 80:24 84:23
87:14,15 99:5
102:22 103:11
124:5,7 128:19
135:24 137:5
139:14 147:18

152:7 173:1,5 179:5
180:5,17 186:25
193:3 199:4 202:19
208:15 209:3 228:5
243:8 252:6
**seeing** 41:16 119:16
129:7 259:16
**seeking** 39:19
**seen** 31:1 59:25 60:23
60:25 67:16,17
85:19 118:25
121:10 122:14
132:14,17 187:16
201:14
**select** 221:19
**selected** 221:17,20
229:17
**selecting** 19:10
**self-employed** 122:8
**self-made** 177:15
**sell** 180:4,11,23
181:16,22
**semi-nude** 215:7
**send** 12:10 92:2
97:10 255:20 258:5
**sense** 125:8 190:16
228:17
**sent** 12:15 36:6
**separate** 6:5 93:25
96:3 119:1 179:4
**September** 49:11
51:18 172:16
**series** 107:7
**service** 199:25
260:16
**sessions** 154:24
**set** 4:24 6:18 20:2,4
82:22 86:14 96:13
99:18 112:11
**sets** 19:25 20:7 86:13
112:7,9
**setting** 4:1 233:8
**settled** 220:16 221:14
**settlement** 197:19
220:19,22,23
221:15
**settlements** 213:13,23
**setup** 5:1
**seven** 23:10,11,13,15
23:16,16 141:20
159:3 198:7 199:2
212:15 250:2,4

**shape** 175:18
**share** 256:16
**sharp** 26:8
**sheet** 94:12
**shift** 10:10 12:6 14:14
15:6,23 17:17 20:19
23:4,5 44:2 48:1,1,2
48:2 83:2 91:8
101:14 102:6 104:8
105:16 139:21
**shifts** 91:21 139:6
**shirt** 49:18
**shocked** 176:3
**shoot** 256:4
**short** 155:24 159:5
**show** 10:5 12:14
39:25 83:14,14,18
84:20 85:7 87:3
106:9 108:15
120:24 126:7
137:16 139:20
185:24 186:6,14
189:7 198:11,12
200:13 201:2 212:4
225:7,19,23 227:11
237:14 241:24
**showed** 30:17 74:24
225:16
**shower** 100:16,17
**showers** 100:15
**shown** 239:17
**shows** 24:22 86:24
**shut** 6:15
**sic** 132:7
**sick** 177:13
**side** 4:15 67:19
112:24 253:2,11
254:19
**sides** 257:8
**sign** 12:5,7 83:12
85:20 94:10 105:18
106:7 111:19 139:8
193:17 205:23
206:6 215:14
234:17 237:1,5
238:12
**sign-in** 94:12 112:3,7
**signatory** 234:7
**signature** 109:8
204:19,21,22 205:1
205:3,4,6,7,12,20
205:20 207:12,17

208:5,6,9 234:11
**signatures** 207:5
**signed** 21:18,19,22
86:9 87:24 111:5
206:4,8,9 207:16,19
208:4 220:21,23
221:15 222:25
223:2,6 234:14
**signing** 216:24
234:12
**signs** 21:1
**similar** 41:8 117:15
198:22 243:7
**Simmons** 33:18 35:13
36:2 37:12
**Simmons'** 107:16
**Simons** 35:19
**Simons'** 35:7,21
**simpler** 119:13
**simply** 120:20 251:5
**singles** 16:3,4 18:24
20:14 21:15
**sir** 7:11 69:13 89:23
90:15 91:2 95:15
104:14 112:17
122:9,15 123:8
125:4,6 126:25
127:11,17 129:19
130:20 132:13
134:16 135:16,18
136:22,24 138:9,11
138:13 139:1,22
140:18 141:4,10,24
142:20,22,24 143:2
143:4,13 146:21
148:3 152:10,17
154:2 159:13 228:1
**sit** 4:11 161:9
**sitting** 26:25 88:22
193:3 194:21
200:18
**six** 23:8,17 28:16 50:3
54:10,11 161:7
**six-page** 106:16
107:5
**slip** 21:20 22:1
105:18,19 106:3,5,7
109:7 110:25 111:1
111:3,9,13,17,19
117:3 168:18
**slips** 107:2,6,14 109:7
109:14,16,18,21,23

110:21,24 111:20
117:7 132:12,19
133:1 166:6,11
168:19 169:8 186:9
187:3
**slow** 8:3 9:11 13:8
19:4 27:9 60:19
165:8,9,13 192:5,17
**small** 174:1,4,12
178:14 179:25
200:16
**smart** 96:25 110:9
**snacks** 100:18
**social** 54:23,24 62:4,6
62:12,18 218:1
**sold** 174:1,8 183:3,25
184:4 190:11,23
208:1 215:10
**somebody** 11:9 97:4
119:15 124:8,9
142:11 188:9
**son** 29:1 54:20,20
55:6 68:1,9,24
173:21 182:2
**son's** 182:3
**Sonders** 209:21 224:4
**song** 20:4,5,5 82:12
86:13 162:25 163:1
**songs** 19:11,24 20:4
82:11 99:18
**soon** 107:4 179:17
**sorry** 8:5 9:12 10:19
11:6 16:5,7 17:8,16
19:5 23:12,14,15
25:5 26:5 27:10
29:5 31:14 33:17,24
34:13 35:3 38:10
39:6,13 41:22 42:3
42:13 43:11 47:4
56:22,23 58:3 59:23
60:20 61:7 64:10
65:6 69:22 71:16
72:6 76:6 79:13
81:5,7 83:20 84:24
85:3 87:5,10 88:10
89:19 90:10 92:3,9
95:11,21 97:13
99:20 102:1 103:1
104:8,10 105:14,25
107:9 108:2 109:17
112:6,8 114:21
120:11 126:19,21

131:12,15 132:21
136:13 138:18
141:14 142:1,2
151:6 153:11
155:15 156:25
165:19 166:8 167:2
167:8,13 168:1,5
172:11,13 177:18
190:8 194:15,15
198:12 201:10,20
203:25 204:1
209:18 210:13
211:5 214:25 216:5
217:17 220:10
223:3,8 228:23
230:18 232:19
233:17 234:13
236:1 238:1 239:8
242:1
**sort** 33:13 161:20
193:18
**sounds** 65:2 220:14
**South** 42:15 68:3
86:2 145:12 174:7
178:2 191:7,16
192:4,24 196:1,10
197:13,15,22
209:13 214:6
219:10,18
**Southwest** 172:4,7
178:3
**spa** 69:21
**space** 178:8,16,20
211:1
**span** 172:24
**Spanish** 43:1
**speak** 4:13,15 39:11
60:4 79:2 86:22,22
129:6 162:15
164:15 208:11
209:4 211:2,21
**speaking** 126:19
177:1
**specific** 70:12 78:4
79:14 132:9,11
134:10 136:3
148:22 151:15
152:13 153:24
154:9,18 156:24
158:23 165:7
203:14 212:10
**specifically** 132:2

150:11,13,17
153:21 156:3
160:21 161:9 175:4
177:25 214:6
215:19 216:1
224:12 232:18
236:24 241:23
259:25 260:1
**specifics** 219:24
**specify** 77:4
**speculation** 132:20
132:23,24 144:1,5
**spell** 8:7,15 10:21
11:1 65:14,17,19,22
72:19
**spelled** 8:11
**spend** 51:21 181:9
259:14,15
**spent** 24:24 161:6
174:23 258:16
**split** 113:5 131:5
160:7,8 161:5 163:8
**spoke** 80:6 142:21
211:7
**spot** 49:17 82:19
**spring** 13:2,3
**square** 43:15,16
178:15 180:8,9
**St** 175:8
**staff** 18:6,8 188:22
193:23 220:12
**stage** 11:19,20,21,22
16:8 19:18 45:9,10
45:11,12,13 58:23
59:15,17,17,19,21
59:22 86:13 96:13
96:15 98:15 112:7,9
112:11,14 124:24
**stages** 95:20 112:18
112:19,22,23,24
113:1,2,5,6 181:6
**stairs** 179:6
**stand** 170:6
**standpoint** 4:23
147:16
**staple** 118:16,22
**stapled** 106:21
**stapler** 106:20
118:16
**start** 6:25 7:12 10:15
13:4,18,19 15:1
25:24,25 80:25 93:5

103:13 187:18
252:18,21,25
**started** 9:4 50:24
51:2 89:11 93:14
100:17 110:9
126:24 141:6 146:4
146:5,8 148:20
149:15 172:24
173:4 175:4 179:17
183:6 248:24
**starting** 6:24 107:8
184:24
**starts** 93:5
**state** 8:1 70:12 81:12
128:8 145:14
170:14,24 171:4
201:24 255:25
**stated** 29:5 115:21
159:19
**statement** 5:13,18
183:1 245:9
**States** 144:11
**stationed** 9:17
**statute** 6:6
**stay** 26:11 46:3 48:11
68:3 97:5 143:5,8
145:9,18,24 146:2
146:18 147:12
249:18
**stayed** 48:5 129:10
130:4 146:9,10,16
147:22
**stays** 54:21
**stealing** 94:20
**steering** 241:19,19,22
244:4 245:9,22
**Stephanie** 4:10 37:9
40:21 81:1 103:2
106:20 262:4,22
**steps** 180:12
**Steve** 203:9 204:4,8
204:12,18,25
205:15 209:17,19
209:19 221:21
224:1 234:11,14
**stick** 38:2 46:7
**stipulated** 14:6
**stipulating** 81:3
**stole** 157:9,10
**stolen** 73:9,18 158:1
158:4,8,15 162:10
162:16,18

**stop** 8:21 89:14 90:24
120:25 156:11
**stopped** 22:3,4 70:8,8
89:13 122:23
139:19 146:12
155:25 173:5
175:22
**stopping** 120:6
**store** 60:16,21 174:11
174:17 178:5
210:21
**story** 72:16,18,19
119:10 156:17
**strabismus** 173:3
**straighten** 130:13
167:21
**street** 209:2
**strict** 116:12
**strictly** 199:14
**strike** 22:18 24:2 39:6
90:11 91:7 92:3
94:8 95:7 97:13
102:1 109:17 112:2
122:16 160:16
164:12 165:19
181:23 183:7
190:25 217:17
222:10 223:8
230:18 232:16
**stringent** 94:24
**strip** 212:23
**stripper** 140:25
149:22
**strippers** 127:12
**study** 257:10
**stuff** 68:16,17 79:12
100:19 115:22
181:5
**styled** 219:9 221:7
240:7 247:2
**subject** 86:23 119:3
152:5
**submission** 250:14
256:6,7 257:25
258:15 259:2
**submissions** 6:19
135:25 250:25
252:21 253:1,14
255:13 256:19,20
258:10 261:9
**submit** 251:4 254:21
**submitted** 118:15

165:23
subsequent 207:4
succeeded 258:20,21
succinct 256:24 257:1
  257:3
suggested 3:24
suggestion 117:13
suing 142:11
suit 221:1
summary 6:3 34:14
  167:25 168:2,9
  169:11
sums 99:12
Sunday 13:9
Sundays 165:8
supervised 210:9
support 141:9 172:17
supporting 123:9,13
supports 6:14
supposed 6:25 135:4
  145:11 157:12
sure 4:17 5:5 11:8
  53:8 58:20,21 63:1
  64:13 68:4,9 77:5
  79:1 89:17 105:20
  115:1 118:17,21
  120:4,9 126:14
  130:13 132:6 133:4
  137:12 138:16
  144:4 145:25
  149:11 186:4 190:5
  199:17 201:10
  205:21 208:20
  209:24 210:4
  218:19 220:20
  223:15 226:21
  234:10 235:24
  238:21 240:21
  252:10 257:19
surprise 63:8,17
surprised 176:2
surprising 188:3
surrounds 212:13
suspend 18:21 64:2
suspended 64:4 98:4
sustain 123:18
sustained 46:24
swear 4:3,3,20
  170:18,21,22
sweepers 95:9,12,13
  95:14,22,23,25 96:2
  96:4 97:10,13,20

switched 9:5 42:22,22
  168:6
sworn 4:3 5:9,10
  81:16 171:1
symmetry 37:15
system 218:18

                T
T-A-N-G-A-L-A 11:3
table 26:25 96:5
  176:2 200:18
tabs 108:12 260:5
tackling 180:5
take 16:3,7,9,11
  18:23,24 20:12 21:6
  22:13 25:12,23
  28:19,24 29:9,19
  33:12 35:18 36:21
  41:2 49:19 50:8,9
  51:23 52:17,18
  54:12 60:16 69:19
  76:11 82:17 87:1
  90:19 96:22,22 97:1
  97:9,12,19,20 98:11
  99:2 100:17 103:10
  110:16 122:20,21
  154:25 160:8 161:8
  162:3 179:15
  202:15 207:9
  237:16 250:1 251:6
  254:3,24 257:2
  258:19,21 260:14
taken 52:17 162:19
  251:23,24
takes 256:23 257:5,6
talk 6:17 8:5 60:20
  91:8 170:2 171:22
  214:4 234:20
  249:16 253:8 255:8
  256:3 258:12,23
talked 45:19 67:16
  79:7 111:23 243:15
  243:15 251:4
talking 4:16 55:17
  58:16 60:24 67:17
  68:19 73:4 79:11
  81:6 85:18 93:22
  102:13 118:9
  123:17 129:9
  137:13,17 147:13
  156:11 157:22
  176:21 183:19

207:7 211:4,19
  216:1 223:19 228:5
  228:6 236:2 239:9
  243:13 244:11
  250:19 259:15,25
  261:2
Tan 10:18,20,23 11:5
  11:9,25 94:10
  112:10,13 124:19
  124:21 139:12,14
  139:16,18 140:16
Tangala 11:3
tax 55:8,8,11 126:7,9
  126:9,11,13,16,24
  134:18,25 135:2
  149:7,19
taxes 62:3 113:10,12
  113:15 126:14,17
  126:21,23 135:4
  149:11,18,21,21
  182:14 217:22,23
  234:23 235:3,5
  236:8
technically 199:25
  233:20
tell 4:17 7:2 9:8 27:6
  35:11 36:5 39:5
  41:23 42:3 44:25
  51:18 52:8 58:17,18
  60:22 68:12 70:2
  72:15,19 75:21
  79:20 80:3,6,9,12
  82:4 84:6 85:25
  89:3,9 90:6,10
  93:18 100:12
  101:12,25 102:2,10
  103:24,25 104:6
  110:12 111:15,18
  114:3 129:11 132:2
  134:8 136:25 144:7
  150:11,13,17,20
  171:8 176:17,18,19
  176:19 180:6 181:4
  182:22 183:15
  195:24 204:1,1,10
  204:14,19 243:21
  244:16 251:13
telling 4:21 32:11
  36:24 127:7
ten 16:3,7,11,19,20
  16:23 20:10 21:5,6
  21:9,12 22:15 24:19

28:1 52:16,18 83:2
  83:25 98:11,12,14
  98:15,17,20,22,23
  99:2,7,9,11,13
  101:9 105:14,15
  109:8,23 110:9
  116:13,14 130:14
  154:25 155:1,5,7
  160:8 161:8 162:1
  169:7 250:2,4
Teri 1:8 2:19 3:5,14
  6:1 35:8,22 59:24
  60:2,4,6,22 63:25
  64:2 95:3 122:10
  124:11 128:19
  129:17 132:18
  148:16 162:23
  163:4 165:25 166:5
  166:9,13 167:9,16
  168:9 170:16,25
  171:5
term 11:25
terminated 193:15,18
  237:6,8,10 238:11
  239:25
terms 102:3 256:21
terrible 49:7
testified 74:6 76:18
  90:4 114:21 130:2
  134:17 137:8 156:1
  156:15,20 159:24
  178:3 195:7 196:16
  221:16 222:24
  236:11
testify 156:7
testimony 46:23 74:8
  79:5 90:1 112:16
  135:23 143:1
  145:21 151:3
  161:25 184:11
  213:8 222:11 223:5
  231:2 232:13
  242:21 251:19
Texas 89:18,21,22
  141:17 143:12,14
  143:18,20,21,23
  144:7
text 91:19
texted 12:15
thank 38:6,21 40:22
  59:8 65:5 69:25
  75:9 80:17 81:2

86:25 122:2,22
  137:4 151:23
  159:16 165:20
  186:3 194:8 199:5
  208:15 219:8
  227:13 230:3
  232:14 249:15
  252:12,14,16 261:7
  261:10,13,14
Thanksgiving 176:2
thing 4:13 24:7,11,11
  24:12 30:9 33:1
  35:12 46:12,14
  51:11 52:13 54:21
  128:4 167:12
  179:16 186:25
  187:3 207:18
  218:15
things 7:16 11:18,20
  19:17 49:5 68:6,19
  173:19 178:18
  188:2 190:7 208:3
  236:10 245:21
  248:17,24 249:24
  255:8 258:23
think 4:25 5:19,23
  6:16 7:5 24:23
  28:13 38:9 49:5
  50:18 51:25 55:14
  55:15 59:21 61:24
  64:10 70:17 73:3
  74:1 78:17,18
  101:23 102:3
  110:19 116:8
  117:24 118:2
  120:10 121:10
  142:6 145:22
  151:19 154:14,22
  158:19,19,20
  172:15 175:11
  179:16 180:22
  181:4,5 184:14
  185:15 190:16,18
  193:1 194:25 195:6
  195:17,18 196:5
  197:17 199:25
  206:25 214:16
  215:15,24 216:12
  227:10 234:11
  235:1,6 241:20,22
  244:14 245:3
  246:21 249:8

251:13,15,17
252:22 253:19,22
254:1,20 258:12
**thinking** 56:20,23
142:4,7 234:5
**third** 20:5 82:12
**thought** 5:15 149:16
173:8 191:23
**three** 20:4 42:19 50:8
76:5 82:11 84:15
106:13 118:5
130:10 131:9
139:25 145:25
150:4 154:24 170:9
172:15 238:16
**threw** 73:8,12
**throat** 176:12
**throw** 73:11
**throwing** 96:6 161:2
**thrown** 160:19
**thumb** 119:8
**Thursdays** 165:6
**ticket** 21:20 208:21
208:23 226:7
**Till** 42:5
**time** 9:1 13:11 14:5,8
18:18 23:5,25 24:1
24:14,17 26:6,14
27:20 28:11,20
33:12 39:9 46:9
50:14,24 51:13 52:6
53:12,23 55:14,16
55:24 60:25 67:17
71:4,6 72:17 73:23
73:25 76:25 77:4,5
77:6,9,10,11,13
78:6,9,13 82:7,10
82:25 84:2 85:15
88:12 90:19 91:10
99:4,12 100:20
101:19 102:4 104:6
104:11 105:3
111:22 113:10,23
115:3,19,25 116:9
118:3 123:1 128:12
129:7 138:20 142:8
143:11 147:1
148:22 149:12,17
152:2 161:2,10
171:23 174:23
175:1,1,21,25
176:10 177:6,6

178:7 183:3 184:2,3
186:23,24 193:14
198:24 207:10
210:15,17,25,25
211:2,2,4,19 212:10
212:12 215:18
216:13 219:13
220:9 224:9 225:13
229:10 235:24
236:25 237:10
238:8 242:19 248:7
248:11 250:12
252:2,15,23 253:20
259:14,15 261:13
261:14
**times** 12:21 13:6,8
23:1 24:4,23 25:1
28:15 75:25 84:15
90:4 101:9 104:16
131:7,9,9 141:16
147:19 158:23
162:11 164:17
174:22 254:16
**timesed** 102:4
**tip** 17:3,5 19:15 25:16
27:25 28:1,3 45:2
48:18 95:25 99:15
100:1,19,22 110:5
112:13 164:10,13
164:23 235:14,16
235:18
**tip-out** 20:10 30:2
92:25 93:2 94:20
109:8 111:5 148:11
**tip-outs** 18:15 22:21
23:24 27:21 29:23
53:20 93:23 113:18
116:25 142:21
**tipped** 100:4
**tipping** 18:14,19
19:13 83:3,25 84:8
84:17,19 101:10
115:20 148:11,12
**tips** 16:1,16 113:7
235:10 246:12
251:22
**titled** 83:15 92:14
189:8
**Tobin** 2:5,9,15,17
3:13 5:4,6,17 31:6
40:20 41:10,13
46:25 49:20 50:11

57:6 59:7,9 60:18
61:15 62:18,21 63:3
64:13,15 65:7,8,11
66:2,9 69:11,15,25
70:1,6,15 72:23
73:1,5,6,23 74:1
75:10 77:3,13 85:2
117:15,16 122:1,2,4
123:12,15,17,20
131:17 133:3,5,14
134:7 136:1,20
137:5,14 138:4,24
143:7 144:7,9,14,17
146:19 147:23
148:4,24,25 149:6
149:24 150:7,10
151:22,23,24 155:6
155:11 156:5,7,15
156:22 158:11
159:1,3,5 169:20
211:24 214:2 239:7
255:5 261:13
**today** 3:19 6:11,22
30:12 36:21 118:3
118:12 123:14
184:9 185:22
187:10 256:10
257:12 259:18
**told** 36:19 56:24 57:1
57:17 62:14 63:7,16
68:14 79:8 127:8
135:3 177:12
182:13 188:1,9
203:1 227:10
**top** 82:12 85:25
112:12 151:16
242:6,9
**topless** 20:5
**total** 30:14 39:6,8
56:13,19 57:1,11
102:10,13 104:1,2
**totally** 48:4 91:5
94:22 167:20
245:14
**touchy** 218:15
**towels** 100:14
**town** 9:15 12:19 13:5
59:20
**track** 15:22 16:1 26:5
31:17 68:5 113:7
142:7 235:7,7,10,20
236:9

**trade** 237:23
**trademark** 199:10,13
199:23 200:2,3,3
231:10
**transcript** 166:1,1,6
166:10,14,23 167:9
212:6,12 243:2,8,20
244:3,7 245:1 250:1
250:5,13,18 255:3
262:7
**transcripts** 250:17
**transpired** 180:2
**transported** 161:16
**trash** 157:16 163:15
**treasure** 203:6
**treasurer** 187:12,24
202:10,21,23
203:11 204:3,6,15
204:24 205:9,13
234:18
**treated** 128:9 172:10
**trial** 166:22 212:5,6
**TRIBUNAL** 1:2
**tried** 111:16 179:17
218:16,20
**trouble** 4:16 131:20
150:24
**true** 31:2 48:5 88:15
184:13 197:24
198:2,4 202:9 210:1
210:6,9,12 211:10
211:16 213:12
214:7,9,17 219:17
220:1,7,11,15,18,21
220:25 222:16
224:14,17,23 225:1
225:12 227:4,19
229:19 230:21
233:19 234:1,9
236:15 237:1,4,9
238:8 240:7,18,22
240:25 241:17
247:10,12,17 262:7
**Truman** 210:21
**truncate** 256:5
**Trust** 40:4
**truth** 4:21
**try** 78:5 167:21
179:18 223:20
257:3
**trying** 58:15 59:7
107:24 108:19

110:20 197:2
216:12 223:20
256:5
**Tuesday** 93:17
**Tuesdays** 165:6
**turn** 175:6
**turned** 110:8 111:1
124:15 159:2
**twelve** 24:20 28:17
50:5
**twice** 213:25
**two** 35:2 39:23 42:19
48:15 84:16 90:9
96:3 106:13 107:7
107:13 112:20,24
112:24 113:3,4,5
134:13 140:1
145:25 147:19
150:23 162:22
165:10 169:7 172:6
178:3 193:15
197:20 208:3 209:7
229:15 238:15
239:10 242:3,5,5
257:18
**type** 74:7 104:24
110:25 111:1 153:3
208:6 245:2
**types** 109:16,18,22
111:20
**typical** 10:8 92:22
163:23
**typically** 25:23 91:10
104:7,23
**typing** 19:6

---

## U

**Uh-huh** 28:7 43:6
45:21 47:21 57:15
58:24 151:2
**ultimate** 195:15
**ultimately** 181:16
183:24
**umbrella** 196:10
**uncomfortable** 95:5
**understand** 5:23 7:14
16:6 17:15 26:6
32:16 39:18 53:24
71:15 90:22 91:5
103:15 107:25
109:1 110:17,23
111:2 135:7 146:4,5

146:7 168:23
176:13 199:17
200:4 203:3 225:8
232:4
**understanding** 9:19
148:2 260:8,17
**Understood** 227:13
**undertook** 180:13
**Unemployment** 218:5
**United** 144:11
**universe** 196:2
**unquote** 162:9 241:18
**unsigned** 223:6
**unwieldy** 106:12
**upholstery** 180:24
**upper** 173:11
**upstairs** 11:16 20:15
**urban** 43:3
**use** 14:7 38:5 40:25
68:11 75:24 109:23
113:12 205:19
226:18 232:6 238:5
**usually** 16:12 29:15
29:16
**utilize** 179:2 211:1
**utilized** 178:8

**V**

**v** 5:25 194:20 220:12
221:1,8 232:18,20
232:24 240:7 247:2
**VA** 122:25
**vacations** 28:19 50:7
**valuations** 245:19
**Vanity** 54:18 89:5,12
**various** 185:21
213:13 214:4
246:11
**Vegas** 171:21,23,25
172:2,8 173:17,24
173:25 174:3,22
192:3,25
**vendors** 221:17,19,20
**verbal** 20:6
**verbatim** 92:18
157:25
**verify** 161:22
**versus** 3:5 123:18
219:10
**vice** 204:8,18 205:15
**Virgo** 28:13 49:2,4,7
49:14 68:19

**visit** 141:18
**visited** 179:19
**voice** 176:11
**voluminous** 242:2
**volunteer** 79:3
**vouched** 163:5
**VP** 238:2
**vs-** 1:6

**W**

**W-2** 235:16
**W-2s** 127:11 149:13
218:17
**wage** 28:15,17 48:22
50:2 54:10,11 58:1
58:2,4,11,18 74:23
75:7,18,22 76:12
102:4 152:2 164:10
194:23 211:3,11,17
218:19 221:1,5,8,12
232:21 233:4,13,17
235:15 247:8,20
248:3
**wages** 39:6,8 48:21
49:25 57:24 101:19
102:3,11,13 152:8
233:19
**wait** 31:4 60:19
104:18 105:3
129:16 130:11
167:19 173:20
**waiters** 193:10,23
**waiting** 255:2
**waitresses** 193:10,23
**waking** 140:24
**walk** 26:1 52:15
116:14 139:8
158:13 259:18
**walk-through** 180:15
**walked** 158:12
**walking** 12:20 26:12
68:18 105:21,22
148:14
**wand** 48:17
**want** 5:15,17,22 6:10
7:2,2,10,20 11:7
14:7,11,17,22 22:12
41:20,23 44:14 45:4
45:5 49:21,22 72:18
75:8 81:10 83:18
85:7 86:13 89:16
90:18,22 91:3 96:10

97:7 103:17 110:17
111:2 118:21 120:8
127:21 129:11
135:5 136:5,6,7,9
136:15,15 152:14
152:24 153:24
154:4,8,9,16,16,17
154:18 155:20
159:3,7 161:5
168:22 170:5,18
182:7,8 189:10
193:16 200:12
201:10 206:22
207:14 208:12,21
213:6 226:6,19
227:11 235:24
238:16 241:25
249:9 252:9 255:18
255:19,23 257:11
259:1,7,14,15,18
260:25 261:3
**wanted** 44:18,18,19
48:11 60:21 95:2
98:13 110:15,16
144:12 173:20
176:19 179:5 180:4
181:14,22 182:1,5,7
182:9,20 185:1
222:19 261:6
**wanting** 49:19
**wants** 11:1 36:14
75:11 156:17
**warehouse** 178:23
179:1 180:10
210:20,23
**wasn't** 29:2,6 38:24
42:20,23 44:20,20
57:1 59:3 60:23
61:10 68:10 77:2
83:7 101:7 104:25
127:4,11,18,24
128:10,10,13
139:24 142:7
144:18 145:2,5
146:15 149:13,18
153:22 160:5 161:4
162:19 179:7 188:1
194:24 195:14,25
220:1 222:24,24
230:23 232:2 234:5
235:9 239:4,20
248:10 249:2

**waste** 14:8
**watch** 68:2,4 101:7,9
155:8
**watching** 68:9,25
101:10
**way** 13:14 37:14 55:7
59:18 62:12 69:16
78:15,17 83:18
89:12 90:21 95:2
98:22 114:9 118:24
119:19,22 120:18
120:20 121:3
122:21 140:23
145:19 146:16
149:7 173:17
175:15,18 177:2
191:10,12 228:18
238:5 246:11
260:21
**ways** 68:10
**we'll** 4:2 6:16,16
11:15 15:16 37:8
41:4,8 80:24,25
106:21 117:23
118:2 124:5 134:2
135:24 150:6 209:3
226:15,16 252:25
255:21 256:4
**we're** 3:3 4:25 5:2,24
11:17 13:15,18 14:7
16:9 22:23 31:11,23
31:25 33:25 34:5
36:8,20 40:11,23
46:1 73:4 75:12
107:4,13 108:19
118:9,10,11 119:22
120:18 121:13,25
123:17 128:25,25
131:6 147:13 149:4
170:1 201:11 207:7
235:24 240:14
243:13 244:11,17
244:20 249:8
250:19 257:24
261:8
**we've** 5:16 36:23
38:22 121:10
185:15 188:13
199:1 233:6
**wear** 173:4
**Wednesday** 25:13,13
25:14

**Wednesdays** 165:6
**week** 12:25 23:6,7,8
23:10,16 24:7,11
25:11 28:16 30:10
48:24 50:3 51:10
54:11 90:7,8,9
101:13,13 102:6
103:17 114:4
118:21 139:6,25
140:2,4 141:20
165:8,10
**weekday** 26:17
**weekend** 26:16 82:7
92:15 158:20,21,23
158:24,25
**weekly** 182:18
**weeks** 23:14,15,17
28:22 51:10 82:6
103:14 138:12,15
139:3 140:12 141:3
141:5,11 142:14
176:3
**weighing** 189:23
**weight** 241:13
**welcome** 14:23
**well-loved** 177:14
**well-missed** 177:14
**went** 28:15 39:22
42:17,17,19 43:4
45:19 63:22 73:13
96:21 131:19
139:17 141:16,18
141:18 152:1
160:11 162:8
163:10,20 173:10
173:22 174:22
175:5,9 182:15
222:21,23 223:11
231:11
**weren't** 47:23,24
59:17 127:22 128:2
143:18 157:19
177:21 215:3,22
221:12 224:15
**West** 174:11,17 178:5
**Weston** 172:13
**wheel** 241:19,19,22
244:4 245:9,22
**whirlwind** 245:21
**white** 87:10
**wholesale** 227:5,9,17
228:11

**WiFi** 137:9
**willfulness** 64:25
251:16
**Williams** 189:20
191:5,6,7,18 209:12
209:13 211:3,7,10
211:16 212:16
213:12 216:3
**wind** 175:12
**wine** 215:10
**wipes** 100:14
**wish** 6:23 38:1
120:22 133:6,21
169:16
**witness** 4:5 5:10 8:12
8:16 10:20,23 11:6
11:10,15 16:7 17:10
17:12,16 23:14 26:7
26:10,16,20,22
27:12 29:15,18 39:3
39:14,16,25 40:20
49:16 50:2 56:23
57:4 60:15 65:20
66:7,13 70:14 72:21
73:2 79:8 80:1,17
80:22 81:14,16 85:7
85:9 86:7 87:6
89:21,23 90:15 91:2
91:5 95:13,15
102:16,23,25 103:4
104:12,14 105:23
106:1 109:2 110:7
110:20 111:6 121:5
121:7 131:15 133:2
133:16,18 136:19
137:4,9,16,17
144:13 146:3,6,10
148:3 149:3 156:6
156:10 159:4,9,13
170:25 171:1
190:10,13 192:10
192:13 198:16,20
199:22 200:2 202:3
202:18 203:1,8,11
207:21 208:16,19
208:23 209:5,7
212:1 214:1 226:18
226:21 232:14
239:20 241:4 244:6
249:15
**witnesses** 3:19 252:13
**woke** 140:25

**women's** 252:13
**wondering** 103:13
**word** 90:14 176:18
176:18,20,20 177:4
177:4 232:6,9
**words** 17:15 260:14
**work** 9:13,17,18,23
9:23,24 10:7,10,15
11:16 14:2 15:6
19:14,19 21:13
22:25 23:5,7,8,9,11
23:13,14,15,17 24:8
24:15,18,19 25:2
27:14 29:7 30:10
36:21 43:4 46:1
47:18 48:8 52:25
53:2,22 54:14 71:21
83:1 85:17 86:20
88:8,9 90:4,5
101:14,20 105:4
112:3 114:9 118:6
123:21 124:2,24
125:5,18 128:22
132:8 138:20 142:3
142:7 143:10
144:12,14,18,21,22
144:24 145:5,11,18
148:15 165:9
214:17 216:10
218:17 237:2
246:18 250:22
**worked** 9:4 16:2 24:4
27:19,19 42:21
43:20 47:15,16
48:24 51:3,3,7,7,8
51:22 58:10 67:2
74:17 89:7,8,10
90:7,8 101:19 102:5
102:6 114:4,6 115:4
123:7,22 126:1,8
129:24 131:8
138:12,15 139:3,6
139:20,24 140:2
141:5,11,19,23
146:20 147:1,2,2
148:10 149:16,20
152:2,3 161:1
163:12 164:11,17
165:17,18 189:18
224:10,12 236:18
257:7
**workers** 128:7

189:17 193:11
**working** 9:4 10:3,15
22:23 34:1 46:6
47:12 69:16 82:17
82:21 89:11,13,14
92:23 93:9,14
115:10 119:5 131:4
139:19 146:13,15
147:7 149:15,18
155:25 163:19
173:5 236:16
243:12 248:10
**workman's** 218:3
**works** 9:20 38:23
145:12 147:17
**worried** 121:7
**worries** 5:6
**worry** 120:7 232:11
**worst** 175:7
**wouldn't** 52:21 54:4
59:21 68:25 92:6
99:5 128:25 129:14
129:14 134:20
142:10 144:13
154:11,13 158:4,8
165:13 226:5 232:1
233:20 246:6,9
**wrap** 179:18
**write** 16:16 23:23
24:3,6,13 33:13
70:24 113:13,17
139:14 256:23
257:5
**writing** 257:4 259:12
**writings** 70:24
**written** 39:10 54:9
58:22 182:19 200:6
200:9
**wrong** 8:11 57:4
103:2,15 153:25
154:10 160:1
**wrote** 6:9 71:2,11,12
98:9 139:13

---

**X**

**X** 204:7

---

**Y**

**yeah** 10:18 11:6 12:2
13:18,20,22 17:12
18:21 20:12 22:2
23:11 24:21 27:12
28:3,4,13 29:15,19

29:20 30:3,25 35:20
39:23 43:10 44:5
45:24 46:11,16,19
47:17 48:11 49:9,12
57:4,20 58:3 59:16
62:8 64:8 66:16,19
66:24 67:2,5 68:14
68:21,23 72:3,15
73:2 119:11 121:15
123:24 131:20
137:24 159:4
188:16 190:19
194:21,23,25 195:6
195:24 197:14,25
200:2 206:21,25
208:19 221:23
222:1,4 230:25
237:13 238:4
240:21 242:10
251:9 252:9 254:13
258:1
**year** 8:24 28:17,23
29:3,9,13 30:13
41:18 48:23 50:12
53:25 54:1,2,11
55:13 56:1,14 57:9
58:14 67:9,11 70:2
89:21 122:19
123:25 131:18,19
132:4 134:8,23
135:7,12 138:12,15
139:6 141:3,5,7,11
141:20 145:24,25
145:25 147:3,4,5,7
147:7,25 148:6,6
149:15,16,20
150:25 151:8
152:12,15 153:23
154:15,19 155:12
155:19,23,24,24,25
158:16,21 172:18
174:5 190:3 244:13
244:21 248:21,23
248:24
**years** 28:14 42:3 46:8
50:4 57:10,19,20,22
57:23 58:11,16 67:5
67:10 75:18 76:6,13
89:7,9,9 114:6
122:16 123:24
129:8 131:8,10
140:22 141:1

142:16 147:2 148:1
154:6,7 188:5 198:7
205:25 207:4
**yell** 176:14
**yelled** 98:2
**yesterday** 34:17 35:7
35:11,12 107:20,21
194:18,19 227:10
**you-all** 257:12
**young** 26:24 55:24
88:21 159:25 160:4
237:5 238:11 240:4
246:12,17

---

**Z**

**zero** 208:19
**Zoom** 62:5

---

**0**

**01-20-0005-4874** 1:3

---

**1**

**1** 86:11,18,18 200:14
200:19 201:4,6,8
260:12,24 262:7
**1,000** 72:4,7
**1,500** 178:15
**1:15** 118:4,7
**1:30** 118:6 121:22,23
**10** 17:6,17 20:13
86:15 110:5,16
237:22 251:13
**10,000** 63:7 130:10
130:15
**10:00** 24:25 91:12
93:5 105:1 114:9
130:4
**100** 20:12,13 22:25
40:17 44:6,7 93:15
112:13 215:1,5
**1099** 159:8,8
**1099s** 159:11
**11** 51:18 57:23 212:7
237:15,22 238:1,3
242:19,24,24
**11:00** 91:14 105:5,7
130:4
**11:30** 80:23
**11th** 49:11
**12** 57:23 84:21 85:2,5
85:6,22 186:15
188:1,7
**12:00** 13:11,11 91:14

91:15 93:6 105:5,7
**12:12** 117:12
**12:30** 91:15
**122** 2:17
**13** 57:23 142:18
    179:20 216:21
    217:4 227:16
    230:12,13
**14** 57:23 131:14
    142:18 190:4,13,13
    190:14,18 207:11
    207:22 216:21
    217:4 230:13,14
    242:24
**15** 190:6,9,10,17,22
    207:13,14,25
    230:14 243:19
**150** 14:14 15:4 40:17
    53:23
**159** 2:18
**15th** 32:24 33:1,4
    121:15 169:2
    260:16
**16** 207:2,4,7,14,18,19
    207:25 215:4
    230:14
**16th** 107:11
**17** 207:2,4,8,14,25
    243:21
**170** 2:19
**18** 141:11 207:2,5,8
    225:24 226:14,14
    226:25 244:2
**19** 1:15
**194** 2:20
**1982** 171:13
**1987** 171:24
**1A** 260:12,24
**1st** 171:17,18 175:14
    175:19 177:24
    179:8,11 185:11,17
    187:22 217:4 218:9
    236:3,4 243:20
    244:16 246:1
    247:22 250:19
    252:4

**2**
**2,000** 72:12
**20** 17:17 54:20 61:6
    110:5 257:5
**20,000** 143:24 153:7

153:14,17 160:2
**200** 11:21 13:12,13
    21:6 52:17 110:6,8
**2000** 126:18 187:19
    198:7
**2004** 59:23 131:11,13
**2005** 172:9,19,21
**2008** 41:20 42:4 43:4
    51:5,12,16,18,21,24
    51:25 56:1,3 57:11
    58:10 174:1,8
    187:18 188:6
    201:16,25 204:3
**2009** 8:19 24:3,14
    28:8 39:9 41:20
    52:8,9,23 53:4,15
    53:21 54:2 56:6,7
    126:22,24 171:20
    171:24,25 172:2,8
    172:21 173:13
    174:6,13,19 175:2
    178:2 188:6 204:10
    210:18 211:5,7,20
    211:21 214:6
**2010** 56:8 57:10,20
    57:23 58:1,3,5,8,9
    58:15,18,18 59:23
    70:11 75:22 78:10
    82:6 89:11 92:4
    93:15 101:19
    114:13 116:5,6,20
    117:2 131:11,13
    134:8,13,22,25
    135:7,15 138:12
    139:6,18,19 141:5
    141:12 150:25
    152:15 175:12
    188:6 204:17,20
    211:8,21
**2011** 56:10 70:8
    78:25 116:6,20
    132:6 136:2 141:11
    149:3 151:8,11
    152:12,19 187:25
    188:7 204:23 211:8
    211:21 219:14
    220:8
**2012** 56:12 70:2,6,7
    70:13 92:15 116:10
    132:6,7 136:8
    142:18 149:1,3
    153:23 171:17,18

175:2,4,5,14,19
    177:24 179:8,12
    185:1,5,11,18
    187:23 205:5,6,6,17
    211:8,21 212:17
    214:7,18,25 215:19
    216:16,21 217:4
    218:9,23 236:1,2,3
    236:4 244:10,21
    245:4 246:1 247:22
    249:2 252:4
**2013** 56:18 70:16,18
    92:15 116:11 132:7
    149:1 154:15
    155:13 180:3,12
    181:21 182:1,23,25
    183:2,6 184:3,21
    200:10 205:11
    211:8,22 213:15,20
    214:1 218:9 220:10
    220:11 222:12
    224:24 233:25
**2014** 8:19 24:3,14
    28:9 39:9 57:10,21
    58:10,15 59:23
    70:11,20 78:10
    89:13,15,17 92:4
    101:20 114:13
    117:2 123:18 124:1
    124:2 131:15
    139:19 146:13
    155:19,23,24
    181:20 183:3 184:4
    187:19 206:24
    210:18 211:6,20
    214:6,7,18,25
    215:19 216:16
    218:23 236:1,4
    240:7,19,23 246:1
    247:23 248:25
    249:2
**2015** 207:2 215:4
**2016** 201:17
**2018** 8:25 42:7 58:10
    123:22 124:2
    201:25
**2019** 34:6 41:6 123:6
    123:7,18
**2020** 122:23,23
**2021** 1:15 169:3
    198:7 262:16
**20th** 262:16

**22** 61:6 73:8 243:10
    243:13
**23** 31:9 33:14,25 81:6
    81:7,9 152:5,5
    165:25 166:5,9,25
    167:6,9,13 169:14
    240:20,25 241:4
**23A** 41:8 70:10 74:25
    75:14,15 81:9 166:1
    169:6
**23B** 41:10 102:19,20
    102:21 138:2,3
    152:5 166:3
**24** 31:9 34:21,23,24
    35:5,7,20 36:16,19
    36:22,23 37:2,4
    61:6 73:8 109:6
    132:12 167:13
    168:19 169:7 186:7
    187:1,3
**24A** 37:9,18,22 38:4
    38:8 39:1 41:7
**24B** 37:14,20,21
    137:1
**24C** 137:1
**25** 33:25 34:5,9,12,12
    34:14,15 35:5
    167:14,14,16
    168:12,13,16,23,24
    169:8 260:9,18
**250** 13:10 18:22 19:1
    22:17,20 30:6,9,9
    54:12 71:16,23
    84:12 93:20,21
    112:12 115:2
    131:22,25
**26** 167:15,18 168:7,8
    168:9 169:11
**262** 262:7
**26th** 49:14
**27** 168:5,8 169:11,14
**27th** 33:20 34:6 41:6
**28th** 49:9
**29** 243:10
**2A** 260:12
**2nd** 33:4

**3**
**3** 260:12
**30** 17:17 73:12 91:15
    93:7 138:12,15
    139:3 141:5 242:5

242:14,15,17,24
    250:9,15,16 252:23
**30,000** 130:16 160:2
    161:6,23 162:3
**300** 13:4 21:6 52:2,18
    93:5
**300,000** 181:10
**302** 242:15,17 243:10
**305-858-9020** 2:7
**30th** 250:20
**310** 57:1,2
**318** 39:15,18 57:3,7
**318,000** 39:10,12,14
    102:22 104:2
**318,248** 102:12
**33** 6:24
**33146** 2:6
**340** 39:18 57:5,7
**340,000** 57:1,8
    102:22
**34A** 81:4
**34B** 81:4
**354** 242:7
**39** 228:2
**3A** 260:13

**4**
**4** 166:23
**4:00** 209:2 226:4
**4:48** 1:16
**40** 54:18 257:4,6,6
**40,000** 130:17,18,21
    130:23,24 161:6
    162:6
**400** 13:15
**41** 2:15
**44** 103:14
**448** 251:14
**450** 92:21 156:2
**4551** 2:6
**47** 212:7
**48** 237:21

**5**
**5,000** 161:3 163:7
**5:00** 24:16 25:24,24
    26:8,9,10,21 53:23
    118:3
**5:30** 25:25 209:5,6
**50** 130:9
**50,000** 135:17 155:12
    155:22 180:9
**500** 13:15,19 22:25

84:12 93:10 131:22
131:25
**52** 141:3

---

**6**

**6** 87:9,19 189:8 193:5
243:7
**6:00** 104:9,12,13,19
**60** 252:23
**60,000** 43:15 63:16
73:8,12,12 135:19
151:4 152:16 154:1

---

**7**

**7** 2:14
**7.25** 75:23
**7:00** 26:1
**70,000** 154:3,6
**706** 245:20
**74** 2:15
**7th** 52:23,24,25 53:1
53:3

---

**8**

**8** 86:11
**8:00** 26:17,19
**80** 20:16
**80,000** 154:7
**81** 2:17

---

**9**

**9** 17:6,16 24:8
**9:00** 13:4 24:8,16
26:17,19 53:23
105:1 114:8 130:3
**9:58** 1:16
**90** 20:14,15